Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For The Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

CLAUDIA WOODARD AND ELISE       :
LAWLESS,
                                :
            Plaintiffs,
                                :
        - against -             :

TWC MEDIA SOLUTIONS, INC. and   :
THE WEATHER CHANNEL,
                                :
            Defendants.         :

- - - - - - - - - - - - - - - x

**09-CIV-3000**

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

**JURY TRIAL DEMANDED**



APR ╌ 7 2009

U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION AND THE PARTIES

1.   This is an action to redress unlawful discrimination
and harassment based on sex, pregnancy, race, color, and national
origin, unlawful retaliation, and unlawful employment practices,
under Title VII of the Civil Rights Act of 1964, as amended
("Title VII"), 42 U.S.C. § 2000e et seq., the Civil Rights Act of
1866, as amended ("Section 1981"), 42 U.S.C. § 1981 et seq., the
New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. L. §
290 et seq., and the New York City Human Rights Law, (the
"NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.

2.   This is a case about an employer that discriminates and
retaliates against women and minorities, and about two brave
women who opposed that conduct only to be unlawfully fired.  The
EEOC found the employer to be in violation of the law and

attempted to resolve the matter. The employer declined to do so requiring that these two women bring their case to court.

3.    Plaintiff Claudia Woodard ("Ms. Woodard") is an adult female, residing in South Orange, New Jersey.

4.    Plaintiff Elise Lawless ("Ms. Lawless") is an adult female, residing in Fair Haven, New Jersey.

5.    TWC Media Solutions, Inc. ("TWCMS") is a Delaware corporation with a place of business in New York, New York.

6.    The Weather Channel is a Georgia corporation with an address in Atlanta, Georgia. Upon information and belief, The Weather Channel is also known as The Weather Channel, Inc.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over Plaintiffs' claims pursuant to federal law, Title VII, 42 U.S.C. § 2000e-5(f), Section 1981, 42 U.S.C. §§ 1981, 1981a, 1988, and 28 U.S.C. §§ 1331, 1343, 1367(a) and 2201.

8.    Venue is proper in this district pursuant to federal law, Title VII, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1391.

9.    Each Plaintiff filed a timely charge of discrimination, harassment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC").

10.    In August 2008, the EEOC issued a Determination in favor of Ms. Woodard on her claims. On or about January 8, 2009, the EEOC issued a Notice of Right To Sue letter.

-2-

11. In August 2008, the EEOC issued a Determination in favor of Ms. Lawless on her claims. On or about January 8, 2009, the EEOC issued a Notice of Right To Sue letter.

12. Plaintiffs mailed a copy of this Complaint to the New York City Commission Of Human Rights and the New York City Corporation Counsel.

13. Plaintiffs filed this lawsuit in a timely fashion and satisfied all of the statutory prerequisites to filing same.

14. Each Plaintiff seeks an award of appropriate relief.

### DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE

15. Plaintiffs seek to hold TWCMS and The Weather Channel jointly and severally liable under various legal doctrines, including without limitation, integrated enterprise, single employer doctrine, alter ego, respondeat superior, joint employer doctrine, agency, successor liability, aiding and abetting liability and/or other grounds.

16. The Weather Channel and TWCMS are a "single employer" for purposes of applicable law, because at all relevant times, they had: (1) interrelated operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. There is an identity of interests between The Weather Channel and TWCMS.

17. Some of the facts supporting such liability are listed below.

18. At all relevant times, there was substantial interrelation of operations as between The Weather Channel and

-3-

TWCMS. The Weather Channel controlled and managed various functions of TWCMS, including human resources, finance, accounts payable, payroll, compensation/benefits, marketing, information technology, and travel. The Weather Channel made decisions regarding matters involving TWCMS. During Plaintiffs' employment, employees of The Weather Channel regularly interacted with employees of TWCMS.

19. The Weather Channel advertises that it has "advertising sales offices" in New York, Atlanta, Chicago, Detroit, San Francisco, Dallas, and Los Angeles. All sales offices operate under the name TWCMS. At all relevant times, TWCMS handled sales and advertising functions for The Weather Channel.

20. According to The Weather Channel, Lynn Brindell is Executive Vice President, Strategic Marketing of The Weather Channel. Ms. Brindell's department creates sales and marketing materials, promotions and presentations for TWCMS.

21. Upon information and belief, The Weather Channel and TWCMS shared services, records, facilities and/or equipment. During Plaintiffs' employment, employees of The Weather Channel and TWCMS were connected through an e-mail system, with each employee having an e-mail address in the form: name@weather.com.

22. At all relevant times, there was centralized control of labor relations. The Weather Channel maintained a Human Resources department, which covered The Weather Channel and TWCMS. The Weather Channel was involved in hiring, firing, complaints and discipline of TWCMS employees, and significantly

-4-

affected employment opportunities of TWCMS employees. Lisa Chang
(SVP, HR), Pam Sawyer (VP, HR) and Richard Klein (Director, HR),
HR personnel at The Weather Channel, communicated with Plaintiffs
regarding various matters, were aware of Plaintiffs' protected
activities, and were aware of and/or involved in the termination
of Plaintiffs' employment. The Weather Channel received a copy
of Plaintiffs' EEOC Charges after they were filed with EEOC.

23. At all relevant times, The Weather Channel issued
policies applicable to TWCMS employees. The Weather Channel
maintained an "intranet site" containing handbooks and policies
applicable to TWCMS employees, including without limitation
benefits, company offerings, company holidays, job postings,
company ethics and "Core Characteristics."

24. At all relevant times, there was common management
between The Weather Channel and TWCMS.

25. According to The Weather Channel, Lisa Chang is
Executive Vice President of Human Resources for The Weather
Channel Companies, which include The Weather Channel and TWCMS.

26. According to The Weather Channel, Becky Powhatan Kelley
is General Counsel for The Weather Channel Companies, which
include The Weather Channel and TWCMS.

27. Paul Iaffaldano is executive vice president and general
manager of TWCMS. According to Defendants' website, Mr.
Iaffaldano oversees and has leadership responsibility for all
advertising sales functions of The Weather Channel® and
weather.com®. During Plaintiffs' employment, Debora Wilson was

-5-

President and CEO of The Weather Channel Companies.  Mr.
Iaffaldano reported to Debora Wilson.

28.  At all relevant times, there was common financial
control and/or common ownership.

29.  At all relevant times, The Weather Channel issued
paychecks to employees of TWCMS.  The Weather Channel and TWCMS
both have an address in Atlanta Georgia at 300 Interstate North
Pkwy, Atlanta, GA 30339.  During Plaintiffs' employment, their
paychecks indicated that they were issued by The Weather Channel
in Atlanta, Georgia.  Upon information and belief, The Weather
Channel owns all or part of TWCMS.  The Weather Channel had
immediate control over TWCMS employees by, among other items, The
Weather Channel's Human Resources department and the fact that
employee paychecks were issued by The Weather Channel.

## INTRODUCTION TO DEFENDANTS' UNLAWFUL CONDUCT

30.  Defendants unlawfully discriminated against Plaintiffs
regarding compensation, terms, conditions and privileges of
employment, and employment opportunities, unlawfully harassed
them, forced them to work in a hostile work environment, and
unlawfully retaliated against them.  Defendants treated
Plaintiffs differently than, and accorded preferential treatment
to, persons outside their protected classes who were not
subjected to such discrimination, harassment and retaliation.

31.  Defendants discriminated against Ms. Woodard because of
her sex, race, color, and national origin.  Defendants retaliated

-6-

against Ms. Woodard because she opposed, objected to and filed
complaints of discrimination.

32.   Defendants discriminated against Ms. Lawless because of
her sex, pregnancy and disability. Defendants retaliated against
Ms. Lawless because she opposed, objected to and filed complaints
of discrimination and an EEOC Charge, because she aided, gave
information, participated in, assisted and supported Ms.
Woodard's claims of discrimination and retaliation, and agreed to
be a witness for Ms. Woodard regarding her claims, and because
she had previously opposed other discrimination and/or supported
other claims of discrimination. See 42 U.S.C. § 2000e-3(a).

33.   The discrimination included, among other items:

- * Verbal harassment, abusive and demeaning
  treatment, and defamatory statements.
- * Denial of equal terms, conditions and
  privileges of employment, and employment
  opportunities.
- * False criticisms of job performance.
- * Hostile work environment.
- * Promoting a "boys club" environment.
- * Denying Plaintiffs equal pay, compensation,
  raises and bonuses and according preferential
  treatment in compensation to male employees
  and employees outside Plaintiffs' protected
  classes.

-7-

   *   Denying Plaintiffs equal access to and
       assignment of accounts and according
       preferential treatment with respect to
       assignment of accounts to male employees and
       employees outside Plaintiffs' protected
       classes.

   *   Denying Ms. Woodard training and support, and
       according preferential treatment to male
       employees and employees outside Ms. Woodard's
       protected classes.

   *   Failure to reasonably accommodate Ms. Lawless
       regarding her pregnancy.

   34.   In addition, during Plaintiffs' employment, Defendants
made discriminatory compensation decisions and adopted
discrimination compensation practices, and subjected Plaintiffs
to discriminatory compensation decisions and discriminatory
compensation practices.

   35.   Plaintiffs opposed, objected to and complained about
the unlawful conduct.  Defendants failed to take appropriate
remedial action and failed to put an end to the unlawful conduct
and it continued throughout Plaintiffs' employment.  Defendants
retaliated against Plaintiffs and unlawfully discharged them.

   36.   Defendants' unlawful conduct against Plaintiffs was
ongoing and culminated in unlawful termination of employment.

   37.   Set forth below are further details regarding
Defendants' unlawful conduct against Ms. Woodard and Ms. Lawless.

## CLAUDIA WOODARD

38.    Ms. Woodard is an African American female.   Her national origin is Jamaican.   She is of Jamaican ancestry, heritage, ethnicity and descent.

39.    Ms. Woodard was employed by Defendants from June 2004 to April 22, 2005.   At all times, she was fully qualified for her position.   In fact, prior to joining Defendants, and for more than four years, Ms. Woodard worked for The Wall Street Journal as an advertising sales Account Executive.

40.    Ms. Woodard's initial title with Defendants was Client Development Manager and she initially reported to Meade Camp ("Camp"), Senior Vice President for Client Development.   In or about August 2004, the client development managers were transferred to Account Manager positions.   Ms. Woodard was transferred to the position of Account Manager, which carries an Account Executive title industry-wide, and was assigned to report to Mark Gall, Senior Vice President for Eastern Regional Sales ("Gall").   Gall, a Caucasian male, had joined Defendants in or about February 2003.   Gall told Ms. Woodard that he understood that she was coming from The Wall Street Journal and had excellent sales experience and business acumen, but cautioned Ms. Woodard that it would still take approximately 16 months to fully transition from a print media sales environment into the cable world.

41.    Throughout Ms. Woodard's employment, Defendants made numerous discriminatory and harassing comments to her about

-9-

women, blacks, and persons of Jamaican national origin. This included, among other items, numerous derogatory comments about Jamaicans, blacks and women. For example, such unlawful comments were made by, among others, Paul Celt, Account Manager ("Celt"), Gall, and Mary Jo Romeo, Vice President ("Romeo").

42.  The unlawful conduct was ongoing, unwelcome and offensive. Ms. Woodard opposed, objected to and complained about the conduct. Defendants knew or should have known of the unlawful conduct, but failed to take appropriate remedial action and failed to end the unlawful conduct. The unlawful conduct continued and escalated, Defendants unlawfully retaliated against Ms. Woodard, and Defendants unlawfully discharged Ms. Woodard.

43.  Ms. Woodard witnessed that Celt, a Caucasian male Account Manager with substantial seniority, repeatedly made discriminatory comments about his sales assistant, Lavern Broderick (also known as Lavern Gordon), an African American female of Jamaican descent.

44.  During a staff meeting in or about mid August 2004, Celt commented that Ms. Broderick was illegally tilling Jamaican rum in her home bathtub and bringing the rum to work.

45.  After the August 2004 staff meeting, Ms. Woodard filed a written complaint of discrimination with Defendants. Specifically, on August 18, 2004, Ms. Woodard sent an e-mail to Gall and Pam Sawyer (VP, HR, The Weather Channel) complaining about Celt's unlawful conduct.

-10-

46. When Ms. Woodard complained to Gall, Gall himself made discriminatory and harassing comments to Plaintiff.

47. For example, Gall told Ms. Woodard that Jamaicans do not have a strong work ethic.

48. For example, Gall told Ms. Woodard that Jamaicans think they are better than other blacks but they are not better.

49. For example, Gall told Ms. Woodard that he used to be a "big brother" for inner city black boys and that all they wanted to do was to sow their seed and have babies with several women in order to prove their masculinity.

50. Following Ms. Woodard's complaint of discrimination, Defendants raised false criticisms of Ms. Woodard's job performance, attempted to sabotage her work and sought to interfere with the performance of her job duties.

51. Defendants denied Ms. Woodard equal assignment of accounts, stripped Ms. Woodard of accounts, denied her training opportunities, excluded her from events and social relations and/or discouraged her from participating in same, denied her employment opportunities and opportunities to advance her career, and reduced her compensation and/or denied her equal pay and equal compensation.

52. Defendants accorded preferential treatment to male employees, employees outside Ms. Woodard's protected classes, and employees that did not engage in protected activities, with respect to, among other items, assignment of accounts, training

-11-

opportunities, events and social relations, employment opportunities, opportunities for advancement, and compensation.

53. In or about mid October 2004, Defendants gave Ms. Woodard a list of accounts and agencies to call upon. The list was primarily comprised of unpromising accounts and agencies. The list also contained one traditional agency, Horizon Media. However, Defendants stripped Ms. Woodard of Horizon Media, and assigned Horizon to white male account managers, before Ms. Woodard could make a sales call to that entity.

54. Defendants provided superior account lists to Account Managers outside Ms. Woodard's protected classes, including among others white male Account Managers. Defendants gave Ms. Woodard an inferior list because of her sex, race, color and national origin, and because she had filed a complaint of discrimination.

55. Defendants, and particularly Gall, favored Account Managers outside Ms. Woodard's protected classes, and particularly white male Account Managers, with respect to assignments, training and his willingness to accompany them on sales calls. Gall regularly held closed door meetings with such Account Managers, but excluded Ms. Woodard from such meetings. Gall also excluded other female Account Managers from such meetings. Gall had lunch with such Account Managers and excluded Plaintiff and other female Account Managers from such lunches.

56. In November 2004, Defendants hired Romeo (Caucasian) for the position of Vice President and Regional Manager, reporting to Gall. Defendants assigned Ms. Woodard to report to

-12-

Romeo. Romeo made discriminatory and harassing comments to Ms. Woodard based on her race, color and/or national origin.

57. For example, Romeo told Ms. Woodard that Ms. Woodard was hired because of a diversity initiative. In essence, Romeo was telling Ms. Woodard that she was only hired for cosmetic purposes, to fill some alleged quota.

58. Romeo told Ms. Woodard that she once had to pay a recruiter to find a diversity candidate because she couldn't find one otherwise, and that it was very difficult for her to waste company money on that recruiter. Romeo was essentially telling Ms. Woodard that she didn't want to hire someone of Ms. Woodard's protected classes and didn't want to spend money to do so.

59. Romeo told Ms. Woodard that black women have problems speaking up and asking questions because they do not want to appear stupid. Romeo was essentially degrading all black women.

60. In December 2004, Defendants gave Ms. Woodard a performance evaluation that raised false criticisms of her job performance. Defendants allege that the evaluation was prepared by Gall and Romeo. In addition, Defendants substantially reduced Ms. Woodard's compensation package for 2005. This was a continuation of discrimination, harassment and retaliation.

61. While driving to a client meeting, Romeo and Ms. Woodard passed through Paterson, New Jersey, which is predominantly Black and Hispanic. During this trip, Romeo made discriminatory and harassing comments. Romeo asked how people could live there. Ms. Woodard reminded Romeo that Ms. Woodard

-13-

was born in Jamaica and raised in Paterson. Romeo asked Ms. Woodard what language is spoken in Jamaica. Ms. Woodard said English and Romeo said she speaks good English.

62. On another occasion, Romeo demanded that Ms. Woodard reschedule a critical surgery for Ms. Woodard's then two-year old son, because of a sales meeting to be held in Florida that overlapped the surgery. This was a continuation of discrimination, harassment and retaliation. Ms. Woodard provided Defendants with a doctor's note and was told she could leave the sales meeting one day early for the surgery.

63. On or about January 28, 2005, Ms. Woodard filed a written complaint of discrimination with Defendants, focusing on Romeo's unlawful conduct. On or about February 2, 2005, Ms. Woodard submitted a follow-up memorandum, referring to "hostile conditions" and providing details of "discriminatory comments."

64. On January 28, 2005, Romeo sent an e-mail to Ms. Woodard removing her from certain deals and stating that "I have reservations in general about your skillsets and the mismatch for the skills required for an Account Manager." On February 1, 2005, Ms. Woodard sent an e-mail to Gall responding to and complaining about Romeo's January 28, 2005 e-mail.

65. In February 2005, Romeo separated from Defendants and Defendants assigned Ms. Woodard to report to Camp, an Interim Sales Manager. At this time, Ms. Woodard became the only Account Manager assigned to Camp. Gall continued to exercise authority and control over Ms. Woodard and the unlawful conduct continued.

-14-

66. Ms. Woodard asked Camp for guidance. Camp referred Ms. Woodard to Gall, who failed to provide effective assistance.

67. Gall regularly went on sales calls with white, male Account Managers, but rarely went on calls with Ms. Woodard.

68. Defendants sought to prevent Ms. Woodard from participating in training, trips and other events and activities by, among other items, failing to notify Ms. Woodard of same.

69. Defendants assigned Ms. Woodard unpromising accounts and when she asked for more accounts, she was given a "dead list" for sales calls. Ms. Woodard scheduled sales calls. Defendants told Ms. Woodard that she could not go on a sales call without a representative from management and often no one was available. Defendants also made Ms. Woodard cancel several client meetings, which further undermined Ms. Woodard's performance of her job.

70. Gall attempted to undermine Ms. Woodard with her clients. Gall offered such clients discounted rates behind Ms. Woodard's back and defamed Ms. Woodard to clients.

71. On or about April 18, 2005, Defendants, through Gall, issued a memorandum to Ms. Woodard raising false criticisms of her performance and threatening her employment. Gall's memorandum stated that Plaintiff had until May 12, 2005 to achieve certain goals and that her performance would be reviewed at that time. Gall's memorandum also contained requirements that clearly contradicted established policies and practices of Defendants. For example, Defendants forbade Ms. Woodard from

-15-

working with her split-partners, which was a clear contradiction of established sales procedures.

72.    On or about April 22, 2005, Ms. Woodard filed a written response to the April 18, 2005 memorandum.

73.    On April 22, 2005, shortly after Defendants received Ms. Woodard's memorandum, Defendants unlawfully terminated Ms. Woodard's employment. Among other items, Defendants told Ms. Woodard that she was being fired for the reasons set forth in the April 18, 2005 memorandum. Defendants never gave Ms. Woodard the opportunity to meet the alleged goals in that memorandum.

74.    As of April 22, 2005, Ms. Woodard was about 17% ahead of her sales goal for the current quarter. Ms. Woodard's final paycheck contained her largest sales commission to date.

75.    Defendants unlawfully discharged Ms. Woodard because of her sex, race, color and national origin, and because she opposed, objected to and complained of discrimination.

76.    In or about June 2005, Ms. Woodard filed an EEOC Charge. She subsequently filed an Amended EEOC Charge.

77.    The EEOC conducted an investigation and, in or about August 2008, issued a Determination in Ms. Woodard's favor stating, among other items:

>    *    The evidence shows that during Charging Party's ten month employment with Respondent she made two separate complaints of discrimination based on race and national origin.

-16-

\* Charging Party was given a "Confidential
Memorandum" regarding performance issues and
four days later was terminated for not
following an order.

\* Given the above-described incidents, there is
sufficient evidence to believe that Charging
Party was subjected to a hostile work
environment because of her sex, race,
national origin, and in retaliation for her
internal complaints of discrimination, in
violation of Title VII.

**ELISE LAWLESS**

78.  Ms. Lawless is a female.

79.  Ms. Lawless was employed by Defendants as an Account
Manager from January 1999 to March 29, 2006. At all times, she
was fully qualified for her position. For example, Ms. Lawless
received raises from 1999 through 2004. For example, in January
2004, Ms. Lawless received a performance evaluation indicating
that she met or exceeded every goal. For example, Ms. Lawless
received a substantial bonus for 2003 and regularly received
written praise, through about mid-2005, for her job performance.
Ms. Lawless regularly achieved or exceeded her sales goals.

80.  During Ms. Lawless' employment, Defendants denied Ms.
Lawless equal assignment of accounts and equal pay. Defendants
gave more desirable accounts and higher compensation to male

-17-

Account Managers in the New York office who were less experienced and less qualified than Ms. Lawless.

81.  In or about January 2005, Ms. Lawless advised Defendants that she was pregnant and that she had a high-risk pregnancy.  That same year, Defendants substantially increased Ms. Lawless' workload, allegedly due to high staff turnover.

82.  As noted above, in 2004 and 2005, Ms. Woodard filed internal complaints of discrimination with Defendants.  As noted above, in April 2005, Defendants terminated Ms. Woodard's employment and in June 2005, Ms. Woodard filed an EEOC Charge.

83.  Ms. Woodard identified Ms. Lawless as a witness in support of her claims.  In 2005, Ms. Lawless agreed to be a witness in support of Ms. Woodard's claims.

84.  In 2005, Defendants confronted Ms. Lawless and told her that Ms. Woodard was relying upon Ms. Lawless to support her claims.  Defendants threatened Ms. Lawless, telling her that she was "either for the Company or not" and that Ms. Lawless should cease helping "birds with broken wings", apparently referring to Ms. Woodard and Meena Bhiro, a female employee of Guyanese descent.

85.  On August 11, 2005, Ms. Lawless went to work and suffered contractions.  She called her doctor and scheduled a doctor's appointment for that day.  Ms. Katherine Cachola, a co-worker, accompanied Ms. Lawless to her doctor's office.  Ms. Lawless' doctor advised her to cease commuting from New Jersey to New York for work.  Ms. Lawless so advised Pam Sawyer (VP, HR,

-18-

The Weather Channel) and provided a doctor's note, and was told that she could telecommute. Ms. Lawless did so and performed job duties well. While Ms. Lawless was telecommuting, Defendants made defamatory statements about Ms. Lawless to staff, including among other items that Ms. Lawless was not performing her job duties.

86.  Gall defamed Ms. Lawless and sought to undermine her relationship with clients.

87.  On August 18, 2005, Ms. Lawless sent an e-mail to Pam Sawyer (VP, HR, The Weather Channel) complaining about this matter and regarding her pregnancy and medical condition. Defendants raised false criticisms of Ms. Lawless' job performance and on August 19, 2005 essentially directed her to commence a leave of absence. Prior to those communications, Ms. Lawless was not planning to commence her leave of absence until on or about September 6, 2005.

88.  At Defendants' direction, Ms. Lawless commenced a protected maternity leave on or about August 29, 2005.

89.  During Ms. Lawless' leave, Defendants unlawfully discriminated against her and retaliated against her. Examples are set forth below.

90.  For example, Defendants stripped Ms. Lawless of major accounts and replaced them with inferior accounts. Those major accounts were not reassigned to Ms. Lawless when she returned to work from maternity leave. Some of these clients asked

-19-

Defendants to be reassigned to Ms. Lawless, but Defendants refused to do so.

91. For example, Defendants made defamatory statements about Ms. Lawless to staff. Upon information and belief, Catherine Jolly and Rick Monihan witnessed Gall making defamatory statements about Ms. Lawless, including criticizing her sales figures. Ms. Lawless' actual sales figures reflected that she was on track to achieve or exceed her goals and that the criticisms of her job performance were baseless. Ms. Lawless also received correspondence through about mid-2005 praising her job performance, which further belies the baseless criticism.

92. For example, Defendants moved Ms. Lawless' workstation away from a window, where she had worked for years, to a windowless area, referred to as "rookie row", because less experienced employees were generally assigned to work there.

93. In or about mid December 2005, Ms. Lawless returned to work from her protected maternity leave.

94. Defendants continued to discriminate and retaliate against Ms. Lawless. Examples are set forth below.

95. For example, when Ms. Lawless returned from leave, she noticed a vacant window-area workstation and requested it. Defendants denied Ms. Lawless' request. Thereafter, in or about January 2006, Defendants hired Mr. RJ Maloney as an Account Manager, gave him certain of Ms. Lawless' accounts, gave him a window-area workstation, and upon information and belief, paid him greater wages than Ms. Lawless.

-20-

96.   For example, shortly after Ms. Lawless returned from her leave, Defendants gave her a performance evaluation that raised false criticisms of her job performance and placed her on a 60-day performance improvement action plan.  This was the first time in Ms. Lawless' 7+ year career at Defendants that she was placed on such a plan, and the plan was not justified.

97.   For example, Defendants denied Ms. Lawless a raise for 2006.

98.   For example, Defendants denied Ms. Lawless sales credit (for bonus purposes) for accounts that Ms. Lawless closed prior to commencing her leave.  Defendants gave such credit to male account managers that had not negotiated or closed those deals.

99.   In January 2006, Defendants gave Ms. Lawless two warnings, in rapid succession, dated January 23, 2006 and January 27, 2006, that raised false criticisms of her performance.

100.  In January 2006, Ms. Lawless filed an EEOC Charge.  Ms. Lawless' counsel sent a copy of the EEOC Charge to Defendants and Defendants received it by early February 2006.

101.  On February 15, 2006, Ms. Lawless met with Richard Klein (Director, HR, The Weather Channel), regarding discrimination and retaliation against her.  She sent a follow up e-mail to him on February 16, 2006 documenting the disparate treatment of male and female employees.  In addition, in February 2006, Ms. Lawless met with Lisa Chang (SVP, HR, The Weather Channel), at Ms. Chang's office in Atlanta, Georgia, regarding Ms. Lawless' EEOC Charge.

102. Defendants' Human Resource Department, including Pam Sawyer, Richard Klein and Lisa Chang, were repeatedly made aware of discrimination but failed to take appropriate remedial action.

103. On February 17, 2006, Ms. Lawless responded in writing to the warnings given to her in January 2006.

104. Ms. Lawless also complained that Defendants gave her a goal for 2006 that was unattainable and requested an explanation as to the basis for the assignment of such a goal. Defendants did not respond to Ms. Lawless' request.

105. Notably, Gall assigned Mr. Maloney an account list with approximately 70% of booked revenue for 2006. Gall assigned Ms. Lawless an account list with approximately 20% of booked revenue. Defendants gave Ms. Lawless the lowest percentage of booked revenue of all 11 Account Managers. The other 10 Account Managers all had booked revenue between approximately 40%-80%. This was done even though Ms. Lawless was the most experienced Weather Channel salesperson. She was given a list of unpromising accounts and a "dead list" of accounts where clients greatly reduced spending and/or had already placed little to no business for the year. Some never advertised on television. Ms. Lawless complained to Defendants that certain accounts assigned to Ms. Lawless, to inflate her budget, actually belonged to other Account Managers. Defendants imposed an inflated goal upon Ms. Lawless even though such clients belonged to other Account Managers. This was done to prevent Ms. Lawless from meeting the goal for 2006 imposed upon her when she returned from leave.

-22-

This was in direct contradiction to established policies and
procedures.

106. On or about March 9, 2006, Defendants paid Ms. Lawless
a bonus of approximately $6,000. At or about that time, Ms.
Lawless also closed about $1.1 million in business. On March 17,
2006, Defendants placed Ms. Lawless on a paid administrative
leave. Klein told Ms. Lawless that she was being placed on leave
because she had filed an EEOC Charge, which was akin to "sticking
a stick in management's eye." At the same time, Defendants told
Ms. Lawless that it had an interest in seeking a settlement of
her claims.

107. Ms. Lawless asked how long she would be forced to
remain on leave. Defendants responded as long as she negotiated
in good faith. Defendants made an unreasonable offer to Ms.
Lawless in exchange for her resignation and release of claims.
During Ms. Lawless' leave, her manager Terry Sekel told Ms.
Lawless' clients that Ms. Lawless had taken an emergency leave to
be with her children. Clients called Ms. Lawless expressing
concern.

108. Ms. Lawless rejected Defendants' offer. Defendants
directed Ms. Lawless to return to work. Ms. Lawless did so and
was immediately fired. Defendants unlawfully discharged Ms.
Lawless because of her sex and pregnancy, and because she engaged
in protected activities. Ms. Lawless' 7+ years' experience at
Defendants, combined with her track record of performance, sales
and successes, further demonstrate that Defendants' proffered

-23-

reason for firing her was a pretext for discrimination,
retaliation and unlawful termination of employment.

109. The EEOC conducted an investigation regarding Ms.
Lawless' EEOC Charge and, in or about August 2008, issued a
Determination in Ms. Lawless' favor stating, among other items:

* Charging Party alleges that she was
  discriminated against based on pregnancy and
  gender. Charging Party asserts that she was
  retaliated against for opposing
  discrimination in the workplace, and for
  agreeing to be a witness for complainant
  Claudia Woodard.

* Respondent denies the allegations, and
  asserts that Charging Party was terminated
  for poor performance, problematic behavior,
  and lack of communication.

* The evidence gathered contradicts
  Respondent's contention that Charging Party
  was a substandard performer.

* The record shows that the Charging Party
  opposed alleged discriminatory employment
  practices by Respondent, and as a result, her
  performance was unfairly criticized and she
  was terminated.

* Given the above there is sufficient evidence
  to believe that Charging Party was retaliated

-24-

against for her opposing respondent's

discriminatory practices, and because of her

gender and pregnancy, in violation of Title

VII.

### GENERAL

110. From time to time, Gall summoned Ms. Woodard, Ms. Lawless and/or other female employees into his office. He often put his legs on the desk and opened them, thereby exposing his crotch. During such meetings, Gall sometimes also swung a toy baseball bat. Gall said that SVP Paul Iaffaldano had a "hard on" for Ms. Lawless and that female employees should "suck up" to Gall. Gall had high turnover among his female subordinates.

111. Defendants' conduct, as alleged herein, constituted unlawful discrimination, harassment and retaliation. Defendants' proffered reason for the conduct was a pretext for unlawful discrimination, unlawful discharge and unlawful retaliation.

112. Defendants' discrimination and harassment was severe and pervasive, adversely affected the terms, conditions and privileges of Plaintiffs' employment, resulted in adverse tangible employment actions, and created a hostile, offensive and abusive work environment.

113. Tolerance of unlawful discrimination and harassment was a term and condition of Plaintiffs' employment, and they suffered adverse tangible employment actions because they refused to acquiesce to that conduct and protested such conduct. Plaintiffs have also been the victims of "quid pro quo" harassment.

-25-

114. Defendants' unlawful conduct was intentional and was carried out with malice or reckless indifference to Plaintiffs' protected rights to be free from unlawful discrimination, harassment and retaliation.

115. Defendants knew or should have known of the unlawful discrimination, harassment and retaliation. Defendants failed to exercise reasonable care to prevent and correct unlawful discrimination, unlawful harassment and unlawful retaliation.

116. Defendants authorized unlawful discrimination, unlawful harassment and unlawful retaliation and the employees who engaged in such unlawful conduct were unfit and Defendants were reckless and/or negligent in employing them. Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled, supported, ratified, approved, condoned and/or coerced the unlawful conduct.

117. Upon information and belief: (a) Defendants discriminated against and/or harassed other employees; (b) one or more other employees opposed, objected to and/or complained about discrimination and/or harassment; and (c) Defendants retaliated against one or more other employees who objected to, opposed and/or complained about discrimination and/or harassment.

118. Upon information and belief, in addition to Plaintiffs, other victims of Defendants' unlawful discrimination, harassment and retaliation include, among others: Meena Bhiro, Courtney Kurland, Jen Monson, and Catherine Jolly. Upon further

-26-

information and belief, when complaints were filed, Defendants pressured witnesses to change their story and/or statements.

119. Defendants engaged in a continuing violation of law. Upon information and belief, after Defendants unlawfully fired Plaintiffs, Defendants made defamatory statements about Plaintiffs. For example, after Defendants fired Ms. Woodard, Gall attended a client meeting with Jen Monson and Randy Artcher. Gall attempted to blame Ms. Woodard for his own lack of knowledge regarding the client and made defamatory statements about her.

120. As a result of Defendants' unlawful conduct, each Plaintiff has suffered, and continues to suffer, among other items, substantial damages, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Each Plaintiff is entitled to the relief sought herein.

### COUNT ONE

### (TITLE VII)

121. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 120 of this Complaint with the same force and effect as though fully set forth herein.

122. This Count is brought under Title VII, 42 U.S.C. § 2000e et seq., as amended, and reference is made to Title VII in its entirety and to 42 U.S.C. §§ 2000e, 2000e(b), 2000e(f), 2000e-2(a), 2000e-3(a), 2000e-5(g), 2000e-5(k), and 42 U.S.C. § 1981a.

-27-

123. At all relevant times, each Defendant was an "employer" within the meaning of Title VII.

124. At all relevant times, each Plaintiff was an "employee" within the meaning of Title VII.

125. Defendants' conduct, as alleged herein, constituted unlawful employment practices and unlawful discrimination, including without limitation on the basis of sex, pregnancy, race, color, and national origin, in violation of Title VII.

126. In addition, Defendants made discriminatory compensation decisions and adopted discrimination compensation practices, and subjected Plaintiffs to discriminatory compensation decisions and discriminatory compensation practices.

127. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of Title VII.

128. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for each Plaintiff's protected rights to be free from discrimination, harassment, and retaliation.

129. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation, lost wages/bonuses, lost benefits, pension monies and contributions, lost interest and attorneys' fees and costs. Each Plaintiff is entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

-28-

130. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Each Plaintiff is entitled to recover damages for such injuries from Defendants under Title VII.

## COUNT TWO

### (SECTION 1981)

131. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 130 of this Complaint with the same force and effect as though fully set forth herein.

132. This Count is brought under Section 1981, 42 U.S.C. § 1981 et seq. and reference is made to Section 1981 in its entirety and to 42 U.S.C. §§ 1981, 1981a, 1988, and 1988(b).

133. Defendants' conduct, as alleged herein, constituted unlawful discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, pension monies and contributions, privileges, terms, and conditions of the contractual relationship," in violation of Section 1981.

134. Plaintiffs engaged in protected activity under Section 1981. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the Section 1981.

-29-

135. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiffs' rights to be free from discrimination and retaliation.

136. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer injury, with resulting monetary and other damages, including without limitation, lost wages/bonuses, lost benefits, pension monies and contributions, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Section 1981.

137. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Each Plaintiff is entitled to recover damages for such injuries from Defendants under Section 1981.

## COUNT THREE

### (NYSHRL)

138. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 137 of this Complaint with the same force and effect as though fully set forth herein.

139. This Count is brought under the NYSHRL, N.Y. Exec. L. § 290 et seq. and reference is made to the NYSHRL in its entirety

-30-

and to N.Y. Exec. L. §§ 292, 292(1), 292(5), 292(6), 296, 296(1), 296(1)(a), 296(1)(e), 296(3-a)(c), 296(6), 296(7), and 297(9).

140. At all relevant times, each Defendant was an "employer" within the meaning of the NYSHRL.

141. At all relevant times, each Plaintiff was an "employee" within the meaning of the NYSHRL, and a "person" within the meaning of the NYSHRL.

142. Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination, including without limitation on the basis of sex, pregnancy, disability, race, color, and national origin, in violation of the NYSHRL.

143. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the NYSHRL.

144. Defendants are liable for the unlawful conduct herein, including without limitation as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL. See, e.g., NYSHRL § 296(1) and § 296(6).

145. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation, lost wages/bonuses, lost benefits, pension monies and contributions, lost interest and attorneys' fees and costs. Each Plaintiff is entitled to recover such monetary and other damages, from Defendants under the NYSHRL.

-31-

146. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Plaintiff is entitled to recover damages for such injuries from Defendants under the NYSHRL.

## COUNT FOUR

### (NYCHRL)

147. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 146 of this Complaint with the same force and effect as though fully set forth herein.

148. This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq. and reference is made to the NYCHRL in its entirety and to N.Y.C. Admin. Code §§ 8-102, 8-102(1), 8-102(5), 8-102(17), 8-107, 8-107(1), 8-107(1)(a), 8-107(6), 8-107(7), and 8-502.

149. At all relevant times herein, each Defendant was an "employer", "covered entity" and a "person" within the meaning of the NYCHRL.

150. At all relevant times herein, each Plaintiff was a "person" within the meaning of the NYCHRL.

151. Defendants' conduct, as alleged herein, constituted "unlawful discriminatory practices" and unlawful discrimination, including without limitation on the basis of sex, pregnancy,

-32-

disability, race, color, and national origin, in violation of the NYCHRL.

152. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the NYCHRL.

153. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for each Plaintiff's protected rights to be free from discrimination and harassment, and retaliation.

154. Defendants are liable for the unlawful conduct herein, including without limitation as an "employer" under the NYCHRL and under the "aiding and abetting" provision of the NYCHRL. See, e.g., NYCHRL § 8-107(1) and § 8-107(6).

155. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation, lost wages/bonuses, lost benefits, pension monies and contributions, lost interest and attorneys' fees and costs.

156. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Each Plaintiff is entitled to recover damages for such injuries from Defendants under the NYCHRL.

157. Each Plaintiff is entitled to recover monetary damages and other damages and relief, punitive damages, interest, and attorneys' fees and costs from Defendants under the NYCHRL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment on all Counts, as follows:

(A) On Count One, enter a judgment declaring the acts and practices of Defendants to be in violation of Title VII;

(B) On Count One, award each Plaintiff as against Defendants reinstatement and the amount of wages, including without limitation back pay, front pay, bonuses, benefits, pension monies and contributions, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(C) On Count One, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(D) On Count One, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(E) On Count One, award each Plaintiff as against Defendants punitive damages;

-34-

(F)   On Count One, award each Plaintiff as against Defendants the costs of this action, together with reasonable attorneys' fees;

(G)   On Count Two, enter a judgment declaring the acts and practices of Defendants to be in violation of Section 1981;

(H)   On Count Two, award each Plaintiff as against Defendants reinstatement and the amount of wages, including without limitation back pay, front pay, bonuses, benefits, pension monies and contributions, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(I)   On Count Two, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(J)   On Count Two, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(K)   On Count Two, award each Plaintiff as against Defendants punitive damages;

(L)   On Count Two, award each Plaintiff as against Defendants the costs of this action, together with reasonable attorneys' fees;

-35-

(M)   On Count Three, enter a judgment declaring the acts and practices of Defendants to be in violation of the NYSHRL;

(N)   On Count Three, award each Plaintiff as against Defendants reinstatement and the amount of wages, including without limitation back pay, front pay, bonuses, benefits, pension monies and contributions, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(O)   On Count Three, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(P)   On Count Three, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(Q)   On Count Four, enter a judgment declaring the acts and practices of Defendants to be in violation of the NYCHRL;

(R)   On Count Four, award each Plaintiff as against Defendants reinstatement and the amount of wages, including without limitation back pay, front pay, bonuses, benefits, pension monies and contributions, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

-36-

(S)   On Count Four, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation;

(T)   On Count Four, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses;

(U)   On Count Four, award each Plaintiff as against Defendants punitive damages;

(V)   On Count Four, award each Plaintiff as against Defendants the costs of this action, together with reasonable attorneys' fees;

(W)   On Counts One to Four, award each Plaintiff any and all other damages and relief provided by the applicable statutes; and

(X)   Grant each Plaintiff such other and further relief as may be necessary and proper.

## JURY DEMAND

Plaintiffs demand a jury trial for all issues triable.

Dated:    New York, New York
          April 7, 2009

                          GOLDBERG & FLIEGEL LLP

                   By:    _Kenneth A. Goldberg_

                          Kenneth A. Goldberg (KG 0295)
                          60 East 42nd Street, Suite 3421
                          New York, New York 10165
                          (212) 983-1077
                          Attorneys for Plaintiffs

-38-