UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLAUDIA WOODARD and ELISE LAWLESS,

Plaintiffs,

-against-

TWC MEDIA SOLUTIONS, INC. and THE WEATHER CHANNEL,

Defendants.

Case No. 09 Civ. 3000 (BSJ)(AJP)

---

## AFFIDAVIT OF MEADE CAMP

STATE OF CALIFORNIA   )
                      ) ss.:
COUNTY OF SAN FRANCISCO )

Meade Camp, being duly sworn, deposes and says:

1. I am familiar with the facts and circumstances set forth in this Affidavit. I make this Affidavit based on my personal knowledge. I make this affidavit voluntarily, knowing that it will be used in legal proceedings.

2. I was employed by TWC Media Solutions, Inc. ("TWCMS") from June 2003 until I resigned my employment in May 2006. During my tenure at TWCMS, my title was Senior Vice President, Client Solutions.

3. In 2003, I was assigned the responsibility of creating a brand-new sales team at TWCMS called the Client Solutions Team. This team was responsible for working directly with clients to convince them that The Weather Channel ("TWC") should be part of their advertising strategy. The role of the Client Solutions Team was different than the general sales team insofar

1

as Client Development Managers ("CDMs") were not responsible for negotiating advertising deals or communicating with agencies to sell advertising.

4. As part of my responsibilities as the head of the Client Solutions Team, I was responsible for hiring the CDMs who would work on this new team.

5. TWCMS emphasized and valued diversity in the workplace and, as a matter of practice, TWCMS recruited employees from minority organizations. In fact, I first met Claudia Woodard at an event sponsored by an organization whose members were principally African Americans in the advertising industry.

6. At no time during my employment with TWCMS and/or TWC did I receive (or to my knowledge, was I eligible for) any bonus tied to hiring diversity candidates. I never told anyone that I was required to hire an African American for a CDM position. I never told anyone that they should not bother referring an applicant if that prospective employee was not an African American.

7. I was not required to hire an African American to fill one of the CDM positions on the Client Solutions Team I was creating. I interviewed Ms. Woodard and decided to hire her as a CDM because I thought her skill set would be a great match for the CDM position.

8. I have learned that Ms. Woodard has claimed that I "hired her to fire her" in order to satisfy TWCMS's diversity goals. This is absolutely untrue. TWCMS was taking the risk of starting a new group with me as its head. Thus, I was very careful to select individuals for the team whom I believed could succeed in the CDM role. Furthermore, relationships and familiarity with clients are the most important commodities in the advertising business. Thus, it was never my desire to fire anyone soon after they started, thereby forcing clients to establish a new relationship from scratch with a new CDM.

TWC 2988
CONFIDENTIAL

9. Ms. Woodard was not a good performer as a CDM. That role required her to call on clients to convince them to advertise on TWC. Yet Ms. Woodard failed to contact all of the clients on her list, even after she had been employed as a CDM for roughly two months. When I asked Ms. Woodard for updates concerning her contact with clients on her list, she usually responded that "they won't call me back." That excuse is unacceptable for a salesperson. It has always been my belief that a good salesperson must be persistent with his or her clients, and must continue trying to contact those clients even if the clients do not return telephone calls. It was my observation as Ms. Woodard's manager that she did not exhibit the perseverance needed to convince clients to advertise on TWC.

10. I was especially frustrated by Ms. Woodard's poor performance because I very much wanted her to succeed; both for her own development as a salesperson, and because the new Client Solutions Team was my responsibility. Any failures on the part of the CDMs I hired would be a poor reflection on the Client Solutions Team, and on me as the head of that team.

11. Furthermore, I was frustrated by Ms. Woodard because she rarely asked me any questions concerning her accounts or sales strategy. By contrast, Bruce Budkofsky and Craig Meadow, the other two CDMs, asked me questions all the time about how they should deal with their clients, and they continuously sought out my advice on creative ways to persuade clients to advertise on TWC.

12. In August 2004, Paul Iaffaldano eliminated the CDM position, and TWCMS decided to transfer Mr. Budkofsky, Mr. Meadow and Ms. Woodard to Account Manager positions. I was not involved in assigning accounts to these individuals as Account Managers.

TWC 2989
CONFIDENTIAL

13. I accompanied Mary Jo Romeo and Ms. Woodard to a client presentation at Hankook Tires. We all drove together to Hankook's headquarters in New Jersey. As we were driving through Paterson, New Jersey, Ms. Romeo commented that Paterson was a dreadful place, and asked how people could live in that town. Ms. Woodard responded that "this is where I grew up." Ms. Romeo did not make any other comments to Ms. Woodard during this drive that were even remotely offensive or inappropriate.

14. In or around March 2005, after Ms. Romeo left TWCMS, I pitched in and supervised Ms. Woodard until TWCMS found a new regional sales manager to replace Ms. Romeo. As her supervisor, it was my observation that Ms. Woodard was a terrible Account Manager. Despite the fact that she had already been an Account Manager for approximately seven months, I found that she still only had a rudimentary grasp of Media Math, and had not developed any significant client relationships.

15. Moreover, during the period I supervised Ms. Woodard as an Account Manager, I observed that she made comparatively few sales calls, and was lacking in strategic ideas as to why a company should advertise on TWC.

16. Additionally, during the period I supervised Ms. Woodard as an Account Manager, I continued to be frustrated by her failure to seek me out for advice on her accounts, or to update me generally as to the status of her efforts. As a supervisor, I believe that I am a great resource for my subordinates, and I have always invited all of them, including Ms. Woodard, to seek me out for advice and counsel at all times. In fact, during my three years as a manager at TWCMS, Ms. Woodard was the *only* individual reporting to me who did not regularly seek me out for advice concerning accounts.

TWC 2990
CONFIDENTIAL

17. I never told Ms. Woodard, in words or substance, that I was unable or unwilling to assist her, whether as a CDM or an Account Manager. Indeed, I have never made any similar comments, in words or substance, to any subordinate during my 25 years as a manager in the advertising industry.

18. Ms. Woodard's most significant performance failures related to her inability to gain the trust and confidence of her clients. Specifically, several executives at barter shop clients told me directly that Ms. Woodard did not understand the business and that they did not want to deal with her anymore, demanding that Ms. Woodard no longer work on their accounts.

19. For example, John Viserto, a senior executive at Active International, told me that dealing with Ms. Woodard was a waste of his time, and that it was not in TWCMS's interests for Ms. Woodard to continue calling Viserto. I understood Mr. Viserto's comments to mean that if TWCMS did not remove Ms. Woodard from the Active account, Active might decrease the amount of advertising it placed on TWC.

20. Furthermore, Heidi Kahme of Initiative was very vocal with me that she did not want Ms. Woodard working on Initiative deals. In fact, I recall Ms. Kahme telling me explicitly to "get this woman out of my shop."

21. In my almost thirty years in advertising, I had never before (or since) had a client demand the removal of an account manager from their account. Yet in Ms. Woodard's case, I received that directive from two different clients in a very brief period of time.

22. In April 2005, Mark Gall and I met with Ms. Woodard to present her with a performance warning. During this meeting, Mr. Gall told Ms. Woodard that she was to have no further contact with representatives of Active, Initiative, and Icon. Furthermore, Mr. Gall told Ms. Woodard that if her performance did not improve, she would be discharged.

TWC 2991
CONFIDENTIAL

23. Almost immediately after this meeting, Ms. Woodard sent an inappropriate internal email to me and other TWCMS employees in which she stated inaccurately that she would no longer be working on the Active and Initiative accounts, but would continue working with Icon.

24. Then, within days after Mr. Gall expressly instructed Ms. Woodard not to call on Active, I learned that she had called Jim Quinn of Active. I was very upset by Ms. Woodard's decision to call Active because: (i) we had told her not to call that client anymore; and (ii) she was aware that her contacts at Active had shared with TWCMS management their unfavorable opinion of her performance. For Ms. Woodard to call a client (only days after she was instructed not to do so) with full knowledge of that client's dissatisfaction with her work showed incredibly poor judgment.

25. Because of those actions, Mr. Gall, Mr. Iaffaldano and I, in conjunction with Human Resources and the Legal department, decided to terminate Ms. Woodard's employment immediately.

26. After the decision had been made to terminate her employment, Ms. Woodard presented me with a rebuttal to her performance warning, which I forwarded to Human Resources. Ms. Woodard's rebuttal did not precipitate her termination, nor did it change my opinion that she should be discharged.

27. During my employment at TWCMS, I regularly observed Mr. Gall's interactions with TWCMS employees, including Account Managers. I never witnessed Mr. Gall treat anyone unfairly. I observed that Mr. Gall differentiated employees by how hard they worked, and I observed that, to the extent Mr. Gall seemed to prefer certain employees over others, he preferred those who worked the hardest. Mr. Gall is the consummate, tough-but-fair professional.

TWC 2992
CONFIDENTIAL

28. During my employment at TWCMS, I never witnessed any TWCMS manager give preferential treatment to male employees over female employees. Further, during my employment at TWCMS, I never witnessed any TWCMS manager give preferential treatment to Caucasian employees over non-Caucasian employees.

29. During my employment at TWCMS, I regularly observed Mr. Gall's interactions with Sly Phifer, an African American Account Manager. Mr. Gall treated Mr. Phifer exceedingly well, and I know that Mr. Gall promoted him on at least one occasion. Furthermore, I observed that Mr. Gall devoted a lot of attention to Mr. Phifer, especially with respect to coaching and counseling his sales efforts.

30. During my employment at TWCMS, I regularly observed Mr. Gall's interactions with Lakieban Brown, an African American TWCMS employee. Mr. Gall treated Mr. Brown exceedingly well, and I know that Mr. Gall promoted him on at least one occasion. Furthermore, I observed that Mr. Gall devoted a lot of attention to Mr. Brown, especially with respect to coaching and counseling his sales efforts.

31. During my employment at TWCMS, I regularly observed Mr. Gall's interactions with Jill Matrange, a female Account Manager. Mr. Gall treated Ms. Matrange exceedingly well. Furthermore, I observed that Mr. Gall devoted a lot of attention to Ms. Matrange, especially with respect to coaching and counseling her sales efforts.

32. During my employment at TWCMS, I regularly observed Mr. Gall's interactions with Janet Poillon, a female Account Manager. Mr. Gall treated Ms. Poillon exceedingly well. Furthermore, I observed that Mr. Gall devoted a lot of attention to Ms. Poillon, especially with respect to coaching and counseling her sales efforts.

TWC 2993
CONFIDENTIAL

33.   During my employment at TWCMS, I observed that Mr. Gall frequently made unscheduled, unannounced visits to Account Managers' cubicles to ask them about the status of specific accounts assigned to them. It is my opinion that Account Managers should be capable of discussing their accounts at any time. I regularly observed Mr. Gall making similar visits to every single Account Manager in TWCMS's New York office.

34.   Mr. Gall had a toy baseball bat in his office. I recall that the bat was no longer than 12-15 inches. I never witnessed Mr. Gall swing his toy bat at anyone or threaten anyone with his toy bat.

_____   10-24-2_
Meade Camp

Sworn to before me
this 24 day of October 2009

SEE ATTACHED Jurat Acknowledge
Notary Public

TWC 2994
CONFIDENTIAL

Signature page
and certificate
bear embossment.

8

## CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], not Notary)

1 ~~_____~~
2 ~~_____~~
3 ~~_____~~
4 ~~_____~~
5 ~~_____~~
6 ~~_____~~

Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California
County of __San Francisco__

Subscribed and sworn to (or affirmed) before me on this __24th__ day of __October__, 20__09__, by

(1) __Meade Calvert Camp__
   Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me (.) (,)

(2) __N/A__ (and
   Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.)

Signature __[signature]__
   Signature of Notary Public

[Notary Seal: L. TORTOLERO, COMM. #1642998, NOTARY PUBLIC - CALIFORNIA, SAN FRANCISCO COUNTY, My Comm. Expires FEB 03, 2010]

Place Notary Seal Above

――――――――― OPTIONAL ―――――――――

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Further Description of Any Attached Document**

Title or Type of Document: __Affidavit of Meade Camp__ __iw cuepa__

Document Date: __Oct 24th 2009__   Number of Pages: __8__

Signer(s) Other Than Named Above: __N/A__

RIGHT THUMBPRINT OF SIGNER #1 — Top of thumb here
RIGHT THUMBPRINT OF SIGNER #2 — Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

Signature page and certificate bear embossment

**TWC 2995**
**CONFIDENTIAL**