UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLAUDIA WOODARD and ELISE LAWLESS,

Plaintiffs,

-against-

TWC MEDIA SOLUTIONS, INC. and THE WEATHER CHANNEL,

Defendants.

Case No. 09 Civ. 3000 (BSJ)(AJP)

**AFFIDAVIT OF PAUL IAFFALDANO**

STATE OF GEORGIA )
) ss.:
COUNTY OF COBB )

Paul Iaffaldano, being duly sworn, deposes and says:

1. I am familiar with the facts and circumstances set forth in this Affidavit. I make this Affidavit based on my personal knowledge, and/or my review of documents regularly maintained in the regular course of business by Defendants TWC Media Solutions, Inc. ("TWCMS") and The Weather Channel ("TWC"). I make this affidavit voluntarily, knowing that it will be used in legal proceedings.

2. From January 2003 through approximately July 2004, I was Senior Vice President of Network Ad Sales. Since approximately July 2004, I have been Executive Vice President, General Manager of TWCMS.

3. In my role as General Manager during the course of Claudia Woodard's employment with TWCMS, I spent roughly 40% of my time in the New York office. When I visited the New York office, I made it a point to try to speak to each Account Manager and ask them about their accounts and what their goals were. Specifically, I wanted to know whether the Account Managers had a business plan and were working that plan enthusiastically. I had several such conversations with Ms. Woodard (each of which lasted for five to ten minutes), in which I asked about her client list and her progress in selling advertising with those clients. Based on those conversations, my overall impression of Ms. Woodard was that she "took no for an answer" too often and did not have the perseverance needed to convince clients to advertise on TWCMS.

4. In 2005, I was apprised of severe performance deficiencies related to Ms. Woodard. For example, I learned from Mark Gall that several clients had complained about Woodard's service, including Active International and Initiative Media. Furthermore, Mr. Gall told me that Ms. Woodard did not have the necessary skill set to perform her role successfully, and was not working hard enough to develop her skill set so that she could succeed. Mr. Gall told me that Ms. Woodard was not progressing at an acceptable pace and had shown no growth in the more than six months during which she had been an Account Manager.

5. In late March 2005, I had a conversation with Mr. Gall about Ms. Woodard's performance deficiencies, during which I expressed the opinion that she should either be discharged immediately, or demoted to a Sales Service Associate ("SSA") position without a pay decrease through a mutually agreeable date.

6. In April 2005, I had conversations with Meade Camp, Ms. Woodard's direct supervisor, concerning her performance. Mr. Camp expressed to me concerns similar to those Mr. Gall had expressed with respect to Ms. Woodard's lack of skill at her job and her not working hard enough. Moreover, Mr. Camp shared my sentiments that Ms. Woodard did not exhibit enough persistence in her dealings with clients and gave up too easily when a client did not return her call.

7. In April 2005, after consultation with Human Resources, Mr. Gall and Mr. Camp, I approved the decision to give Ms. Woodard a written performance warning.

8. Within a matter of days after I approved the request to give Ms. Woodard a written performance warning, I learned that Ms. Woodard had made a phone call to a representative of an agency she had been prohibited from calling on. Mr. Gall informed me that this client representative had complained to him that Ms. Woodard's call made him uncomfortable. I found this very troubling, because it evidenced poor judgment on Ms. Woodard's part and put TWCMS in an awkward position with a client.

9. After consultation with Mr. Gall, Mr. Camp, Human Resources and the Legal Department, the decision was made to terminate Woodard's employment immediately. It has been my general practice throughout my tenure with TWCMS to be aware of and involved in Account Manager discharge decisions, and any decision to terminate an Account Manager is subject to my approval. Ms. Woodard's termination was handled in a manner consistent with this general practice.

10. During the time I worked with Mr. Gall, I never witnessed Mr. Gall make any inappropriate comments or take any inappropriate actions regarding race, national origin, color or gender.

11. During the time I worked with Mr. Gall, I observed that Mr. Gall treated all TWCMS employees, including Account Managers fairly. It was my observation that Mr. Gall preferred employees who worked the hardest, and who tried consistently to apply the sales skills and work habits Mr. Gall was teaching them.

12. During my employment at TWCMS, I have never witnessed any TWCMS manager give preferential treatment to male employees over female employees. Further, during my employment at TWCMS, I have never witnessed any TWCMS manager give preferential treatment to Caucasian employees over non-Caucasian employees. For example, I observed that Mr. Gall treated Sly Phifer and Lakieban Brown (two African American Account Managers) very well, and that he promoted each of them at least once. Further, I observed that Mr. Gall treated Jill Matrange, Janet Poillon, and Diana Scully (three female Account Managers) very well, and that he promoted Ms. Poillon to Director of Sales.

13. During the time I worked with Mr. Gall, I made unscheduled, unannounced visits to Mr. Gall's office to ask him about the status of specific accounts assigned to the sales team. It is my opinion that advertising professionals should be capable of discussing with their superiors at any time the accounts for which they were responsible.

14. Mr. Gall had a toy baseball bat in his office. I recall that the bat was no longer than 12-15 inches. I never witnessed Mr. Gall swing his toy bat at anyone or threaten anyone with his toy bat.

15. Decisions concerning Account Manager compensation were not made by Gall. Those decisions were made collaboratively by myself, Gall, Human Resources, and Compensation after taking into account market practice, the recruiting process, and the applicable pay range.

Paul Iaffaldano

Sworn to before me
this 29th day of October 2009

Staci M. Pittman
Notary Public






TWC 3005