UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------

CLAUDIA WOODARD and ELISE LAWLESS,

                   Plaintiffs,

            -against-

TWC MEDIA SOLUTIONS, INC. and THE
WEATHER CHANNEL,

                  Defendants.

-----------------------------------------

Case No. 09 Civ. 3000 (BSJ) (AJP)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON CLAUDIA WOODARD'S CLAIMS**


**VEDDER PRICE P.C.**
Laura Sack (LS 5501)
Roy P. Salins (RS 0793)
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 1

    A.    TWCMS Hires Woodard as a Client Development Manager ................................ 1

    B.    Woodard is Transferred to an Account Manager Position .................................... 2

    C.    Woodard Makes a Complaint About Celt, in Response to Which TWCMS Takes Prompt and Effective Remedial Action ........................................................ 3

    D.    Woodard Receives a Lackluster 2004 Performance Review ............................... 4

    E.    Woodard's Performance Deficiencies Worsen ..................................................... 5

        1.    TWCMS Takes Woodard Off a Deal in January 2005 ............................ 5

        2.    Woodard Makes a Complaint About Romeo, in Response to Which TWCMS Takes Prompt and Effective Remedial Action ............. 6

        3.    Clients Continue to Complain to TWCMS Management About Woodard .......................................................................................... 7

        4.    Coworkers Complain to TWCMS Management About Woodard's Ineptitude ...................................................................... 7

    F.    TWCMS Decides to Terminate Woodard's Employment ................................... 8

ARGUMENT ......................................................................................................... 11

I.    WOODARD'S CLAIMS OF DISCRIMINATORY AND RETALIATORY DISCHARGE MUST BE DISMISSED ......................................................... 11

    A.    Woodard Cannot Establish a *Prima Facie* Case of Discrimination or Retaliation ..................................................................................................... 11

    B.    Defendants Have Articulated a Legitimate, Nondiscriminatory Reason for Woodard's Discharge .................................................................................. 12

    C.    Woodard Cannot Show that Defendants' Proffered Reasons for Her Discharge are Pretext for Discrimination or Retaliation ................................... 12

II.    WOODARD'S PAY DISPARITY CLAIMS MUST BE DISMISSED ......................... 15

    A.    Woodard Cannot Establish a *Prima Facie* Case of Pay Discrimination ............. 15

    B.    Woodard Cannot Show that TWCMS's Legitimate, Nondiscriminatory Reasons for its Decisions Regarding Her Compensation Were Pretext for Discrimination ................................................................................................... 17

**TABLE OF CONTENTS**
**(continued)**

Page

III.    WOODARD'S SEXUAL AND RACIAL HARASSMENT CLAIMS
        MUST BE DISMISSED .................................................................................. 17

        A.      Woodard's Harassment Claims are not Legally Actionable ................................ 18

        B.      Woodard Cannot Impute Liability to Defendants on Her
                Harassment Claims ........................................................................................ 21

IV.     WOODARD'S TITLE VII GENDER DISCRIMINATION AND SEXUAL
        HARASSMENT CLAIMS MUST  BE DISMISSED AS UNTIMELY ........................ 23

V.      THE EEOC'S FLAWED DETERMINATION DOES NOT ENTITLE
        WOODARD TO A TRIAL................................................................................ 24

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Solomon Page Group, LLC*, 886 N.Y.S.2d 70 (1st Dept. 2009)................................13

*Bolden v. New York City Hous. Auth.*,
  96 Civ. 2835, 1997 WL 666236 (S.D.N.Y. Oct. 27, 1997) ................................... 20

*Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)....................................................... 21

*Carter v. New Venture Gear, Inc.*, 310 Fed. Appx. 454 (2d Cir. 2009) ....................... 17

*Chamberlin v. Principi*, 247 Fed. Appx. 251 (2d Cir. 2007)........................................ 11

*Council v. Tri-Star Constr. Co.*, 01 Civ. 11788 (BSJ),
  2004 WL 253298 (S.D.N.Y. Feb. 10, 2004)................................................... 14, 24

*Davis v. Avaya, Inc.*, 295 Fed. Appx. 380 (2d Cir. 2008)....................................... 11, 12

*DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298,
2004 WL 2181403 (S.D.N.Y. Sep. 23, 2004)................................................. 16, 17

*Dawkins v. Witco Corp.*, 103 F. Supp. 2d 688 (S.D.N.Y. 2000) ................................. 11

*Dister v. Cont'l Group, Inc.*, 859 F.2d 1108 (2d Cir. 1988)........................................ 15

*Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556 (S.D.N.Y. 2009) ................... 18, 22

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996) ..................... 23

*Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567 (7th Cir. 1998)................................ 23

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ................................................ 21

*Ferraro v. Kellwood Co.*, 440 F.3d 96 (2d Cir. 2006)................................................ 21

*Fraser v. Fiduciary Trust Co. Int'l*, 04 Civ. 6958,
  2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009)........................................................ 20

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2d Cir. 1997),
  *cert. denied*, 525 U.S. 936 (1998)........................................................................ 14

*Greene v. Trs. of Columbia Univ.*, 234 F. Supp. 2d 368 (S.D.N.Y. 2002) .................. 22

*Hamilton v. Bally of Switzerland*, 03 Civ. 5685,
  2005 WL 1162450 (S.D.N.Y. May 17, 2005) ........................................................ 19

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494 (2d Cir. 2001) ......................... 17

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993)................................................................. 18

*Kemp v. A&J Produce Corp.*, 164 Fed. Appx. 12 (2d Cir. 2005)................................. 20

*Lloyd v. The New York Botanical Garden*,
  03 Civ. 7557 (BSJ), 2006 U.S. Dist. LEXIS 49066 (S.D.N.Y. July 6, 2006) .......... 24

# TABLE OF AUTHORITIES
## (continued)

Page

*Manning v. Chevron Chem. Co. LLC*,
  332 F.3d 874 (5th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004)...........................23

*Mazzella v. RCA Global Commc'ns., Inc.*, 642 F. Supp. 1531 (S.D.N.Y. 1986) ........................13

*McIntosh v. Bank of Am.*, 08 Civ. 5035, 2009 WL 2901597 (W.D.N.Y. Sep. 4, 2009)..............23

*McLee v. Chrysler Corp.*, 109 F.3d 130 (2d Cir. 1997).................................................................11

*McManamon v. City of New York Dep't of Corrs.*,
  07 Civ. 10575 (BSJ), 2009 WL 2972633 (S.D.N.Y. Sep. 16, 2009)........................13

*McNally v. Posterloid Corp.*, 148 Fed. Appx. 23 (2d Cir. 2005) ................................................21

*Monte v. Ernst & Young LLP*, 148 Fed. Appx. 43 (2d Cir. 2005)................................................13

*Orisek v. Am. Inst. of Aeronautics & Astronautics*,
  938 F. Supp. 185 (S.D.N.Y. 1996), *aff'd*, 162 F.3d 1148 (2d Cir. 1998),
  *cert. denied*, 526 U.S. 1065 (1999)................................................................15

*Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414 (S.D.N.Y. 1998)................................15

*Quarless v. Bronx-Lebanon Hosp.*, 228 F. Supp. 2d 377 (S.D.N.Y. 2002),
  *aff'd*, 75 Fed. Appx. 846 (2d Cir. 2003) ................................................16

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998) ................................................19

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)................................................12

*Regis v. Metro. Jewish Geriatric Ctr.*, 97 Civ. 906,
  2000 WL 264336 (S.D.N.Y. Jan. 11, 2000) ................................................14

*Richter v. Monroe County Dep't of Soc. Serv.*,
  01 Civ. 6409, 2005 WL 351052 (W.D.N.Y. Feb. 11, 2005) ...............................15

*Ricks v. Conde Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338 (S.D.N.Y. 2000),
  *aff'd*, 6 Fed. Appx. 74 (2d Cir. 2001) ................................................15

*Sampson v. City of New York*, 07 Civ. 2836 (BSJ),
  2009 WL 3364218 (S.D.N.Y. Oct. 19, 2009)................................................13, 18

*Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997) ..............................................................20

*Shumway v. UPS*, 118 F.3d 60 (2d Cir. 1997) ..............................................................................13

*Simpson v. Metro-North Commuter R.R.*, 04 Civ. 2565,
  2006 WL 2056366 (S.D.N.Y. July 21, 2006) ................................................16, 17

*Simpson v. New York State Dep't of Civil Servs.*, 166 Fed. Appx. 499 (2d Cir. 2006) ...............14

*Soderberg v. Gunther Int'l, Inc.*, 124 Fed. Appx. 30 (2d Cir. 2005) ...........................................15

*Stembridge v. City of New York*, 88 F. Supp. 2d 276 (S.D.N.Y. 2000) ........................................20

*Torriero v. Olin Corp.*, 684 F. Supp. 1165, 1170 (S.D.N.Y. 1988)..............................................24

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Trotman v. CBS Radio, Inc.*, 06 Civ. 3389,
   2007 WL 2827803 (S.D.N.Y. Sep. 27, 2007)........................................................................ 16

*Tunis v. Corning Glass Works*, 747 F. Supp. 951 (S.D.N.Y. 1990),
   *aff'd without op.*, 930 F.2d 210 (2d Cir. 1991)................................................................... 21

*Vazquez v. Southside United Hous.*, 06 Civ. 5997,
   2009 WL 2596490 (E.D.N.Y. Aug. 21, 2009)..................................................................... 22

*Wanamaker v. Columbian Rope Co.*, 907 F. Supp. 522 (N.D.N.Y. 1995) ................................... 25

*Watt v. New York Botanical Garden*, 98 Civ. 1095 (BSJ),
   2000 WL 193626 (S.D.N.Y. Feb. 16, 2000)................................................................. 12, 14

*Williams v. Alliance Nat'l Inc.*, 24 Fed. Appx. 50 (2d Cir. 2001) ................................................ 11

*Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009)............................................ 13

*Wilson v. N.Y.P. Holdings, Inc.*, 05 Civ. 10355,
   2009 WL 873206 (S.D.N.Y. Mar. 31, 2009)...................................................................... 17

*Zakrzewska v. The New Sch.*, 574 F.3d 24 (2d Cir. 2009) ......................................................... 21

**Statutes**
42 U.S.C. § 2000e-5(e) ............................................................................................................ 23

N.Y. Exec. L. § 296 ................................................................................................................. 22

N.Y.C. Admin. Code 8-502(d)................................................................................................. 24

**Rules**
N.Y. C.P.L.R. 214(2) ............................................................................................................... 24

## PRELIMINARY STATEMENT

Claudia Woodard's brief, ten-month employment at TWC Media Solutions, Inc. ("TWCMS") was marred by significant performance problems, which led to her dismissal. Not only did each one of Woodard's supervisors observe that her performance was deficient, but those supervisors also received numerous complaints regarding her performance from her coworkers and clients. Indeed, two clients demanded that Woodard be removed from their accounts entirely. Moreover, Woodard had a more generous compensation package during her employment than her white male comparator. Thus, each of Woodard's myriad claims of discrimination and retaliation must be dismissed because she can not establish that Defendants' legitimate, nondiscriminatory reasons for their actions were pretext for intentional discrimination or retaliation. Woodard's harassment claims must likewise be dismissed because the conduct she alleges does not come close to meeting the definition of legally actionable harassment, and because Defendants took prompt and effective remedial action following the complaints she lodged pursuant to their internal complaint procedure.

## STATEMENT OF FACTS[1]

A.  TWCMS Hires Woodard as a Client Development Manager

Woodard was hired by TWCMS as a Client Development Manager ("CDM") in or about May 2004, reporting to Meade Camp, SVP Client Development.[2]  (Sack Decl., Ex. J.) Woodard's job as a CDM was to convince clients to include TWC in their advertising strategy. (Affidavit of Meade Camp, dated October 24, 2009 ("Camp Aff."), ¶¶ 3, 9; Pl. Tr. 35-36.)  While Woodard was not responsible as a CDM for negotiating advertising deals or communicating with

---

[1] Relevant transcript pages from the depositions of Claudia Woodard ("Pl. Tr."), Lisa Chang, Mark Gall, Elise Lawless, Lisa Longo, Rick Monihan, Jen Monson, Mary Jo Romeo, and Pam Sawyer are attached as Exhibits A through I to the Declaration of Laura Sack, dated November 3, 2009 ("Sack Decl.").

[2] Woodard thought Camp was a "great" supervisor when she reported to him as a CDM.  (Pl. Tr. 362-63.)

agencies to sell advertising, she was nonetheless required to understand the basics of the business.  (Camp Aff. ¶ 3; Pl. Tr. 37, 49.)  Thus, when Woodard started at TWCMS, Camp told her to speak to TWCMS's Pricing & Inventory Department ("P&I") concerning Media Math.[3] (Pl. Tr. 54-55.)  Aside from one brief conversation with Sales Associate Will Tague, Woodard did nothing to gain a general overview of Media Math during her tenure as a CDM.  (*Id.*)

Camp did not consider Woodard to be a good performer as a CDM.  (Camp Aff. ¶ 9.)  It was her job to convince clients to advertise on TWC, but in nearly two months in the CDM role, she failed to contact all of the clients on her list, and she met with only three clients.[4]  (*Id.*; Pl. Tr. 67-69; Sack Decl., Exs. K-L.)  And, unlike the other two CDMs (Bruce Budkofsky and Craig Meadow), Woodard rarely asked Camp questions about her accounts or sales strategy.  (Camp Aff. ¶ 11; Pl. Tr. 47.)

B.    Woodard is Transferred to an Account Manager Position

In August 2004, the CDM role was eliminated and all three CDMs became Account Managers.  (Pl. Tr. 57.)  When Woodard started at TWCMS, she had no prior experience selling cable advertising or building sales plans, and her only experience in television was "a very entry level position" during college.  (Pl. Tr. 55, 62, 70-71.)  Not surprisingly, then, hers was a "somewhat junior" account list.[5]  (Romeo Tr. 59-60.)  Woodard's target compensation package for 2005 remained the same as it had been for 2004 ($148,050), although she was now eligible as

---

[3] Media Math is "a simple day-to-day commonly used major part of our business . . .," which concerns how advertising deals are negotiated on television.  (Lawless Tr. 297.)

[4] When Camp asked Woodard for updates concerning her contact with clients on her list, she usually responded, "they won't call me back."  (Camp Aff. ¶ 9.)  This excuse was unacceptable to Camp, who believes that a good salesperson must be persistent with his or her clients, and must continue trying to contact those clients even if the client does not return telephone calls.  (*Id.* ¶ 9.)  Camp observed that Woodard did not exhibit the perseverance needed to convince clients to advertise on TWC.  (*Id.* ¶ 9.)

[5] At her request, Woodard retained responsibility for two accounts, Hankook Tires and TIAA-CREF, after she became an Account Manager.  (Pl. Tr. 110; Sack Decl., Ex. L.)  Woodard recognized that she was new to the cable industry as a whole, and she told Gall and Camp in August 2004 that she was "excited about the opportunity to develop relationships in any given category."  (Sack Decl., Ex. L.)

an Account Manager to earn $176,987 if she performed at 10% above target.[6]  (Sack Decl., Ex. M.)

Woodard believed she knew what she needed to know to perform her job as an Account Manager.  (Pl. Tr. 95.)  TWCMS also provided her with training and counseling to help her succeed.  For example, in December 2004, Woodard attended a Media Math class, which she found helpful.  (Pl. Tr. 101-02, 104.)  Woodard also attended sales training in January 2005, which she found helpful in certain areas.  (Pl. Tr. 127.)  In addition, Woodard "had a great deal of conversations with Mark Gall about her deals because every deal [she] did had to be approved by him."  (Pl. Tr. 151.)

C.  Woodard Makes a Complaint About Celt, in Response to Which
    TWCMS Takes Prompt and Effective Remedial Action

On August 18, 2004, Woodard informed Gall that Paul Celt, another TWCMS Account Manager, had made inappropriate comments to his Sales Assistant, Lavern Broderick, including a comment to the effect that Broderick was tilling Jamaican rum in her bathtub.  (Sack Decl., Ex. Q.)  Gall thanked Woodard for coming forward, and he told her that he would discuss the matter with Human Resources.  (*Id.*)  That same day, Gall spoke with Pam Sawyer (the HR representative who supported TWCMS at the time), Broderick and Celt regarding the incident Woodard had reported.  (Sack Decl., Ex. R.)  Gall warned Celt that "this incident is a serious breach of conduct and that offensive behavior will not be tolerated by TWC," and Celt assured Gall that the behavior would not occur again.  (*Id.*; Gall Tr. 34; Sawyer Tr. 64.)

On August 19 and 20, Gall spoke further with Woodard about the incident.  (*Id.*)  Woodard thanked Gall for his follow-up, and she commented that Gall's "immediate action says

---

[6] Woodard's base compensation decreased (as did that of Meadow and Budkofsky), while her commission opportunity increased.  (Sack Decl., Exs. M-P; Affidavit of Craig Meadow, dated November 2, 2009 ("Meadow Aff."), Exs. A-B.)

a whole lot about [his] stance on this matter." (*Id.*, Ex. S.) Woodard told Gall that she was "not personally interested in any actions against Paul Celt." (*Id.*; Pl. Tr. 200.) On August 25, Celt invited Woodard for a "quick drink" and apologized for his comments. (Sack Decl., Ex. T; Pl. Tr. 201.) Woodard accepted Celt's apology and said that she "trust[ed] we will be able to put this issue behind us . . ." (*Id.*) Later that day, Gall gave Woodard a summary of his investigation, and he told her that Celt had been given a verbal warning. (Sack Decl., Ex. R.) Gall asked Woodard to tell him immediately if any similar situations arose in the future. (*Id.*) Woodard never heard Celt make any similar comments again, and she made no further complaint to TWCMS about him. (Pl. Tr. 211-12; *see* First Am. Compl ("Compl.").)

D.    Woodard Receives a Lackluster 2004 Performance Review

Woodard was given a performance review in December 2004, in which she received an overall score of .55 out of 3.0, which ranked between "Requires improvement" and "Exhibits good behaviors consistently."[7] (Sack Decl., Ex. U.) In January 2005,[8] Woodard sent a memorandum to Paul Iaffaldano, Executive Vice President and General Manager of TWCMS, and Patricia Keener, Compensation Analyst, claiming that her performance review "[did] not provide a fair or timely behavioral assessment." (*Id.*, Ex. V; Chang Tr. 15.) Woodard also sent an email to her supervisor, Mary Jo Romeo, on January 4 in which she expressed concerns regarding her review and 2005 compensation package. (Sack Decl., Ex. W.) Nowhere in the memorandum or email did Woodard claim that she was being paid less because she is a black woman or because she had previously complained about Celt's comments towards Broderick. (Sack Decl., Exs. V-W.)

---

[7] If one removes the zero ratings for categories in which Woodard was thought to be "too new," her overall rating remains between "Requires improvement" and "Exhibits good behaviors consistently." (Sack Decl. ¶ 22.)

[8] Unless otherwise noted, all dates referenced herein occurred in 2005.

E.      Woodard's Performance Deficiencies Worsen

      1.      *TWCMS Takes Woodard Off a Deal in January 2005*

On December 13, 2004, Lisa Siewers, Associate Director of National Broadcast at Active International (an advertising agency), sent Woodard specifications for an advertising commitment.  (Sack Decl., Ex. X.)  At some point in the ensuing weeks, Siewers reported to Gall that Woodard's performance was unacceptably substandard; Woodard did not understand Siewers's business and was not getting back to her in a timely fashion.[9]  (Gall Tr. 96, 285-86.) Gall asked Romeo to share Siewers's feedback with Woodard.  (Gall Tr. 96.)

On January 18, Romeo worked with P&I to get Siewers a revised advertising plan.  (Sack Decl., Ex. Y.)[10]  After TWCMS sent Siewers the revised plan, Romeo told Woodard not to contact Siewers or call Active until after Romeo met Siewers for lunch on Friday, January 21. (*Id.*)  At that lunch, Siewers rated TWC a 3 out of 10, whereas in her previous dealings with TWC she had rated it an 8.5 out of 10.  (Romeo Tr. 35; Sack Decl., Ex. Z.)  Siewers told Romeo that "it's very difficult to work with [Woodard], that [Siewers] wasn't getting what she needed, and as a result, we were going to lose business, the Weather Channel," and she asked Romeo to remove Woodard from the Pella deal.  (Romeo Tr. 75.)  Siewers also indicated to Romeo that other buyers at Active shared her dissatisfaction with Woodard's client service, and that Woodard's continued involvement in the account could negatively affect TWCMS's business. (Romeo Tr. 76-77.)

In late January, Romeo met with Woodard concerning Siewers.  (Pl. Tr. 328-29.)  Romeo relayed to Woodard Siewers's perception that Woodard wanted Siewers to do her job for her, that Woodard had a "listening problem" and a "knowledge problem," and that Siewers had to

---

[9] Siewers had never before complained to Gall about any Account Manager.  (Gall Tr. 96-97.)

[10] Woodard appreciated Romeo's hands-on approach in getting the plan out to Siewers.  (*Id.*)

call Woodard four times to get a response from Woodard.  (Romeo Tr. 77; Pl. Tr. 324; Sack

Dec., Ex. AA.)  On January 28, Romeo took Woodard off the Pella deal, although Woodard was

still paid commissions on that deal after Romeo completed the necessary work.[11]  (Pl. Tr. 309-

10; Sack Decl., Ex. Z.)

> 2.   *Woodard Makes a Complaint About Romeo, in Response to Which TWCMS Takes Prompt and Effective Remedial Action*

Shortly after Romeo took Woodard off the Pella deal because of client complaints,

Woodard faxed a memo to Sawyer complaining for the first time about alleged discriminatory

comments and actions by Romeo that dated back almost two months.  (Sack Decl., Exs. BB-CC.)

Woodard complained specifically that in December 2004, Romeo made inappropriate comments

to the effect that Woodard had been hired to fill a diversity initiative, and that in Romeo's

experience, black women have problems asking questions because they do not want to appear

stupid.[12]  (*Id.*, Ex. BB; *see also id.*, Ex. DD.)

TWCMS immediately investigated Woodard's complaint.  By February 2, Sawyer had

spoken to Woodard about her complaint; Gall and Woodard had met twice to discuss the

complaint; and Gall and Sawyer had spoken with Romeo concerning the complaint.  (Pl. Tr. 295-

97, 303-04, 311; Sack Decl., Ex. EE.)  On February 3, Romeo submitted a response to

Woodard's complaint, which Sawyer investigated.[13]  (Sawyer Tr. 140-41; Sack Decl., Ex. FF.)

In mid-February, Sawyer flew to New York from her office in Atlanta to discuss the complaint

---

[11] Woodard understood the decision and did not argue with Romeo's instruction because, as Woodard herself acknowledged, "the customer is always right."  (Sack Decl., Ex. Y.)

[12] Woodard also complained about other comments Romeo allegedly made that were unrelated to Woodard's race, color, national origin or gender.  (*Id.*)

[13] Romeo's statement that Woodard was on the wrong seat on the bus had nothing to do with race.  Instead, it was a reference to the "Good to Great" sales philosophy which became a guiding principle for the TWCMS sales force in late 2004. (Lawless Tr. 43.)  "Good to Great" is "all about putting people in the right place on the bus, and it was repeated repeatedly throughout the day, all the time . . ."  (Lawless Tr. 44-45.)

in person with Woodard and Romeo.  (Pl. Tr. 320.)  TWCMS terminated Romeo's employment

within days after this meeting, in large part because of her comments to Woodard.  (Pl. Tr. 321;

Sawyer Tr. 127.)  Thereafter, Woodard reported once again to Camp.  (Pl. Tr. 361.)

> 3.      *Clients Continue to Complain to TWCMS Management About Woodard*

Client complaints about Woodard did not end with Siewers.  Heidi Kahme of Initiative

Media, another agency, insisted that Woodard be taken off that account.  (Camp Aff. ¶ 20.)

Kahme told Camp explicitly to "get this woman out of my shop."  (*Id.*)  John Viserto, the senior

executive who "headed up" Active International, also complained to TWCMS management

concerning Woodard's performance.  (Camp Aff. ¶ 19; Pl. Tr. 361.)  Viserto told Camp that

dealing with Woodard was a waste of his time and that it was not in TWCMS's interest for

Woodard to continue calling Viserto.  (Camp Aff. ¶ 19.)  Camp understood Viserto's comments

to mean that if TWCMS did not remove Woodard from the Active account, Active might

decrease the amount of advertising it placed on TWC.  (*Id.*)

> 4.      *Coworkers Complain to TWCMS Management About Woodard's Ineptitude*

Woodard's coworkers at TWCMS also complained to her supervisors about her

deficiencies as an Account Manager.  For example, Deirdre O'Grady, Head of P&I, reported to

Gall on April 5 that:

> From a planning perspective and overall understanding of media
> Claudia is struggling.  It does not seem to be a learning curve issue
> at this point we have had the same questions and conversation
> there just doesn't seem to be any retention.  There are specific
> concepts that we have reviewed that she is not absorbing. . . .
>
> I am becoming increasingly concerned b/c having the same
> conversation over and over again is not the best use of our
> resources.

(Sack Decl., Ex. GG.)  Rick Monihan, a Director in P&I who reported to O'Grady, expressed the

same view: he spent a lot of time coaching Woodard, but she nonetheless kept coming back to

him with the same questions.  (Monihan Tr. 27-28, 30, 79; Sawyer Tr. 231-32.)  Monihan

complained to Romeo that Woodard repeatedly asked him the same questions and "that

[Woodard] just didn't seem to get" it.[14]  (Romeo Tr. 78-79; Monihan Tr. 59.)  Monihan's

concerns about Woodard's performance led him to tell Sawyer that discharging Woodard "was

probably the right thing to do."  (Monihan Tr. 33-34.)  Jen Monson, another TWCMS Account

Manager, likewise complained to Romeo that Woodard was taking too much of her time asking

her questions.  (Romeo Tr. 79.)

F.     TWCMS Decides to Terminate Woodard's Employment

         As the months wore on, Woodard's supervisors grew increasingly concerned about her

performance.  This was no surprise to her: she had received a performance review in December

2004 that she described as "negative"; then on January 28, Romeo and Gall told her they were

considering "a range of options including other roles at a lower level" for her, and that Romeo

"[had] reservations in general about [Woodard's] skillsets and the mismatch for the skills

required for an Account Manager."  (Sack Decl., Ex. Z; Pl. Tr. 118.)  Gall also observed that

Woodard was not sufficiently developing her skill sets, nor was she learning the business at the

pace necessary for her to be successful.[15]  (Gall Tr. 286.)  In late March, Iaffaldano had a

conversation with Gall about Woodard's performance deficiencies in which Iaffaldano expressed

the opinion that she should either be discharged immediately, or demoted to a Sales Service

---

[14] Monihan was "not fond" of Woodard's work ethic.  (Monihan Tr. 27-28.)  He explained, "[m]y feeling was in my experience I spent a lot of time having to coach her on media math and when she finally had a deal that was closing, it was her first deal through Active Media, I happen to know the buyer so I made the call with her in the office and as we reached a point where the deal was getting ready to close I offered her to take over the conversation and she basically said to me no, you're doing fine, keep it up and I wound up closing the deal and that to me was – left me with a bad feeling.  It was not the kind of thing I would have expected."  (*Id.*)  Monihan was not a salesperson, and it was not his job to close deals.  (Monihan Tr. 78-79.)

[15] Woodard's gross revenue for the first quarter of 2005 was 53.3% of goal.  (Sack Decl., Ex. HH.)

Associate ("SSA") position without a pay decrease through an agreed upon date.[16]  (Affidavit of

Paul Iaffaldano, dated October 29, 2009 ("Iaffaldano Aff."), ¶ 5; Sack Decl., Ex. II.)

On April 18, Gall and Camp presented Woodard with a written warning "to express []

concerns regarding [Woodard's] general performance as an Account Manager."[17]  (Sack Decl.,

Ex. JJ; Pl. Tr. 416.)  Gall informed Woodard that Kahme and Viserto had complained about her

and had requested a new TWCMS salesperson because of their dissatisfaction with her customer

service, and he told Woodard that she was no longer to call on Active, Initiative and Icon Media.

(Sack Decl., Ex. JJ; Pl. Tr. 424.)  A follow-up performance discussion was scheduled for

May 12, and Woodard was explicitly warned that "[f]ailure to meet the above expectations and

sustain the improved level of performance will result in further disciplinary action, up to and

including termination."  (Sack Decl., Ex. JJ.)

Almost immediately after this meeting, Woodard sent out an inappropriate and inaccurate

email in which she instructed TWCMS employees to see Gall regarding questions concerning

Active or Initiative, but misstated that she would continue to work with Icon.  (Camp Aff. ¶ 23;

Sack Decl., Ex. KK.)  Gall advised Woodard that her email was both inappropriate and incorrect,

and she apologized.  (Sack Decl., Ex. KK.)  Also shortly after the April 18 meeting, Woodard

told Jim Quinn, a buyer with Active, that she had been informed by Gall that "[Quinn's]

superiors are looking for or wanted someone else."  (Pl. Tr. 432-33, 497.)  Quinn reported to Gall

that Woodard had put him in a very uncomfortable and embarrassing situation by telling him that

---

[16] After he had several conversations with Woodard concerning her accounts, Iaffaldano was left with the overall impression that she "took no for an answer" too often and did not have the perseverance needed to convince clients to advertise on TWC.  (Iaffaldano Aff. ¶ 3.)  Camp shared Iaffaldano's sentiments.  (*Id.* ¶ 6.)

[17] Gall drafted the memorandum with assistance from Sawyer and Camp.  (Gall Tr. 112; Sawyer Tr. 154-55.) Sawyer's role in drafting the warning "was to ensure that it delivered clear information to Woodard using input of leaders and their assessments . . ."  (Sawyer Tr. 157.)  At Gall's request, Regional Sales Manager Lisa Longo was also present at this meeting with Woodard.  (Longo Tr. 21.)

"John Viserto [Quinn's superior] wanted her off the shop, but it was great working with you."
(Sack Decl., Ex. LL; Gall Tr. 154; Longo Tr. 189; Pl. Tr. 361; Camp Aff. ¶ 24.)

Camp was very upset by Woodard's decision to call Active because: (i) she had been
instructed not to call that client anymore; and (ii) she was aware that her contacts at Active held
an unfavorable opinion of her performance. (Camp Aff. ¶ 24.) For Woodard to call an
advertising agency (only days after she was instructed not to do so) with knowledge of that
agency's dissatisfaction with her work showed incredibly poor judgment. (*Id.*) By contacting
Quinn after she had been taken off his account, Woodard once again put TWCMS in an awkward
and potentially unfavorable position vis-à-vis an agency, as she had when agencies had
complained about her previously. Furthermore, Camp observed that Woodard was a terrible
Account Manager, who had only a rudimentary grasp of Media Math, and had not developed any
significant client relationships. (Camp Aff. ¶ 14.) Camp further observed that Woodard made
comparatively few sales calls, and was lacking in strategic ideas as to why a company should
advertise on TWC. (*Id.* ¶ 15.) Most significantly, Camp observed that Woodard failed to gain
the trust and confidence of her clients. (*Id.* ¶ 18.)[18] Similarly, Gall spoke to Human Resources
and shared his opinion that Woodard could not perform the job of an Account Manager because
of "her inability to satisfy her customers and to understand the customer's business . . ." (Gall
Tr. 287.) Therefore, Gall, Iaffaldano and Camp, in consultation with Human Resources and the
Legal department, decided to terminate Woodard's employment, and she was discharged on
April 22.[19] (Camp Aff. ¶ 25; Iaffaldano Aff. ¶ 9; Gall Tr. 149; Sawyer Tr. 161-62, 169.)

---

[18] Camp was also frustrated by Woodard's failure to seek him out for advice on accounts, or to update him generally
as the status of her efforts. (Camp Aff. ¶ 16.) During Camp's three years as a manager at TWCMS, Woodard was
the only individual reporting to him who did not regularly seek him out for advice concerning accounts. (*Id.*)

[19] After the decision had been made to terminate Woodard's employment, she presented Camp with a rebuttal to her
April 18 written warning, which Camp forwarded to Human Resources. (Camp Aff. ¶ 26; Sack Decl., Ex. MM.)

## ARGUMENT

I.    **WOODARD'S CLAIMS OF DISCRIMINATORY AND RETALIATORY DISCHARGE MUST BE DISMISSED**

   A.    Woodard Cannot Establish a *Prima Facie* Case of Discrimination or Retaliation[20]

Woodard cannot prove that she was qualified for and satisfactorily performing her job *at the time of her discharge*: (i) TWCMS was compelled to remove Woodard from the Pella deal in late January because of client complaints; (ii) senior executives at Active and Initiative subsequently complained to Gall and to Camp about Woodard, and demanded that Woodard be removed entirely from their accounts; (iii) Woodard's coworkers complained to her supervisors about her lack of progress; and (iv) her supervisors had their own grave concerns about her performance.  (*See supra* 5-10.)  Thus, she cannot establish a *prima facie* case of discrimination based on her race, national origin, color or gender.  *See Williams v. Alliance Nat'l Inc.*, 24 Fed. Appx. 50, 52 (2d Cir. 2001) (affirming summary judgment for employer where plaintiff failed to make out a *prima facie* case because her performance deficiencies rendered her unqualified for her position at the time of her termination); *McLee v. Chrysler Corp.*, 109 F.3d 130, 134-35 (2d Cir. 1997); *Dawkins v. Witco Corp.*, 103 F. Supp. 2d 688, 696-97 (S.D.N.Y. 2000).[21]

Nor can Woodard establish a *prima facie* case of retaliation, because she cannot show a causal connection between her protected activity and her discharge.  *See*, *e.g.*, *Chamberlin v. Principi*, 247 Fed. Appx. 251, 253 (2d Cir. 2007).  Woodard lodged two complaints of discrimination during her employment at TWCMS: (i) her August 2004 complaint concerning

---

Woodard's rebuttal did not precipitate her termination, nor did it change Camp's opinion that she should be discharged.  (Camp Aff. ¶ 26.)

[20] Woodard's Section 1981 claims are subject to the same analysis as her claims under Title VII.  *Davis v. Avaya, Inc.*, 295 Fed. Appx. 380, 381 (2d Cir. 2008).

[21] For the sake of brevity, Defendants will address the fourth prong of Woodard's *prima facie* case in Section I.C below, regarding Woodard's inability to show pretext.

Celt; and (ii) her January 2005 complaint concerning Romeo. (*See supra* 3-4, 6-7.) There is absolutely no evidence that either of these complaints was related to Woodard's discharge months later. And there is certainly no evidence to suggest that her termination was precipitated by anything other than the spate of client complaints about her (resulting in her removal from major accounts), management dissatisfaction with her development as an Account Manager, and the bad judgment she exhibited with respect to certain internal and external communications concerning account assignments. (*See supra* 5-10.)

      B.    Defendants Have Articulated a Legitimate,
              Nondiscriminatory Reason for Woodard's Discharge

TWCMS discharged Woodard because a number of her clients, coworkers and supervisors observed her severe performance deficiencies as an Account Manager, and because she displayed poor judgment in communicating with coworkers and clients about account assignments. (*See supra* 5-10.) It is axiomatic that poor performance is a legitimate, non-discriminatory reason for discharge. *Davis*, 295 Fed. Appx. at 381-82 (affirming summary judgment for employer and holding that poor performance in interactions with clients constituted a legitimate, nondiscriminatory reason for plaintiff's termination); *Watt v. New York Botanical Garden*, 98 Civ. 1095 (BSJ), 2000 WL 193626, at *5 (S.D.N.Y. Feb. 16, 2000) (granting summary judgment for employer and holding that poor performance was a legitimate, nondiscriminatory reason for discharge). Thus, Defendants have met their burden in this regard.

      C.    Woodard Cannot Show that Defendants' Proffered Reasons
              for Her Discharge are Pretext for Discrimination or Retaliation

Since Defendants have articulated a legitimate, nondiscriminatory reason for Woodard's dismissal, her wrongful discharge claims cannot survive summary judgment unless she proves, by a preponderance of the evidence, *both* that Defendants' stated reasons are false *and* that she was, in fact, terminated because of her race, gender, national origin or color. *Reeves v.*

*Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000); *Monte v. Ernst & Young LLP*, 148 Fed. Appx. 43, 45 (2d Cir. 2005) (affirming summary judgment where plaintiff did not establish that his age or national origin was a "determinative factor" in the discharge decision).  Woodard cannot meet this burden.[22]

First, Woodard cannot establish pretext because she cannot show that "she was treated differently than a fellow employee outside her protected class 'similarly situated in all material respects' including conduct and performance."  *Sampson*, 2009 WL 3364218, at *4 (holding that plaintiff failed to satisfy her *prima facie* burden of showing an inference of discrimination because the alleged similarly situated employee did not engage in the same behavior that led to plaintiff's termination) (citing *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir. 1997)).  "[T]he similarly situated employee 'must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it."  *Id.* (quoting *Mazzella v. RCA Global Commc'ns., Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986)).  Here, Woodard cannot identify any white male Account Manager who was the subject of multiple client complaints to TWCMS management, and who was removed from any account at a client's request, and who then inappropriately raised the issue of his reassignment directly with the client, and who was not discharged.  Indeed, during Camp's almost thirty years in advertising, he had never before (or since) had a client demand the removal of an Account Manager from their account.  (Camp Aff. ¶ 21.)  Yet, in Woodard's case, Camp received that directive from two different clients in a very brief period of time.  (*Id.*)

---

[22] Woodard's discriminatory discharge and retaliation claims under the NYCHRL fail under the standard recently articulated in *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27 (1st Dep't 2009).  Woodard cannot demonstrate "by a preponderance of the evidence that she has been treated less well than other employees" due to discrimination.  *Id.* at 33-34; *See Sampson v. City of New York*, 07 Civ. 2836 (BSJ), 2009 WL 3364218, at *7-8 (S.D.N.Y. Oct. 19, 2009); *McManamon v. City of New York Dep't of Corrs.*, 07 Civ. 10575 (BSJ), 2009 WL 2972633, at *9 (S.D.N.Y. Sep. 16, 2009).  *See also Anderson v. Solomon Page Group, LLC*, 886 N.Y.S.2d 70 (1st Dept. 2009) (affirming summary judgment because plaintiff was not treated "unequally" or "less well" than other employees).

Similarly, Gall never received complaints from Siewers concerning any Account Manager other than Woodard.  (Gall Tr. 96-97.)  Because she cannot show that similarly situated males were treated better than she was, Woodard's termination claims must be dismissed.[23]

Second, where, as here, the same person who hires an individual later implements an adverse employment decision within a reasonably short period of time, a strong inference of non-discrimination arises.  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997), *cert. denied*, 525 U.S. 936 (1998).  Indeed, "the same actor inference remains significant if the interim period is fewer than two years."  *See Council v. Tri-Star Constr. Co.*, 01 Civ. 11788 (BSJ), 2004 WL 253298, at *3 (S.D.N.Y. Feb. 10, 2004); *Watt*, 2000 WL 193626, at *7.  Camp interviewed Woodard and hired her as a CDM, and he participated in the decision to terminate her employment less than eleven months later.  (*See supra* 1-2, 8-10.)  These facts heighten the implausibility of Woodard's claim that she was terminated for discriminatory reasons.[24]

Third, the fact that TWCMS terminated Woodard's employment roughly three months after she complained about Romeo (and more than eight months after she complained about Celt) does not establish pretext with respect to her retaliation claim.  *See Simpson v. New York State*

---

[23] Woodard's discrimination claims are further undermined by Gall's favorable treatment of African Americans and women.  *See, e.g., Regis v. Metro. Jewish Geriatric Ctr.*, 97 Civ. 906, 2000 WL 264336 (S.D.N.Y. Jan. 11, 2000) (granting summary judgment because, *inter alia*, "the undisputed record evidence shows that the other members of [plaintiff's] protected class . . . were treated well by [plaintiff's supervisor]").  For example, black employees Sly Phifer and Lakieban Brown were both promoted to Account Manager by Gall, and both received ample coaching and counseling from Gall.  (Monihan Tr. 106-07, 202; Monson Tr. 48, 115; Camp Aff. ¶¶ 29-30; Affidavit of Matt Derella, dated November 3, 2009 ("Derella Aff."), ¶¶ 7-8; Meadow Aff. ¶¶ 12-13; Iaffaldano Aff. ¶ 12; Sack Decl., Ex. PP.)  Also, Gall hired two women (Mary Jo Romeo and Jeanne Sachs) in supervisory positions; he hired another woman, Janet Schatz-Poillon, as an Account Manager, and he later promoted her to Director of Sales; he hired Diana Scully; and he promoted Monson to Account Manager.  (Gall Tr. 14, 28; Monson Tr. 34-35; Affidavit of Janet Poillon, dated October 30, 2009 ("Poillon Aff."), ¶ 2; Camp Aff. ¶¶ 29-32; Derella Aff. ¶¶ 9-11; Meadow Aff. ¶¶ 14-16; Iaffaldano Aff. ¶ 12; Sack Decl., Exs. QQ-SS.)

[24] Woodard may claim that she was "hired to be fired" to satisfy a diversity initiative.  However, Camp was not required to hire an African American, nor did he ever receive (or to his knowledge, was he eligible for) any bonus tied to hiring diversity candidates.  (Camp Aff. ¶¶ 6-7.)  Camp interviewed Woodard and decided to hire her as a CDM not because she was black, but because he thought her skill set would be a great match for the CDM position.  (*Id.*)

*Dep't of Civil Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. 2006) (affirming dismissal of retaliation claim because "temporal proximity is insufficient to satisfy the appellant's burden to bring forward some evidence of pretext").[25]  Here, the evidence is overwhelming that Woodard's unsatisfactory performance precipitated her discharge, and the mere fact that the decision to terminate her employment was made months after she complained about Romeo and Celt does not save her retaliatory discharge claim from dismissal.

Finally, Woodard cannot establish pretext by arguing that Defendants' employment decisions were incorrect.  *See Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996), *aff'd*, 162 F.3d 1148 (2d Cir. 1998), *cert. denied*, 526 U.S. 1065 (1999) (plaintiff's "own disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the [employer's] proffered justification was a pretext for discrimination"); *Ricks v. Conde Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), *aff'd*, 6 Fed. Appx. 74 (2d Cir. 2001).  In evaluating whether any evidence of pretext exists, "it is not the function of the fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance."  *Soderberg v. Gunther Int'l, Inc.*, 124 Fed. Appx. 30, 32 (2d Cir. 2005) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).

## II.   WOODARD'S PAY DISPARITY CLAIMS MUST BE DISMISSED

### A.   Woodard Cannot Establish a *Prima Facie* Case of Pay Discrimination

Woodard cannot establish a *prima facie* case of pay discrimination because she was not "similarly situated" to any comparators outside her protected class who were treated better than she was with respect to compensation, or that Defendants acted with discriminatory intent in

---

[25] *See also Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (dismissing retaliation claim where termination occurred 2½ months after alleged protected activity); *Richter v. Monroe County Dep't of Soc. Serv.*, 01 Civ. 6409, 2005 WL 351052 (W.D.N.Y. Feb. 11, 2005) (19-day period between complaint and discharge for poor performance insufficient to establish pretext in Title VII retaliation case).

determining her pay.[26]  *Quarless v. Bronx-Lebanon Hosp.*, 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002), *aff'd*, 75 Fed. Appx. 846 (2d Cir. 2003).  "[T]o be 'similarly situated,' employees must be substantially similar as to specific work duties, education, seniority, and performance history, all of which affect an employee's rate of pay."  *Simpson v. Metro-North Commuter R.R.*, 04 Civ. 2565, 2006 WL 2056366, at *7 (S.D.N.Y. July 21, 2006).[27]  "Employees are not 'similarly situated' merely because their [job duties] might be analogized."  *Id.*

Here, there are no comparators who were paid more than Woodard.  As a new Account Manager with *no* prior experience negotiating television advertising sales, Woodard was not similarly situated to employees who had been Account Managers at TWCMS for several years, and who had significant experience negotiating television ad sales.  (Pl. Tr. 55, 62, 70-71.)  The only remotely appropriate comparator to Woodard is Meadow, who was hired as a CDM at roughly the same time as Woodard, and who, like Woodard, was subsequently transferred to an Account Manager position in August 2004.[28]  (*See supra* 2; *infra* 17 n. 29.)  Woodard was treated *more* favorably than Meadow with respect to compensation: her compensation package as both a CDM and an Account Manager was more lucrative than his, even though his revenue

---

[26] Woodard's gender-based pay disparity claims under Title VII must be dismissed as untimely because she failed to file a gender discrimination claim within 300 days after her discharge.  (*See infra* 23-24.)

[27] S*ee also Trotman v. CBS Radio, Inc.*, 06 Civ. 3389, 2007 WL 2827803, at *9 (S.D.N.Y. Sep. 27, 2007) (to satisfy *prima facie* burden, plaintiff must set forth specific admissible proof that he was paid less than those outside the protected class who were similarly situated "in all material respects").

[28] Even assuming that Woodard established that any of her male colleagues other than Meadow were "similarly situated" to her in all material respects, she cannot point to any intentional discrimination against her stemming from compensation decisions that were made by Iaffaldano and Gall in consultation with Human Resources and Compensation.  (Chang Tr. 16-17; Iaffaldano Aff. ¶ 15.)  Evidence of discriminatory animus must consist of admissible facts beyond the mere circumstance of unequal pay for equal work.  *See DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298, 2004 WL 2181403, at *10 (S.D.N.Y. Sep. 23, 2004) (granting summary judgment because there was no evidence of intentional discrimination).

target was higher than hers (requiring him to bring in more revenue to earn his target compensation).[29]  (Sack Decl., Exs. M-N; Meadow Aff., Exs. A-B.)

      B.    **Woodard Cannot Show that TWCMS's Legitimate, Nondiscriminatory Reasons for its Decisions Regarding Her Compensation Were Pretext for Discrimination**

Even assuming Woodard is able to make out a *prima facie* case of discriminatory pay disparity, she cannot rebut Defendants' legitimate, nondiscriminatory reasons for the decisions regarding her compensation (*i.e.*, that her compensation and that of her fellow Account Managers was determined collaboratively by their managers, Human Resources and Compensation, taking into account market practice, the recruiting process, and the applicable pay range).  (Iaffaldano Aff. ¶ 15; Chang Tr. 16-17.)  Woodard rests on her conclusory opinion that Defendants' pay decisions were motivated by discriminatory animus; she fails to offer any evidence of animus through "concrete particulars," which she must do to establish pretext.  *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001); *Simpson*, 2006 WL 2056366, at *8; *DeJesus*, 2004 WL 2181403, at *10.

## III.    WOODARD'S SEXUAL AND RACIAL HARASSMENT CLAIMS MUST BE DISMISSED

In order to survive summary judgment on her harassment claims, Woodard must prove: (i) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment; and (ii) a specific basis for imputing the allegedly harassing conduct to Defendants.[30]  *Carter v. New Venture Gear, Inc.*,

---

[29] Woodard's initial compensation package was $148,050.  (Sack Decl., Ex. N.)  TWCMS also paid Woodard a sign-on bonus of $5,000, grossed up.  (*Id.*, Ex. J.)  Meadow started as a CDM on March 8, 2004, with a total compensation package of $121,800.  (Meadow Aff. ¶ 2, Ex. A.)  Meadow was not paid a sign-on bonus.  (*Id.* ¶ 3, Ex. A.)  As of January 2005, Woodard's total target compensation was $148,050, while Meadow's was $125,454.12.  (Sack Decl., Ex. M; Meadow Aff., Ex. B.)

[30] Woodard's harassment claims must also be dismissed under the NYCHRL's standard for actionable harassment because the alleged conduct at issue amounts to no more than petty slights and trivial inconveniences.  *See Wilson v.*

310 Fed. Appx. 454, 457 (2d Cir. 2009).  Woodard can prove neither.  First, her harassment

allegations fall far short of the applicable legal standards set forth in Title VII, Section 1981, the

New York State Human Rights Law, and the New York City Human Rights Law.  (*See infra* 18-

20.)  Second, even if her harassment claims did meet the applicable legal standards, she cannot

impute liability to Defendants with respect to the alleged harassment because: (i) she failed to

take advantage of the complaint procedure outlined in Defendants' harassment policy; and (ii)

when she did lodge internal complaints regarding Celt and Romeo, TWCMS investigated those

complaints and took prompt and effective remedial action.[31]  (*See infra* 21-22.)

> A.    Woodard's Harassment Claims are not Legally Actionable

"To state a hostile work environment claim, a plaintiff must show that the workplace is

'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'"  *Sampson*, 2009 WL 3364218, at *6 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17,

21 (1993)).  In this action, Woodard complains about certain supposed sexually harassing

conduct by Gall, despite that she never raised those issues during her employment.  (Pl. Tr. 453,

458-59.)  Woodard alleges, for example, that Gall "exposed his crotch" to her and other female

employees.  (Compl. ¶ 110.)  In reality, though, Gall never exposed his crotch to Woodard or

anyone else at work.  (Pl. Tr. 450-51; Monson Tr. 69-70.)  Instead, Woodard testified that Gall

twice split his pants, and that she was not offended by these two minor incidents; indeed, she and

others "giggled" when it happened.  (Pl. Tr. 450-52.)  Woodard has also made vague, generalized

---

*N.Y.P. Holdings, Inc.*, 05 Civ. 10355, 2009 WL 873206, at *29 (S.D.N.Y. Mar. 31, 2009) (dismissing race and gender harassment claims under NYCHRL).

[31] For example, in *Early v. Wyeth Pharms, Inc.*, 603 F. Supp. 2d 556 (S.D.N.Y. 2009), the court dismissed the plaintiff's harassment claims on summary judgment on the grounds that the employer took prompt and effective remedial action following the plaintiff's only complaint of harassment, and the plaintiff failed to take advantage of the employer's internal complaint procedures with respect to her other harassment allegations.  *Id.* at 581-82.

allegations that Gall swung a toy baseball bat during meetings.[32]  (*Id.*)  Finally, for the first time

at her deposition, Woodard alleged that on a single occasion "very early" in her employment, as

she was leaving Gall's office following a business meeting, he "got up real close to me and

violated my personal space."  (Pl. Tr. 454-55, 460.)  Although Gall neither touched Woodard nor

said anything provocative (and, in fact, he said nothing at all), Woodard believes that Gall "was

trying his luck" based "on his posture, his attitude, his demeanor, and the way he looked at me

and the way he approached me."  (Pl. Tr. 454, 460-61.)  Collectively, Woodard's allegations are

not sufficiently severe or pervasive to establish a sexually hostile work environment.[33]  Her

claims of sexual harassment must therefore be dismissed.

Similarly, the alleged racially harassing comments that Woodard attributes to Celt,

Romeo and Gall do not come close to satisfying the severe or pervasive standard under Title VII

or the NYSHRL.  In addition to the alleged comments made by Celt and Romeo (which resulted

in prompt and effective remedial action by TWCMS after Woodard complained), Woodard

claims that, during the investigation of Celt's comments in August 2004, Gall commented that:

(i) Jamaicans do not have a strong work ethic; (ii) Jamaicans think they are better than other

blacks, but they are not better; and (iii) black men want to have multiple children with multiple

women to prove their masculinity.  (Pl. Tr. 503-505.)  Further, Woodard alleges that, during this

---

[32] Gall's toy bat was 12-15 inches long, and was a memento Ted Turner (Gall's former employer) had given to him. (Gall Tr. 136; Meadow Aff. ¶ 17; Derella Aff. ¶ 14; Poillon Aff. ¶ 9; Camp Aff. ¶ 34; Iaffaldano Aff. ¶ 14.)

[33] *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (dismissing plaintiff's sexual harassment claims on grounds that the conduct alleged was neither severe nor pervasive, where plaintiff claimed that her supervisor told her that she had been voted the "sleekest ass" in the office and deliberately touched her breasts); *Hamilton v. Bally of Switzerland*, 03 Civ. 5685, 2005 WL 1162450, at *8-10 (S.D.N.Y. May 17, 2005) (dismissing plaintiff's sexual harassment claims on grounds that the conduct alleged was neither severe nor pervasive, where plaintiff claimed that her supervisor told her she was gay, left her undergarments in plaintiff's store, and touched plaintiff's breast over plaintiff's objection while feeling the material of plaintiff's bodysuit and stating that the bodysuit was "very sexy").

same time period, Gall asked her whether she was married and how many children she had. (Pl. Tr. 504-09.)

It is well-settled that "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be steady barrage of opprobrious racial comments." *Kemp v. A&J Produce Corp.*, 164 Fed. Appx. 12, 14 (2d Cir. 2005) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). *See also Fraser v. Fiduciary Trust Co. Int'l*, 04 Civ. 6958, 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009) (dismissing plaintiff's racial harassment claims on the grounds that the conduct was not severe or pervasive, where plaintiff's direct supervisor referred to him as a "fucking asshole, nigger son of a bitch," and other employees suggested to plaintiff that African Americans are lazy and on welfare);[34] *Stembridge v. City of New York*, 88 F. Supp. 2d 276 (S.D.N.Y. 2000) (dismissing plaintiff's racial harassment claims on the grounds that the conduct was not severe or pervasive, where plaintiff's manager called him an "uppity nigger," other supervisors called him "boy," referred to black youths as "animals," called Mayor David Dinkins a "washroom attendant," and hung a black doll from a door in the office); *Bolden v. New York City Hous. Auth.*, 96 Civ. 2835, 1997 WL 666236 (S.D.N.Y. Oct. 27, 1997) (dismissing plaintiff's racial harassment claims on the grounds that the conduct was not severe or pervasive, where plaintiff's supervisor made derogatory remarks about "niggers" five times in six weeks). The racial comments Woodard alleges here are, by any measure, far less offensive than the repeated and overtly racist epithets alleged in *Fraser*, *Stembridge*, or *Bolden*. Her claims of racial harassment must therefore be dismissed.

---

[34] *See* Sack Decl., Ex. TT.

B.     Woodard Cannot Impute Liability to Defendants on Her Harassment Claims

Defendants cannot be liable for Celt's or Romeo's alleged comments because they took prompt and effective remedial action following Woodard's.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998);[35] *see also McNally v. Posterloid Corp.*, 148 Fed. Appx. 23, 25 (2d Cir. 2005) (affirming grant of summary judgment on the grounds that employer's actions immediately following the alleged harassment by a coworker constituted appropriate remedial action); *Tunis v. Corning Glass Works*, 747 F. Supp. 951, 959 (S.D.N.Y. 1990), *aff'd without op.*, 930 F.2d 210 (2d Cir. 1991) (dismissing hostile work environment claim because plaintiff did not complain about alleged harassers following employer's prompt remedial action).  Celt was given a verbal warning shortly after Woodard complained; he apologized to Woodard; and Woodard advised Gall that she was satisfied with the action taken by the Company in response to her complaint and did not want further action taken against Celt.  (*See supra* 3-4.)  The Company's response to Woodard's complaint was obviously effective, as evidenced by the fact that Woodard is aware of no other inappropriate remarks by Celt after he was warned and she made no subsequent complaint about him.  (*See supra* 3-4.)  Similarly, the Company promptly investigated Woodard's complaints against Romeo, and Romeo's employment was terminated shortly thereafter.  (*See supra* 6-7.) Therefore, liability cannot be imputed to Defendants for Celt's and/or Romeo's allegedly harassing conduct.

---

[35] In *Zakrzewska v. The New Sch.*, 574 F.3d 24, 27-28 (2d Cir. 2009), the Second Circuit certified to the New York Court of Appeals the question whether the *Faragher/Ellerth* defense is applicable to sexual harassment and retaliation claims under the NYCHRL.  Thus, as of now, there is no controlling precedent abrogating prior cases that dismissed NYCHRL harassment claims under a *Faragher/Ellerth* analysis.  *See*, *e.g.*, *Ferraro v. Kellwood Co.*, 440 F.3d 96 (2d Cir. 2006) (applying *Faragher/Ellerth* analysis in affirming grant of summary judgment for employer on Title VII, NYSHRL and NYCHRL claims of harassment).

Furthermore, even if Gall's alleged inappropriate comments concerning race and/or Gall's alleged sexual harassment (*see supra* 18-20) were sufficiently severe or pervasive to constitute harassment, Defendants cannot be held liable for that conduct because Woodard never complained to them about any of those matters.  (Pl. Tr. 453, 458-59.)  Defendants had in place a comprehensive policy which prohibited harassment and detailed a procedure for employees to use to complain of harassment.  (Sack Decl., Ex. UU.)  That policy expressly permitted the employee to complain directly to the Head of Human Resources if she believed that her supervisor or Human Resources representative was the source of the harassment.  (*Id.*)  It is undisputed that by July 21, 2004, Woodard had received, read and understood Defendants' harassment policy, and that she had "received two (2) hours of training on eliminating sexual harassment in the workplace and [her] responsibilities for enforcing Company policy."  (*Id.*, Ex. VV.)  Indeed, Woodard utilized the complaint procedure outlined in the harassment policy when she complained to Gall about Celt, and when she complained to Sawyer and Gall about Romeo.  Thus, Defendants cannot be held liable for Gall's alleged sexual and racial harassment because Woodard never brought that alleged conduct to the attention of anyone in management or Human Resources.[36]  (Pl. Tr. 75-76, 216, 453, 458-59.)  *See Early*, 603 F. Supp. 2d at 581-82 (dismissing racial harassment claims for failure to complain internally); *Greene v. Trs. of Columbia Univ.*, 234 F. Supp. 2d 368, 380 (S.D.N.Y. 2002) (same).[37]  Therefore, Woodard's harassment claims must be dismissed in their entirety.[38]

---

[36] Nor does Woodard have any emails or even notes to herself to corroborate that Gall made any inappropriate race-based comments or that he sexually harassed her, despite that she memorialized both Celt's and Romeo's alleged inappropriate racial comments in that manner.  (Pl. Tr. 273, 459.)  Thus, there is no contemporaneous evidence that Gall made the racial remarks Woodard has very belatedly ascribed to him.

[37] The Eastern District recently dismissed a race harassment claim because the plaintiff had failed to complain internally, notwithstanding that the plaintiff's supervisor made the following comments to her: (i) "you fucking old lady, I'm going to do the impossible for you to get the hell out of here"; (ii) calling her a "stupid Puerto Rican, "a fucking spick," "a fucking Puerto Rican spick," "a stupid old woman, a [waste] of time and too old to perform [her]

**IV.    WOODARD'S TITLE VII GENDER DISCRIMINATION AND SEXUAL
        HARASSMENT CLAIMS MUST  BE DISMISSED AS UNTIMELY**

Woodard's gender discrimination claims under Title VII must be dismissed on the alternative grounds that she failed to assert those claims within the applicable 300-day statute of limitations.  42 U.S.C. § 2000e-5(e).  On June 3, 2005, Woodard's counsel filed an EEOC Charge on her behalf, alleging race, national origin, and color discrimination, and retaliation. (Sack Decl., Ex. NN.)  The Charge did not reference gender discrimination.  (*Id.*)  On or about March 1, 2006 (more than 300 days after her discharge on April 22, 2005), Woodard amended her Charge to raise a new legal theory: gender discrimination.  (*Id.*, Ex. OO.)  Woodard's untimely gender discrimination claims must be dismissed because "generally, amendments that raise a new legal theory do not relate back to an original charge of discrimination."  *Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 878-81 (5th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004) (affirming summary judgment for defendant on the grounds that plaintiff's untimely amended charge alleging disability discrimination did not relate back to his original charge of race and gender discrimination, and retaliation).[39]

Woodard's sexual harassment claims must be dismissed on the alternative grounds that neither her original nor her amended EEOC Charge contained any reference whatsoever to sexual harassment.  (Sack Decl., Exs. NN-OO.)  Her original and amended EEOC Charge focused on discrimination based on race, national origin, color and gender, retaliation, and race-

---

job duties"; and (iii) telling her "[I] would not hire any other Puerto Rican because they're all stupid."  *Vazquez v. Southside United Hous.*, 06 Civ. 5997, 2009 WL 2596490, at *14-18 (E.D.N.Y. Aug. 21, 2009).

[38] Woodard's harassment claims under the NYSHRL must be dismissed because she cannot establish that Defendants encouraged, condoned or approved any allegedly harassing conduct.  *See* N.Y. Exec. L. § 296.

[39] *See also Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 575 (7th Cir. 1998) ("an untimely amendment that alleges an entirely new theory of recovery does not relate back to a timely filed original charge"); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996); *McIntosh v. Bank of Am.*, 08 Civ. 5035, 2009 WL 2901597 (W.D.N.Y. Sep. 4, 2009) (dismissing age, sex, and disability discrimination claims because they were included in an untimely filed amended EEOC Charge that did not relate to plaintiff's original claims of national origin discrimination and retaliation).

based harassment.  Because Woodard may only pursue in federal court those claims that either

were included in or are "reasonably related to" the allegations contained in her EEOC Charge,

her sexual harassment claims must be dismissed.[40]  *Lloyd v. The New York Botanical Garden,*

03 Civ. 7557 (BSJ), 2006 U.S. Dist. LEXIS 49066, at *18-19 (S.D.N.Y. July 6, 2006)

(dismissing sexual harassment claim because it was not included in EEOC Charge); *Torriero v.*

*Olin Corp.*, 684 F. Supp. 1165, 1170 (S.D.N.Y. 1988) (same).

## V.   THE EEOC'S FLAWED DETERMINATION DOES NOT ENTITLE WOODARD TO A TRIAL

Although Woodard may tout the fact that the EEOC issued a reasonable cause

determination, that determination is far from binding on this Court and should not influence its

analysis or decision.  Indeed, in *Council*, this Court granted summary judgment in favor of a

defendant after the EEOC found reasonable cause.  *See Council*, 2004 WL 253298.  Here, the

EEOC's determination is not worthy of credence by the Court because its "investigation" was

completely one-sided.  More than three years elapsed between Woodard's filing of her original

EEOC Charge on June 3, 2005 and the EEOC's issuance of its determination on Woodard's

Amended Charge on August 13, 2008.  (Affidavit of Becky Powhatan ("Powhatan Aff."), dated

October 29, 2009, ¶ 3.)  During that time, the EEOC investigator and an EEOC lawyer met with

Woodard and Woodard's attorney; Woodard also submitted rebuttal statements in response to

TWCMS's position statements.[41]  Yet, at no time during this very lengthy investigation period

---

[40] Furthermore, Woodard's sexual harassment claims under city and state law must be dismissed as untimely because they were asserted more than three years after her employment at TWCMS ended on April 22, 2005.  N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code 8-502(d).

[41] During discovery, Defendants learned for the first time that the EEOC investigator and an EEOC trial attorney had met with Woodard and her lawyer sometime after she filed her EEOC Charge against TWCMS, but before the EEOC issued its determination on that Charge.  (Powhatan Aff. ¶ 5.)  Had TWCMS been informed that Woodard and her counsel had been given the opportunity to meet with the EEOC investigator and with counsel for the EEOC in the course of the EEOC investigation, TWCMS would have requested the same opportunity to meet with the EEOC.  (*Id.*)

did the EEOC contact TWCMS to request additional information, nor was TWCMS ever invited

to meet with any EEOC representatives regarding Ms. Woodard's EEOC Charge.  (Powhatan

Aff. ¶ 4.)  Thus, TWCMS was deprived of any opportunity to counter the arguments presented in

Woodard's written rebuttals or in her meeting with EEOC's investigator and legal counsel.

Moreover, the EEOC found in Woodard's favor only after her attorney complained in writing to

the EEOC that the EEOC investigator had repeatedly failed to return his calls.  (Sack Decl.,

Ex. WW.)  Finally, following its incomplete and lopsided investigation, the EEOC issued a

determination that was devoid of legal analysis.  The Court should disregard the determination

for that reason as well.  *See*, *e.g.*, *Wanamaker v. Columbian Rope Co.*, 907 F. Supp. 522, 538 n.

24 (N.D.N.Y. 1995) (granting summary judgment to defendant in employment discrimination

claim after the EEOC found reasonable cause because, *inter alia*, the EEOC determination

contained no legal analysis).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court issue an Order

granting their Motion for Summary Judgment, dismissing Plaintiff Claudia Woodard's claims in

their entirety, and awarding their costs, including attorneys' fees and such other further relief as

the Court may deem just and proper.

Dated: New York, New York
      November 3, 2009

                              VEDDER PRICE P.C.


                              By:____/s/ Laura Sack_____
                                    Laura Sack (LS 5501)
                                    Roy P. Salins (RS 0793)
                              1633 Broadway, 47th Floor
                              New York, New York 10019
                              (212) 407-7700
                              Attorneys for Defendants