UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

CLAUDIA WOODARD and ELISE LAWLESS,

        Plaintiffs,

        -against-

TWC MEDIA SOLUTIONS, INC. and THE
WEATHER CHANNEL,

        Defendants.

---------------------------------------------------------------

Case No. 09 Civ. 3000 (BSJ) (AJP)

## LOCAL RULE 56.1 STATEMENT[1]

    Pursuant to Local Civil Rule 56.1, Defendants TWC Media Solutions, Inc. ("TWCMS") and The Weather Channel ("TWC") set forth below material facts as to which there is no genuine issue to be tried:

A.     <u>TWCMS Hires Woodard as Client Development Manager</u>

    1.     In 2003, Meade Camp, Senior Vice President Client Solutions, was assigned the responsibility of creating a brand-new sales team at TWCMS called the Client Solutions Team ("CST"). (Affidavit of Meade Camp, dated October 24, 2009 ("Camp Aff."), ¶ 3.)

    2.     The CST was responsible for working directly with clients to convince them that TWC should be part of their advertising strategy. (Camp Aff. ¶ 3.)

---

[1] Relevant transcript pages from the depositions of Claudia Woodard ("Pl. Tr."), Lisa Chang, Mark Gall, Elise Lawless, Lisa Longo, Rick Monihan, Jen Monson, Mary Jo Romeo, and Pam Sawyer are attached as Exhibits A through I to the Declaration of Laura Sack, dated November 3, 2009 ("Sack Decl.").

3.      The role of the CST was different than the general sales team insofar as Client Development Managers ("CDMs") were not responsible for negotiating advertising deals or communicating with agencies to sell advertising.  (Camp Aff. ¶ 3.)

4.      Camp was not required to hire an African American to fill one of the CDM positions on the CST he was creating.  (Camp Aff. ¶ 7.)

5.      At no time during Camp's employment with TWCMS and/or TWC did he ever receive (or to his knowledge, was he eligible for) any bonus tied to hiring diversity candidates. (Camp Aff. ¶ 6.)

6.      Camp interviewed Woodard.  (Pl. Tr. 30.)

7.      Camp decided to hire Woodard as a CDM not because she was black, but because he thought her skill set would be a great match for the CDM position.  (Camp Aff. ¶ 7.)

8.      Woodard was hired by TWCMS as a CDM in or about May 2004, reporting to Camp.  (Sack Decl., Ex. J.)

9.      Craig Meadow and Bruce Budkofsky were the other two CDMs reporting to Camp.  (Pl. Tr. 47.)

10.     Woodard thought Camp was a "great supervisor" when she reported to him as a CDM.  (Pl. Tr. 362-63.)

11.     Woodard's job as a CDM was to convince clients to include TWC in their advertising strategy.  (Camp Aff. ¶¶ 3, 9; Pl. Tr. 35-36.)

12.     While Woodard was not responsible as a CDM for negotiating advertising deals or communicating with agencies to sell advertising, she was nonetheless required to understand the basics of the business.  (Camp Aff. ¶ 3; Pl. Tr. 37, 49.)

13.     When Woodard started at TWCMS, Camp told her to speak to TWCMS's Pricing & Inventory Department ("P&I") concerning Media Math.  (Pl. Tr. 54-55.)

14.     Media Math is "a simple day-to-day commonly used major part of our business . . .," which concerns how advertising deals are negotiated on television.  (Lawless Tr. 297.)

15.      Aside from having one brief conversation with Sales Associate Will Tague, Woodard did nothing to gain a general overview of Media Math during her tenure as a CDM.  (Pl. Tr. 54-55.)

16.     Camp did not consider Woodard to be a good performer as a CDM.  (Camp Aff. ¶ 9.)

17.     In nearly two months in the CDM role, Woodard failed to contact all of the clients on her list, and she met with only three clients.  (Camp Aff. ¶ 9; Pl. Tr. 67-69; Sack Decl., Ex. K-L.)

18.     When Camp asked Woodard for updates concerning her contact with clients on her list, Woodard usually responded, "they won't call me back."  (Camp Aff. ¶ 9.)

19.     Woodard's excuse was unacceptable to Camp, who believes that a good salesperson must be persistent with his or her clients, and must continue trying to contact those clients even if the client does not return telephone calls.  (Camp Aff. ¶ 9.)

20.     Camp observed that Woodard did not exhibit the perseverance needed to convince clients to advertise on TWC.  (Camp Aff. ¶ 9.)

21.     Unlike the other two CDMs (Budkofsky and Meadow), Woodard rarely asked Camp questions about her accounts or sales strategy.  (Camp Aff. ¶ 11.)

B.      Woodard Receives a More Generous Compensation Package than Craig Meadow

22.     Woodard's total compensation package as a CDM was $148,050.  (Sack Decl., Ex. N.)

23.     TWCMS also paid Woodard a sign-on bonus of $5,000, grossed up.  (Sack Decl., Ex. J.)

24.     Meadow started as a CDM on March 8, 2004, with a total compensation package of $121,800.  (Affidavit of Craig Meadow, dated November 2, 2009 ("Meadow Aff."), ¶ 2, Ex., A.)

25.     Meadow was not paid a sign-on bonus.  (Meadow Aff. ¶3, Ex. A.)

26.     Woodard's target compensation package for 2005 remained the same as it had been for 2004 ($148,050).  (Sack Decl., Ex. M.)

27.     Woodard's total gross revenue goal was $3,050,000.  (Sack Decl., Ex. M.)

28.     As an Account Manager in January 2005, Woodard was eligible to earn $176,987 if she performed at 10% above target.  (Sack Decl., Ex. M.)

29.     Woodard's base compensation decreased in 2005 (as did that of Meadow and Budkofsky), while her commission opportunity increased.  (Sack Decl., Exs. M-P; Meadow Aff., Exs. A-B.)

30.     As an Account Manager in January 2005, Meadow's total target compensation was $125,454.12.  (Meadow Aff. ¶ 8, Ex. B.)

31.     Meadow's total gross revenue goal was $3,350,000.  (Meadow Aff., Ex. B.)

32.      Compensation decisions for Account Managers were determined collaboratively by their managers, Human Resources and Compensation, taking into account market practice, the recruiting process, and the applicable pay range.  (Iaffaldano Aff. ¶ 15; Change Tr. 16-17.)

C.    Woodard is Transferred to an Account Manager Position

33.    In August 2004, the CDM role was eliminated and all three CDMs became Account Managers.  (Pl. Tr. 57.)

34.    When Woodard started at TWCMS, she had no prior experience selling cable advertising.  (Pl. Tr. 62.)

35.    When Woodard started at TWCMS, her only experience in television was "a very entry level position" during college.  (Pl. Tr. 70-71.)

36.    When Woodard started at TWCMS, she had no prior experience building sales plans.  (Pl. Tr. 55.)

37.    When Woodard started as an Account Manager, her client list was "somewhat junior."  (Romeo Tr. 59-60.)

38.    The "Good to Great" sales philosophy became the guiding principle for the TWCMS sales force in late 2004.  (Lawless Tr. 43.)

39.    "Good to Great" is "all about putting people in the right place on the bus, and it was repeated repeatedly throughout the day, all the time . . ."  (Lawless Tr. 44-45.)

40.    At her request, Woodard retained responsibility for two accounts, Hankook Tires and TIAA-CREF, after she became an Account Manager.  (Pl. Tr. 110; Sack Decl., Ex. L.)

41.    Woodard recognized that she was new to the cable industry as a whole, and she told Gall and Camp in August 2004 that she was "excited about the opportunity to develop relationships in any given category."  (Sack Decl., Ex. L.)

42.    Woodard believed she knew what she needed to know to perform her job as an Account Manager.  (Pl. Tr. 95.)

43.    In December 2004, Woodard attended a Media Math class.  (Pl. Tr. 101-02.)

44.     Woodard found the Media Math class helpful.  (Pl. Tr. 104.)

45.     Woodard attended sales training in January 2005, which she found helpful in certain areas.  (Pl. Tr. 127.)

46.     Woodard "had a great deal of conversations with Mark Gall about her deals because every deal [she] did had to be approved by him."  (Pl. Tr. 151.)

47.     Since approximately July 2004, Paul Iaffaldano has served as Executive Vice President, General Manager of TWCMS.  (Affidavit of Paul Iaffaldano, dated October 29, 2009 ("Iaffaldano Aff.") ¶ 2.)

48.     In his role as General Manager during the course of Woodard's employment with TWCMS, Iaffaldano spent roughly 40% of his time in the New York office.  (Iaffaldano Aff. ¶ 3.)

49.     When Iaffaldano visited the New York office, he made it a point to try to speak to each Account Manager and ask them about their accounts and what their goals were.  (Iaffaldano Aff. ¶ 3.)

50.     Iaffaldano wanted to know whether the Account Managers had a business plan and were working that plan enthusiastically.  (Iaffaldano Aff. ¶ 3.)

51.     After Iaffaldano had several conversations with Woodard concerning her accounts, he was left with the overall impression that Woodard "took no for an answer" too often and did not have the perseverance needed to convince clients to advertise on TWC.  (Iaffaldano Aff. ¶ 3.)

D.   Woodard Makes a Complaint About Celt, in Response to
      Which TWCMS Takes Prompt and Effective Remedial Action

52.   On August 18, 2004, Woodard informed Gall that Paul Celt, another TWCMS Account Manager, had made inappropriate comments to his Sales Assistant, Lavern Broderick, including a comment to the effect that Broderick was tilling Jamaican rum in her bathtub.  (Sack Decl., Ex. Q.)

53.   Gall thanked Woodard for coming forward, and he told her that he would discuss the matter with Human Resources.  (Sack Decl., Ex. Q.)

54.   On August 18, 2004, Gall spoke with Pam Sawyer (the HR representative who supported TWCMS at the time), Broderick and Celt regarding the incident Woodard had reported.  (Sack Decl., Ex. R)

55.   Gall warned Celt that "this incident is a serious breach of conduct and that offensive behavior will not be tolerated by TWC."  (Sack Decl., Ex. R; Gall Tr. 34; Sawyer Tr. 64.)

56.   Celt assured Gall that the behavior would not occur again.  (Sack Decl., Ex. R.)

57.   On August 19 and 20, Gall spoke further with Woodard about the incident. (Sack Decl., Ex. R.)

58.   Woodard thanked Gall for his follow-up, and she commented that Gall's "immediate action says a whole lot about [his] stance on this matter."  (Sack Decl., Ex. S.)

59.   Woodard told Gall that she was "not personally interested in any actions against Paul Celt."  (Sack Decl., Ex. S; Pl. Tr. 200.)

60.   On August 25, Celt invited Woodard for a "quick drink" and apologized for his comments.  (Sack Decl., Ex. T; Pl. Tr. 201.)

61.     Woodard accepted Celt's apology and told Celt that she "trust[ed] we will be able to put this issue behind us . . ."  (Sack Decl., Ex. T; Pl. Tr. 201.)

62.     Later that day, Gall gave Woodard a summary of his investigation, and he told her that Celt had been given a verbal warning.  (Sack Decl., Ex. R.)

63.     Gall asked Woodard to tell him immediately if any similar situations arose in the future.  (Sack Decl., Ex. R.)

64.     Woodard never heard Celt make any similar comments again.  (Pl. Tr. 201-02, 211-12.)

65.     Woodard never complained again about Celt.  (*See* First Am. Compl.)

E.     Woodard Receives a Lackluster 2004 Performance Review

66.     Woodard was given a performance review in December 2004, in which she received an overall score of .55 out of 3.0, which ranked between "Requires improvement" and "Exhibits good behaviors consistently."  (Sack Decl., Ex. U.)

67.     Woodard described this review as "negative."  (Pl. Tr. 118.)

68.     If one removes the zero ratings for categories in which Woodard was thought to be "too new," her overall rating remains between "Requires improvement" and "Exhibits good behaviors consistently."  (Sack Decl. ¶ 22.)

69.     In January 2005,[2] Woodard sent a memorandum to Iaffaldano and Patricia Keener, Compensation Analyst, claiming that her performance review "[did] not provide a fair or timely behavioral assessment."  (Sack Decl., Ex. V; Chang Tr. 15.)

---

[2] Unless otherwise noted, all dates referenced herein occurred in 2005.

70.     Woodard also sent an email to her supervisor, Mary Jo Romeo, on January 4 in which she expressed concerns regarding her review and 2005 compensation package.  (Sack Decl., Ex. W.)

71.     Nowhere in the memorandum or email did Woodard claim that she was being paid less because she is a black woman or because she had previously complained about Celt's comments towards Broderick.  (Sack Decl., Exs. V-W.)

F.     <u>Woodard's Performance Deficiencies Worsen</u>

        1.     *TWCMS Takes Woodard Off a Deal in January 2005*

72.     On December 13, 2004, Lisa Siewers, Associate Director of National Broadcast at Active International (an advertising agency), sent Woodard specifications for an advertising commitment.  (Sack Decl., Ex. X.)

73.     At some point in the ensuing weeks, Siewers reported to Gall that Woodard's performance was unacceptably substandard; Woodard did not understand Siewers's business and was not getting back to her in a timely fashion.  (Gall Tr. 96, 285-86.)

74.     Siewers had never before complained to Gall about any Account Manager.  (Gall Tr. 96-97.)

75.     Gall asked Romeo to share Siewers's feedback with Woodard.  (Gall Tr. 96.)

76.     On January 18, Romeo worked with P&I to get Siewers a revised advertising plan.  (Sack Decl., Ex. Y.)

77.      Woodard appreciated Romeo's hands-on approach in getting the plan out to Siewers.  (Sack Decl., Ex. Y.)

78.     After TWCMS sent Siewers the revised plan, Romeo told Woodard that she was not to contact Siewers or call Active until after Romeo met Siewers for lunch on Friday, January 21. (Sack Decl., Ex. Y.)

79.    At that lunch, Siewers rated TWC a 3 out of 10, whereas in her previous dealings with TWC she had rated it an 8.5 out of 10.  (Romeo Tr. 35; Sack Decl., Ex. Z.)

80.    Siewers told Romeo that "it's very difficult to work with [Woodard], that [Siewers] wasn't getting what she needed, and as a result, we were going to lose business, the Weather Channel," and she asked Romeo to remove Woodard from the deal.  (Romeo Tr. 75.)

81.    Siewers indicated to Romeo that other buyers at Active shared her dissatisfaction with Woodard's client service, and that Woodard's continued involvement in the account could negatively affect TWCMS's business.  (Romeo Tr. 76-77.)

82.    In late January, Romeo met with Woodard concerning Siewers.  (Pl. Tr. 328-29.)

83.    Romeo relayed to Woodard Siewer's perception that Woodard wanted Siewers to do her job for her, that Woodard had a "listening problem" and a "knowledge problem," and that Siewers had to call Woodard four times to get a response from Woodard.  (Romeo Tr. 77; Pl. Tr. 324; Sack Dec., Ex. AA.)

84.    On January 28, Romeo took Woodard off the Pella deal.  (Sack Decl., Ex. Z.)

85.    Woodard understood the decision and did not argue with Romeo's instruction because, as Woodard herself acknowledged, "the customer is always right."  (Sack Decl., Ex. Y.)

86.    Woodard was still paid commissions on the Pella deal after Romeo completed the necessary work.  (Pl. Tr. 309-10.)

   2.    *Woodard Makes a Complaint About Romeo, in Response to Which TWCMS Takes Prompt and Effective Remedial Action*

87.    Shortly after Romeo took Woodard off the Pella deal because of client complaints, Woodard faxed a memo to Sawyer complaining for the first time about alleged discriminatory comments and actions by Romeo that dated back almost two months.  (Sack Decl., Exs. BB-CC.)

-10-

88.     Woodard complained specifically that in December 2004, Romeo made inappropriate comments to the effect that Woodard had been hired to fill a diversity initiative, and that in Romeo's experience, black women have problems asking questions because they do not want to appear stupid.  (Sack Decl., Ex. BB; *see also id.*, Ex. DD.)

89.     Woodard also complained about other comments Romeo allegedly made that were unrelated to Woodard's race, color, national origin or gender.  (Sack Decl., Ex. BB.)

90.     By the end of the day on February 1, Sawyer and Gall had already talked with Woodard about her complaint.  (Pl. Tr. 295-97, 303-04.)

91.     On February 2, Gall met again with Woodard to discuss her complaint.  (Pl. Tr. 311.)

92.     Also, on February 2, Gall and Sawyer spoke to Romeo to discuss Woodard's complaint.  (Sack Decl., Ex. EE.)

93.     On February 3, Romeo submitted a response to Woodard's complaint, which Sawyer investigated.  (Sawyer Tr. 140-41; Sack Decl., Ex. FF.)

94.     In mid-February, Sawyer flew to New York from her office in Atlanta to discuss the complaint in person with Woodard and Romeo.  (Pl. Tr. 320.)

95.     TWCMS terminated Romeo's employment within days after this meeting, in large part because of her comments to Woodard.  (Pl. Tr. 321; Sawyer Tr. 127.)

96.     Thereafter, Woodard reported once again to Camp.  (Pl. Tr. 361.)

*3.     Clients Continue to Complain About Woodard*

97.     Heidi Kahme of Initiative Media, another agency, insisted that Woodard be taken off that account.  (Camp Aff. ¶ 20.)

98.     Kahme was very vocal in telling Camp that she did not want Woodard working on Initiative deals.  (Camp Aff. ¶ 20.)

99.     Kahme told Camp explicitly to "get this woman out of my shop."  (Camp Aff. ¶ 20.)

100.    John Viserto, the senior executive who "headed up" Active International, also complained to TWCMS management concerning Woodard's performance.  (Camp Aff. ¶ 19; Pl. Tr. 361.)

101.    Viserto told Camp that dealing with Woodard was a waste of his time and that it was not in TWCMS's interest for Woodard to continue calling Viserto.  (Camp Aff. ¶ 19.)

102.    Camp understood Viserto's comments to mean that if TWCMS did not remove Woodard from the Active account, Active might decrease the amount of advertising it placed on TWC.  (Camp Aff. ¶ 19.)

103.    During Camp's almost thirty years in advertising, he had never before (or since) had a client demand the removal of an Account Manager from their account.  (Camp Aff. ¶ 21.)

104.    Yet, in Woodard's case, Camp received that directive from two different clients in a very brief period of time.  (Camp Aff. ¶ 21.)

    *4.     Coworkers Complain About Woodard's Ineptitude*

105.    Deirdre O'Grady, Head of P&I, reported to Gall on April 5 that:

> From a planning perspective and overall understanding of media Claudia is struggling.  It does not seem to be a learning curve issue at this point we have had the same questions and conversation there just doesn't seem to be any retention.  There are specific concepts that we have reviewed that she is not absorbing. . . .
>
> I am becoming increasingly concerned b/c having the same conversation over and over again is not the best use of our resources.

(Sack Decl., Ex. GG.)

106.    Rick Monihan, a Director in P&I who reported to O'Grady, expressed the same view as O'Grady: he spent a lot of time coaching Woodard, but she nonetheless kept coming back to him with the same questions.  (Monihan Tr. 27-28, 30, 79; Sawyer Tr. 231-32.)

107.    Monihan complained to Romeo that Woodard repeatedly asked him the same questions and "that [Woodard] just didn't seem to get" it.  (Romeo Tr. 78-79; Monihan Tr. 59.)

108.    Monihan was "not fond" of Woodard's work ethic.  (Monihan Tr. 27-28.)

109.    Monihan explained, "[m]y feeling was in my experience I spent a lot of time having to coach [Woodard] on media math and when she finally had a deal that was closing, it was her first deal through Active Media, I happen to know the buyer so I made the call with her in the office and as we reached a point where the deal was getting ready to close I offered her to take over the conversation and she basically said to me no, you're doing fine, keep it up and I wound up closing the deal and that to me was – left with a bad feeling.  It was not the kind of thing I would have expected."  (Monihan Tr. 27-28.)

110.    Monihan was not a salesperson, and it was not his job to close deals.  (Monihan Tr. 78-79.)

111.    Monihan told Sawyer that discharging Woodard "was probably the right thing to do."  (Monihan Tr. 33-34.)

112.    Jen Monson, another TWCMS Account Manager, likewise complained to Romeo that Woodard was taking too much of her time asking her questions.  (Romeo Tr. 79.)

113.    Over the roughly ten-month period during which Meadow worked with Woodard, he formed the opinion that she was not a good performer, and that she did not understand the television business.  (Meadow Aff. ¶ 22.)

G.    TWCMS Decides to Terminate Woodard's Employment

114.    On January 28, Romeo and Gall told Woodard that they were considering "a range of options including other roles at a lower level" for her, and that Romeo "[had] reservations in general about [Woodard's] skillsets and the mismatch for the skills required for an Account Manager."  (Sack Decl., Ex. Z.)

115.    Gall also observed that Woodard was not sufficiently developing her skill sets, nor was she learning the business at the pace necessary for her to be successful.  (Gall Tr. 286.)

116.    Woodard's gross revenue for the first quarter of 2005 was 53.3% of goal.  (Sack Decl., Ex. HH.)

117.    In 2005, Iaffaldano was apprised of several performance deficiencies related to Woodard.  (Iaffaldano Aff. ¶ 4.)

118.    Iaffaldano learned from Gall that several clients had complained about Woodard's service, including Active and Initiative.  (Iaffaldano Aff. ¶ 4.)

119.    Gall told Iaffaldano that Woodard did not have the necessary skill set to perform her role successfully, and was not working hard enough to develop her skill set so that she could succeed.  (Iaffaldano Aff. ¶ 4.)

120.    Gall told Iaffaldano that Woodard was not progressing at an acceptable pace and had shown no growth in the more than six months during which she had been an Account Manager.  (Iaffaldano Aff. ¶ 4.)

121.    In late March, Iaffaldano had a conversation with Gall about Woodard's performance deficiencies in which Iaffaldano expressed the opinion that she should either be discharged immediately, or demoted to a Sales Service Associate ("SSA") position without a pay decrease through an agreed upon date.  (Iaffaldano Aff. ¶ 5; Sack Decl., Ex. II.)

122.    In or around March 2005, after Romeo left TWCMS, Camp pitched in and supervised Woodard until TWCMS found a new regional manager to replace Romeo.  (Camp Aff. ¶ 14.)

123.    As Woodard's supervisor, it was Camp's observation that she was a terrible Account Manager.  (Camp Aff. ¶ 14.)

124.    As Woodard's supervisor, Camp found that she only had a rudimentary grasp of Media Math, and had not developed any significant client relationships.  (Camp Aff. ¶ 14.)

125.    As Woodard's supervisor, Camp observed that she made comparatively few sales calls, and was lacking in strategic ideas as to why a company should advertise on TWC.  (Camp Aff. ¶ 15.)

126.    As Woodard's supervisor, Camp was frustrated by Woodard's failure to seek him out for advice on her accounts, or to update him generally as to the status of her efforts.  (Camp Aff. ¶ 16.)

127.    During Camp's three years as a manager at TWCMS, Woodard was the only individual reporting to him who did not regularly seek him out for advice concerning accounts. (Camp Aff. ¶ 16.)

128.    As Woodard's supervisor, Camp observed that Woodard's most significant performance failures related to her inability to gain the trust and confidence of her clients. (Camp Aff. ¶ 18.)

129.    In April 2005, Camp expressed to Iaffaldano concerns similar to those Gall had expressed with respect to Woodard's lack of skill at her job and her not working hard enough. (Iaffaldano Aff. ¶ 6.)

130.    Camp shared Iaffaldano's sentiments that Woodard did not exhibit enough persistence in her dealings with clients and gave up too easily when a client did not return her call.  (Iaffaldano Aff. ¶ 6.)

131.    In April 2005, after consultation with Human Resources, Gall and Camp, Iaffaldano approved the decision to give Woodard a written performance warning.  (Iaffaldano Aff. ¶ 7.)

132.    On April 18, Gall and Camp presented Woodard with a written warning "to express [] concerns regarding [Woodard's] general performance as an Account Manager."  (Sack Decl., Ex. JJ; Pl. Tr. 416.)

133.    Gall drafted the memorandum with assistance from Sawyer and Camp.  (Gall Tr. 112; Sawyer Tr. 154-55.)

134.    Sawyer's role in drafting the warning "was to ensure that it delivered clear information to Woodard using input of leaders and their assessments . . ."  (Sawyer Tr. 157.)

135.    At Gall's request, Regional Sales Manager Lisa Longo was also present at this meeting with Woodard.  (Longo Tr. 21.)

136.    Gall informed Woodard that Kahme and Viserto had complained about her and had requested a new TWCMS salesperson because of their dissatisfaction with Woodard's customer service, and he told Woodard that she was no longer to call on Active, Initiative and Icon Media.  (Sack Decl., Ex. JJ; Pl. Tr. 424.)

137.    A follow-up performance discussion was scheduled for May 12, and Woodard was explicitly warned that "[f]ailure to meet the above expectations and sustain the improved level of performance will result in further disciplinary action, up to and including termination." (Sack Decl., Ex. JJ.)

138.   Almost immediately after this meeting, Woodard sent out an inappropriate and inaccurate email in which she instructed TWCMS employees to see Gall regarding questions concerning Active or Initiative, but misstated that she would continue to work with Icon. (Camp Aff. ¶ 23; Sack Decl., Ex. KK.)

139.   Gall advised Woodard that her email was both inappropriate and incorrect, and she apologized. (Sack Decl., Ex. KK.)

140.   Soon after the April 18 meeting, Woodard told Jim Quinn, a buyer with Active, that she had been informed by Gall that "[Quinn's] superiors are looking for or wanted someone else." (Pl. Tr. 432-33, 497.)

141.   Quinn reported to Gall that Woodard had put him in a very uncomfortable and embarrassing situation by telling him that "John Viserto [Quinn's superior] wanted her off the shop, but it was great working with you." (Sack Decl., Ex. LL; Gall Tr. 154; Longo Tr. 189; Pl. Tr. 361; Camp Aff. ¶ 24.)

142.   Camp was very upset by Woodard's decision to call Active because: (i) she had been instructed not to call that client anymore; and (ii) she was aware that her contacts at Active held an unfavorable opinion of her performance. (Camp Aff. ¶ 24.)

143.   For Woodard to call an advertising agency (only days after she was instructed not to do so) with knowledge of that agency's dissatisfaction with her work showed incredibly poor judgment. (Camp Aff. ¶ 24.)

144.   Within days after Iaffaldano approved the request to give Woodard a written performance warning, he learned that Woodard had made a phone call to a representative of an agency she had been prohibited from calling on. (Iaffaldano Aff. ¶ 8.)

145.    Gall informed Iaffaldano that the client representative had complained to Gall that Woodard's call made him uncomfortable.  (Iaffaldano Aff. ¶ 8.)

146.    Iaffaldano found this very troubling, because it evidenced poor judgment on Woodard's part and put TWCMS in an awkward position with a client.  (Iaffaldano Aff. ¶ 8.)

147.    Gall spoke to Human Resources and shared his opinion that Woodard could not perform the job of an Account Manager because of "her inability to satisfy her customers and to understand the customer's business . . ."  (Gall Tr. 287.)

148.    Gall, Iaffaldano and Camp, in consultation with Human Resources and the Legal department, decided to terminate Woodard's employment, and she was discharged on April 22.  (Camp Aff. ¶ 25; Iaffaldano Aff. ¶ 9; Gall Tr. 149; Sawyer Tr. 161-62, 169.)

149.    After the decision had been made to terminate Woodard's employment, she presented Camp with a rebuttal to her April 18 written warning, which Camp forwarded to Human Resources.  (Camp Aff. ¶ 26; Sack Decl., Ex. MM.)

150.    Woodard's rebuttal did not precipitate her termination, nor did it change Camp's opinion that she should be discharged.  (Camp Aff. ¶ 26.)

H.    Woodard Files EEOC Charges

151.    On June 3, 2005, Woodard's counsel filed an EEOC Charge on her behalf, alleging race, national origin, and color discrimination, and retaliation.  (Sack Decl., Ex. NN.)

152.    On or about March 1, 2006 amended her Charge to raise a new legal theory: gender discrimination.  (Sack Decl., Ex. OO.)

153.    More than three years elapsed between Woodard's filing of her original EEOC Charge on June 3, 2005 and the EEOC's issuance of its determination on Woodard's Amended

Charge on August 13, 2008.    (Affidavit of Becky Powhatan ("Powhatan Aff."), dated October 29, 2009, ¶ 3.)

154.    At no time during this very lengthy investigation period did the EEOC contact TWCMS to request any information beyond what was contained in the position statements TWCMS submitted in response to Woodard's EEOC Charge and her Amended EEOC Charge. (Powhatan Aff. ¶ 4.)

155.    At no time during this very lengthy investigation period did the EEOC invite TWCMS to meet with any EEOC representatives regarding Woodard's Charge.  (Powhatan ¶ 4.)

156.    In the course of discovery in this action, Defendants learned for the first time that the EEOC investigator and an EEOC trial attorney had met with Woodard and her lawyer sometime after she filed her EEOC Charge against TWCMS, but before the EEOC issued its determination on that Charge.  (Powhatan Aff. ¶ 5.)

157.    Had TWCMS been informed that Woodard and her counsel had been given the opportunity to meet with the EEOC investigator and with counsel for the EEOC in the course of the EEOC investigation, TWCMS would have requested the same opportunity to meet with the EEOC.  (Powhatan Aff. ¶ 5.)

158.    On January 18, 2006, Woodard's attorney complained in writing to the EEOC that the EEOC investigator had repeatedly failed to return his calls.  (Sack Decl., Ex. WW.)

I.      Members of Woodard's Protected Class are Treated Favorably by the Company

159.    Black employees Sly Phifer and Lakieban Brown were both promoted to Account Manager by Gall, and both received ample coaching and counseling from Gall.  (Monihan Tr. 106-07, 202; Monson Tr. 48, 115; Camp Aff. ¶¶ 29-30; Meadow Aff. ¶¶ 12-13; Iaffaldano Aff. ¶

12; Sack Decl., Ex. PP; Affidavit of Matt Derella, dated November 3, 2009 ("Derella Aff."), ¶¶ 7-8.)

160.   Gall hired two women (Mary Jo Romeo and Jeanne Sachs) in supervisory positions.  (Sack Decl., Exs. RR-SS.)

161.   Gall hired Janet Schatz-Poillon as an Account Manager, although she had no prior national cable sales experience.  (Affidavit of Janet Poillon, dated October 30, 2009 ("Poillon Aff.") ¶ 2; Sack Decl., Ex. QQ.)

162.   Gall promoted Poillon to Director of Sales in May 2007.  (Poillon Aff. ¶ 2; Iaffaldano Aff. ¶ 12; Gall Tr. 28.)

163.   Gall always treated Poillon with the utmost respect and professionalism.  (Poillon Aff. ¶ 2.)

164.   Gall hired Diana Scully as an Account Manager.  (Gall Tr. 14.)

165.   Gall promoted Jen Monson to Account Manager.  (Monson Tr. 34-35.)

166.   During the time Iaffaldano worked with Gall, he never witnessed Gall make any inappropriate comments or take any inappropriate actions regarding race, national origin, color or gender.  (Iaffaldano Aff. ¶ 10.)

167.   During the time Iaffaldano worked with Gall, he observed that Gall treated all TWCMS employees, including Account Managers fairly, and that Gall preferred employees who worked the hardest, and who tried consistently to apply the sales skills and work habits Gall was teaching them.  (Iaffaldano Aff. ¶ 11.)

168.   During Camp's employment at TWCMS, he regularly observed Gall's interactions with TWCMS employees, including Account Managers.  (Camp Aff. ¶ 27.)

169.    During Camp's employment at TWCMS, he never witnessed Gall treat anyone unfairly.  (Camp Aff. ¶ 27.)

170.    During Camp's employment at TWCMS, he observed that Gall differentiated employees by how hard they worked, and he observed that, to the extent Gall seemed to prefer certain employees over others, he preferred those who worked the hardest.  (Camp Aff. ¶ 27.)

171.    During Camp's employment at TWCMS, he never witnessed any TWCMS manager give preferential treatment to male employees over female employees.  (Camp Aff. ¶ 28.)

172.    During Camp's employment at TWCMS, he never witnessed any TWCMS manager give preferential treatment to Caucasian employees over non-Caucasian employees. (Camp Aff. ¶ 28.)

173.    During Camp's employment at TWCMS, he regularly observed Gall treat Jill Matrange and Janet Poillon very well, and devote a lot of attention to them with respect to coaching and counseling sales efforts.  (Camp Aff. ¶¶ 31-32.)

174.    During the time Poillon worked with Gall, she never witnessed Gall make any inappropriate comments or take any inappropriate actions regarding race, national origin, color or gender.  (Poillon Aff. ¶ 5.)

175.    During Poillon's employment at TWCMS, she observed that all TWCMS managers treated male employees and female employees equally.  (Poillon Aff. ¶ 7.)

176.    During Poillon's employment at TWCMS, she observed that all TWCMS managers treated Caucasian employees and non-Caucasian employees equally.  (Poillon Aff. ¶ 7.)

177.    Throughout her employment, Poillon has always been compensated fairly and she never felt that her compensation, account assignments, or any other aspect of her employment was negatively impacted by gender.  (Poillon Aff. ¶ 4.)

178.    During Poillon's employment at TWCMS, she always received the help she needed when she asked for it.  (Poillon Aff. ¶ 8.)

179.    During Poillon's tenure as an Account Manager at TWCMS, Gall held Monday morning meetings beginning at 8:00 a.m.  (Poillon Aff. ¶ 10.)

180.    At 8:00 a.m., Gall would lock the door to the conference room, thereby forcing any Account Manager who arrived later than 8:00 a.m., whether male or female, Caucasian or non-Caucasian, to be locked out of the meeting.  (Poillon Aff. ¶ 10.)

181.    In 2005, the sales managers and Iaffaldano named Matt Derella "salesperson of the year" for the whole company.  (Derella Aff. ¶ 4.)

182.    The sales managers and Iaffaldano named Terry Sekel's team "sales team of the year" for the whole company in 2005 and 2006.  (Derella Aff. ¶ 4.)

183.    During Derella's employment at TWCMS, he regularly observed Gall's interactions with TWCMS employees, including Account Managers.  (Derella Aff. ¶ 5.)

184.    During Derella's employment at TWCMS, he does not recall ever witnessing Gall treating anyone unfairly.  (Derella Aff. ¶ 5.)

185.    During Derella's employment at TWCMS, he observed that Gall differentiated employees by how hard they worked and that to the extent Gall seemed to prefer certain employees over others, he preferred those who worked the hardest.  (Derella Aff. ¶ 5.)

186.    During Derella's employment at TWCMS, he does not recall ever witnessing any TWCMS manager give preferential treatment to male employees over female employees. (Derella Aff. ¶ 6.)

187.    During Derella's employment at TWCMS, he does not recall ever witnessing any TWCMS manager giving preferential treatment to Caucasian employees over non-Caucasian employees.  (Derella Aff. ¶ 6.)

188.    During Derella's employment at TWCMS, he regularly observed Gall's interactions with Matrange.  (Derella Aff. ¶ 9.)

189.    During Derella's employment at TWCMS, he observed that Gall treated Matrange exceedingly well and that Gall devoted a lot of attention to Matrange, especially with respect to coaching and counseling her sales efforts.  (Derella Aff. ¶ 9.)

190.    During Derella's employment at TWCMS, he regularly observed Gall's interactions with Poillon.  (Derella Aff. ¶ 10.)

191.    During Derella's employment at TWCMS, he observed that Gall treated Poillon exceedingly well and that Gall devoted a lot of attention to Poillon, especially with respect to coaching and counseling her sales efforts.  (Derella Aff. ¶ 10.)

192.    During Derella's employment at TWCMS, he regularly observed Gall's interactions with Scully.  (Derella Aff. ¶ 11.)

193.    During Derella's employment at TWCMS, he observed that Gall treated Scully exceedingly well and that Gall devoted a lot of attention to Scully, especially with respect to coaching and counseling her sales efforts.  (Derella Aff. ¶ 11.)

194.    During Meadow's employment at TWCMS, he regularly observed Gall's interactions with TWCMS employees, including Account Managers.  (Meadow Aff. ¶ 10.)

195.    During Meadow's employment at TWCMS, he does not recall ever witnessing Gall treating anyone unfairly.  (Meadow Aff. ¶ 10.)

196.    During Meadow's employment at TWCMS, he observed that Gall differentiated employees by how hard they worked and that to the extent Gall seemed to prefer certain employees over others, he preferred those who worked the hardest.  (Meadow Aff. ¶ 10.)

197.    During Meadow's employment at TWCMS, he never witnessed any TWCMS manager give preferential treatment to male employees over female employees.  (Meadow Aff. ¶ 11.)

198.    During Meadow's employment at TWCMS, he never witnessed any TWCMS manager giving preferential treatment to Caucasian employees over non-Caucasian employees.  (Meadow Aff. ¶ 11.)

199.    During Meadow's employment at TWCMS, he regularly observed Gall's interactions with Matrange.  (Meadow Aff. ¶ 14.)

200.    During Meadow's employment at TWCMS, he observed that Gall treated Matrange exceedingly well.  (Meadow Aff. ¶ 14.)

201.    During Meadow's employment at TWCMS, he regularly observed Gall's interactions with Poillon.  (Meadow Aff. ¶ 15.)

202.    During Meadow's employment at TWCMS, he observed that Gall treated Poillon exceedingly well.  (Meadow Aff. ¶ 15.)

203.    During Meadow's employment at TWCMS, he regularly observed Gall's interactions with Scully.  (Meadow Aff. ¶ 16.)

204.    During Meadow's employment at TWCMS, he observed that Gall treated Scully exceedingly well.  (Meadow Aff. ¶ 16.)

205.     During Meadow's tenure as an Account Manager at TWCMS, he was required to arrive at work by 8:30 a.m. each morning.  (Meadow Aff. ¶ 18.)

206.     On two occasions when Meadow was late to work without a prior excuse, Gall took Meadow's chair into Gall's office, requiring Meadow to retrieve his chair from Gall personally when Meadow arrived to work.  (Meadow Aff. ¶ 18.)

J.     Woodard Never Filed Internal Complaints Concerning Gall's Alleged
       Sexual Harassment and Inappropriate Comments Concerning Race

207.     Defendants had in place a comprehensive policy which prohibited harassment and detailed a procedure for employees to use to complain of harassment.  (Sack Decl., Exs. UU.)

208.     That policy expressly permitted the employee to complain directly to the Head of Human Resources if she believed that her supervisor or Human Resources representative was the source of the harassment.  (Sack Decl., Exs. UU.)

209.     By July 21, 2004, Woodard had received, read and understood Defendants' harassment policy, and that she had "received two (2) hours of training on eliminating sexual harassment in the workplace and [her] responsibilities for enforcing Company policy."  (Sack Decl., Ex. VV.)

210.     Gall had a toy bat in his office that was 12-15 inches long.  (Meadow Aff. ¶ 17; Derella Aff. ¶ 14; Poillon Aff. ¶ 9; Camp Aff. ¶ 34; Iaffaldano Aff. ¶ 14.)

211.     Gall's toy bat was a memento Ted Turner (Gall's former employer) had given to him.  (Gall Tr. 136.)

212.     Paul Iaffaldano, Janet Poillon, Matt Derella and Craig Meadow never witnessed Gall swing his toy bat at anyone or threaten anyone with his toy bat.  (Iaffaldano Aff. ¶ 14; Poillon Aff. ¶ 9; Derella Aff. ¶ 14; Meadow Aff. ¶ 17.)

213.     Gall never exposed his crotch to Woodard or anyone else at work.  (Pl. Tr. 450-51; Monson Tr. 69-70.)

214.     Woodard's allegation that Gall exposed his crotch stems from two occasions on which Gall split his pants.  (Pl. Tr. 450-52.)

215.     Woodard and others "giggled" when Gall split his pants.  (Pl. Tr. 452.)

216.     Woodard did not report Gall's splitting his pants to Human Resources.  (Pl. Tr. 453.)

217.     Gall never touched Woodard nor said anything provocative on the single occasion "very early" in her employment, as she was leaving Gall's office following a business meeting, that Gall allegedly "got real close to me and violated [Woodard's] personal space."  (Pl. Tr. 454-55, 460.)

218.     Other than this single instance, Woodard does not allege that anyone else engaged in inappropriate or sexually provocative behavior towards her.  (Pl. Tr. 461.)

219.     Woodard did not report this single instance to Human Resources.  (Pl. Tr. 458-59.)

220.     Woodard never brought Gall's alleged racial or sexual harassment to the attention of anyone in management or Human Resources.  (Pl. Tr. 75-76, 216, 453, 458-59.)

221.     Woodard did not take any written notes or send herself any emails to corroborate that Gall made any race-based comments or that he sexually harassed her.  (Pl. Tr. 273, 459.)

222.     Woodard never reported to Human Resources or Iaffaldano that she considered TWCMS to be a "boy's club."  (Pl. Tr. 443-44.)

223.    Woodard never complained to anyone that TWCMS employees allegedly were going through her desk.  (Pl. Tr. 75-76.)

Dated: New York, New York
        November 3, 2009

VEDDER PRICE P.C.

By:____/s/ Laura Sack_____
        Laura Sack (LS 5501)
        Roy P. Salins (RS 0793)
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
Attorneys for Defendants