Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For The Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CLAUDIA WOODARD AND ELISE
LAWLESS,

              Plaintiffs,

        - against -

TWC MEDIA SOLUTIONS, INC. and
THE WEATHER CHANNEL,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09-CIV-3000

**AFFIDAVIT OF CLAUDIA WOODARD**

STATE OF NEW YORK    )
                                : ss.:
COUNTY OF NEW YORK  )

       CLAUDIA WOODARD, being duly sworn, deposes and says:

**A.**    **Complaint**

       1.    I incorporate by reference the First Amended Complaint and Jury Demand. Thus, when my opposition papers cite to the Complaint ("Compl."), I am alleging that such allegation is a fact and is incorporated within this Affidavit by reference.

**B.**    **Affidavit of Meade Camp**

       2.    I have reviewed the Affidavit of Meade Camp. That document contains many false statements. Many of those false statements are contradicted by testimony and documents in the record. This affidavit responds to certain other allegations of Mr. Camp.

3. In Paragraph 3 of his affidavit, Ms. Camp appears to argue that Client Development Managers were not responsible for communicating with agencies. To the contrary, CDMs communicated with Advertising Agencies while working closely with their Account Manager counterparts. In addition, as a CDM, I attended and participated in presentations with respective client agencies, including Clark Advertising and TargetCast.

4. In Paragraph 5 of his affidavit, Mr. Camp references an event sponsored by an organization whose members are primarily African Americans in the advertising industry. Mr. Camp told me that it was his very first time attending an African Americans in Advertising (AAIA) event and, to my knowledge he did not attend any such events after Defendants hired me. In fact, I invited Mr. Camp to subsequent Multicultural Industry events and he declined.

5. In Paragraph 8 of his affidavit, Mr. Camp alleges that "relationships and familiarity with clients are the most important commodities in the advertising business." Mr. Camp knew I had strong relationships and was familiar with various clients and told me that I had the skills to succeed in both the CDM and Account Manager roles.

6. During the approximately eight-weeks I served as a Client Development Manager, I reached out to the clients on my assigned account list. I was successful in securing meetings with some clients very early on. As I recall, Craig Meadow and Bruce Budkofsky, the two white male CDMs, were not able to secure meetings with all their clients and did not meet with all the clients on their list. In September 2004, Bruce was already a CDM for over nine-months and sent me an email indicating same (Goldberg Cert., Exh. DD).

7. In Mr. Camp's affidavit, he alleges that he was not satisfied with my job performance. This is untrue and is contradicted by many statements he made to me during my

employment at TWC. Within the first few weeks of my employment with The Weather Channel, Meade Camp told me that he admired my persistence and complimented me on getting a meeting with Bill Bainbridge, SVP Marketing at Hankook Tires. This resulted in over $350K in brand new advertising revenue from Hankook that had never previously advertised on TWC. In August 2004, Defendants eliminated the Client Development Manager ("CDM") position.

8. A meeting with Hankook was rescheduled to accommodate my new manager Mary Jo Romeo, who joined Defendants in November 2004. Neither Mr. Camp nor Ms. Romeo knew Hankook's business. Mr. Camp praised my ability to ask strategic business questions at the Hankook meeting. Mr. Camp told me he was impressed that I knew so much about the client and complimented me on the fact that I inquired about Michelin's and Firestone's stake in the Hankook business.

9. Mr. Camp complimented my efforts and persistence to secure a meeting with Jennifer Kane, Director of Advertising at Oppenheimer Funds, which took place in or about August 2004. The client had previously declined several meetings with Paul Celt who covered the account before I came on board. After I secured the meeting and was preparing my presentation, Mr. Gall took the account from me and assigned it to Mr. Celt. The client requested that I attend the meeting even after the account was given to Mr. Celt.

10. During my employment, I blind copied ("bcc") Mr. Camp on various sales letters that I drafted to prospective clients. Mr. Camp told me that I wrote some of the best Sales Letters he had ever seen and he praised me in several emails.

11. Mr. Camp said he liked to hire people that were smarter than him because they made him look good. He in fact, told me that I was one of his smartest hires.

12. In or about July 2004, I suggested to Mr. Camp that he and Bruce Budkofsky attend an Industry luncheon to honor Michelle Cervantez, CMO of BMW North America. At this time, Mr. Budkofsky had been covering BMW and was unsuccessful in scheduling meetings with BMW. When I made this suggestion, Mr. Camp complimented my sales instincts and perseverance. I attended the luncheon with Mr. Camp and Mr. Budkofsky and I specifically introduced them to Michelle Cervantez as well as other clients.

13. Mr. Camp told me that I exercised good judgment in handling the situation involving Paul Celt's discriminatory comments in August, 2004. Mr. Camp warned me that I would likely hear discriminatory comments from others at the company and suggested to me that I address such situations similarly to the Paul Celt matter.

14. When I became an Account Manager, I was assigned the Active International "Barter Shop" Agency. I scheduled several meetings with that agency which Mr. Gall canceled at least five times. When the meeting finally took place in February/March 2005, Mr. Gall was not available. I asked Mr. Gall not to again cancel this meeting. The meeting finally took place with Active International and Mr. Camp attended the meeting and then met the entire Active International team for the very first time. This meeting was held after various communications in January 2005 concerning Lisa Siewers. Mr. Camp told me that the meeting went well. He did not criticize my performance and he never alleged that John Viserto, SVP-Director of National Broadcast was disappointed with my services as the agency's Account Manager. During my employment as an Account Manager, I had dealings with John Viserto and he never expressed any dissatisfaction with my services as Account Manager. In February 2005, I invited Mr. Viserto and others to TWC's Upfront Presentation and weekend getaway on March 11-13, 2005

in Quebec and the invitations were accepted.

15. Contrary to Paragraph 9 of Mr. Camp's affidavit, I never told Mr. Camp that clients "won't call me back." I repeatedly asked Mr. Camp questions about accounts and strategies. After I was reassigned to Camp in 2005, he refused to provide me with guidance and support.

16. In Paragraph 11 of his affidavit, Mr. Camp alleges that "I was frustrated by Ms. Woodard because she rarely asked me any questions." This is false. I repeatedly asked Mr. Camp questions. He told me he was not able to help me and he told me that he had a "day job."

17. In Paragraph 13 of his affidavit, Mr. Camp admits certain comments made by Ms. Romeo during a drive through Paterson New Jersey. At the time the comments were made, I complained to Camp about them and he stated that he had not heard Mary Jo's comments.

18. In Paragraph 14 of his affidavit, Mr. Camp alleges that "Ms. Woodard was a terrible Account Manager." To the contrary, Mr. Camp regularly praised my job performance.

19. In Paragraph 15, Mr. Camp alleges that I "made comparatively few sales calls." Meanwhile, Defendants forbid me from making sales calls without a Sales Manager. Sales Managers including Interim Sales Manager Camp were often unwilling to accompany me on sales calls. Mr. Camp attended two sales calls with me during my entire tenure at TWC. Mr. Gall canceled a meeting I had scheduled with ICON International and on the day of that canceled meeting, Gall, Camp and Sekel attended a sales call with Account Manager Matt Derella.

20. In Paragraph 18 of his affidavit, Mr. Camp alleges that "several executives at barter shop clients told me directly that Ms. Woodard did not understand the business.....demanding that Ms. Woodard no longer work on their accounts." However, in

Paragraph 21, Mr. Camp alleges that only two clients made such a request. Thus, Mr. Camp contradicts himself. The allegation about purported statements by clients are without merit.

21. In Paragraph 19 of his affidavit, Mr. Camp alleges that Active International threatened to reduce their advertising spending if Ms. Woodard handled their account. This is a lie. When I covered the Active International account, I was able to increase their spending and generated profitable revenue out of that "Barter Shop".

22. In Paragraph 20 of his affidavit, Mr. Camp alleges that Initiative wanted me off its account. This is untrue. Matt Derella covered Initiative Media and I covered Initiative Trade "Barter Shop." When I covered Initiative Trade, their spending increased significantly and the Buyers Kara LeVine and Patty Norway told me that they were pleased with me as their Account Manager.

23. In March 2005, both John Verserto and Heidi Kahme accepted my invitations to attend the 2005 Upfront Presentation in Quebec, Canada for an entire weekend.

24. In Paragraph 21 of his affidavit, Mr. Camp alleges that I am the only Account Manager for which a client has sought removal from its account. To my knowledge, I was the only Account Manager that Mr. Camp supervised at TWC. Meade Camp was a Client Solutions Manager and as such did not supervise Account Managers.

25. In Paragraph 22 of his affidavit, Mr. Camp alleges that on April 18, 2005, Mr. Gall and Mr. Camp gave me a warning and "Mr. Gall told Ms. Woodard that she was to have no further contact with representatives of Active, Initiative, and Icon." This is false. Defendants only told me that I was no longer covering certain accounts.

26. In Paragraph 33 of his affidavit, Mr. Camp alleges that he "observed that Mr. Gall

frequently made....visits to Account Managers' cubicles." This is untrue. Mr. Camp was often out of the office and Mr. Gall did not make such visits.

### C. Affidavit of Paul Iaffaldano

27. I have reviewed the Affidavit of Paul Iaffaldano. That affidavit contains many statements that are completely false.

28. From about July 2004 until his separation from Defendants in 2009, Mr. Iaffaldano was Executive Vice President, General Manager of TWC Media Solutions.

29. Mr. Iaffaldano alleges he had several conversations with me. In fact, I had limited contact with Mr. Iaffaldano. He was based in Atlanta, Georgia. He covered all eight TWC Sales Offices around the country.

30. On the few occasions I had contact with Mr. Iaffaldano he praised my performance and not once did he criticize my work. He praised my Quarterly Business Review Presentation in October 2004. He praised my efforts on the Denise Austin Integrated Marketing Presentation and told me he was aware it was a "dead account." He gave me positive feedback for the sales training in Florida in January 2005. I did not have other discussions with Mr. Iaffaldano about my accounts and I never told him that I "took no for an answer."

31. I filed written internal complaints with Mr. Iaffaldano regarding my discriminatory 2004 evaluation and 2005 compensation package. He did not respond.

### D. Meadow, Derella, Schatz/Poillon, Celt, Gall and O'Grady

32. During my employment, Dierdre O'Grady never raised any criticism of my job performance with me. In early 2005 to the Spring 2005, Ms. O'Grady told me that she saw how hard I was working and took notice that I was closing a lot of deals.

33. During my employment, I had no reporting relationship with other Account Managers. This included, among others, Craig Meadow, Matt Derella or Janet Schatz/Poillon. These account managers were not involved in my deals.

34. In Mr. Derella's Affidavit, he alleges that he began reporting to Terry Sekel in January 2004. However, Mr. Sekel joined Defendants in January 2005. (TS Dep. 11).

35. In Mr. Derella's affidavit, he refers to his wife, who is Melissa Drucker. Mr. Derella joined Defendants in late 2002. Ms. Drucker joined Defendants in 2006 and listed Mr. Derella as the person that referred her to the company. Gall was listed as a groomsman in Mr. Derella and Melissa Drucker's wedding in 2009. If Mr. Derella's wife now works for Mr. Gall at BBC America, this simply reflects Mr. Gall's loyalty to his white male Account Managers.

36. In Paragraph 9 of Mr. Meadow's affidavit, he alleges that Account Managers pitched in and took over accounts when Paul Celt and Jill Matrange were fired in the Spring of 2005. I requested additional accounts but was denied new accounts. Gall denied me the Oppenheimer Funds account which was previously taken away from me and given to Celt.

37. I occasionally discussed issues at TWC with Janet Schatz (aka Poillon). We shared a room at a company trip to Stratton. She once mentioned to me that Mr. Gall was a "guys guy". A copy of Ms. Schatz's resume is attached hereto as Exhibit A.

38. Based upon Craig Meadow's Resume and TWC Employment Application, he had less sales experience than me when he joined Defendants (Goldberg Cert., Exh. OO).

39. During my employment, Paul Celt kept a baseball bat in his cubicle, just like Mark Gall.

40. Defendants never produced any written warning to Paul Celt. Shortly after I filed a complaint about Mr. Celt, Defendants gave him an award, purportedly for exemplifying the

company's core values.

41. On August 4, 2004, Mr. Gall scheduled a team meeting for August 5, 2004 at 7:30 a.m. I appeared at 7:30 a.m. on August 5, 2004 and there was no meeting. Mr. Gall failed to provide me with advance notice of the cancellation. (Pl. Dep. Exh. 82).

42. In connection with the April 18, 2005 warning, Mr. Gall gave me a revised account list. (Goldberg Cert., Exh. GG). This list was essentially my October 2004 account list, with any potential revenue generating clients removed from the list.

E. **Account Assignments, Production and Miscellaneous Items**

43. Based on my documents produced during discovery, Account Managers Bruce Budkofsky (white male), Craig Meadow (white male) and Janet Schatz (white female) failed to meet their goals for the first quarter of 2005. As of the end of the second Quarter of 2005, Mr. Budkofsky and Ms. Schatz had achieved about 49% of their annual goals which was similar to my production. No action was taken against these Account Managers based on their production.

44. In or about October 2004, Defendants assigned me an account list with 44 clients, but only 4 had any prior spending history with TWC or broadcast cable overall. These 4 clients were credited with only $117,375 in spending. Defendants assigned Meadow a far superior account list. Defendants assigned Mr. Meadow an account list with 16 clients, 11 of which had a prior spending history with TWC. These 11 clients were credited with $1,709,180 in spending. In March 2005, Defendants hired Peter Wright a white male as an Account Manager and assigned him an account list with 12 clients, 7 of which had previously spent monies on TWC and broadcast cable, and had a substantial spending history, including credits for $4,440,343 in spending on TWC and his goal for 2005 was $3,952,500, instantly putting him at above goal by

112%.

45. I made it clear to Mr. Gall that his discriminatory conduct was unwelcome and offensive. I filed complaints about my 2004 evaluation and my compensation package for 2005. Defendants did not take any remedial action on those complaints. Plaintiffs requested that Defendants produce 2004 evaluations for all Account Managers. Defendants failed to do so.

46. Defendants assigned me the Advertising Agencies (Barter Shops) previously covered by Jen Monson prior to her demotion from Account Manager to Direct Response.

47. In April 2005, I was negotiating a deal with Christina Lincoln, a buyer at ICON International on the Lennox Account, and Mr. Gall had instructed me to complete the deal.

48. As I recall, on or about April 20, 2009, Mr. Camp went to Colorado.

49. During my employment, TWC sales office meetings were regularly scheduled for 5:00 p.m. on Mondays or Tuesdays and Mr. Gall sometimes scheduled New York office meetings in the morning before regular office hours.

50. During my employment at TWC, account lists and assignments were stored in a shared folder on the computer system and was viewed by all Account Managers.

51. I sought to take a multi-day external media math course but was not allowed to do so. In or about December 2004, I attended a 1-2 hour media math class given by Defendants to staff during a lunch period.

52. The EEOC's files produced during discovery reflect that all parties had a full and fair opportunity to present documents and information to the EEOC. TWC's counsel submitted multiple submissions to the EEOC during the investigation process. To my knowledge, Defendants did not file a request for reconsideration of the EEOC's Determinations.

_____
Claudia Woodard

Sworn to before me
this 1st day of December 2009

_____
Notary Public

KENNETH A. GOLDBERG
Notary Public, State of New York
No: 02GO5061677
Qualified in New York County
Commission Expires ~~June~~
July 27, 2010

**EXHIBIT A**

REDACTED

## Janet M. Schatz



Telephone: █████ (work),

### BUSINESSWEEK TV
McGraw Hill, New York, NY                                                      3/02-Present
*Director of Sales-*
- Leverage the 75 year-old brand of BusinessWeek magazine to sell half hour nationally syndicated television program
- Manage independent sales team to extend client and agency coverage (budget to exceed $1.2 million)
- Work in tandem with BusinessWeek print and online regional account managers to build multi-platform media packages for advertisers
- Coordinate creative advertising executions with BusinessWeek TV production team to develop unique sponsorship opportunities. Clients include: Nextel, Prudential, Siemens, Computer Associates, IBM, General Motors, Samsung, British Airways, Phoenix Wealth Management, American Stock Exchange, UBS and Eli Lilly.

### PHASE2MEDIA
PHASE2MEDIA, New York, NY                                                      2/00-7/1/01
*Vice President East Coast Sales-*
- Managed 8 people in sales organization representing over 45 distinct web properties.
- Initiated daily Account Manager training seminars with emphasis on research, presentation skills, client interaction, sponsorship packages and product knowledge.
- Assigned budget allocations, client and agency list management for East Coast advertising market

*Sales Manager, San Francisco, CA-*
- Built a cohesive sales team to penetrate the Northern California and Pacific Northwest advertising market using email, direct mail, banners and offline packages.
- Advertisers included: Nike, RealNetworks, AT&T Wireless, Oracle and MSN Internet Explorer.

### DOW JONES & COMPANY
CNBC INTERNATIONAL, San Francisco, CA                                          12/98-2/00
*West Coast Sales Manager-*
- Opened West Coast office for CNBC International Cable Television.
- Sales responsibilities included: building new relationships with prospective clients to advertise on CNBC Europe and CNBC Asia cable television networks, expanding existing accounts, and selling international cross-media opportunities using Dow Jones International print publications.
- Closed first time Microsoft program deal that aired globally on television in Europe, Asia and U.S.
- Top-level client base included: Cisco Systems, E*Trade, Intuit, Chevron, Bank of America, Hyundai, Qualcomm, Oracle, Visa, Microsoft and Yahoo!

1

NATIONAL BROADCASTING COMPANY
CNBC INTERNATIONAL, New York, NY
*International Sales Planner-*                                    4/95-12/98

- Researched and evaluated U.S. companies for prospective international advertising campaigns to run on CNBC Europe and CNBC Asia.
- Created pan-regional media strategies tailored to clients' global products and services.
- Responsible for generating new business advertisers and presenting global sales pitch.

NBC NETWORK SALES, NBC NEWS, NBC OLYMPICS, NBC PAGE PROGRAM
New York, NY                                                       2/90-4/95

- *Sales Assistant-*Maintained LateNight and Daytime advertising inventory for NBC Network accounts. Heavy client and agency contact regarding contract adjustments and program content.
- *News Researcher-*Researched and tracked story ideas for Network News. Responsible for writing daily reports on news activity in foreign bureaus, domestic bureaus and affiliate stations.
- *Production Assistant-*Worked with Senior Profiles Producer on athlete biographies for NBC coverage of the 1992 Barcelona Olympics. Responsibilities included all facets of television production.
- **NBC Page Assignments** during term were: Assistant to Head Writer for *NBC TODAY* Show, Press Aide in Media Relations Department and Audience Coordinator for *Saturday Night Live*.

EDUCATION:
Boston College, Chestnut Hill, MA
BA Philosophy, Romance Languages/Spanish                           1985-1989
Instituto Internacional, Madrid, Spain
Studies in Art History and Spanish Literature                      Spring 1988

Janet Schatz (203) 981 0172

2

CONFIDENTIAL

TWC 2199