Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For The Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CLAUDIA WOODARD AND ELISE :     **09-CIV-3000**
LAWLESS,
    :     **PLAINTIFF WOODARD'S STATEMENT**
    Plaintiffs,     **OF DISPUTED MATERIAL FACTS**
    :     **PURSUANT TO LOCAL RULE 56.1**
    - against -
    :
TWC MEDIA SOLUTIONS, INC. and
THE WEATHER CHANNEL,     :

    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Claudia Woodard ("Ms. Woodard") submits the following statement of disputed

facts in opposition to Defendants' motion for summary judgment and Defendants' Statement Of

Material Facts Pursuant To Rule 56.1 ("Defendants' Statement") in the above-referenced matter.

Unless expressly admitted herein, Plaintiff Woodard denies the allegations in Defendants'

Statement. This submission is comprised of a Point I paragraph by paragraph response and a

Point II additional facts section. Plaintiff further denies Defendants' Statement to the extent it is

inconsistent with the additional facts set forth in Point II below.[1]

---

[1] Copies of documents cited herein are attached to the certification of Plaintiffs' counsel.
("Goldberg Cert."). Citations to Complaint and Answer are to "Compl." and "Ans." (Goldberg
Cert., Exhs. A, B). Citations to deposition transcripts are to: Lisa Chang ("LC Dep.", Goldberg
Cert., Exh. C), Mark Gall ("MG Dep.", Goldberg Cert., Exh. D), Liz Janneman.("LJ Dep.",
Goldberg Cert., Exh. E); Catherine Jolly ("CJ Dep.", Goldberg Cert., Exh. F); Richard Klein
("RK Dep.", Goldberg Cert., Exh. G); Elise Lawless ("EL Dep.", Goldberg Cert., Exh. H); Lisa
Longo ("LL Dep.", Goldberg Cert., Exh. I); Rick Monihan. ("RM Dep.", Goldberg Cert., Exh. J);
Jen Monson. ("JM Dep.", Goldberg Cert., Exh. K); Mary Jo Romeo ("MJR Dep.", Goldberg
Cert., Exh. L); Pam Sawyer ("PS Dep.", Goldberg Cert., Exh. M); Terry Sekel ("TS Dep.",
Goldberg Cert., Exh. N); Claudia Woodard. ("CW Dep.", Goldberg Cert., Exh. O). Citations to
deposition exhibits herein are to "Pl. Dep. Exh." (Goldberg Cert., Exh. P) and "Woodard Dep.
Exh." (Goldberg Cert., Exh. Q). Copies of additional deposition exhibits from the depositions of
(continued...)

## PARAGRAPH BY PARAGRAPH RESPONSE PURSUANT TO RULE 56.1(b)

## I.   RESPONSES TO DEFENDANTS' ALLEGATIONS[2]

1.   Deny Paragraph 1, except admit that Meade Camp was Senior Vice President of Client Solutions.

2.   Admit Paragraph 2.

3.   Deny Paragraph 3, except admit that Ms. Woodard testified that her job duties as Client Development Manager included "working with–with clients at a very high level to develop the relationships that were necessary to later entice them to—to secure advertising space on The Weather Channel" (CW Dep. 35-6).

4.   Deny Paragraph 4 and aver that Meade Camp repeatedly made statements to the effect that  he would only hire a black woman.  (Supra Point II-B; Tague Aff. ¶ 9 (Goldberg Cert., Exh. W); EL Dep. 91-93; JM Dep. 109-110; RM Dep. 77-79, 94-5, 170-1, 182-3, 228-230; Bhiro Aff. ¶ 18 (Goldberg Cert., Exh. X).

5.   Deny Paragraph 5 and aver that as per the deposition of Pam Sawyer, bonuses for management at the VP level and above were based in part upon diversity hiring (PS Dep. 133) and aver that Meade Camp (SVP) made statements to the effect that he would only a hire a black woman. (Supra Point II-B; Tague Aff. ¶ 9 (Goldberg Cert., Exh. W); EL Dep. 91-93; JM Dep. 109-110; RM Dep. 77-79, 94-5, 170-1, 182-3, 228-230).

6.   Admit Paragraph 6 (CW Dep. 30).

7.   Deny Paragraph 7, except admit that Ms. Woodard was fully qualified for the position of CDM and was hired (Pl. Dep. Exh. 29; see also Woodard Dep. Exh. 1; Woodard Dep.

---

[1](...continued)
Lawless, Monihan, and Monson are attached to the Goldberg Cert. as Exhibits R, S, T, respectively.  Copies of affidavits of Will Tague, Courtney Kurland, Meena Bhiro and Peggy Grundt and other materials are attached to the Goldberg Cert.  Plaintiff is separately filing two Affidavits of Claudia Woodard ("Woodard Aff." and "Affidavit of Claudia Woodard Regarding EEOC Investigation") and an Affidavit of Lavern Gordon ("Gordon Aff.").

[2]Citations to "Point II" are to Point II herein and "supra" refers to paragraphs herein.

Exh. 2; Compl.¶ 40; CW Dep. 32 ) and aver that Meade Camp repeatedly made statements to the effect that he would only hire a black woman. (Supra Point II-B; Tague Aff. ¶ 9 (Goldberg Cert., Exh. W); EL Dep. 91-93; JM Dep. 109-110; RM Dep. 77-79, 94-5, 170-1, 182-3, 228-230).

     8.     Deny Paragraph 8, except admit that Defendants hired Ms. Woodard in or about June 2004 and aver that Ms. Sawyer issued a document regarding same (Woodard Dep. Exh. 2, TWC 0009-10; CW Dep. 34; Pl. Dep. Exh. 62), aver that in July 2004, the parties signed a letter stating that Defendants were hiring Ms. Woodard as a Client Development Manager, reporting to Meade Camp, SVP Client Development, which was Ms. Woodard's initial position. (Pl. Dep. Exh. 29; see also Woodard Dep. Exh. 1; Woodard Dep. Exh. 2; Compl.¶ 40; CW Dep. 32 ).

     9.     Admit Paragraph 9 (CW Dep. 46-47).

     10.     Deny Paragraph 10, except admit that Ms. Woodard testified that when she was a Client Development Manager, she thought Mr. Camp was "great." (CW Dep. 362-3).

     11.     Deny Paragraph 11, except admit that Ms. Woodard testified that her job duties as Client Development Manager included "working with–with clients at a very high level to develop the relationships that were necessary to later entice them to—to secure advertising space on The Weather Channel" (CW Dep. 35-6).

     12.     Admit Paragraph 12 (CW Dep. 37, 49).

     13.     Admit Paragraph 13 (CW Dep. 54-5).

     14.     Deny Paragraph 14, except admit that Ms. Lawless, in describing Media Math, testified among other items: "It's a simple day-to-day commonly used major part of our business...It involves CPM's, it involves day part mixes..." (EL Dep. 297).

     15.     Deny Paragraph 15, except admit that Mr. Camp told Ms. Woodard to ask P&I to provide her with a general overview of media math and that Ms. Woodard did so by speaking with Will Tague, an experienced Planner (CW Dep. 54-55, 93-94, 105-106), and aver that Ms. Woodard sought additional training (Woodard Aff. 51).

16.      Deny Paragraph 16 and aver that prior to the unlawful termination of Ms. Woodard's employment, Mr. Camp praised Ms. Woodard and did not criticize her job performance.  (Woodard Aff. ¶ 2-14; see also Woodard Aff. ¶ 15-26).

17.      Deny Paragraph 17, except admit that Ms. Woodard testified that in the two months that she was a CDM, "I probably didn't have contact with every single client on my list" and that during that time, she brought in a client Hankook Tire which purchased advertising with Defendants, met with Bill Bainridge, met with TIAA-Cref and the account was obtained and it ultimately generated revenue for Defendants, and met with Oppenheimer Fund (CW Dep. 67-69, 93, 109-110), aver that Ms. Woodard explained in writing "I have not had an opportunity to contact everyone on my list" (Woodard Dep. Exh. 10; Pl. Dep. Exh. 85; Woodard Dep. Exh. 54; CW Dep. 110, 476), and aver that Mr. Camp praised Ms. Woodard.  (Woodard Aff. ¶ 2-14).

18.      Deny Paragraph 18 and aver that Ms. Woodard did not tell Mr. Camp that clients "won't call me back" and in fact Ms. Woodard persevered and obtained business.  (Woodard Aff. ¶ 15; CW Dep. 67-69, 93, 109-110).

19.      Deny Paragraph 19 and aver that Ms. Woodard did not tell Mr. Camp that clients "won't call me back" and in fact Ms. Woodard persevered and obtained business.  (Woodard Aff. ¶ 2-15; (CW Dep. 67-69, 93, 109-110).

20.      Deny Paragraph 20 and aver that prior to the unlawful termination of Ms. Woodard's employment, Mr. Camp praised Ms. Woodard and did not criticize her job performance.  (Woodard Aff. ¶ 2-14).

21.      Deny Paragraph 21 and aver that Ms. Woodard repeatedly asked Mr. Camp questions about accounts and strategy. (Woodard Aff. ¶ 16).

22.      Deny Paragraph 22, except admit that Ms. Woodard's initial annual compensation package was $85,000 annual salary, $57,000 annual commission opportunity, and $7,050 annual bonus opportunity, for a total of $148,050 (at goal). (Pl. Dep. Exh. 29; Woodard Dep. Exh. 3; Pl. Dep. Exh. 38; CW Dep. 37).

– 4 –

23.     Admit Paragraph 23 and aver that Ms. Woodard negotiated this item to compensate her for a bonus she would forfeit by leaving The Wall Street Journal.  (Pl. Dep. Exh. 29; Woodard Dep. Exh. 3; Pl. Dep. Exh. 38; CW Dep. 37), and aver that Defendants gave Matt Derella a sign on bonus of $20,000 (Goldberg Cert., Exh. NN).

24.     Deny Paragraph 24, except admit that Mr. Meadow joined Defendants in March 2004 and that his initial annual compensation package was $70,000 annual base salary, $46,000 annual commission opportunity and $5,800 annual bonus opportunity, and aver that for 2005, Defendants increased the overall compensation package of Mr. Meadow, who became an Account Manager at the same time as Ms. Woodard, by 3%, to $125,454 (at goal) (Pl. Dep. Exh. 18 at TWC 1958, TWC 1973; Woodard Dep. 68), and continued to give Mr. Meadow raises and bonuses  (Pl. Dep. Exh. 166; supra Point II-F), and aver that Mr. Meadow had less sales experience than Ms. Woodard  (Woodard Aff. ¶ 38).

25.     Admit that Mr. Meadow's initial hiring documents do not list any sign-on bonus. (Id.).

26.     Deny Paragraph 26, except admit that for 2005, Defendants gave Ms. Woodard an annual compensation package of $148,050 (at goal), which included a reduced base salary of $66,622.51.  (Pl. Dep. Exh. 39; Pl. Dep. Exh. 66; Woodard Dep. Exh. 14; Compl. ¶ 34, 60; CW Dep. 131-3).

27.     Deny Paragraph 27, except admit that for 2005, Defendants assigned Ms. Woodard an "Annual Gross Revenue Goal" of $3,050,000 (Id.).

28.     Deny Paragraph 28, except admit that for 2005, if Ms. Woodard exceeded her targets by 10%, she was eligible to receive total cash compensation of $176,987.03.  (Id.).

29.     Deny Paragraph 29, except admit that for 2005, Defendants reduced Ms. Woodard's annual base salary (id.), Defendants increased Mr. Meadow's annual compensation package by 3%, to $125,454, although there was a decrease in the base salary component.   (Pl. Dep. Exh. 18 at TWC 1958, TWC 1973; Woodard Dep. 68), and Defendants increased Mr.

Budkofsky's annual compensation package, although there was a decrease in the base salary component. (CW Dep. 513).

30.   Deny Paragraph 30, except admit that for 2005, Defendants increased Mr. Meadow's annual compensation package by 3%, to $125,454 (at goal) (Pl. Dep. Exh. 18 at TWC 1958, TWC 1973; Woodard Dep. 68).

31.   Deny Paragraph 31, except admit that for 2005, Defendants assigned Mr. Meadow an "Annual Gross Revenue Goal" of $3,350,000, and aver that Defendants assigned Mr. Meadow an account list and booked business that was far superior to Ms. Woodard's list. (Id; Woodard Aff. ¶ 44; Goldberg Cert., Exh. FF; Compl. ¶ 54; CW Dep. 495-6).

32.   Deny Paragraph 32 and aver that according to various deposition testimony, sales management made compensation decisions for Account Managers and according to other deposition testimony, HR is consulted in the process. (RK Dep. 108-9, 127-8; LC Dep. 16-7, 96).

33.   Admit Paragraph 33 (CW Dep. 57).

34.   Admit Paragraph 34 (CW Dep. 62).

35.   Admit Paragraph 35 (CW Dep. 70-1).

36.   Admit Paragraph 36 and aver that at Defendants building a sales plan was the function of sales planners. (CW Dep. 55).

37.   Deny Paragraph 37, except admit that Ms. Romeo testified that during the period that Ms. Woodard reported to Ms. Romeo, she had a junior account list (MJR Dep. 59-60), and aver that Defendants gave Ms. Woodard what was essentially a "dead accounts" list. (Pl. Dep. Exh. 55; CW Dep. 57; Compl. ¶ 51, 53, 69; CJ Dep. 131-2, 142; Woodard Dep. Exh. 55; MJR Dep. 59-60; Monihan Exh. 17; JM Dep. 138-9; CW Dep. 66, 108-9, 336-7, 477-9, 495-6; see also RM Dep. 104-5, 108-9, 180, 209-210, 257-258).

38.   Admit Paragraph 38 (EL Dep. 43-44).

39.    Deny Paragraph 39, except admit that Ms. Lawless testified that her understanding of the "good to great" philosophy, as explained by Defendants, was "it's all about putting the right people in the right place on the bus." (EL Dep. 44-45).

40.    Admit Paragraph 40 and aver that Ms. Woodard also requested several other accounts but was only allowed to retain TIAA-Cref and Hankook. (CW Dep. 110; Pl. Dep. Exh. 85; Woodard Dep. Exh. 10; Woodard Dep. Exh. 54; CW Dep. 109-113, 476).

41.    Admit Paragraph 41 (Woodard Dep. Exh. 10; CW Dep. 110).

42.    Admit Paragraph 42 and aver that Ms. Woodard testified that at the time of her unlawful discharge, "I knew what I needed to know to get the job done" and that "I was tracking at 117 percent to goal at the time I was terminated." (CW Dep. 95).

43.    Admit Paragraph 43 (CW Dep. 101).

44.    Admit Paragraph 44 (CW Dep. 104).

45.    Admit Paragraph 45 (CW Dep. 127).

46.    Deny Paragraph 46, except admit that Ms. Woodard testified that "I had a great deal of conversation with Mark Gall about my deals because every deal I did had to be approved by him." (CW Dep. 151).

47.    Deny Paragraph 47, except admit that from about July 2004 until his separation from Defendants in 2009, Mr. Iaffaldano was Executive Vice President, General Manager of TWCMS. (Woodard Aff. ¶ 28).

48.    Deny Paragraph 48 and aver that Ms. Woodard had limited contact with Mr. Iaffaldano, as described in her affidavit, and he praised her performance. (Woodard Aff. ¶ 27-31).

49.    Deny Paragraph 49, and aver that Mr. Iaffaldano had limited contact with Ms. Woodard and he praised her performance and not once did he criticize her work, and she never told Mr. Iaffaldano that I "took no for an answer." (Woodard Aff. ¶ 27-31).

50.     Deny Paragraph 50, and aver that Mr. Iaffaldano had limited contact with Ms. Woodard and he praised her performance and not once did he criticize her work, and she never told Mr. Iaffaldano that I "took no for an answer." (Woodard Aff. ¶ 27-31).

51.     Deny Paragraph 51, and aver that Mr. Iaffaldano had limited contact with Ms. Woodard and he praised her performance and not once did he criticize her work, and she never told Mr. Iaffaldano that I "took no for an answer." (Woodard Aff. ¶ 27-31).

52.     Admit Paragraph 52 (Woodard Dep. Exh. 25) and aver that Ms. Woodard filed an internal complaint of discrimination against Mr. Celt based upon his unlawful discriminatory comments noting that such conduct occurred over a period of weeks. (Compl. ¶ 45; Pl. Dep. Exh. 31; Woodard Dep. Exh. 25; CW Dep. 196; Gordon Aff.).

53.     Deny Paragraph 53, except admit that Mr. Gall sent an email to Ms. Woodard stating "Thank you...." and "I will meet with you again after Pam and I discuss this matter at length." (Id.), and aver that Mr. Gall then proceeded to make discriminatory comments directly to Ms. Woodard and therefore, Mr. Gall was insincere in expressing a "thank you" because he too harbored unlawful discriminatory animus. (Compl. ¶ 46-49; Woodard Aff. ¶ 1; supra Point II-B).

54.     Deny Paragraph 54, except admit that Mr. Gall sent an email to Ms. Woodard alleging, among other items, that he had discussed Ms. Woodard's complaint with Pam Sawyer, Laverne Broderick and Paul Celt. (Pl. Dep. Exh. 33; Woodard Dep. Exh. 27; CW Dep. 205).

55.     Deny Paragraph 55, except admit that Mr. Gall sent an email to Ms. Woodard stating that Mr. Celt's unlawful discriminatory conduct was a "serious breach of conduct." (Pl. Dep. Exh. 33; Woodard Dep. Exh. 27; CW Dep. 205), aver that Mr. Gall alleges that he advised Mr. Celt "that type of behavior is not allowed, it's inexcusable and I wanted to understand more about it" (MG Dep. 34), aver that Ms. Sawyer alleged that a verbal warning was given by Mr. Gall to Mr. Celt. (PS Dep. 64), and aver that Mr. Gall testified that a written warning was given to Mr. Celt but no written warning was produced (MG Dep. 34-35, 41-42; Woodard Aff. ¶ 40).

56. Deny Paragraph 56, except admit that Mr. Gall sent an email to Ms. Woodard alleging, among other items, that Mr. Celt "assured me that the behavior will not occur again." (Pl. Dep. Exh. 33; Woodard Dep. Exh. 27; CW Dep. 205).

57. Admit Paragraph 57 (Pl. Dep. Exh. 33; Woodard Dep. Exh. 27; CW Dep. 205) and aver that Mr. Gall himself made discriminatory comments to Ms. Woodard (Compl. ¶ 46-49; Woodard Aff. ¶ 1; supra Point II-B).

58. Admit Paragraph 58 (Woodard Dep. Exh. 26; CW Dep. 203).

59. Admit Paragraph 59 (Woodard Dep. Exh. 26; CW Dep. 200-201, 203) and aver that Ms. Woodard stated in her memo that "I am sure that there are policies in place to correct and prevent this behavior from reoccurring."

60. Admit Paragraph 60 (Woodard Dep. Exh. 23; CW Dep. 183-4, 201).

61. Admit Paragraph 61 (Woodard Dep. Exh. 23; CW Dep. 183-4, 201).

62. Deny Paragraph 62, except admit that Ms. Woodard received an email from Mr. Gall, dated August 25, 2004 (Woodard Dep. Exh. 27; Pl. Dep. Exh. 33; CW Dep. 205).

63. Deny Paragraph 63, except admit that Ms. Woodard received an email from Mr. Gall, dated August 25, 2004 (Woodard Dep. Exh. 27; Pl. Dep. Exh. 33; CW Dep. 205), in which Mr. Gall stated "I want to hear from you immediately if any similar situations arise in the future."

64. Admit Paragraph 64 (CW Dep. 201-202, 211-212), and aver that Ms. Woodard subsequently learned that Mr. Celt had rummaged through her desk and/or was involved in Mr. Gall's assignment of "dead accounts" to her. (CJ Dep. 139-142; JM Dep. 144).

65. Admit Paragraph 65 (First Amended Complaint).

66. Admit that in December 2004 Defendants gave Ms. Woodard a performance evaluation with an Overall Performance Score of .55 and refer to the document for the allegations therein (Pl. Dep. Exh. 36; Woodard Dep. Exh. 11; Compl. ¶ 60; CW Dep. 114).

67. In response to Paragraph 67, admit that Ms. Woodard testified that the December 2004 performance evaluation was "negative", that she disagreed with "a lot of things" in the

– 9 –

evaluation, and that the evaluation was part of an effort "to get rid of me." (CW Dep. 118; Pl. Dep. Exh. 36).

68.    Deny Paragraph 68, except admit that if the scores of 0 are removed, the Overall Performance Score would be more than "1", which is denoted as "Exhibits good behaviors consistently." (Woodard Dep. Exh. 11; Pl. Dep. Exh. 36; CW Dep. 114).

69.    Admit Paragraph 69 and aver that Ms. Woodard also complained about her 2005 Compensation Package and refer to the January 6, 2005 memorandum for its complete contents. (Woodard Dep. Exh. 13; CW Dep. 129).

70.    Admit Paragraph 70 and aver that on January 4, 2005, Ms. Woodard filed a complaint with Ms. Romeo about her 2005 compensation package and the performance evaluation that she had received in December 2004 and refer to the written complaint for its complete contents. (Woodard Dep. Exh. 58; CW Dep. 480).

71.    Deny Paragraph 71, except refer to Ms. Woodard's complaints of January 4, 2005 and January 6, 2005 for their complete contents, and aver that Ms. Woodard raised the issue of the compensation of her peers in her complaints, and admit that Ms. Woodard did not expressly allege in those two written complaints that she was being paid less because she is a black woman or had complained about Paul Celt. (Woodard Dep. Exh. 13; Woodard Dep. Exh. 58; CW Dep. 129, 480).

72.    Admit Paragraph 72 (CW 0989-90).

73.    Deny Paragraph 73 and aver that Mr. Gall's testimony regarding alleged statements made by Lisa Siewers constitute inadmissible hearsay. (See MG Dep. 96, 285-286), and aver that Ms. Woodard needed approval from Mr. Gall for all deals including rates and on the Pella deal Mr. Gall failed to provide approval. (CW Dep. 151; Woodard Dep. Exh. 61).

74.    Deny Paragraph 74 and aver that Mr. Gall's testimony regarding alleged statements made by Lisa Siewers constitute inadmissible hearsay. (See MG Dep. 96-97).

75.     Deny Paragraph 75, except admit that Mr. Gall stated that "our process is to connect with Mary Jo Romeo, her supervisor, and have Mary Jo give that feedback" (MG Dep. 96).

76.     Admit Paragraph 76 and aver that the original plan was revised. (See Sack Dec. Exh. Y).

77.     Deny Paragraph 77, except admit that Ms. Woodard sent an email to Ms. Romeo on January 19, 2005 which speaks for itself (TWC0160), and refer to Ms. Woodard's complete correspondence with Ms. Romeo for its terms. (See Sack Dec. Exh. Y).

78.     Deny Paragraph 78, except admit that on or about January 19, 2005, Ms. Romeo directed Ms. Woodard not to contact Lisa Siewers/Active International about the deal until after Ms. Romeo met with the client on January 21, 2005 (See Sack Dec. Exh. Y).

79.     Deny Paragraph 79, except admit that on January 28, 2005, Ms. Romeo sent an email to Ms. Woodard (Woodard Dep. Exh. 62; MJR Dep. 35; CW Dep. 485-6), and aver that the contents of such email contains inadmissible hearsay.

80.     Deny Paragraph 80, except admit that Ms. Romeo testified that Siewers told her "it's very difficult to work with Claudia, that she wasn't getting what she needed, and as a result, we were going to lose business, the Weather Channel" (MJR Dep. 75), and aver that such alleged statements are inadmissible hearsay.

81.     Deny Paragraph 81, except admit that Ms. Romeo testified about alleged statements made by Ms. Siewers (MJR Dep. 76-77), and aver that such alleged statements are inadmissible hearsay.

82.     Admit Paragraph 82 (CW Dep. 328-9).

83.     Deny Paragraph 83, except admit that Ms. Romeo alleged to Ms. Woodard that Ms. Siewers had herself alleged that Ms. Woodard had a listening problem and a knowledge problem and that Ms. Siewers had to call four times to get a response (CW Dep. 324; MJR Dep.

-11-

77; Woodard Dep. Exh. 37A; CW Dep. 325, 328-9, 484-5), and aver that such alleged statements are inadmissible hearsay.

84.     Admit Paragraph 84 (Woodard Dep. Exh. 62; CW Dep. 485)

85.     Deny Paragraph 85, except admit that at 12:43 p.m. on January 28, 2005, several hours before Ms. Romeo's January 28, 2005 email of 5:13 p.m., Ms. Woodard sent an email to Ms. Romeo including the catch-phrase "the customer is always right" and refer to Ms. Woodard's email for its contents.  (Woodard Dep. Exh. 41; TWC 0158; CW Dep. 341, 344-51).

86.     Deny Paragraph 86, except admit that Ms. Woodard was paid commissions on the Pella deal because it had been her account and she had worked on it.  (CW Dep. 309-10; <u>see also</u> Pl. Dep. Exh. 52).

87.     Deny Paragraph 87, except admit that Ms. Woodard faxed a written complaint to Pam Sawyer, regarding unlawful conduct by Ms. Romeo, which complaint speaks for itself and refer to same, and which complaint was submitted after Ms. Woodard had orally advised Ms. Sawyer at a meeting in Florida in late January 2005 that a complaint would be filed.  (Woodard Dep. Exh. 33; CW Dep. 127,  274-80).

88.     Admit Paragraph 88, aver that Ms. Woodard filed an internal complaint of discrimination and hostile work environment, and refer to Ms. Woodard's written complaint and subsequent submissions for their complete content regarding her complaints about Ms. Romeo. (Woodard Dep. Exh. 33; Woodard Dep. Exh. 62; Compl. ¶ 63; Pl. Dep. Exh. 45; Pl. Dep. Exh. 46; CW Dep. 485).

89.     Deny Paragraph 89, except refer to Ms. Woodard's written complaint and submissions for their complete content regarding her complaints (dated January 28, 2005 and February 2, 2005 notes) about Ms. Romeo.  (Compl. ¶ 63; Pl. Dep. Exh. 45; Pl. Dep. Exh. 46; Woodard Dep. Exh. 33; Woodard Dep. Exh. 62; Compl. ¶ 63; Pl. Dep. Exh. 49; Woodard Dep. Exh. 52; CW Dep. 461-2; <u>see also</u> Woodard Dep. Exh. 35).

90.     Admit Paragraph 90 (CW Dep. 295-7, 303-4).

91.     Admit Paragraph 91 (CW Dep. 311).

92.     Admit Paragraph 92 (Pl. Dep. Exh. 52).

93.     Deny Paragraph 93, except admit that on or about February 3, 2005, Ms. Romeo submitted a memorandum to Mr. Gall and Ms. Sawyer, which speaks for itself (Pl. Dep. Exh. 53), and admit that Ms. Sawyer admitted that Ms. Woodard's complaint had validity. (PS Dep. 126-7, 140-2).

94.     Deny Paragraph 94, except admit that Ms. Woodard testified that Ms. Sawyer came to New York in mid-February 2005 " to speak with me and Mary Jo Romeo to try to find a way for us to work together" and that Ms. Woodard met with Ms. Sawyer. (CW Dep. 320-1).

95.     Deny Paragraph 95, except admit that Defendants terminated Ms. Romeo's employment (CW Dep. 321), and aver that Ms. Sawyer testified that Ms. Romeo was fired because of complaints by (1) "other individuals in Media Solutions" that reported to Ms. Romeo and (2) Ms. Woodard's complaints about Ms. Romeo (PS Dep. 126-127), and further aver that Ms. Romeo testified that Defendants told her that her employment was being terminated not because of any complaint by Ms. Woodard or any other employee, but solely because of complaints by "perspective employees." (MJR Dep. 8-11), which directly contradicts Ms. Sawyer's testimony, and aver that Ms. Romeo also testified that she received a severance package. (MJR Dep. 60-61).

96.     Admit Paragraph 96 and aver that Ms. Woodard was assigned to Meade Camp as an interim sales manager and that Ms. Woodard was the only Account Manager reporting to Mr. Camp. (CW Dep. 361).

97.     Deny Paragraph 97 and also aver that Mr. Camp's allegation in his Affidavit that Heidi Kahme of Initiative Media requested the removal of Ms. Woodard from its account is inadmissible hearsay, and aver that Kara Levine and Patty Norway, who negotiated with Ms.

Woodard on behalf of Initiative Trade, were pleased with her performance, and Ms. Woodard did not cover Initiative Media (Goldberg Cert., Exh. II).[3]

98.    Deny Paragraph 98 and also aver that Mr. Camp's allegation in his Affidavit that Heidi Kahme of Initiative Media requested the removal of Ms. Woodard from its account is inadmissible hearsay, and aver that Kara Levine and Patty Norway, who negotiated with Ms. Woodard on behalf of Initiative Trade, were pleased with her performance, and Ms. Woodard did not cover Initiative Media (Goldberg Cert., Exh. II).

99.    Deny Paragraph 99 and also aver that Mr. Camp's allegation in his Affidavit that Heidi Kahme of Initiative Media requested the removal of Ms. Woodard from its account is inadmissible hearsay, and aver that Kara Levine and Patty Norway, who negotiated with Ms. Woodard on behalf of Initiative Trade, were pleased with her performance, and Ms. Woodard did not cover Initiative Media (Goldberg Cert., Exh. II).

100.    Deny Paragraph 100 and also aver that Mr. Camp's allegation in his Affidavit that John Viserto of Active International complained about Ms. Woodard is inadmissible hearsay (CW Dep. 361), aver that Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261), aver that in February 2005, Ms. Woodard invited Mr. Viserto and others to TWC's Upfront Presentation and weekend getaway on March 11-13, 2005 in Quebec and the invitations were accepted, aver that Ms. Woodard had success with other clients that praised her, and aver that Ms. Woodard had dealings with John Viserto and he never expressed any dissatisfaction with her services as Account Manager. (Goldberg Cert., Exh. II; Woodard Dep. Exh. 63; CW Dep. 486-7; Woodard Aff. ¶ 14).

101.    Deny Paragraph 101 and also aver that Mr. Camp's allegation in his Affidavit that John Viserto of Active International complained about Ms. Woodard is inadmissible hearsay (CW Dep. 361), aver that Ms. Woodard had a history of successful dealings with the account

---

[3]There are two Initiative entities: Initiative Trade and Initiative Media.  Ms. Woodard covered Initiative Trade.  (RM Dep. 271).

(RM Dep. 244-246, 261), aver that Ms. Woodard had success with other clients that praised her (Goldberg Cert., Exh. II), and aver that Ms. Woodard had dealings with John Viserto and he never expressed any dissatisfaction with her services as Account Manager. (Woodard Dep. Exh. 63; CW Dep. 486-7; Woodard Aff. ¶ 14).

102. Deny Paragraph 102 and also aver that Mr. Camp's allegation in his Affidavit that John Viserto of Active International complained about Ms. Woodard is inadmissible hearsay (CW Dep. 361), aver that Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261), aver that Ms. Woodard had success with other clients that praised her (Goldberg Cert., Exh. II), and aver that Ms. Woodard had dealings with John Viserto and he never expressed any dissatisfaction with her services as Account Manager. (Woodard Dep. Exh. 63; CW Dep. 486-7; Woodard Aff. ¶ 14).

103. Deny Paragraph 103 and also aver that Mr. Camp's allegation in his Affidavit that John Viserto of Active International complained about Ms. Woodard is inadmissible hearsay (CW Dep. 361), aver that Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261), aver that Ms. Woodard had success with other clients that praised her (Goldberg Cert., Exh. II), aver that Ms. Woodard had dealings with John Viserto and he never expressed any dissatisfaction with her services as Account Manager (Woodard Dep. Exh. 63; CW Dep. 486-7; Woodard Aff. ¶ 14), and aver that Mr. Camp was a Client Solutions Manager and as such did not supervise Account Managers. (Woodard Aff. ¶ 24).

104. Deny Paragraph 104 and also aver that Mr. Camp's allegation in his Affidavit that John Viserto of Active International complained about Ms. Woodard is inadmissible hearsay (CW Dep. 361), aver that Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261), aver that Ms. Woodard had success with other clients that praised her. (Goldberg Cert., Exh. II), aver that Ms. Woodard had dealings with John Viserto and he never complained to her about her performance and never expressed any dissatisfaction with her services as Account Manager (Woodard Dep. Exh. 63; CW Dep. 486; Woodard Aff. ¶ 14), and

aver that Mr. Camp's allegation in his Affidavit that clients complained about Ms. Woodard is inadmissible hearsay. (Woodard Aff. ¶ 2-26).

105.  Deny Paragraph 105, except refer to the alleged email from Deirdre O'Grady to Mark Gall (dated April 5, 2005) for its contents (CW 0063; Woodard Dep. Exh. 65), aver that during Ms. Woodard's employment, Ms. O'Grady never raised any criticism of Ms. Woodard's performance with Ms. Woodard, aver that after Ms. Woodard filed a complaint about Paul Celt in August 2004, O'Grady took Ms. Woodard to lunch and told her that "she understood that I was coming from The Wall Street Journal and The Weather Channel must be a real culture shock for me", and told Ms. Woodard "If any of her employees ever went to HR or complained to file a complaint about anything that it would be the end of them" (CW Dep. 51-52), and aver that in 2005 Ms. O'Grady told Ms. Woodard that she saw how hard Ms. Woodard was working and took notice that Ms. Woodard was closing a lot of deals. (Woodard Aff. ¶ 32).

106.  Deny Paragraph 106, except admit that Mr. Monihan coached Ms. Woodard and she sought his help (RM Dep. 28), aver that in or about the Spring of 2005, Rick Monihan, Director of Planning and Inventory, complained to Pam Sawyer that Mr. Gall and Mr. Iaffaldano were setting up Ms. Woodard. (RM Dep. 33-4), aver that Mr. Monihan witnessed that Ms. Woodard "was not getting enough support" from Mr. Gall (RM Dep. 28-9), aver that Mr. Monihan had previously approached Mr. Gall about providing support to Ms. Woodard and Mr. Gall's response made it clear to Mr. Monihan that Mr. Gall had no intention of doing so, aver that Mr. Monihan felt that Mr. Gall should have been concerned when Mr. Monihan expressed that Ms. Woodard needed more support (RM Dep. 181, 228), aver that Mr. Monihan said "I don't believe that they gave her enough support. I contended that when I was there." (RM Dep. 201-2), aver that Mr. Monihan testified that he told Ms. Woodard that she had been set up for failure, and aver that Mr. Monihan felt this way because he was aware of the poor quality account list that had been assigned to Ms. Woodard. (RM Dep. 104-5, 108-9, 180; CW Dep. 178-9, 374-5).

107.    Deny Paragraph 107, except admit that on Page 59 of Mr. Monihan's deposition transcript, he stated "I might have" spoken with Ms. Romeo about problems he had with Ms. Woodard's performance (RM Dep. 59) and aver that Mr. Monihan testified that Defendants set up Ms. Woodard to fail and did not provide her with adequate support (Supra ¶ 106, 255, 313).

108.    Deny Paragraph 108, except admit that Mr. Monihan testified that at some point he was not fond of Ms. Woodard's work ethic (RM Dep. 27), aver that Mr. Monihan also testified that he did not supervise Account Managers and did not evaluate their job performance. (RM Dep. 86-87, 160, 234), and aver that Mr. Monihan testified that Defendants set up Ms. Woodard to fail and did not provide her with adequate support (Supra ¶ 106, 255, 313).

109.    Deny, except admit that Mr. Monihan made the quoted statement during his deposition, and refer to Mr. Monihan's complete testimony regarding Ms. Woodard.  (RM Dep. 28; Supra ¶ 106, 255, 313).

110.    Deny Paragraph 110, except admit that Mr. Monihan's position was Director of Planning and Inventory, aver that his job duties were broad (RM Dep. 78-9), aver that he provided examples of job duties and stated "There's probably more", and aver that Mr. Monihan testified that he helped various Account Managers with their deals and testified that it was not uncommon for him to do so.  (RM Dep. 28, 59-60).

111.    Deny Paragraph 111, except admit that Mr. Monihan complained to Pam Sawyer, among other items, that the Company was "setting up Claudia" to fail because Ms. Woodard "has a very difficult list and a very...from what I knew had a difficult budget to reach given the list" (RM Dep. 34), and that Mr. Monihan also testified that he told Ms. Sawyer "releasing her...it was probably the right thing to do."  (RM Dep. 34).[4]

112.    Deny Paragraph 112, except admit that Ms. Romeo alleged that Ms. Monson said that Ms. Woodard asked her questions "and she was just getting worn out by it."  (MJR Dep. 79),

---

[4]At some point Mr. Monihan was given a warning and was then asked him if he would support the company regarding matters pertaining to Ms. Woodard.  (RM Dep. 179-80, 227-228).

and aver that Ms. Monson testified that Ms. Woodard "was a perfectly capable account manager who would have a very successful career outside of The Weather Channel because she was never going to get anywhere there" (JM Dep. 103), aver that after Ms. Monson was demoted by Mr. Gall from Account Manager to Account Manager-Direct Response, she was angry and did not want to train an Account Manager that received the job that Ms. Monson had been demoted from. (JM Dep. 103-104, 154), and aver that Defendants assigned Ms. Woodard to accounts previously covered by Ms. Monson prior to her demotion from Account Manager to Direct Response. (Woodard Aff. ¶ 46).

113.    Deny Paragraph 113 and aver that Mr. Meadow did not work with Ms. Woodard on any deals (Woodard Aff. ¶ 33), and Mr. Meadow had no reporting relationship with Ms. Woodard and attempted to sabotage Ms. Woodard by going through her desk. (CJ Dep. 139-41; JM Dep. 144).

114.    Deny Paragraph 114, except admit that on January 28, 2005, Ms. Romeo sent an email to Ms. Woodard stating "Mark and I are considering a range of options including other roles at a lower level for you" and that "I have reservations in general about your skillsets and the mismatch for the skills required for an Account Manager." (Woodard Dep. Exh. 60; CW Dep. 483).

115.    Deny Paragraph 115, except admit that Mr. Gall testified that "I observed that she wasn't developing her skill sets in an appropriate fashion and in learning the business at the levels that are required to be successful" (MG Dep. 286) and aver that Mr. Gall had no basis to render such an opinion on Ms. Woodard because, among other items, he was unable to identify any sales call he had with Ms. Woodard (MG Dep. 54), and failed to provide training and support to Ms. Woodard (MG Dep. 54, 61; Compl. ¶ 33, 51, 52, 55, 68), and aver that Mr. Gall told Ms. Woodard that it would still take approximately 16 months to fully transition from a print media sales environment into the cable world. (CW Dep. 92-93).

116. In response to Paragraph 116, admit that Ms. Woodard's gross revenue for the first quarter of 2005 was at 53.3% to goal (CW0332), aver that the entire Company failed to meet its goals for the first quarter of 2005 (RM Dep. 199-201, 243-4), and aver that as of April 19, 2005, Ms. Woodard was tracking at 116.9% of goal for the second quarter of 2005 and, therefore, was exceeding her goals as of the date of her unlawful termination on April 22, 2005. (Pl. Dep. Exh. 89; Monihan Dep. Exh. 15; RM Dep. 195-7, 242-3).

117. Deny Paragraph 117, aver that Ms. Woodard filed a complaint with Mr. Iaffaldano in January 2005 regarding her compensation package and 2004 evaluation (Pl. Dep. Exh. 40; Woodard Dep. Exh. 13; MJR Dep. 32, 59; CW Dep. 129), aver that Mr. Iaffaldano was aware of Ms. Woodard's protected complaints, and aver that by March 28, 2005, Mr. Iaffaldano advised Mr. Gall that he wanted Ms. Woodard to be fired, which Mr. Gall relayed to Pam Sawyer by email (Pl. Dep. Exh. 53; Pl. Dep. Exh. 54; Woodard Dep. Exh. 64; PS Dep. 147-151; MG Dep. Tr. 108-112; Pl. Dep. Exh. 54; CW Dep. 487).

118. Deny Paragraph 118 and aver that alleged client complaints about Ms. Woodard are inadmissible hearsay and alleged statements by Gall to Iaffaldano are hearsay.

119. Deny Paragraph 119 and aver that alleged statements by Gall to Iaffaldano are hearsay, and aver that in the Statement Of Mark Gall submitted to EEOC in response to Ms. Woodard's EEOC Charge, he makes absolutely no mention of Mr. Iaffaldano. (Pl. Dep. Exh. 81).

120. Deny Paragraph 120 and aver that alleged statements by Gall to Iaffaldano are hearsay, and aver that in the Statement Of Mark Gall submitted to EEOC in response to Ms. Woodard's EEOC Charge, he makes absolutely no mention of Mr. Iaffaldano. (Pl. Dep. Exh. 81).

121. Deny Paragraph 121 and aver that in the Statement Of Mark Gall submitted to EEOC in response to Ms. Woodard's EEOC Charge, he makes absolutely no mention of Mr. Iaffaldano (Pl. Dep. Exh. 81), and aver that on March 28, 2005, Mr. Gall sent an email to Ms.

-19-

Sawyer stating that Mr. Iaffaldano wanted to "either terminate her now, or offer to keep her on through the upfront as an SSA, pay her as a salesperson, but let her know she's out by June 15 - or some other date that we agree on." (Pl. Dep. Exh. 54), which occurred after complaints that Woodard filed. (Pl. Dep. Exh. 31; Woodard Dep. Exh. 13; Pl. Dep. Exh. 94; Woodard Dep. Exh. 39; Woodard Dep. Exh. 58).

122. Deny Paragraph 122, except admit that after Ms. Romeo separated from Defendants, Ms. Woodard was assigned to Mr. Camp (Pl. Dep. Exh. 171), and aver that Mr. Camp had a "hands off" approach with Ms. Woodard, declined to provide assistance or support, and told Ms. Woodard that he had a "day job." (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3).

123. Deny Paragraph 123 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties. (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

124. Deny Paragraph 124 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support did not regularly observe her in the performance of her job duties. (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26), and aver that Ms. Woodard was tracking at 116.9% of her goal for the quarter at the time of her termination. (Compl. ¶ 74; Pl. Dep. Exh. 89).

125. Deny Paragraph 125 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

126. Deny Paragraph 126 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the

performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

127.    Deny Paragraph 127 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

128.    Deny Paragraph 128 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

129.    Deny Paragraph 129 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her (Woodard Aff. ¶ 2-14, 15-26), and aver that Camp's alleged statements to Iaffaldano are hearsay.

130.    Deny Paragraph 130 and aver that Mr. Camp had a "hands off" approach with Ms. Woodard and declined to provide assistance or support and did not regularly observe her in the performance of her job duties (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3), and aver that Mr. Camp had praised Ms. Woodard in prior dealings with her. (Woodard Aff. ¶ 2-14, 15-26).

131.    Deny Paragraph 131, except admit that on April 18, 2005, Defendants gave Ms. Woodard a written warning (CW Dep. 413, 416; Pl. Dep. Exh. 56; Woodard Dep. Exh. 47), aver that such document raised false criticisms of Ms. Woodard's performance (Woodard Dep. Exh. 49; CW Dep. 427) and aver that such document was a set up for discharge based upon Mr. Gall's March 28, 2005 email to Pam Sawyer. (Pl. Dep. Exh. 53; Pl. Dep. Exh. 54; Woodard Dep. Exh. 64; PS Dep. 147-151; MG Dep. Tr. 108-112; Pl. Dep. Exh. 54; CW Dep. 476; supra ¶ 255).

132.     Deny Paragraph 132, except admit that on April 18, 2005, Defendants gave Ms. Woodard a written warning (CW Dep. 413, 416; Pl. Dep. Exh. 56; Woodard Dep. Exh. 47), aver that such document raised false criticisms of Ms. Woodard's performance (Woodard Dep. Exh. 49; CW Dep. 427) and aver that such document was a set up for discharge based upon Mr. Gall's March 28, 2005 email to Pam Sawyer.  (Pl. Dep. Exh. 53; Pl. Dep. Exh. 54; Woodard Dep. Exh. 64; PS Dep. 147-151; MG Dep. Tr. 108-112; Pl. Dep. Exh. 54; CW Dep. 476; supra ¶ 255).

133.     Deny Paragraph 133, except admit that Mr. Gall alleges that he drafted the memorandum with assistance from Mr. Camp and Ms. Sawyer.  (MG Dep. 112), and aver that Ms. Sawyer testified that the document was prepared by Mr. Gall, Mr. Camp, Ms. Sawyer and "perhaps a legal partner" (PS Dep. 126, 154-155, 172-3).

134.     Deny Paragraph 134, except admit that Ms. Sawyer testified that her role "was to ensure that it delivered clear information to Claudia using input of the leaders and their assessments and then I guess using your terminology, yes, looking at it stylistically."  (PS Dep. 157).

135.     Deny Paragraph 135, except admit that Ms. Longo attended the April 18, 2005 meeting with Ms. Woodard (LL Dep. 21; EL Dep. 282-283).

136.     Deny Paragraph 136, except refer to the April 18, 2005 warning for its specific contents (Pl. Dep. Exh. 56; Woodard Dep. Exh. 47), aver that Mr. Gall alleged there were client complaints, aver Mr. Gall told Ms. Woodard she would no longer cover Active and Initiative, and that Ms. Woodard subsequently understood that she would not longer cover Icon International (CW Dep. 424), and aver that Defendants did not prohibit Ms. Woodard from having contact with such agencies.  (CW Dep. 419-22, 489-490; MG Dep. 156-157).

137.     Deny Paragraph 137, except admit that the April 18, 2005 written warning stated that "Meade and I will review your performance with you again on a formal basis on May 12, 2005" and "failure to meet the above expectations and sustain the improved level of performance

will result in further disciplinary action, up to and including termination. (Pl. Dep. Exh. 56; Woodard Dep. Exh. 47).

138.    Deny Paragraph 138, except admit on April 18, 2005, Ms. Woodard sent an internal email indicating that questions on accounts out of Active International or Magna Global Trading should be directed to Mark Gall because Ms. Woodard was no longer covering the account (Pl Dep. Exh. 55; Woodard Dep. Exh. 48; CW Dep. 422), and aver that Ms. Woodard's April 18, 2005 email was substantially similar to Ms. Woodard's January 28 email about account coverage and aver that Ms. Romeo admits there was nothing improper about Ms. Woodard's January 28, 2005 email (MRJ Dep. 53-54; Pl. Dep. Exh. 83), and aver that Ms. Woodard had been negotiating a deal with Christina Lincoln, a buyer at ICON International-the Lennox Account, and Mr. Gall had instructed Ms. Woodard to complete the deal.  (Woodard Aff. ¶ 47).

139.    Deny Paragraph 139, except admit that Mr. Gall sent an email to Ms. Woodard alleging that "your email to the team was not only inappropriate....but incorrect" and that Ms. Woodard responded to Mr. Gall's email on April 19, 2005. (Woodard Dep. Exh. 48; CW Dep. 422).

140.    Deny Paragraph 140, except admit that Ms. Woodard advised Jim Quinn of Active that she was no longer covering the Active account, and that when Mr. Quinn asked Ms. Woodard for an explanation, she provided the information that Mr. Gall had relayed to her, i.e., that Mr. Gall had told Ms. Woodard that "your superiors....are looking for or wanted somebody else."  (CW Dep. 432-33, 497), and aver that Mr. Gall admitted that it  was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts.  (MG Dep. 156-157).

141.    Deny Paragraph 141 and aver that Mr. Quinn's alleged statements to Mr. Gall are inadmissible hearsay, that Mr. Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and Mr. Gall testified that he never asked Mr. Quinn what was said.  (MG Dep. 153-155), and aver that Lisa Longo has no personal knowledge (LL Dep. 189; see also LL Dep. 17-24).

142.    Deny Paragraph 141 and aver that Mr. Quinn's alleged statements to Mr. Gall are inadmissible hearsay, that Mr. Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and Mr. Gall testified that he never asked Mr. Quinn what was said.  (MG Dep. 153-155), and aver that Lisa Longo has no personal knowledge (LL Dep. 189; see also LL Dep. 17-24), and aver that on or about April 20, 2005, Mr. Camp went to Colorado for a business meeting (Woodard Aff. ¶ 48).

143.    Deny Paragraph 142 and aver that Mr. Gall admitted that it  was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts (MG Dep. 156-157) and that Defendants did not forbid Ms. Woodard from having any contact with clients  (CW Dep. 419-422, 489-90), and Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261) and Mr. Camp had no personal knowledge of any alleged "agency's dissatisfaction" with Ms. Woodard and did not make any such allegation to Ms. Woodard.

144.    Deny Paragraph 144 and aver that Mr. Gall admitted that it  was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts (MG Dep. 156-157) and that Defendants did not forbid Ms. Woodard from having any contact with clients (CW Dep. 419-422, 489-90), and Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261).

145.    Deny Paragraph 145 and aver that Mr. Quinn's alleged statements to Mr. Gall and Gall's alleged statements to Iaffaldano are inadmissible hearsay, that Mr. Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and Mr. Gall testified that he never asked Mr. Quinn what was said (MG Dep. 153-155), and aver that Mr. Gall admitted that it  was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts (MG Dep. 156-157), and that Defendants did not forbid Ms. Woodard from having any contact with clients (CW Dep. 419-422, 489-90), and Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261).

146.    Deny Paragraph 146 and aver that Mr. Quinn's alleged statements to Mr. Gall and Gall's alleged statements to Iaffaldano are inadmissible hearsay, that Mr. Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and Mr. Gall testified that he never asked Mr. Quinn what was said (MG Dep. 153-155), and aver that Mr. Gall admitted that it  was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts (MG Dep. 156-157), and that Defendants did not forbid Ms. Woodard from having any contact with clients (CW Dep. 419-422, 489-90), and Ms. Woodard had a history of successful dealings with the account (RM Dep. 244-246, 261).

147.    Deny Paragraph 147, except admit that Mr. Gall testified that he told HR "That Claudia cannot do the job as presented required" (MG Dep. 287) and aver that Ms. Woodard was tracking at 116.9% of her goal for the quarter at the time of her discharge.  (Compl. ¶ 74; Pl. Dep. Exh. 89).

148.    Deny Paragraph 148 and aver that Mr. Gall testified that he did not make the decision to terminate Ms. Woodard's employment and was not involved in termination decisions (MG Dep. 83-5, 89-90), aver that Mr. Gall testified that the decision to terminate Ms. Woodard was made by Paul Iaffaldano, which testimony excludes Gall and Camp from the decision (MG Dep. 89-90, 92; 149-150), and aver that Mr. Gall's testimony is contradicted by deposition testimony of other witnesses and Mr. Gall's written statement submitted to EEOC (Pl. Dep. Exh. 81, ¶ 3; MG Dep. 120, 280, 287), and aver that Richard Klein, former HR Director, testified that Mr. Gall had authority to fire employees and terminated Elise Lawless. (RK Dep. 15-16, 23-24), and aver that Lisa Chang testified that Mark Gall and Paul Iaffaldano could recommend termination (LC Dep. 79-81).

149.    Deny Paragraph 149 and aver that Ms. Woodard submitted a written rebuttal to Defendants on April 22, 2005, before she was terminated.  (Woodard Dep. Exh. 49; CW Dep. 427).

-25-

150.     Deny Paragraph 150 and aver that on March 28, 2005, Mr. Gall sent an email to Pam Sawyer stating that Paul Iaffaldano "proposes that we either terminate her now, or offer to keep her on through the upfront as an SSA, pay her as a salesperson, but let her know she's out by Jun 15 - or some other date that we agree on" (Pl. Dep. Exh. 53; Pl. Dep. Exh. 54; Woodard Dep. Exh. 64; PS Dep. 147-151; MG Dep. Tr. 108-112; Pl. Dep. Exh. 54; CW Dep. 476) and further aver that Ms. Woodard submitted a written rebuttal to Defendants on April 22, 2005, before she was terminated.  (Woodard Dep. Exh. 49; CW Dep. 427).

151.     In response to Paragraph 151, admit that on June 3, 2005, Ms. Woodard timely filed an EEOC Charge, admit that such EEOC Charge included, among other items, claims of discrimination based on race, national origin and color, and retaliation, and further aver that Ms. Woodard's EEOC Charge also raised a claim of discrimination based on gender, and further aver that such EEOC Charge referred to discrimination against black females.  (Woodard Dep. Exh. 20; CW Dep. 171; Affidavit of Claudia Woodard Regarding EEOC Investigation).

152.     Deny Paragraph 152 and aver that on June 3, 2005, Ms. Woodard timely filed an EEOC Charge raising claims of discrimination based on race, national origin, color and gender, and retaliation, and further aver that Ms. Woodard's EEOC Charge referred to discrimination against black females.  (Woodard Dep. Exh. 20; CW Dep. 171; Affidavit of Claudia Woodard Regarding EEOC Investigation), and aver that on or about March 1, 2006, Ms. Woodard filed an amended EEOC Charge (Compl. ¶ 76; Pl. Dep. Exh. 65; Woodard Dep. Exh. 20; Woodard Dep. Exh. 21; CW Dep. 171, 173).

153.     Admit Paragraph 153 and aver that EEOC issued a Determination in Ms. Woodard's favor on her EEOC Charge in August 2008.  (Goldberg Cert., Exh. U).

154.     Deny Paragraph 154 and aver the EEOC conducted a thorough and detailed investigation over a period of years and Defendants were at all times represented by counsel and were given every opportunity to submit documents and information in response to Ms. Woodard's EEOC Charges.  (Goldberg Cert., Exhs. U, V; Woodard Aff. ¶ 52).

155.    Deny Paragraph 155 and aver the EEOC conducted a thorough and detailed investigation over a period of years and Defendants were at all times represented by counsel and were given every opportunity to submit documents and information in response to Ms. Woodard's EEOC Charges.  (Goldberg Cert., Exhs. U, V; Woodard Aff. ¶ 52).

156.    Deny Paragraph 156 and aver the EEOC conducted a thorough and detailed investigation over a period of years and Defendants were at all times represented by counsel and were given every opportunity to submit documents and information in response to Ms. Woodard's EEOC Charges, and EEOC is not required to disclose an ongoing investigation. (Goldberg Cert., Exhs. U, V; Woodard Aff. ¶ 52).

157.    Deny Paragraph 157 and aver the EEOC conducted a thorough and detailed investigation over a period of years and Defendants were at all times represented by counsel and were given every opportunity to submit documents and information in response to Ms. Woodard's EEOC Charges and EEOC is not required to disclose an ongoing investigation. (Goldberg Cert., Exhs. U, V; Woodard Aff. ¶ 52).

158.    Deny Paragraph 158, except refer to counsel's letter for its contents.  (See Sack Decl., Exh. WW), and aver that on February 6, 2006, Plaintiff's counsel submitted a follow up letter rescinding the request of January 18, 2006.  (Goldberg Cert., Exh. AA).

159.    Deny Paragraph 159, except admit that in April 2006, Defendants promoted Lakieben Brown (African American male) to Account Manager (Pl. Dep. Exh. 106; JM Dep. Tr. 115), which occurred after both Plaintiffs had been terminated and had both filed EEOC Charges (CW Dep. 11), and admit that in or about 2004, Defendants promoted Sly Phifer to Account Manager (Goldberg Cert.,  Exh. BB), and aver that according to Mr. Monihan, Mr. Phifer (African American) was promoted and "got some beneficial treatment, but no, not in the way that Matt (Derella) or Peter (Wright) was" (both of whom are Caucasian)  (RM Dep. 106), and aver that any support given by Gall to Phifer and Brown supports Plaintiffs' claims of gender

-27-

discrimination, since Messrs. Phifer and Brown are males, and aver that Mr. Phifer was given a raise over Ms. Monson when both were serving in a Direct Response position. (JM Dep. 48).

160. Deny Paragraph 160, except admit that Defendants hired Ms. Romeo in November 2004 (Pl. Dep. Exh. 35) and hired Ms. Sachs in June 2005 (TWC 1567), and aver that Mr. Gall testified that Ms. Romeo was hired by upper management using a search firm. (MG Dep. 29-30), and aver that Ms. Sachs and Ms. Romeo were both terminated.

161. Deny Paragraph 161, except admit that in September 2004, Janet (Schatz) Poillon, a Caucasian, joined Defendants as an Account Manager, and was hired with a guaranteed commission and no formal revenue goal for 2004 (CW Dep. 245-9; Goldberg Cert., Exh. JJ), and aver that Ms. Schatz had cable/tv experience prior to joining Defendants. (CW Dep. 245-9; Woodard Aff., Exh. A).

162. Deny Paragraph 162, except admit that Defendants allege that in May 2007, while Plaintiffs' EEOC Charges were pending, Ms. Schatz was promoted from Account Manager to Sales Manager (MG Dep. 28).

163. Deny Paragraph 163 and aver that Mr. Gall's alleged treatment of Ms. Schatz is not a defense.

164. Deny Paragraph 164, except admit that Defendants hired Ms. Scully as an Account Manager after Ms. Woodard separated from Defendants. (MG Dep. 14; Goldberg Cert., Exh. KK).

165. In response to Paragraph 165, admit that Ms. Monson testified that Mr. Gall promoted her to Account Manager. (JM Dep. 34-35).

166. Deny Paragraph 166 and aver Mr. Iaffaldano engaged in inappropriate and unlawful conduct and is unqualified to opine that Mr. Gall acted properly.

167. Deny Paragraph 167 and aver that Mr. Iaffaldano engaged in inappropriate and unlawful conduct and is unqualified to opine that Mr. Gall acted properly.

168.     Deny Paragraph 168 and aver that Mr. Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that Mr. Gall acted properly.

169.     Deny Paragraph 169 and aver that Mr. Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that Mr. Gall acted properly.

170.     Deny Paragraph 170 and aver that Plaintiff Elise Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants, and aver that according to Richard Klein, Gall made the decision to fire Ms. Lawless. (Compl. ¶ 78-109; Goldberg Cert., Exhs. U and V; RK Dep. 15-16, 23).

171.     Deny Paragraph 171 and aver that Mr. Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that other managers acted properly.

172.     Deny Paragraph 172 and aver that Mr. Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that other managers acted properly.

173.     Deny Paragraph 173 and aver that Mr. Gall's alleged treatment of Ms. Matrange and Ms. Schatz (aka Poillon) is not a defense, and aver that Ms. Matrange was having an affair with Paul Celt, who was close with Mr. Gall (JM Dep. 115-6; CW Dep. 218), and aver that Ms. Schatz is a current employee.

174.     Deny Paragraph 174 and aver that Ms. Schatz's alleged observations is not a defense.

175.     Deny Paragraph 175 and aver that Ms. Schatz's alleged observations is not a defense.

176.     Deny Paragraph 176 and aver that Ms. Schatz's alleged observations is not a defense.

177.     Deny Paragraph 177 and aver that Defendants' alleged treatment of Ms. Schatz is not a defense.

178.     Deny Paragraph 178 and aver that Defendants' alleged treatment of Ms. Schatz is not a defense.

179.     Deny Paragraph 179 and aver that during Ms. Woodard's employment, TWC sales office meetings were regularly scheduled for 5:00 p.m. on Mondays or Tuesdays and Mr. Gall sometimes scheduled New York office meetings in the morning before regular office hours. (Woodard Aff. ¶ 33, 37, 49).

180.     Deny Paragraph 180 and aver that during Ms. Woodard's employment, TWC sales office meetings were regularly scheduled for 5:00 p.m. on Mondays or Tuesdays and Mr. Gall sometimes scheduled New York office meetings in the morning before regular office hours. (Woodard Aff. ¶ 33, 37, 49).

181.     Deny Paragraph 181 and aver that any award to Mr. Derella is not a defense.

182.     Deny Paragraph 182 and aver that the alleged events occurred after Ms. Woodard was unlawfully terminated and are not a defense.  (Woodard Aff. ¶ 33, 34, 35).

183.     Deny Paragraph 183 and aver that Mr. Derella's alleged observations is not a defense. (Woodard Aff. ¶ 33, 34, 35).

184.     Deny Paragraph 184 and aver that Mr. Derella's alleged observations is not a defense. (Woodard Aff. ¶ 33, 34, 35).

185.     Deny Paragraph 185 and aver that Plaintiff Elise Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants, and aver that according to Richard Klein, Gall made the decision to fire Ms. Lawless. (Compl. ¶ 78-109; Goldberg Cert., Exhs. U and V; RK Dep. 15-16, 23; Woodard Aff. ¶ 33, 34, 35).

186.     Deny Paragraph 186 and aver that Mr. Derella's alleged observations is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

187.     Deny Paragraph 187 and aver that Mr. Derella's alleged observations is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

188.     Deny Paragraph 188 and aver that Mr. Derella's alleged observations is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

189.    Deny Paragraph 189 and aver that Mr. Gall's alleged treatment of Ms. Matrange and Ms. Schatz (aka Poillon) is not a defense, and aver that Ms. Matrange was having an affair with Paul Celt, who was close with Mr. Gall  (JM Dep. 115-6; CW Dep. 218).  (Woodard Aff. ¶ 33, 34, 35).

190.    Deny Paragraph 190 and aver that Mr. Derella's alleged observations is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

191.    Deny Paragraph 191 and aver that Mr. Gall's alleged treatment of Ms. Matrange and Ms. Schatz is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

192.    Deny Paragraph 192 and aver that Ms. Scully was hired after Ms. Woodard separated from Defendants.  (MG Dep. 14; Goldberg Cert., Exh. KK; Woodard Aff. ¶ 34, 35).

193.    Deny Paragraph 193 and aver that Mr. Gall's alleged treatment of Ms. Scully is not a defense.  (Woodard Aff. ¶ 33, 34, 35).

194.    Deny Paragraph 194 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

195.    Deny Paragraph 195 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

196.    Deny Paragraph 196 and aver that Plaintiff Elise Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants, and aver that according to Richard Klein, Gall made the decision to fire Ms. Lawless. (Compl. ¶ 78-109; Goldberg Cert., Exhs. U and V; RK Dep. 15-16, 23; Woodard Aff. ¶ 33).

197.    Deny Paragraph 197 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

198.    Deny Paragraph 198 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

199.    Deny Paragraph 199 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

200.    Deny Paragraph 200 and aver that Mr. Gall's alleged treatment of Ms. Matrange is not a defense, and aver that Ms. Matrange was having an affair with Paul Celt, who was close with Mr. Gall.  (JM Dep. 115-6; CW Dep. 218; Woodard Aff. ¶ 33).

201.    Deny Paragraph 201 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

202.    Deny Paragraph 202 and aver that Mr. Gall's alleged treatment of Ms. Schatz is no defense to Plaintiffs' claims.  (Woodard Aff. ¶ 33).

203.    Deny Paragraph 203 and aver that Mr. Meadow's alleged observations is not a defense.  (Woodard Aff. ¶ 33).

204.    Deny Paragraph 204 and aver that Mr. Gall's alleged treatment of Ms. Scully is not a defense.  (Woodard Aff. ¶ 33).

205.    Admit regular office hours were 8:30 a.m. to 5:30 p.m. (Pl. Dep. Exh. 107).

206.    Deny Paragraph 206 except admit that regular office hours were 8:30 a.m. to 5:30 p.m.  (Pl. Dep. Exh. 107).

207.    Deny Paragraph 207, except refer to Defendants' alleged policy for its terms, and aver that Defendants failed and refused to enforce such policy.  (See Sack Decl. Exhs. UU).

208.    Deny Paragraph 208, except refer to Defendants' alleged policy for its terms, and aver that Defendants failed and refused to enforce such policy.  (See Sack Decl. Exhs. UU).

209.    In response to Paragraph 209, admit receipt of Acknowledgment Of Receipt Of Sexual Harassment Policies & Training form and refer to same for its contents, and admit that Ms. Woodard received training on eliminating sexual harassment.  (Woodard Dep. Exh. 57; CW Dep. 478).

210.    Deny Paragraph 210, except admit that Mr. Gall had a baseball bat in his office and Defendants did not produce the baseball bat during discovery for measurement. (JM Dep. 47-8, 118-9 ; Compl. ¶ 110; CW Dep. 450-4; EL Dep. 382-387; CJ Dep. 56-7), and aver that Mr. Celt also kept a baseball bat in his office.  (Woodard Aff. ¶ 39).

211.    Deny Paragraph 211, except admit that Mr. Gall alleges he received the baseball bat from Ted Turner.  (MG Dep. 136).

212.    Deny Paragraph 212 and aver that on multiple occasions, Gall summoned Ms. Woodard, Ms. Lawless, Jen Monson and/or other female employees into his office and swung a baseball bat and rubbed his hand on it in a sexual manner, in front of these and other female employees.  (JM Dep.  47-8, 118-9 ; Compl. ¶ 110; CW Dep. 450-452; EL Dep. 382-387; CJ Dep. 56-7).

213.    Deny Paragraph 213 and aver that on multiple occasions, Gall summoned Ms. Woodard, Ms. Lawless, Jen Monson and/or other female employees into his office and put his legs on the desk and opened them, thereby exposing his crotch.  (JM Dep.  47-8, 118-9 ; Compl. ¶ 110; CW Dep. 450-452; EL Dep. 382-387; CJ Dep. 56-7).

214.    Deny Paragraph 214, except admit that Ms. Woodard testified that she recalled occasions when Mr. Gall exposed his crotch and split his pants.  (CW Dep. 450-452).

215.    Deny Paragraph 215, except admit that Ms. Woodard "giggled" about who would tell Mr. Gall that his pants were split.  (CW Dep. 450-452).

216.    Admit Paragraph 216.  (CW Dep. 453).

217.    Deny Paragraph 217, except aver that Ms. Woodard testified early in her employment Mr. Gall "got real close to me and violated my personal space."  (CW Dep. 454-455, 460).

218.    Admit Paragraph 218 and also aver that and aver that on multiple occasions, Gall summoned Ms. Woodard, Ms. Lawless, Jen Monson and/or other female employees into his office and swung a baseball bat and rubbed his hand on it in a sexual manner, in front of these and other female employees.  (JM Dep.  47-8, 118-9 ; Compl. ¶ 110; CW Dep. 450-452; EL Dep. 382-387; CJ Dep. 56-7).

219.    Admit Paragraph 219 (CW Dep. 458-459).

-33-

220.    Deny Paragraph 220 and aver that Ms. Woodard made it clear to Mr. Gall, who was a member of management, that his unlawful conduct was unwelcome and offensive and Mr. Gall knew his conduct was unwelcome and offensive, and aver that Ms. Woodard did not file a formal internal complaint with HR about Mr. Gall.  (CW Dep. 75-76, 216, 453, 458-9; Woodard Aff. ¶ 45).

221.    Admit Paragraph 221 (CW Dep. 273, 459).

222.    Deny Paragraph 222, except admit that Ms. Woodard did not use the term "boys' club" in her written internal complaints to Defendants.  (CW Dep. 443-444).

223.    In response to Paragraph 223, admit that Ms. Woodard did not expressly include in her written complaints an allegation about employees going through her desk and aver that Defendants already knew that Mr. Gall and others were going through Ms. Woodard's desk. (CW Dep. 75-81, 218).

## II.        ADDITIONAL FACTS PURSUANT TO RULE 56.1(b)

### A     Ms. Woodard's Employment In 2004

224.    Claudia Woodard is a Plaintiff in this action.  She is an African American female. She is of Jamaican national origin, ancestry, heritage, ethnicity and descent.  (Compl. ¶ 3, 38). Ms. Woodard was employed by Defendants from June 2004 to April 22, 2005.  (Compl. ¶ 39; see Pl. Dep. Exh. 29; Pl. Dep. Exh. 60; Pl. Dep. Exh. 62).  She alleges claims of discrimination based on race, color, sex/gender and national origin, claims of retaliation, and claims of unlawful discharge. The claims are detailed in Ms. Woodard's Complaint, which she incorporates by reference.  (CW Dep. 503-4; Woodard Aff. ¶ 1; Compl. ¶ 75; Compl. ¶ 33; Woodard Aff. ¶ 1). During Ms. Woodard's employment, she was the only African American female Account Manager.  (MG Dep. 137-8)

225.    Elise Lawless is a Plaintiff.  She was employed by Defendants as an Account Manager from January 1999 to March 29, 2006.  (EL Dep. 14-20, 453-9).  Ms. Lawless worked with and knows Claudia Woodard.  (EL Dep. 53).  Ms. Lawless alleges claims of discrimination

based on gender, pregnancy and disability, retaliation and unlawful termination.  (Compl. ¶ 4, 78-109; see also (EL Dep. 17-24, 30, 468, 474, 480; EL Dep. Exh. 1).   Defendants have not moved for summary judgment on Ms. Lawless's claims.  Ms. Lawless testified about her claims.  As Ms. Lawless testified, the allegations in the Complaint are true and accurate.  (EL Dep. 63, 68, 123-127; Lawless Dep. Exh. 6).

226.    Jen Monson was employed by Defendants from 1999 to May 31, 2005.  (JM Dep. 25, 30, 44, Monson Exh. 7).  Ms. Monson was promoted to Account Manager and served in that position for about 1 year but was demoted by Mr. Gall to Account Manager-Direct Response.  (JM Dep. 35, 47, 58).  According to Ms. Monson, she resigned from Defendants because of discrimination by Mr. Gall and gave examples at her deposition.[5]  (JM Dep. 47-9, 52-56, 118-9).  She filed an EEOC Charge.  (Pl. Dep. Exh. 152; JM Dep. 23-7, 137; Monson Dep. Exh. 3).   Ms. Monson knows Plaintiffs and testified in support of their claims.  (JM Dep. 12).

227.    Defendants are TWC Media Solutions, Inc. ("TWCMS") and The Weather Channel.  Plaintiffs seek to hold Defendants jointly and severally liable.  Defendants have not moved for summary judgment on that issue.  (Compl. ¶ 5-6, 15-29).

228.    In July 2004, the parties signed a letter stating that Ms. Woodard was hired as a Client Development Manager, reporting to Meade Camp, SVP Client Development.  (Pl. Dep. Exh. 29; see also Woodard Dep. Exh. 1; Woodard Dep. Exh. 2; Compl. ¶ 40; Ans. ¶ 40; CW Dep. 32-35, 456-7).  Ms. Woodard's job duties included working with clients at a very high level to develop the relationships that were necessary to later entice them to secure advertising space.  (CW Dep. 35-37).  Defendants admit Ms. Woodard was qualified.   (See Affidavit of Meade Camp at ¶ 7, stating "I thought her skill set would be a great match for the CDM position.").

---

[5]Ms. Monson's resignation letter refers to mixed emotions, which Ms. Monson explained pertained to the discrimination she experienced. (Monson Dep. Exh. 7; JM Dep. 137-8).

229.    Prior to joining Defendants, Ms. Woodard was employed by The Wall Street Journal for years as an advertising sales Account Executive and had a very successful career there.  (CW Dep. 14-23; Compl. ¶ 39; Woodard Dep. Exh. 30; CW Dep. 249-50).

230.    Ms. Woodard served as a Client Development Manager ("CDM") with Defendants for about two months.  (CW Dep. 53, 67-68).  As a CDM, Ms. Woodard reported to Mr. Camp.  Mr. Camp repeatedly praised Ms. Woodard's job performance.  Prior to Ms. Woodard's termination, Mr. Camp never advised Ms. Woodard that there was any deficiency in her job performance and in fact praised Ms. Woodard's job performance, as did other managers and clients.  (Woodard Aff. ¶ 2-14, 27-31, 32; Goldberg Cert., Exh. HH, Exh II).  Ms. Woodard was told to obtain an overview of media math and did so.  (CW Dep. 48-55).  Media math involves terminology and calculations used in the business.  (CW Dep. 97-8).  Ms. Woodard had certain accounts to cover and brought in new business for Defendants, including Hankook Tire.  (CW Dep. 67-69, 93-94).  Ms. Woodard sought to take a multi-day external medial math course but was not allowed to do so. In or about December 2004, Ms. Woodard attended a 1-2 hour media math class given by Defendants to staff during a lunch period.  She had the skill set required to negotiate her own deals (Woodard Aff. ¶ 51; CW Dep. 101, 95-96).

231.    On or about July 26, 2004, Defendants announced that effective immediately: "All New York Network Sales initiatives will report to Mark Gall", Senior Vice President for Eastern Regional Sales ("Gall"). (Pl. Dep. Exh. 30).  Paul Iaffaldano became EVP in 2004 and Mr. Gall reported to him and reported to him throughout Ms. Woodard's employment.  (CW Dep. 219).

232.    In August 2004, Defendants eliminated the position of Client Development Manager and Ms. Woodard was transferred to the position of Account Manager, and was assigned to report to Mr. Gall  (Compl. ¶ 40; Pl. Dep. Exh. 30; CW Dep. 53, 57-58, 127, 456).  The other two Client Development Managers, Craig Meadow and Bruce Budkofsky (both white males), were also transferred to Account Manager positions.  (CW Dep. 46-48).  Mark Gall, a

−36−

Caucasian male, had joined Defendants in or about February 2003. Mr. Gall was head of the New York office and thus in charge of the Account Managers. (CW Dep. 58-9, 179).

233. All Account Managers had the same job duties and the primary job duty was to generate revenue. (MG Dep. 31, 300). Meeting or exceeding revenue goals is an indication of good job performance and Defendants paid Account Managers compensation based on their revenue. (PS Dep. 229-30; LL Dep. 96-7; RK Dep. 142; EL Dep. 37-39; MG Dep. 31, 300; CW Dep. 63-67, 108, 207-8).

234. Ms. Woodard, moving into the Account Manager role, signed a compensation package document, commonly referred to as a "deal sheet." Her initial annual compensation package as Account Manager was $85,000 annual salary, $57,000 annual commission opportunity (at goal), and $7,050 annual bonus opportunity, for a total of $148,050 (at goal). (Pl. Dep. Exh. 29; Woodard Dep. Exh. 3; Pl. Dep. Exh. 38; CW Dep. 37-39, 131-3).

235. Gall told Ms. Woodard that he understood that she was coming from The Wall Street Journal and had excellent sales experience and business acumen, but cautioned Ms. Woodard that it would still take approximately 16 months to fully transition from a print media sales environment into the cable world. (Compl. ¶ 40; CW Dep. 92-93). Paul Iaffaldano, EVP (white male), who was Mr. Gall's supervisor, admitted in an August 26, 2004 email that the sales process takes months. This corroborated Mr. Gall's comments to Ms. Woodard. (Pl. Dep. Exh. 88). The sales process involves Account Managers, Coordinators and Planners. (LL Dep. 96).

### B. Discriminatory Comments In 2004 And Ms. Woodard's Complaint

236. Ms. Woodard maintains that Defendants subjected her to numerous discriminatory, derogatory, harassing and inappropriate comments about women, blacks, and persons of Jamaican national origin. She maintains that unlawful and discriminatory comments were made by, among others, Paul Celt, Account Manager ("Celt"), Gall, Mary Jo Romeo, Vice President ("Romeo") and Meade Camp ("Camp"). (Compl. ¶ 41; CW Dep. 171, 173; Pl. Dep. Exh. 65; Woodard Dep. Exh. 20; Woodard Dep. Exh. 21).

237.     In 2004, Meade Camp essentially told Jen Monson (Account Manager) that he was required to hire a black woman for the Client Development Manager position filled by Ms. Woodard.  Ms. Monson advised Mr. Camp that she wanted to refer John Lefferts for the position.  Mr. Camp said "unless John Lefferts is a black woman he's not getting hired."  (JM Dep. 109-110).  Rick Monihan (Director of Planning and Inventory), wanted to recommend a candidate to Mr. Camp.  Mr. Camp told him "unless it's a black woman don't bother."  (RM Dep. 94-5, 170-1).  Mr. Camp also said that Ms. Woodard had been hired to fulfill a "diversity initiative"  (Tague Aff. ¶ 9 (Goldberg Cert., Exh. W); EL Dep. 91-93; JM Dep. 109-110).  Dierdre O'Grady, to whom Mr. Rick Monihan reported, told Mr. Monihan that bonuses were going to be connected to diversity hiring.  (RM Dep. 77-79, 182-3, 228-229).  Mr. Camp told Mr. Monihan that he would be wealthy if he hired all black women, implying that his bonus would be larger based upon such diversity hiring.  (RM Dep. 183, 229-230).   Similar comments were made when Defendants hired Catherine Jolly, another African American female. (Bhiro Aff. ¶ 18 (Goldberg Cert., Exh. X)).  In 2004, Ms. Lawless advised Ms. Woodard that Ms. Lawless had heard statements to the effect that Ms. Woodard had been hired to fulfill a diversity initiative. (CW Dep. 41; see also CW Dep. 371-3, 376).

238.     According to Pam Sawyer, Defendants paid bonuses to managers at the Vice President level and up, which bonuses took into account diversity hiring.  (PS Dep. 133).  Based on Ms. Sawyer's testimony, Mr. Camp, a Senior Vice President, received bonuses linked to diversity hiring.  (PS Dep. 133; Pl. Dep. Exh. 29; see also Woodard Dep. Exh. 1; Woodard Dep. Exh. 2).

239.     In 2004, during Ms. Woodard's employment, Paul Celt, a Caucasian male Account Manager, repeatedly made discriminatory comments about his sales assistant, Laverne Broderick (also known as Laverne Gordon), an African American female of Jamaican descent.  Mr. Celt made discriminatory comments about "Jamaican Tourism", Ms. Gordon "tilling Jamaican rum" in her bathtub, and others.  In August 2004, Ms. Woodard sent emails to Ms.

Gordon about these unlawful comments, all of which occurred. (Compl. ¶ 43; Woodard Dep. Exh. 57; CW Dep. 478-80).

240.     On August 18, 2004, during a staff meeting, which Ms. Woodard and others attended, Celt made a discriminatory comment that Ms. Broderick was illegally tilling Jamaican rum in her home bathtub and bringing the rum to work. (Compl. ¶ 44; CJ Dep. 99-102; Pl. Dep. Exh. 31; JM Dep. 97-8; RM Dep. 169-70; CW Dep. 209; Bhiro Aff.).

241.     On August 18, 2004, immediately after the staff meeting, Ms. Woodard filed a complaint of discrimination against Mr. Celt, with Mr. Gall and Pam Sawyer (VP, HR, The Weather Channel). The complaint stated, among other items: "As discussed, I am extremely offended by Paul Celts "Jamaican" comments that he has been making over the past 8 weeks." (Compl. ¶ 45; Pl. Dep. Exh. 31; Woodard Dep. Exh. 25; CW Dep. 194-197, 202-03, 217). Ms. Woodard followed up on that complaint with Gall and Sawyer. (Pl. Dep. Exh. 32; Woodard Dep. Exh. 26; Compl. ¶ 42; CW Dep. 203-05). Ms. Sawyer advised management about employee complaints. (PS Dep. 31, 51; see also Pl. Dep. Exh. 50; Woodard Dep. Exh. 36).

242.     On August 25, 2004, Mr. Gall admitted in writing to Ms. Woodard that Mr. Celt's conduct "is a serious breach of conduct." Mr. Gall alleged that "offensive behavior (sp) will not be tolerated by TWC." (Pl. Dep. Exh. 33; Woodard Dep. Exh. 27; CW Dep. 205-6).[6] Similarly, Pam Sawyer admitted that Mr. Celt had in fact made discriminatory comments. Ms. Sawyer also admitted that Mr. Celt was not discharged for making any such comments. (PS Dep. 58-9). Mr. Gall testified that a written warning was given to Mr. Celt, but Defendants did not produce any such warning. Within a few months after this incident, Mr. Celt was rewarded with an award. (MG Dep. 34-35, 42-41; Woodard Aff. ¶ 40).

243.     When Ms. Woodard complained to Gall about Mr. Celt's conduct, Gall himself made discriminatory and harassing comments to Plaintiff. Thus, Mr. Gall's emails to Ms.

---

[6]Ms. Woodard received an apology from Mr. Celt. (Pl. Dep. Exh. 34; Woodard Dep. Exh. 28; CW Dep. 201, 206-7). Mr. Celt engaged in other improper conduct discussed herein.

Woodard purporting to address Mr. Celt's unlawful conduct were insincere. Ms. Woodard made it clear to Mr. Gall that his conduct was unwelcome and offensive. (Compl. ¶ 46; CW Dep. 197-9, 201, 273-4, 504).

244.    For example, Gall told Ms. Woodard that Jamaicans do not have a strong work ethic. (Compl. ¶ 47; CW Dep. 197).

245.    For example, Gall told Ms. Woodard that Jamaicans think they are better than other blacks but they are not better. (Compl. ¶ 48; CW Dep. 197).

246.    For example, Gall told Ms. Woodard that he used to be a "big brother" for inner city black boys and that all they wanted to do was to sow their seed and have babies with several women in order to prove their masculinity. (Compl. ¶ 49; CW Dep. 197, 505-9).

247.    In November 2004, Defendants hired Mary Jo Romeo (Caucasian) for the position of Vice President and Regional Sales Manager, reporting to Gall. (Compl. ¶ 56; Ans. ¶ 56; Pl. Dep. Exh. 35; EL Dep. 108-109; MJR Dep. 7-8). Ms. Woodard and several other Account Managers were assigned to report to Ms. Romeo. (MJR Dep. 15-6, 67; CW Dep. 101-4, 214). Ms. Romeo reported to Mr. Gall. (CW Dep. 295).

248.    Ms. Woodard met with Ms. Romeo for the first time on December 3, 2004. (CW Dep. 214). Ms. Romeo immediately began making unlawful discriminatory comments to Ms. Woodard based on race, ethnicity and about black women which incorporated gender discrimination. (CW Dep. 213). Romeo told Ms. Woodard that Ms. Woodard was hired because of a diversity initiative. In essence, Romeo was telling Ms. Woodard that she was only hired for cosmetic purposes, to fill some alleged quota. (Compl. ¶ 57; Pl. Dep. Exhs. 45, 46, 49; Woodard Dep. Exhs. 33, 52).

249.    Romeo told Ms. Woodard that she once had to pay a recruiter to find a diversity candidate because she couldn't find one otherwise, and that it was very difficult for her to waste company money on that recruiter. Romeo was essentially telling Ms. Woodard that she didn't

want to hire someone of Ms. Woodard's protected classes and didn't want to spend money to do so. (Compl. ¶ 58; Pl. Dep. Exhs. 45, 46, 49; Woodard Dep. Exhs. 33, 52).

250. Romeo told Ms. Woodard that black women have problems speaking up and asking questions because they do not want to appear stupid. Romeo was essentially degrading all black women. (Compl. ¶ 59; Pl. Dep. Exhs. 45, 46, 49; Woodard Dep. Exhs. 33, 52).

251. While driving to a client meeting, Romeo and Ms. Woodard passed through Paterson, New Jersey, which is predominantly Black and Hispanic. During this trip, Romeo made discriminatory and harassing comments. Romeo asked how people could live there. Ms. Woodard reminded Romeo that Ms. Woodard was born in Jamaica and raised in Paterson. Romeo asked Ms. Woodard what language is spoken in Jamaica. Ms. Woodard said English and Romeo said she speaks good English. (Compl. ¶ 61; Pl. Dep. Exhs. 45, 46, 49; Woodard Dep. Exhs. 33, 52). Mr. Camp now admits statements were made. (See Affidavit of Meade Camp, ¶ 13; Woodard Aff. ¶ 17).

### C. Denial Of Equal Accounts In 2004 To Ms. Woodard As Account Manager

252. Ms. Woodard maintains that Defendants denied her equal assignment of accounts and support and stripped Ms. Woodard of accounts, and accorded preferential treatment to Account Managers that were male and/or caucasian. (Compl. ¶ 33, 51, 52, 53, 69; Woodard Aff. ¶ 50).

253. On August 12, 2004, Ms. Woodard sent a memorandum to Mr. Gall about her account assignments. (Pl. Dep. Exh. 85; Woodard Dep. Exh. 10; Woodard Dep. Exh. 54; CW Dep. 109-113, 476). Ms. Lawless overheard a telephone conversation between Mr. Shrank and Mr. Gall about what accounts to give to Ms. Woodard. (Lawless Dep. Exh. 35; EL Dep. 307-312). Mr. Gall allowed Mr. Shrank and Paul Celt - white male Account Managers - to provide input on account assignments. (RM Dep. 215, 265-8; CW Dep. 355-8). In August 2004, Ms. Woodard overheard Mr. Shrank and Mr. Celt discussing Ms. Woodard and what accounts she should cover. Mr. Gall had final authority on account assignments. (CW Dep. 358-9, 501).

254.    Defendants assigned Ms. Woodard a Revenue Goal for 2005 of $3,050,000.  In or about October 2004, Defendants assigned Ms. Woodard an account list with 44 clients, but only 4 had any prior spending history with TWC or broadcast cable overall.  These 4 clients were credited with only $117,375 in spending.  Simply put, at least 90% of the accounts on this list were "dead accounts" and Defendants assigned what was essentially a "dead accounts" list to Ms. Woodard, containing unpromising accounts and agencies.  Ms. Romeo considered Ms. Woodard's assignment to be a junior territory with a dead list of accounts.  (Pl. Dep. Exh. 55; CW Dep. 57; Woodard Aff. ¶ 44; Compl. ¶ 51, 53, 69; CJ Dep. 131-2, 142; Woodard Dep. Exh. 55; MJR Dep. 59-60; Monihan Exh. 17; JM Dep. 138-9; CW Dep. 66, 108-9, 336-7, 477-9, 495-6).  In fact, when Ms. Woodard asked her peers for information on the accounts, she received information that they had not returned calls made by her peers.  For example, Ms. Woodard received an email from Bruce Budkofsky to that effect (Goldberg Cert., Exh. DD).  Notably, Mr. Budkofsky became a Client Development Manager in January 2004 and prior to transferring to Account Manager did not meet with all of the clients that had been assigned to him.  (Goldberg Cert., Exhs. LL, DD).

255.    In 2004, Ms. Woodard had interaction with Rick Monihan, Director of Planning and Inventory.  Mr. Monihan, who was aware of Ms. Woodard's account list, told Ms. Woodard that some employees are set up for success and some are set up for failure, and told Ms. Woodard that she had been set up for failure.  Mr. Monihan felt this way because he was aware of the poor quality account list that had been assigned to Ms. Woodard. (RM Dep. 104-5, 108-9, 180; CW Dep. 178-9, 374-5).  Mr. Monihan testified that Ms. Woodard's account list had many accounts with zero or low historical spending and that this account list was "a pretty tough one" and "a very difficult list" and Ms. Woodard "had a difficult budget to reach given the list." (RM Dep. 34, 209-210, 257-258; Monihan Dep. Exh. 17).  Monihan told Ms. Woodard that the company had a problem hiring black people and that black employees are resented.  (RM Dep. 94, 99-100).

256.    Ms. Woodard's account list contained one traditional agency, Horizon Media.

However, Defendants stripped Ms. Woodard of Horizon Media, and assigned Horizon to white male account managers, before Ms. Woodard could make her first sales call to that entity. (Compl. ¶ 51, 53).

257.    In 2004, Defendants hired Craig Meadow, a white male, as a Client Development Manager.  (Pl. Dep. Exh. 18; Woodard Dep. Exh. 68; CW Dep. 491-2).  Mr. Meadow was transferred to Account Manager at the same time as Ms. Woodard.   Defendants assigned Meadow a far superior account list.  Defendants assigned Mr. Meadow an account list with 16 clients, 11 of which had a prior spending history with TWC.  These 11 clients were credited with $1,709,180 in spending.  Mr. Meadow's revenue goal for 2005 was $3,050,500, merely $5,000 above that assigned to Ms. Woodard.  Thus, Defendant gave Mr. Meadow an account list that placed him at more than 58% to his annual revenue goal before Mr. Meadow made any sales. (Id.; Woodard Aff.  ¶ 44; Goldberg Cert., Exh. FF; Compl. ¶ 54; CW Dep. 495-6).

258.    In or about March 2005, Defendants hired Peter Wright, a white male Account Manager.  Defendants gave Mr. Wright an account list that was far superior to Ms. Woodard's account list.  (CJ Dep. 131-2, 142, 447).  Defendants assigned Mr. Wright an account list with 12 clients, 7 of which had previously spent monies on TWC or broadcast cable, and had a substantial spending history.  The accounts assigned to Mr. Wright in March 2005 had already been meeting or exceeding the goals for months as shown by an Account Manager Performance Tracking report.  Defendants assigned Mr. Wright a client list that had been credited with $4,440,343 in spending and Defendants assigned Mr. Wright a goal for 2005 of $3,952,500. (Woodard Aff. ¶ 44; RM Dep. 186-89; Monihan Dep. Exh. 13).  As Mr. Monihan testified, Defendants assigned Mr. Wright a very good book of business and a large book of business. (RM Dep. 189-90, 238-9.).  As of June 15, 2005, the account list assigned to Mr. Wright was already scheduled to exceed his goal for the year.  (RM Dep. 191-2; Monihan Dep. Exh. 13; see also RM Dep. 235-40).

259.    Peter Wright lacked qualifications in the area of media math.  Mr. Wright was unable to negotiate his own up front deals.  Notwithstanding these facts, no adverse action was taken against him for his performance deficiency in that area.  Rather, he was given a substantial book of business.  (TS Dep. 14; Monson EEOC Charge, Pl. Dep. Exh. 152, at ¶ 6; EL Dep. 452; JM Dep. 129-130; RM Dep. 160-3).  Lisa Longo (manager) was deficient in media math but no adverse action was taken against her for that.  (EL Dep. 283-284).  Ms. Romeo was no expert in media math and was not terminated for any deficiency in that subject.  (MJR Dep. 63).

260.    Defendants assigned Paul Celt to cover an account that had been his previous employer, which was a conflict of interest. (RM Dep. 88-9).

261.    Mr. Monihan worked with other Account Managers.  He testified that Mr. Gall set up male Account Managers for success, such as Matt Derella and Peter Wright, by giving them attention and support.  Mr. Monihan observed deficiencies in the performance of Messrs. Derella and Wright and complained to management about Mr. Wright's performance.   Defendants did not take any adverse action against those white male Account Managers  (RM Dep. 104-5, 160-3, 177, 218-219).  Mr. Monihan observed that Derella and Meadow violated policies and Meadow's work habits were erratic.  No action was taken against them. (RM Dep. 138-141, 184, 230-1).

262.    According to Jen Monson, a former Account Manager that worked with Ms. Woodard: (1) Ms. Woodard was not given the same opportunities that her male counterparts were given (JM Dep.  99-100); (2) Defendants gave Ms. Woodard  ridiculous demands in terms of goals and accounts (JM Dep. 100); (3) Defendants gave Ms. Woodard many accounts with no spending history (JM Dep.. 101); and (4) Mr. Meadow showed Ms. Monson a document showing Ms. Woodard's goals and said "I guess we know who won't be here in a few weeks" (JM Dep. 101-102). Ms. Monson believed that Ms. Woodard "was a perfectly capable account manager who would have a very successful career outside of The Weather Channel because she was never going to get anywhere there." (JM Dep. 103).  Mr. Gall demoted Ms. Monson from Account Manager to Direct Response and Defendants assigned Ms. Woodard to accounts previously

covered by Ms. Monson prior to her demotion from Account Manager to Direct Response. Ms. Monson was angry because she was demoted and did not want to train an Account Manager that received the job that Ms. Monson had been demoted from. (JM Dep. 35, 47, 58, 103-104, 154; Woodard Aff. ¶ 46).

263.   Ms. Lawless was also denied equal treatment regarding account assignments and complained to Human Resources about same.   (EL Dep. 382, 388; Lawless Dep. Exh. 25; Pl. Dep. Exh. 15; Pl. Dep. Exh. 16).  Jen Monson testified that Mr. Gall denied her equal accounts and took accounts away from her, giving such accounts to male Account Managers such as Craig Meadow. (JM Dep.  47-48, 67-9, 121). Mr. Gall did not go on any sales calls with Ms. Monson, which distinguished Mr. Gall's treatment of Ms. Monson from his treatment with male Account Managers that he fully supported.  (JM Dep. Tr. 52-66).

### D.    Other Incidents

264.   Defendants attempted to sabotage Ms. Woodard's work and sought to interfere with the performance of her job duties. Paul Celt, Craig Meadow and Peter Wright (white male Account Managers) went through Ms. Woodard's desk behind her back, as witnessed by, among others Ms. Woodard, Catherine Jolly and Jen Monson, and items were missing from Ms. Woodard's desk, such as sales documents, notes, presentation materials, etc.  (Compl. ¶ 50; CJ Dep. 139-41; JM Dep. 144; CW Dep. 76, 386-7).  On December 16, 2004, Ms. Woodard witnessed Mr. Celt and Mr. Gall "going through my stuff" and saw Mr. Celt serving as a "lookout" as Mr. Gall rummaged through Ms. Woodard's things.   Mr. Celt was, in fact, close with Mr. Gall.  Mr. Gall then wrote a note "stop by" and gave it to Ms. Woodard.  Mr. Gall then told Ms. Woodard that her showing up for work at 8:30 a.m. was not acceptable.  (Pl. Dep. Exh. 37; Woodard Dep. Exh. 4; CW Dep. 76-81, 218).  However, according to Mr. Gall, office hours were 8:30a.m. to 5:30 p.m.  (Pl. Dep. Exh. 107).

265.   During Ms. Woodard's employment, she asked Defendants for support and help on various matters. (CW Dep. 56).  Defendants denied Ms. Woodard training and support.

Defendants, and particularly Gall, favored Account Managers outside Ms. Woodard's protected classes, and particularly white male Account Managers, with respect to assignments, training and his willingness to accompany them on sales calls. Gall regularly went on sales calls with white, male Account Managers. Mr. Gall was unable to identify any sales call that he went on with Ms. Woodard and did not provide any training to Ms. Woodard. (MG Dep. 54, 61; Bhiro Aff. ¶ 14, 19, 20 (Goldberg Cert., Exh. X); Compl. ¶ 33, 51, 52, 55, 67, 68). Ms. Lawless sought to provide training and support to Ms. Woodard and Mr. Gall told Ms. Lawless that he totally lost respect for her for doing so. (Lawless Dep. Exh. 4, at ¶ 11).

266. Gall regularly held closed door meetings with such Account Managers, but excluded Ms. Woodard from such meetings. Gall also excluded other female Account Managers from such meetings. Gall had lunch with such Account Managers and excluded Plaintiff and other female Account Managers from such lunches. (Compl. ¶ 55; CW Dep. 442-450).

### E. Defamatory Performance Evaluation In December 2004

267. On or about December 8, 2004, Defendants gave Ms. Woodard a performance evaluation. The evaluation appeared to be issued by Mr. Gall and Ms. Romeo. According to the document, Mr. Camp had no input in the evaluation. (Pl. Dep. Exh. 36; Woodard Dep. Exh. 11; Compl. ¶ 60; MJR Dep. 26; CW Dep. 114-5, 126-7). According to Ms. Romeo, who was hired on or about November 30, 2004, she did not form an opinion of Ms. Woodard until she worked with her for a couple of months. (MJR Dep Tr. 31). Thus, Ms. Romeo had no basis to evaluate Ms. Woodard on December 8, 2004, after just one week of working with her.

268. The evaluation allowed for ratings of 0 (lowest score for Requires improvement") to 3 (highest score for "Exhibits great behaviors consistently). Ms. Woodard received an average score of .55, clearly a negative score. (PL. Dep. Exh. 36; Woodard Dep. Exh. 11; Compl. ¶ 60; CW Dep. 114).

269. The evaluation raised false criticisms of Ms. Woodard's job performance. (Compl. ¶ 50; CW Dep. 118-122). Significantly, Defendants assigned Ms. Woodard a score of 0

("Requires improvement") in several categories where Defendants stated that Ms. Woodard was "too new" to be evaluated. These scores of 0 substantially reduced the overall rating. (Pl. Dep. Exh. 36; Woodard Dep. Exh. 11; CW Dep. 114). Ms. Wodoard was, in fact, "too new" to be evaluated and certainly too new to be evaluated by Ms. Romeo, who had only been employed since on or about November 30, 2004. (CW Dep. 126). This treatment of Ms. Woodard stood in stark contrast to Defendants' treatment of male Account Managers. For example, in 2005, Defendants hired Rob Duke (white male) as an Account Manager. (Pl. Dep. Exh. 162). When Defendants issued the first review to Mr. Duke, Defendants left blank categories in which Mr. Duke was "too new" to evaluate, rather than assigning him the lowest score in such areas. Thus, unlike Ms. Woodard, who was penalized in her review for being "too new", Mr. Duke was not penalized in his review for being "too new" (Pl. Dep. Exh. 164).

270. According to Defendants, performance evaluations for Account Managers are supposed to be prepared evenly. (LC Dep. 115). Here, Defendants gave Ms. Woodard the lowest score for categories where she was "too new" but in the case of a white male Account Manager (Rob Duke) left blank categories where he was "too new." Moreover, Lisa Chang admitted that it is reasonable to leave blank a category where an employee is "too new." (LC Dep. 117-8). Defendants denied Ms. Woodard such "reasonable" treatment in preparing her 2004 evaluation, which intentionally included scores of 0, the lowest score, in categories where she was "too new" to push her performance rating downward.

271. On December 14, 2004, Mr. Gall sent an email to Ms. Woodard and others, stating: "One thing I know is that our Pella team of Matrange, Bashan and Woodard is among the very best in our business. I'd go to battle with you folks anytime....As a team, you're so money, and you don't even know it....you all have a lot to offer." (Pl. Dep. Exh. 86; MG Dep. 126-7). Mr. Gall also praised Ms. Woodard in emails dated December 16 and 17, 2004. (Goldberg Cert., Exh. HH). This email contradicted the performance evaluation given to Ms.

Woodard. Clients also praised Ms. Woodard. (Goldberg Cert., Exh. II). Moreover, according to Ms. Romeo's own memoranda, she praised Ms. Woodard's performance. (Pl. Dep. Exh. 53).

272. The evaluation also stated that Ms. Woodard would benefit from "Training." (Pl. Dep. Exh. 36; Woodard Dep. Exh. 11; CW Dep. 114). After the review, Mr. Gall did not provide any training to Ms. Woodard and did not go with her on sales calls. (MG Dep. 54, 61; Compl. ¶ 33, 51, 52, 55, 68).

### F. Discrimination In Compensation Package For 2005

273. Ms. Woodard maintains that Defendants made discriminatory compensation decisions and adopted discrimination compensation practices, and subjected her to discriminatory compensation decisions and compensation practices. (Compl. ¶ 30, 33, 34, 51, 52, 60).

274. Defendants admit that Account Managers received compensation increases. (LG Dep. 94-95; RK Dep. 127). Defendants produced documentation showing that various Account Managers did receive compensation increases. (Pl. Dep. Exh. 166; LC Dep. 131-33).

275. For 2005, Defendants gave Ms. Woodard a compensation package of $148,050 (at goal), which included a reduced base salary of $66,622.51. (Pl. Dep. Exh. 39; Pl. Dep. Exh. 66; Woodard Dep. Exh. 14; Compl. ¶ 34, 60; CW Dep. 131-5, 139-40). Ms. Woodard signed a plan document "under duress" because Ms. Romeo told Ms. Woodard "[y]ou better sign this document if you want your job." (CW Dep. 135-8; Woodard Dep. Exh. 15).

276. By contrast, for 2005, Defendants gave raises to white and male Account Managers. (CW Dep. 139-140, 482)

277. For 2005, Defendants increased the overall compensation package of Mr. Meadow (white male), who became an Account Manager at the same time as Ms. Woodard, by 3%, to $125,454 (at goal). (Pl. Dep. Exh. 18 at TWC 1958, TWC 1973; Woodard Dep. 68; CW Dep. 513). In August 2005, Defendants increased Mr. Meadow's compensation by another 17.5%, to $147,455 (Pl. Dep. Exh. 18 at TWC 1961; (Woodard Dep. Exh. 68; CW Dep. 491-3). For 2006, Defendants increased Mr. Meadow's compensation to $161,050 (Pl. Dep. Exh. 18 at

TWC 1954 Woodard Dep. Exh. 68; CW Dep. 491-3). In 2005 and 2006, Defendants paid Mr. Meadow compensation of $178,511.95 and $179,851.09, amounts above his stated annual compensation package. (Pl Dep. Exh. 166). Mr. Meadow also had a superior account list to Ms. Woodard and, therefore, even if Ms. Woodard's "target compensation" in 2004 or 2005 appeared larger than Mr. Meadow, Mr. Meadow could be paid and was paid larger compensation because of the preferential treatment he received in account assignments. (CW Dep. 509-12).

278.    For 2005, Defendants increased the compensation package of Account Manager Paul Celt (white male) from $182,700 in 2004 (Pl. Dep. Exh. 18 at TWC1808) to $233,698.09 for 2005 (at goal) (Pl. Dep. Exh. 18 at TWC1801).

279.    For 2005, Defendants increased the compensation package of Account Manager Matt Derella (white male) from $157,500 in 2004 (Pl. Dep. Exh. 18 at TWC 1834) to $178,525.16 for 2005 (at goal) (Pl. Dep. Exh. 18 at TWC 1830). In August 2005, Defendants gave Mr. Derella a raise to $200,525 (PL. Dep. Exh. 18 at TWC 1827) and gave him another raise for 2006 to $267,362 for 2006 (TWC1823). Defendants paid Mr. Derella $269,921.31 and $342,762.72 for 2005 and 2006, amounts above his stated compensation package. (Pl. Dep. Exh. 166).

280.    In August 2005, Defendants increased the compensation package of Account Manager Peter Wright (white male), hired in March 2005, from $140,000 to $162,000 (at goal) (Pl. Dep. Exh. 18 at TWC2098, TWC 2100). Defendants gave Mr. Wright a raise to $171,368 for 2006 (Pl. Dep. Exh. 18 at TWC 2092). Defendants did so even though Defendants admit that Mr. Wright had performance deficiencies, particularly with media math. For example, Terry Sekel, who served as a Sales Manager during Peter Wright's employment, testified that Mr. Wright was weak on media math. Other witnesses gave similar testimony. (TS Dep. 14; Pl. Dep. Exh. 152, at ¶ 6). Defendants also gave a raise to Bruce Budkofsky (white male Account Manager) for 2005. (CW Dep. 513).

281.    Defendants allege that performance evaluations affect compensation.  (LC Dep. 95).  According to Mr. Gall, the 2004 evaluation issued to Ms. Woodard was solely for constructive criticism.  Based on Mr. Gall's testimony, Ms. Woodard should have not been denied a raise for 2005 because of that 2004 evaluation.  However, Ms. Woodard was denied a raise for 2005.  (MG Dep. 82; Pl. Dep. Exh. 36).

282.    Plaintiffs requested that Defendants produce 2004 evaluations for all Account Managers because such documents are highly relevant to Ms. Woodard's claims.  Defendants failed to produce 2004 evaluations for the Account Managers that received raises for 2005, alleging the evaluations could not be located.  This excuse is baseless, since Defendants admit that performance evaluations are prepared and retained on their computer system and hard copies are retained in employee personnel files. (PS Dep. 80; MG Dep. 44-46; RK Dep. 120-1; MG Dep. 65-66; Woodard Aff. ¶ 45).

283.    In 2004, Defendants began using a "good to great" format for Account Manager performance evaluations.  (EL Dep. 42-51).  Mr. Gall told Account Managers, such as Elise Lawless, that he intended to give lower performance evaluation scores to Account Managers for 2004, so that he could give higher scores to them in 2005 and show his supervisor, Paul Iaffaldano, that there was improvement in Account Manager performance. (EL Dep. 98-101, 110).  Based on Mr. Gall's statement, the evaluation scores given to Account Managers were below their actual level of job performance.   In fact, Ms. Lawless's 2003 evaluation (prior to the "good to great" format, was a strong evaluation.  (EL Dep. 101-106; Lawless Dep. Exh. 12).

284.    Mr. Gall, who was directly involved in Ms. Woodard's 2004 evaluation, denied any involvement in compensation decisions for Account Managers.   (MG Dep. 67, 70, 73-74, 222, 255, 283).  Mr. Gall's  testimony is directly contradicted by the deposition testimony of Richard Klein (former HR Director), who testified that Mr. Gall was directly involved in compensation decisions for Account Managers.  (RK Dep. 108-9, 127-8), and the deposition

testimony of Lisa Chang, SVP of HR of The Weather Channel  (LC Dep. 16-7, 96).  Moreover, Mr. Iaffaldano implicated Gall in compensation decisions.  (See Iaffaldano Aff. ¶ 15).

285.    Ms. Woodard maintains that Defendants' compensation practices with respect to male Account Managers is also in stark contrast to Defendants' compensation practices with other female Account Managers, particularly Plaintiff Elise Lawless and Jen Monson.

286.    For 2004, Ms. Lawless' compensation package was $162,750, which included a base salary of $97,000  (PL. Dep. Exh. 21 at EL 0665; Lawless Dep. Exh. 28).  In 2004, Ms. Lawless achieved 104.47% of her annual revenue goal and exceeded her goals for new business and integrated revenue.  (Pl. Dep. Exh. 21 at EL 0715; EL Dep. 108-109, 111, 185).[7]

287.    Notwithstanding Ms. Lawless' production in 2004, for 2005, Defendants gave Ms. Lawless a compensation package of $163,202.71, which included a reduced base salary of $73,441.21.  Thus, Defendants cut Ms. Lawless' base salary and her total compensation remained essentially flat. (Pl. Dep. Exh. 21 at EL0664; Lawless Dep. Exh. 29; Pl. Dep. Exh. 189).).

288.    In 2005, Ms. Lawless, achieved 101% of her revenue goal.  (Pl. Dep. Exh. 21 at EL0663).  That was impressive, particularly given Ms. Lawless' maternity leave in 2005. Notwithstanding the foregoing, for 2006, Defendants gave Ms. Lawless a compensation package of $163,263, essentially the same amount she had in 2004 and 2005.  (Lawless Dep. Exh. 30; EL Dep. 271-4).

289.    By contrast, in August 2005, Defendants hired Rob Duke (white male) as an Account Manager and gave him a compensation package of $185,000 (at goal) (Pl. Dep. Exh. 162), an amount above Ms. Lawless's package.  For 2006, Defendants gave Mr. Duke, who had only been employed for a few months, a raise to $186,210 (at goal), again placing him above Ms.

---

[7]In December 2004, Defendants gave Ms. Lawless an evaluation with an overall score of 1.11, which is in the range of "Exhibits good behaviors consistently." (Pl. Dep. Exh. 167; Lawless Dep. Exh. 13; EL Dep. 107-108).  Ms. Lawless disagreed with the review and maintains that her score should have been substantially higher, because, among other items for 2004, Ms. Lawless had exceeded her goals for that year.  In addition, Mr. Gall said that 2004 evaluations would be deflated to show improvement to his supervisor Paul Iaffaldano when 2005 evaluations were issued. (EL Dep. 108-109, 110-112).

Lawless (Pl. Dep. Exh. 163). Similarly, in January 2006, Defendants hired R.J. Maloney (white male) as an Account Manager and gave him a compensation plan of $260,000 (at goal), well above the salary of Elise Lawless. (Pl. Dep. Exh. 166; Pl. Dep. Exh. 113).[8] Matt Derella joined Defendants in or about 2002 (Derella Affidavit, ¶ 2). This was several years after Ms. Lawless joined Defendants, yet Mr. Derella's compensation package in 2005 and 2006 substantially exceeded that of Ms. Lawless.

290.    According to Ms. Monson, she received a good evaluation for 2004 but was denied a raise for 2005. (Pl. Dep. Exh. 152, ¶ 9; JM Dep. 38-9, 126-129; Monson Exh. 4; Monson Exh. 5). According to Ms. Monson, Lisa Longo (Manager) told her that Mr. Gall had funds for one raise for a Direct Response Manager and selected Sly Phifer (male) for the raise. (JM Dep. 47-9). Ms. Monson complained about her compensation. Mr. Gall threatened Ms. Monson that she had to sign her 2005 compensation package document. (JM Dep. 52-66, 128-129). Ms. Monson saw Peter Wright's compensation package for 2005 and he was being paid more than her, even though he was hired in 2005. (JM Dep. 129-130, 152-3).

291.    In 2003, Ms. Lawless complained to Defendants that male Account Managers were being paid more money than her for covering the same accounts. Defendants did not take remedial action. (JM Dep. 82-4; EL Dep. 259-64; Lawless Dep. Exh. 27). Ms. Lawless complained about her 2004 compensation package because she was denied a promised raise. (EL Dep. 264-66; Lawless Dep. Exh. 28). Ms. Lawless complained about her 2005 compensation package because she was again denied a raise. (Lawless Dep. Exh. 29; EL Dep. 266-69; MJR Dep. 51-52; Pl. Dep. Exh. 69). After Ms. Lawless received her 2006 compensation package, she continued to complain about Defendants' discriminatory actions. (EL Dep. 380-384). Ms. Lawless also complained to Pam Sawyer about her compensation. Ms. Lawless met and

---

[8]In December 2005, immediately after Ms. Lawless returned from protected maternity leave, she was given a performance evaluation with an overall rating of 1.08. (Pl. Dep. Exh. 146; Pl. Dep. Exh. 151; Lawless Dep. Exh. 14; EL Dep. 114-115). Ms. Lawless testified that this evaluation contained false criticisms of her job performance. (EL Dep. 115-133; Compl. ¶ 96).

exceeded her goals in 2003, 2004 and 2005, but was unlawfully terminated in 2006. Defendants took no remedial action and retaliated against Ms. Lawless, as supported by the Complaint, Ms. Lawless's EEOC Charge and the EEOC's Determination. (Compl. ¶ 78-109; Lawless Dep. Exh. 4; Goldberg Cert., Exh. V)

### G. Ms. Woodard's Complaints After The Evaluation/Compensation Plan

292. On December 22, 2004, Ms. Woodard filed a complaint with Ms. Romeo about a lack of support. (Woodard Dep. Exh. 31; Pl. Dep. Exh. 168; MG Dep. 128; CW Dep. 56-57, 262-3). Defendants did not take any remedial action. In addition, when Ms. Woodard became an Account Manager, she was initially paired with Will Tague (an experienced Planner) but was then reassigned to work with newly hired black female, Trina Wilson, who was to serve as her Planner. This was inappropriate since both employees were new hires. (RM Dep. 171-2, 223-224; Tague Aff. ¶ 10 (Goldberg Cert., Exh. W); CW Dep. 105-106, 184-6). When Peter Wright (white male) was hired as an Account Manager in March 2005, he was assigned to Will Tague (CW Dep. 186-7). It was Ms. Woodard's understanding that Mr. Gall made the assignments. (CW Dep. 185-7). According to Mr. Monihan, Paul Iaffaldano, to whom Mr. Gall reported, had final authority. (RM Dep. 223-224).

293. As of January 2005, Mr. Gall had not gone on any sales calls with Ms. Woodard and took no interest in her or her development. (CW Dep. 125; MG Dep. 54, 61).

294. On January 4, 2005, Ms. Woodard filed a complaint with Ms. Romeo about her 2005 Compensation Package. Ms. Woodard noted the decrease in her base pay, the increase in her 2005 revenue goal, and the fact that she had been functioning as an Account Manager since only October 2004 (Pl. Dep. Exh. 94; Woodard Dep. Exh. 39; Woodard Dep. Exh. 58; MJR Dep. 32, 59; CW Dep. 122-123, 218, 337, 480-2). Defendants did not take any remedial action. (Woodard Aff. ¶ 45). Ms. Romeo told Ms. Woodard "this is Mark Gall's sandbox and we just have to play in his sand box." Ms. Romeo also told Ms. Woodard that her compensation package

for 2005 was in direct relation to her December 8, 2004 evaluation. Ms. Romeo suggested that Ms. Woodard contact Mr. Gall or Paul Iaffaldano. (CW Dep. 123-124, 230, 480-81).

295.    On January 6, 2005, Ms. Woodard filed a complaint with Paul Iaffaldano (EVP General Manager) and Patricia Keener (Compensation) about her 2005 Compensation Package and 2004 evaluation (Pl. Dep. Exh. 40; Woodard Dep. Exh. 13; MJR Dep. 32, 59; CW Dep. 122, 125-126, 129, 218). She stated: "At the time of my review (on December 8, 2004), I had been an Account Manager for merely two-months. Thus, I feel my Performance Review does not provide a fair or timely behavioral assessment." (Pl. Dep. Exh. 40; Woodard Dep. Exh. 13; CW Dep. 129). Defendants did not take any remedial action. (CW Dep. 129-131).

296.    In January 2005, Romeo demanded that Ms. Woodard reschedule a critical surgery for Ms. Woodard's then two-year old son, because of a sales meeting to be held in Florida that overlapped the surgery. Ms. Woodard gave Defendants a doctor's note stating that her son "needs cataract surgery to prevent vision loss at this critical stage of his development." After substantial efforts, Ms. Woodard was allowed to leave the sales meeting one day early. Under Defendants' policies, Ms. Woodard was entitled to the time off. (Woodard Dep. Exh. 59; Compl. ¶ 62; CW Dep. 127, 274-6, 482-3). Ms. Woodard gave a presentation as part of sales training and Mr. Iaffaldano told her that her presentation was "excellent." (Woodard Aff. ¶ 30). Mr. Iaffaldano required Account Managers to send him a memo about the training and Ms. Woodard did so. (Woodard Dep. Exh 12; CW Dep. 128-9; Goldberg Cert., Exh. CC).

297.    On January 14, 2005, Ms. Woodard complained to Ms. Romeo "that the manner in which [Ms. Romeo] speaks to me is unwelcome and unappreciated." (Woodard Dep. Exh. 29; CW Dep. 219-220, 499-500).

298.    Ms. Woodard exchanged emails with Ms. Romeo throughout January 2005 and repeatedly sought feedback, guidance and support. (Pl. Dep. Exh. 42; Pl. Dep. Exh. 91; Pl. Dep. Exh. 93; Woodard Dep. Exh. 41; CW Dep. 343). On January 20, 2005, Ms. Woodard submitted a territory plan to Ms. Romeo and Mr. Gall. No feedback was provided. (Pl. Dep. Exh. 92).

**H.** **Defendants' Removal Of Ms. Woodard From Deals In Late January 2005**

299.    Following Ms. Woodard's complaints in early January 2005, Romeo removed Ms. Woodard from certain deals.  On January 28, 2005, Romeo sent an e-mail to Ms. Woodard removing her from the "Pella deal" with Lisa Siewers (buyer) of Active Media.  Romeo stated in her email that "I have reservations in general about your skillsets and the mismatch for the skills required for an Account Manager."  (Compl. ¶ 64; Pl. Dep. Exh. 44; Woodard Dep. Exh. 60; see also CW Dep. 324, 337-343, 483).  Prior to Ms. Woodard's complaints, Ms. Romeo had not expressed any such "reservations" to Ms. Woodard.  Mr. Gall described Ms. Romeo's January 28 email as "feedback" and Ms. Romeo stated that Ms. Woodard's job was not in jeopardy.  (MG Dep. 95, 98; Pl. Dep. Exh. 44; MJR Dep. 33-34, 36).  Ms. Siewers (a buyer) was a difficult client.  (JM Dep. 131-2, 153-4; CW Dep. 353, 360).  The Pella deal closed and Ms. Woodard was paid commissions on the Pella deal because it had been her account and she had worked on it.  (CW Dep. 309-10; Pl. Dep. Exh. 52).  The criticism of Ms. Woodard was belied by Mr. Gall's December 14, 2004 email about the "Pella team."  (Pl. Dep. Exh. 86).

300.    On January 28, 2005, at 12:58 p.m., Ms. Woodard sent an internal email advising staff that any questions regarding the Pella deal should be directed to Mary Jo Romeo.  Ms. Woodard sent this email because Ms. Romeo had removed Ms. Woodard from the Pella deal.  Ms. Romeo admits there was nothing improper about the email (MRJ Dep. 53-54; Pl. Dep. Exh. 83).  Ms. Woodard met with Ms. Sawyer and attempted to give her documents showing that Ms. Woodard had not caused any problem on the Pella deal, including a detailed Pella time line.  Ms. Sawyer refused to accept such documents.  (CW Dep. 485; Woodard Dep. Exh. 61).

**I.** **Ms. Woodard's January 28, 2005 Complaint About Ms. Romeo**

301.    In late January 2005, Ms. Woodard, who was attending a sales training meeting in Florida, advised Pam Sawyer (Director of Human Resources) that she intended to file a complaint.  (CW Dep. 127, 274-8).  On or about January 28, 2005, Ms. Woodard filed a written complaint of discrimination and "hostile work environment" against Ms. Romeo with Pam

Sawyer.  (Compl. ¶ 63; Ans. ¶ 63; Pl. Dep. Exh. 45; Pl. Dep. Exh. 46; Woodard Dep. Exh. 33; CW Dep. 212, 215-6, 223-9, 281-288, 310, 474-5).  In the written complaint, Ms. Woodard outlined various incidents, including:

* Ms. Romeo told Ms. Woodard that she was only hired because of the Company's diversity policy.

* Ms. Romeo said "based upon her experience in dealing with "black women" she finds that "black women" have problems speaking up and asking questions because they do not want to appear stupid."

* Ms. Romeo directed Ms. Woodard to reschedule required surgery for her son.

* Ms. Romeo repeatedly screamed at Ms. Woodard.

* Ms. Romeo told a Senior Buyer, referring to Ms. Woodard "most of the nice ones are not too bright."

302.    The incidents listed in Ms. Woodard's complaint occurred.  (CW Dep. 474-5).

303.    On February 2, 2005, Ms. Woodard filed a rebuttal to Ms. Romeo's January 28, 2005 memorandum.  Notably, Ms. Woodard stated that Mr. Gall had advised her "that it may take up to sixteen months to become proficient in my new role" as Account Manager.  Ms. Woodard documented that on September 29, 2004, Mr. Gall praised her after a Sales Meeting in Atlanta and had "complimented me on my ability to ask provocative questions and mentioned that [he was] pleased with my ability to present in front of the entire team because this would be 90% of my new role."  (Pl. Dep. Exh. 47; Pl. Dep. Exh. 48; Woodard Dep. Exh. 34; CW Dep. 309, 388, 502; Compl. ¶ 64).  Defendants did not respond to Ms. Woodard's rebuttal.

304.    Ms. Woodard followed up on her complaint.  (CW Dep. 295-313, 317, 319-20).  On or about February 2, 2005, Ms. Woodard submitted a follow-up memorandum to Mr. Gall (with a copy to Pam Sawyer), referring to "hostile conditions" and providing additional details of "discriminatory comments."  (Compl. ¶ 63; Ans. ¶ 63; Pl. Dep. Exh. 49; Woodard Dep. Exh. 52;

CW Dep. 311-6, 461-4, 515-6; see also Woodard Dep. Exh. 35). Ms. Woodard outlined various incidents:

> \*   Ms. Romeo told Ms. Woodard " I had to once pay a recruiter to find a diversity candidate because I couldn't find one. Do you know how difficult that was for me to waste company money on a recruiter."

> \*   Driving through Paterson New Jersey, a black community, on the way to the Hankook meeting, Ms. Romeo said "how could people live here". Ms. Romeo then asked Ms. Woodard where she grew up and Ms. Woodard said she was born in Jamaica and raised in Paterson. Ms. Romeo said that Ms. Woodard's parents must be very proud of her and asked what language was spoken in Jamaica. Ms. Woodard said English and Ms. Romeo said "you speak very good English."

305. Ms. Sawyer advised Ms. Woodard that she was discussing her complaint with Mr. Gall and directed her to be "transparent with correspondence". (Pl. Dep. Exh. 50; Woodard Dep. Exh. 36; CW Dep. 230-31, 290, 316). Ms. Woodard followed up. (Pl. Dep. Exh. 51).

306. Ms. Romeo was aware of Ms. Woodard's complaint of discrimination. (MJR Dep. 11-13). On February 3, 2005, Ms. Romeo sent a memorandum to Mr. Gall and Ms. Sawyer. Ms. Romeo admitted: (1) that when Ms. Woodard was transferred to Account Manager, she was given a "junior territory" reporting to Mr. Gall; (2) Ms. Romeo made comments to Ms. Woodard about diversity in their very first meeting; (3) Ms. Romeo told Ms. Woodard on "several occasions" that she was doing a good job; (4) Ms. Woodard received a poor review in December 2004 and a 20% reduction in pay. Ms. Romeo stated that Ms. Woodard's "future with TWC was in doubt from the beginning of my job here." Ms. Romeo did not allege any complaints by Meade Camp about Ms. Woodard. (Pl. Dep. Exh. 53; MJR Dep. 43-5, 48-9).

307. On February 3, 2005, Ms. Romeo sent an email to Mr. Gall and Ms. Sawyer, admitting that (1) she raised her voice with Ms. Woodard, and (2) made comments to Ms.

Woodard about diversity. (Pl. Dep. Exh. 52). Ms. Romeo also noted that the Pella deal was closed, stating "The Pella deal went to order. I forwarded it to Claudia last evening and asked her to handle it." Romeo also noted that she was traveling with Bruce Budkofsky (white male Account Manager), apparently on a sales call. (Pl. Dep. Exh. 52; MJR Dep. 45-7). During Ms. Romeo's deposition, she confirmed that she made comments to Ms. Woodard about diversity, raised her voice with Ms. Woodard, commented on Ms. Woodard's posture and had driven through Paterson NJ with Ms. Woodard. (MJR Dep. 42, 45-7).

308.    On February 24, 2005, Pam Sawyer met with Ms. Woodard. Ms. Sawyer advised Ms. Woodard that Ms. Romeo was separating from the Company. Ms. Sawyer downplayed Ms. Romeo's conduct, labeling Ms. Romeo's actions as "simple miscommunication" and "immature statements." Ms. Sawyer did not allege to Ms. Woodard that there was any deficiency in her job performance. (Woodard Dep. Exh. 38; CW Dep. 212-3, 320-324, 330-36; see also EL Dep. 83). Ms. Sawyer admits that Ms. Romeo made discriminatory comments to Ms. Woodard. (PS Dep. 126-7, 140-2).

309.    According to Pam Sawyer, Defendants terminated Ms. Romeo's employment because of her conduct towards Ms. Woodard and because of other employee complaints about Ms. Romeo. (PS Dep. PS Dep. 126-7). However, Ms. Sawyer never advised Ms. Woodard that Ms. Romeo was terminated because of Ms. Woodard's complaints. (PS Dep. 145-6). According to Ms. Romeo, Mr. Gall told her that her employment was being terminated because of complaints from "perspective employees" (i.e. "prospective employees"). (MJR Dep. 8-11). Thus, there is an issue of fact as to why Defendants terminated Ms. Romeo's employment.

**J.    Ms. Woodard's Reassignment To Meade Camp After Romeo's Separation**

310.    Defendants assigned Ms. Woodard to report to Camp, an Interim Sales Manager. At this time, Ms. Woodard became the only Account Manager assigned to Camp. (Compl. ¶ 66; Pl. Dep. Exh. 171; CW Dep. 212-3). Ms. Woodard asked Camp for guidance. Camp declined to help Ms. Woodard, essentially telling Ms. Woodard that he wasn't in a position to assist her, did

not have the inclination to do so. He referred Ms. Woodard to Gall, who failed to provide effective assistance. Mr. Camp took a hands off approach. He told Ms. Woodard that he had a day job. (Compl. ¶ 66; CW Dep. 361, 363-6, 370-3).

311. Ms. Woodard demonstrated an outstanding work ethic. In the Spring of 2005, Defendants terminated Jill Matrange and Paul Celt after a company trip (with clients) during which Ms. Matrange and Mr. Celt were allegedly having sex on a bus. (PS Dep. 29-34; MG Dep. 89-90, 93). After that occurred, and on March 9, 2005, Ms. Woodard advised Mr. Gall that she would be willing to assume additional account coverage duties. (Pl. Dep. Exh. 95). Mr. Gall ignored Ms. Woodard's email and did not even return the Oppenheimer Funds account to Ms. Woodard, an account that she had previously cultivated. (Woodard Aff. ¶ 36).

312. On March 18, 2005, Ms. Woodard advised Mr. Gall that she spoke with John Viserto at Active Media about extending the Active deal. Ms. Woodard had dealings with John Viserto and he never complained to her about her performance and never expressed any dissatisfaction with her services as Account Manager. On March 23, 2005, Ms. Woodard and Ms. Lawless closed a $200,000 deal with TIAA-CREF. (Woodard Dep. Exh. 63; CW Dep. 486-7).

**K.    Paul Iaffaldano's March 2005 Directive To Fire Ms. Woodard**

313. In or about the Spring of 2005, Rick Monihan, Director of Planning and Inventory, complained to Pam Sawyer that Mr. Gall and Mr. Iaffaldano were setting up Ms. Woodard. (RM Dep. 33-4). Ms. Woodard sought help from Mr. Monihan in closing her first deal and he helped her. (CW Dep. 106-8). Mr. Monihan witnessed that Ms. Woodard "was not getting enough support" from Mr. Gall. (RM Dep. 28-9).[9] Mr. Monihan had asked Mr. Gall about providing support to Ms. Woodard and Mr. Gall made it clear that he did not intend to do so. (RM Dep. 181, 228). Mr. Monihan said "I don't believe that they gave her enough support.

---

[9]At some point Mr. Monihan was given a warning. While under warning, Ms. Sawyer asked him if he would support the company regarding matters pertaining to Ms. Woodard. (RM Dep. 179-80, 227-228).

I contended that when I was there." (RM Dep. 201-2). Mr. Monihan also complained to Pam Sawyer that Mr. Gall discriminated against women and ran a boys club. (RM Dep. 130-2, 134). Defendants did not take any remedial action.

314. On March 28, 2005, Mr. Gall sent an email to Pam Sawyer reporting information provided to him by Paul Iaffaldano. Mr. Gall stated: "Paul I is not comfortable with our thoughts on how we handle Claudia. He proposes that we either terminate her now, or offer to keep her on through the upfront as an SSA, pay her as a salesperson, but let her know she's out by June 15 - or some other date that we agree on." (Pl. Dep. Exh. 53; Pl. Dep. Exh. 54; Woodard Dep. Exh. 64; PS Dep. 147-151; MG Dep. Tr. 108-112; Pl. Dep. Exh. 54; CW Dep. 487-488). According to the email, by March 28, Mr. Iaffaldano had decided to terminate Ms. Woodard.

315. On April 6, 2005, Deirdre O'Grady allegedly sent an email to Mark Gall criticizing Ms. Woodard. Ms. Woodard did not have a reporting relationship with Ms. O'Grady and Ms. O'Grady had not raised any performance concerns with Ms. Woodard. Mr. Gall forwarded this email to Ms. Sawyer. Ms. Woodard maintains that Mr. Gall solicited this email from Ms. O'Grady to provide Ms. Sawyer with documentation to support firing Ms. Woodard. (Woodard Dep. Exh. 65; CW Dep. 488-9; Woodard Aff. ¶ 32).

316. On April 7, 2005, Ms. Woodard filed a complaint with Defendants that she had a lack of support. (Pl. Dep. Exh. 98; Woodard Dep. Exh. 66; CW Dep. 489). Defendants did not take any remedial action.

317. Ms. Woodard continued to seek to generate business for Defendants. She scheduled sales calls. Gall attempted to undermine Ms. Woodard with her clients. Defendants prohibited Ms. Woodard from going on sales calls without a sales manager and such managers generally declined to go with her. Defendants also made Ms. Woodard cancel several client meetings, which further undermined Ms. Woodard's performance of her job. (Compl. ¶ 69, 70). Mr. Gall scheduled meetings involving Ms. Woodard and repeatedly canceled them. For example, on August 4, 2004, Mr. Gall scheduled a team meeting for 7:30 a.m. August 5. Ms.

Woodard appeared at 7:30 a.m. on August 5 and there was no meeting.  Mr. Gall failed to

provide Ms. Woodard advance notice of the cancellation.  (Pl. Dep. Exh. 82; Woodard Aff. ¶ 41).

In February 2005, Ms. Woodard documented the fact that Mr. Gall had cancelled meetings that

Ms. Woodard had scheduled with Active.  (Pl. Dep. Exh. 84).  On April 7, 2005, Ms. Woodard

documented that Mr. Gall had canceled a meeting with Reid Steinberg. (Pl. Dep. Exh. 96;

Woodard Dep. Exh. 16; Woodard Dep. Exh. 53; CW Dep. 143-148, 316, 464-5).

### L. __April 18, 2005 Warning__

318.    On or about April 18, 2005, Defendants, through Gall, issued a memorandum to

Ms. Woodard raising false criticisms of her performance and threatening her employment.   Mr.

Gall also removed Ms. Woodard from covering certain accounts and made Ms. Woodard's

account list, which was already essentially a "dead accounts" list, even worse.  (Pl. Dep. Exh. 56;

Woodard Dep. Exh. 47; MG Dep. 112-115; CW Dep. 413, 416-9, 487).  The warning forbade

Ms. Woodard from working with her split-partners, violating Defendants' established policies

and procedures. Gall's memorandum essentially stated that Ms. Woodard had until May 12, 2005

to achieve certain goals and that her performance would be reviewed at that time.   (Compl. ¶ 71;

Ans. ¶ 71; Pl. Dep. Exh. 56; Woodard Dep. Exh. 47; CW Dep. 413).

319.    On April 18, 2005, after Ms. Woodard received the warning, she sent an internal

email indicating that questions on accounts out of Active International or Magna Global Trading

should be directed to Mark Gall because Ms. Woodard was no longer on the account.  (Pl Dep.

Exh. 55).  Ms. Woodard's April 18 email regarding account coverage was substantially similar to

her January 28, 2005 email regarding account coverage.  Ms. Romeo admits there was nothing

improper about the January 28, 2005 email (MRJ Dep. 53-54; Pl. Dep. Exh. 83).  Ms. Woodard

sent the email because she was receiving inquiries about accounts and it was appropriate to

advise certain parties that she was no longer covering certain accounts. (CW Dep. 422-7).

320.    On April 18, 2005, Mr. Gall sent an email to Ms. Woodard criticizing her about

her April 18 email, stating that "Your email to the team was not only inappropriate....but

incorrect." (Pl. Dep. Exh. 55; Woodard Dep. Exh. 48; CW Dep. 422). On April 19, 2005, Ms. Woodard responded to Mr. Gall and stated "Thank you for the clarification and sorry for the misscommunication." (Pl. Dep. Exh. 57).

321. As noted above, in connection with the April 18, 2005 warning, Mr. Gall gave Ms. Woodard a revised account list. This list was essentially Ms. Woodard's October 2004 account list, with any potential revenue generating clients removed from the list. Thus, this was even a worse accounts list and was imposed upon Ms. Woodard to make it impossible for her to do her job. (Woodard Aff. ¶ 42; Goldberg Cert., Exh. GG; CW Dep. 440-1).

322. On April 19, 2005, Ms. Woodard met with Mr. Gall and Mr. Camp. Lisa Longo, another manager attended. According to Ms. Longo, she had no reporting relationship with Ms. Woodard and had no opinion of her. However, Ms. Longo drafted a memorandum about the meeting that demeaned Ms. Woodard, stating in that document: "Note-not every response is entirely captured below, although you'll note consistent patterns in her responses." Ms. Longo included her own "observations", which further demeaned Ms. Woodard, even though Ms. Longo alleged that her role at the meeting was to take notes. (Pl. Dep. Exh. 58; LL Dep. 17-24; CW Dep. 384-6). Ms. Longo had a habit of falling asleep at meetings. (EL Dep. 282-283).

323. After Ms. Woodard received the April 18 warning, she advised one or more clients that had been calling her that she was no longer covering their account, including Jim Quinn of Active Media. He asked for an explanation and Ms. Woodard simply relayed the information that she had received from Mr. Gall as to the reason for the change. (CW Dep. 428-435, 497-8). Ms. Woodard had contact with the Active Media account prior to April 18 and that account had not requested that Ms. Woodard be removed from their account. (CW Dep. 486-7).

**M.**    **Ms. Woodard's April 22, 2005 Rebuttal And Termination That Same Day**

324.    On or about April 22, 2005, at about 11:45 a.m., Ms. Woodard filed a written response to the April 18, 2005 memorandum. She fully rebutted the accusations against her. (Compl. ¶7 2; Pl. Dep. Exh. 59; Pl. Dep. Exh. 60; Woodard Dep. Exh. 49; CW Dep. 427-8).

325.    Ms. Woodard noted that "Meade has made it clear to me on numerous occasions, in a variety of ways that he has neither the time nor the inclination to provide the management or direction you feel I require. He also stated that he does not have the time to direct me on stuff like prioritization 'because he also has a day-job.'" (<u>Id.</u>).

326.    Ms. Woodard also noted that the entire network missed its goal for the first quarter of 2005. (Pl. Dep. Exh. 59) and Mr. Iaffaldano attributed this to moving quarter one inventory to quarter two. (<u>Id.</u>).

327.    Ms. Woodard also noted that she is working at a 136% index over the previous year, even though Defendants had forecasted that the market would be flat. (<u>Id.</u>).

328.    Ms. Woodard complained that she was being directed to work without her split partners, in violation of established policies and procedures. (<u>Id.</u>). The split partners are other account managers that shared in commissions and were responsible for aspects of the business, including client, planning and the buyer. (EL Dep. 39-42; CW Dep. 36-37, 70).

329.    Ms. Woodard also complained that she had been given a dormant account list and non-performing account list with instructions to generate new business from that list within only 18 days. (<u>Id.</u>). This 18-day period was belied by Mr. Iaffaldano's email that the sales process takes months. (Pl. Dep. Exh. 88).

330.    Finally, Ms. Woodard noted that as per Mr. Gall's estimation that it takes 16 months to get up to speed "I am still 10 months away from the time-line you originally gave me to become a proficient cable sales professional." (<u>Id.</u>).

331.     Defendants also raised a criticism about Ms. Woodard regarding client rates.  This accusation was unfounded because Account Managers did not make decisions on rates.  (RM Dep. 78-79, 210).

332.     Defendants' Human Resources Department did not investigate any of Ms. Woodard's allegations that she was subjected to false criticisms of job performance.  According to Pam Sawyer, Human Resources "relies on business unit leaders" with respect to assessment of job performance.   Defendants' HR Department takes management's side with respect to any issues regarding employee job performance.  (PS Dep. 31, 119-121, 157-8, 194).

333.     On April 22, 2005, at about 2:45 p.m., shortly after Defendants received Ms. Woodard's memorandum, Defendants unlawfully terminated Ms. Woodard's employment.  Among other items, Defendants told Ms. Woodard that she was being fired for the reasons set forth in the April 18, 2005 memorandum.  Defendants never gave Ms. Woodard the opportunity to meet the alleged goals in that memorandum.   (Compl. ¶ 73; Pl. Dep. Exh. 60; CW Dep. 83-85, 435-9).

334.     On April 22, 2005, at about 6:25 p.m., Ms. Woodard sent an email to Pam Sawyer, HR, advising Ms. Sawyer of the termination and requesting that Defendants set forth in writing their alleged reason for firing her.  (Pl. Dep. Exh. 60; Woodard Dep. Exh. 67; CW Dep. 490-1).  Ms. Sawyer did not attend the termination meeting, even though HR representatives were supposed to attend such termination meetings.  (PS Dep. 166-167; LC Dep. 89).

335.     Ms. Sawyer received Ms. Woodard's email and, on April 29, 2005, Ms. Sawyer sent a letter to Ms. Woodard alleging that Ms. Woodard was terminated "due to job performance reasons" and "these reasons have been documented in a previous written counseling and verbal counselings." (Pl. Dep. Exh. 62).

336.     During discovery, Defendants alleged that Ms. Woodard was terminated because after she received her April 18 warning, she allegedly made certain statements to clients.  According to Mr. Gall, Ms. Woodard contacted agencies after she was no longer covering those

agencies. (MG Dep. 149-152). Mr. Gall stated that Ms. Woodard spoke with Jim Quinn (buyer) of Active Media and made statements that Mr. Quinn found to be embarrassing (MG Dep. 153-156; CW Dep. 360). Mr. Gall alleged that Ms. Woodard's call was as serious a "breach" as Mr. Celt's comments about Jamaicans in August 2004. (MG Dep. 159-60).

337.  Ms. Woodard maintains that Defendants' stated reason for firing her is a pretext for discrimination and retaliation. On April 18, 2005, Defendants did not forbid Ms. Woodard from having any contact with clients. Rather, Ms. Woodard was simply no longer covering certain accounts. (CW Dep. 419-422, 489-90). Defendants admit that it was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts. (MG Dep. 156-157).

338.  Mr. Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and, in fact, Mr. Gall testified that he never asked Mr. Quinn what was said. (MG Dep. 153-155). After Ms. Woodard received the April 18 warning and was taken off certain accounts, she advised certain clients that she was no longer covering their accounts. (CW Dep. 428-435, 497-8). Moreover, Ms. Woodard, with Mr. Monihan, had previously had successful dealings with Active Media and Jim Quinn and Mr. Gall was fully aware of same and seemed pleased about those prior dealings. (RM Dep. 244-6). Mr. Monihan knew Jim Quinn "pretty well" and he never complained about Ms. Woodard. (RM Dep. 261).

**N.  Decision Maker On Ms. Woodard's Discharge**

339.  According to Mark Gall, he did not make the decision to terminate Ms. Woodard's employment and was not involved in such termination decisions. (MG Dep. 83-5, 89-90). According to Mr. Gall, the decision to terminate Ms. Woodard was made by Paul Iaffaldano and Mr. Gall learned of the termination after the fact. (MG Dep. 89-90, 92; 149-150). Based on Mr. Gall's testimony, Mr. Camp was not involved in the termination decision. (Id.).

340.  Mr. Gall's deposition testimony is contradicted by the deposition testimony of other witnesses. According to Richard Klein, former HR Director, Mr. Gall had authority to fire employees. (RK Dep. 24). Mr. Klein testified that the decision to fire Elise Lawless was made

by Mark Gall. (RK Dep. 15-16, 23). According to Lisa Chang, Mark Gall and Paul Iaffaldano could recommend termination. (LC Dep. 79-81). Mr. Gall's testimony is also contradicted by his own EEOC "Statement Of Mark Gall." (Pl. Dep. Exh. 81, ¶ 3; MG Dep. 120, 280, 287).

341.    Notably, Mr. Gall denies any involvement in the decision to terminate Elise Lawless. (MG Dep 89-93, 218). However, Richard Klein testified that Mr. Gall made the decision to fire her. (RK Dep. 15-16, 23; MG Dep. 209-210, 291-292; Pl. Dep. Exh. 99).

### O.    Ms. Woodard's Production As Of Her Discharge

342.    According to Rick Monihan, Director of Planning and Inventory, Account Managers did not always achieve their goals and the company did not always achieve its goals. (RM Dep. 197-8). In fact, the company missed its goal for the first quarter of 2005 and in that quarter Paul Iaffaldano was shifting inventory. (RM Dep. 199-201, 243-4; CW Dep. 177-9).

343.    Notwithstanding the above, as of April 22, 2005, Ms. Woodard was tracking at 116.9% to her sales goal for the current quarter (second quarter). Ms. Woodard's final paycheck contained her largest TWC sales commission to that date. (Compl. ¶ 74; Pl. Dep. Exh. 89)

344.    The Account Manager Performance Tracking Report shows that, as of April 19, 2005, based upon booked revenue and projected revenue, Ms. Woodard was tracking at 116.9% (i.e., 117%) to her goal for the second quarter of 2005. This is outstanding performance, since the second quarter of 2005 was to end June 30, 2005 and Ms. Woodard was already at about 117% of her goal as of April 19, 2005. (Pl. Dep. Exh. 89; Monihan Dep. Exh. 15; RM Dep. 195-7, 242-3; CW Dep. 94-96). The Account Manager Performance Tracking Report was accurate as it was based on data from other Company generated reports and Account Managers had access to various reports. (Monihan Dep. Exh. 14; RM Dep. 80-84, 192-5, 241). As Rick Monihan, Director of Planning and Inventory, testified, as of April 2005, Ms. Woodard was clearly building business in the right direction. (RM Dep. 201-2; Monihan Dep. Exh. 15).

345.    The Account Manager Performance Tracking Report shows that as of April 19, 2005, Ms. Woodard had already achieved 49% of her annual goal. (Pl. Dep. Exh. 89; MG Dep.

138-40).  According to Mr. Monihan, various production reports reflected that Ms. Woodard had an "excellent return" and was performing as well as or better than other Account Managers such as Peter Wright.  (Monihan Dep. Exh. 16; RM Dep. 205-6; see also RM Dep. 246-252).

346.    Bruce Budkofsky (white male Account Manager) joined Defendants on or about January 1, 2003  (Pl. Dep. Exh. 166).  According to Defendants' records, Mr. Budkofsky failed to achieve his goal for the first quarter of 2005.  No adverse action was taken against him.   As of the end of the second Quarter of 2005, Mr. Budkofsky had achieved about 49% of his annual goal, an amount similar to Ms. Woodard.  No action was taken against him.  (Woodard Dep. Exh. 69; CW Dep. 493-5; Woodard Aff. ¶ 43).

347.    In September 2004, Janet (Schatz) Poillon, a Caucasian, joined Defendants as an Account Manager.  She was hired with a guaranteed commission and no formal revenue goal for 2004.  (CW Dep. 245-9; Goldberg Cert., Exh. JJ).   Ms. Schatz did not achieve her goal for the first quarter of 2005 and was tracking for the year at a percentage similar to Ms. Woodard. No action was taken against her.  Mr. Monihan noted that Ms. Schatz was a female employee that minded her own business.  He noted that she entered a room during the playing of sexually charged material and simply exited the room without comment.  (RM Dep. 108, 119-120, 158) She told Ms. Woodard that Mr. Gall was a "guys guy."  (Woodard Aff. ¶ 37, 43).

348.    According to Mr. Gall, Ms. Woodard would be qualified for employment at BBC America, where Mr. Gall is currently employed.  (MG Dep. 118-9).

349.    Defendants did not terminate any Account Manager for not making 10 calls per week to clients.  (MG Dep. 142-44).

### P.    Other Conduct Of Mr. Gall and Other Males

350.    On multiple occasions, Gall summoned Ms. Woodard, Ms. Lawless, Jen Monson and/or other female employees into his office.  He often put his legs on the desk and opened them, thereby exposing his crotch.  During such meetings, Gall sometimes also swung a baseball bat and rubbed his hand on it in a sexual manner, in front of these and other female employees.

– 67 –

(JM Dep.  47-8, 118-9 ; Compl. ¶ 110; CW Dep. 450-4; EL Dep. 382-387; CJ Dep. 56-7).
According to Liz Janneman, she instructed Mr. Gall to cease playing with his bat.  (LJ Dep. 121).
Mr. Gall denied that he was reprimanded.  (MG Dep. 136-7).   There is an issue of fact as to
whether Defendants took any remedial action regarding Mr. Gall's conduct with a baseball bat.

351.    Mr. Gall also intimidated female employees such as Jen Monson by getting close
in their face.  (JM Dep. 118-119).  Mr. Gall got very close to Ms. Woodard shortly after she was
hired.  (CW Dep. 454–5, 457-461).

352.    Gall said that SVP Paul Iaffaldano had a "hard on" for Ms. Lawless and that
female employees should "suck up" to Gall.  Gall had high turnover among his female
subordinates.  (Compl. ¶ 110; EL Dep. 460-468, 474-475).

353.    In addition, Ms. Monson and Mr. Monihan observed male Account Managers
inebriated or high in the office.  A male Sales Manager, Terry Sekel, exposed his penis to Ms.
Monson outside the office. (RM Dep. 166-8; JM Dep. 121-123; 150-155).  Defendants did not
take any remedial action regarding such behavior.

354.    In 2005, after Defendants fired Ms. Woodard, Defendants threatened Ms. Lawless
(then a current employee) who had supported Ms. Woodard, telling her that she was "either for
the Company or not" and that Ms. Lawless should cease helping "birds with broken wings",
apparently referring to Ms. Woodard and Meena Bhiro, a female employee of Guyanese descent.
(Compl. ¶ 84; Lawless Dep. Exh. 4, at ¶ 11).  Mr. Gall had also made threats to Ms. Monson.
(JM Dep. 52-66, 128-129).

### Q.    Plaintiffs' EEOC Charges

355.    Plaintiffs timely filed charges of discrimination, harassment and retaliation with
the United States Equal Employment Opportunity Commission ("EEOC").  (Compl. ¶ 9; Pl. Dep.
Exh. 13).

356.    On or about June 3, 2005, Ms. Woodard filed an EEOC Charge.  She
supplemented that Charge and filed an Amended Charge.  In Ms. Woodard's June 3, 2005 EEOC

Charge, she identified herself as female and alleged, among other items, that she was a victim of discrimination because she is a black female. (Compl. ¶ 76; Pl. Dep. Exh. 65; Woodard Dep. Exh. 20; Woodard Dep. Exh. 21; CW Dep. 171-174, 465, 503; see also EL Dep. 316-324). Between the date Ms. Woodard filed her EEOC Charge and the end of July 2005, Ms. Woodard and her then counsel met with Samanthia Canary, the EEOC investigator on the case. At that meeting, Ms. Canary interviewed Ms. Woodard regarding her claims and stated that Ms. Canary considered gender-based discrimination to be one of Ms. Woodard's claims to be investigated. (See Affidavit Of Claudia Woodard Regarding EEOC Investigation).

357. The EEOC conducted an investigation and, in or about August 2008, issued a Determination in Ms. Woodard's favor stating, among other items:

    *     The evidence shows that during Charging Party's ten month employment with Respondent she made two separate complaints of discrimination based on race and national origin.

    *     Charging Party was given a "Confidential Memorandum" regarding performance issues and four days later was terminated for not following an order.

    *     Given the above-described incidents, there is sufficient evidence to believe that Charging Party was subjected to a hostile work environment because of her sex, race, national origin, and in retaliation for her internal complaints of discrimination, in violation of Title VII.

(Goldberg Cert., Exh. U).

358. The EEOC issued a right to sue letter in January 2009 and this lawsuit was timely filed. (Compl. ¶ 77; see also Compl. ¶ 10)

359. In January 2006, Ms. Lawless filed an EEOC Charge. (Pl. Dep. Exh. 13; Pl. Dep. Exh. 76; Lawless Dep. Exh. 4; EL Dep. 63-64; LC Dep. 96-7). As noted above, Ms. Lawless

was subsequently terminated in March 2006.  Ms. Lawless then filed an additional EEOC Charge to include a claim of unlawful termination.  (Lawless Dep. Exh.  5; EL Dep. 65-67, 476).

360.    The EEOC conducted an investigation and, in or about August 2008, issued a Determination in Ms. Lawless's favor stating, among other items:

> *    Charging Party alleges that she was discriminated against based on pregnancy and gender.  Charging Party asserts that she was retaliated against for opposing discrimination in the workplace, and for agreeing to be a witness for complainant Claudia Woodard.
>
> *    Respondent denies the allegations, and asserts that Charging Party was terminated for poor performance, problematic behavior, and lack of communication.
>
> *    The evidence gathered contradicts Respondent's contention that Charging Party was a substandard performer.
>
> *    The record shows that the Charging Party opposed alleged discriminatory employment practices by Respondent, and as a result, her performance was unfairly criticized and she was terminated.
>
> *    Given the above there is sufficient evidence to believe that Charging Party was retaliated against for her opposing respondent's discriminatory practices, and because of her gender and pregnancy, in violation of Title VII.

(Goldberg Cert., Exh. V;. Compl. ¶ 109; see also Compl. ¶ 11).

361.    After Plaintiffs received a right to sue letter, Plaintiffs then filed this lawsuit.  (EL Dep. 62).  The EEOC's files produced during discovery reflect that all parties had a full and fair opportunity to present documents and information to EEOC.  Defendants did not file a request for reconsideration of the EEOC's Determinations.  (Woodard Aff. ¶ 52).

362.     In February or March 2006, Jen Monson, another former Account Manager, filed an EEOC Charge alleging, among other items, claims of sex discrimination.  Ms. Monson detailed in her EEOC Charge incidents of discrimination by Mark Gall against female Account Managers, including Elise Lawless and Claudia Woodard.  (Pl. Dep. Exh. 152; LC Dep. 33, 61).

363.     According to Richard Klein, former Human Resources Director with Defendants, the filing of multiple EEOC Charges by females could point towards discrimination. (RK Dep. 108-9).  Mr. Klein gave this testimony knowing that multiple female Account Managers filed EEOC Charges against Defendants.  (RK Dep. 36, 43; Pl. Dep. Exh. 13; RK Dep. 107-8).

### R.     Other Victims Of Discrimination

364.     Meena Bhiro submitted a sworn affidavit in this litigation supporting Plaintiffs' claims and alleging facts reflecting discrimination against her.  (Goldberg Cert., Exh. X)

365.     Catherine Jolly is a black female and former Agency Coordinator.  (CJ Dep. 35-36, 43, 78-79, 115-6).  Ms. Jolly testified that she was a victim of discrimination, including among other items, the fact that she was denied work after she returned to the office from a maternity leave.  (CJ Dep. 91-8).

366.     Plaintiffs also obtained sworn affidavits from Will Tague, Peggy Grundt, Courtney Kurland, Meena Bhiro.  These affidavits support Plaintiffs' claims and provide additional instances of Defendants' discrimination.  (Goldberg Cert., Exhs. X through Z).

367.     According to Rick Monihan, Dierdre O'Grady complained to Mr. Monihan after she returned from maternity leave that the company was no longer viewing her work as good enough and identified Paul Iaffaldano.  Marina Petrova, another female employee, expressed similar sentiments.  (RM Dep. 213-4, 263-5.)

### S.     Lakieben Brown, Sly Phifer and Jill Matrange

368.     In April 2006, Defendants promoted Lakieben Brown (African American male) to Account Manager.  This promotion occurred after both Plaintiffs had been terminated and had both filed EEOC Charges.  (Pl. Dep. Exh. 106; JM Dep. Tr. 115; CW Dep. 11).   In fact,

Defendants demoted Jen Monson to direct response from sales, alleging she first needed to work in direct response, without requiring Mr. Brown to follow the same course. (JM Dep. 35, 47, 58; RM Dep. 106-7; see also EL Dep. 476; CW Dep. 179-82).

369. In August 2005, Defendants paid bonuses to Account Managers. According to Defendants' chart, Derella received $15,000, Meadow received $25,000, Wright received $20,000, Lawless received $10,000 and Phifer received $8,000. Thus, Mr. Phifer, a black male, received one of the lowest bonuses. The only person that received a smaller bonus than Mr. Phifer was Jeff Spencer, who recently became an Account Manager. Similarly, Ms. Lawless, employed since 1999, received one of the smallest bonuses. Mr. Wright, who was hired in March 2005, received one of the largest bonuses. (Goldberg Cert., Exh. EE; Pl. Dep. Exh. 166).

370. According to Jen Monson, Jill Matrange was treated well at Defendants because she was having an affair with another Account Manager, Paul Celt, who was close with Mr. Gall. (JM Dep. 115-6; CW Dep. 218). As noted above, Ms. Matrange and Mr. Celt were ultimately terminated after a company trip (with clients) during which Ms. Matrange and Mr. Celt were allegedly having sex on a bus. (PS Dep. 29-34). Ms. Matrange told Ms. Monson that Mr. Gall's wife accused Ms. Matrange of having an affair with Mr. Gall. (JM Dep. 134-5).

Dated:    New York, New York
             December 1, 2009

                      GOLDBERG & FLIEGEL LLP

          By:    /s/ Kenneth A. Goldberg
                 Kenneth A. Goldberg (KG 0295)

                 60 East 42nd Street, Suite 3421
                 New York, New York 10165
                 (212) 983-1077

                 Attorneys for Plaintiffs