# Appendix – Part 1

Westlaw.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

C

United States District Court,
E.D. New York.
Coster AURELIEN, Plaintiff,
v.
HENRY SCHEIN, INC. and Paul Rose, individu-
ally and in his capacity as Vice President of Invent-
ory Management, Defendants.
**No. 07-CV-2358 (JFB)(AKT).**

Feb. 12, 2009.

West KeySummary
**Federal Civil Procedure 170A ⟨⟩2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
Genuine issues of material fact existed as to wheth-
er an employer's reasons for not promoting an em-
ployee were pretext for racial and gender discrimin-
ation. The employee presented evidence that com-
pared to other individuals who received promotions
he was more qualified. The company then elimin-
ated managerial positions that employee demon-
strated that he would have been the most qualified
to fill and filled a managerial position right after he
left. Further, a supervisor stated that she did not
disagree with the employees contention that he was
not being promoted because of his race. Civil
Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

Anthony C. Ofodile, Esq. of Ofodile & Associates
P.C., Brooklyn, NY, for Plaintiff.

David M. Wirtz, Esq. and Orit Goldring, Esq. of
Littler Mendelson, P.C., New York, NY, for De-
fendant.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** Plaintiff, Coster Aurelien ("Aurelien" or
"plaintiff") brings this employment discrimination
action under Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000e, *et seq.,* against Henry
Schein, Inc. ("Henry Schein" or the "Company")
and Paul Rose (collectively, "defendants"), alleging
that he was denied four promotions and was con-
structively terminated as a result of unlawful dis-
crimination based on gender and race.[FN1]

> FN1. Although defendants also move for
> summary judgment on any discrimination
> claims based upon national origin, plaintiff
> is not pursuing any claims of discrimina-
> tion on the basis of national origin, but
> rather is asserting discrimination on the
> basis of race and gender. The causes of ac-
> tion in the Amended Complaint only make
> reference to race and gender. Moreover,
> plaintiff never raised or referenced his na-
> tional origin in his EEOC Complaint at any
> point and plaintiff's counsel confirmed in
> plaintiff's deposition that there was no na-
> tional origin claim in the Amended Com-
> plaint. (*See* Aurelien Dep., at 147
> (plaintiff's counsel stating: "For the record,
> national origin is not in the amended com-
> plaint").) Finally, plaintiff's counsel did
> not even counter defendants' contention in
> the summary judgment papers that any
> such national origin claim was not ex-
> hausted. To the extent a national origin
> claim is being asserted, the Court agrees
> with defendants on the exhaustion issue.
> Although the Second Circuit has found
> race discrimination claims to be reasonably
> related to an EEOC charge of national-ori-
> gin discrimination in some circumstances,
> *Mathirampuzha v. Potter,* 548 F.3d 70, 77
> (2d Cir.2008); *Deravin v. Kerik,* 335 F.3d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

195, 201 (2d Cir.2003) (collecting cases), there is no indication whatsoever in plaintiff's EEOC complaint or charge that a claim based on national origin may exist. In fact, as noted above, plaintiff does not even mention his Haitian origin in the EEOC complaint. Under these circumstances, it cannot be said that the claims are "reasonably related." *Deravin,* 335 F.3d at 201 ("Raising national origin claim before the EEOC does not automatically suffice to alert the agency to investigate incidences of racial discrimination."); *Benjamin v. N.Y. City Dep't of Health,* 2002 U.S. Dist. LEXIS 5446, at \*11-\*12, 2002 WL 485731 (S.D.N.Y. Mar. 29, 2002) (dismissing national origin claim where a Jamaican plaintiff alleged discrimination based on race, but not national origin, at the administrative level because "[a]n assertion that one is 'dark skinned' does not suggest a claim of discrimination based on national origin"), *aff'd in part and vacated in part on other grounds,* 144 Fed. Appx. 140, 142 (2d Cir.2005); *see also Alonzo v. Chase Manhattan Bank, N.A.,* 25 F.Supp.2d 455, 459 (S.D.N.Y.1998) (holding that the term " 'black' ... does not trigger the concept of national origin or an affiliation to a particular country"). In short, it is the Court's conclusion that there is no national origin claim contained in the Amended Complaint and, even assuming such a claim was asserted, it cannot survive summary judgment under the circumstances of this case because it was not exhausted with the EEOC and was not "reasonably related" to the other claims raised with the EEOC.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, defendants' motion is denied.

**I. FACTS[FN2]**

> FN2. Where only defendants' 56.1 Statement is cited, the facts are taken from defendants' 56.1 Statement, and plaintiff does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

The Court has taken the facts described below from the parties' depositions, affidavits, and exhibits, and from the Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2005).

Plaintiff was hired by Henry Schein, Inc. as an Assistant Buyer in the Inventory Management Department on April 21, 2003. (Defendants' 56.1 Statement ("Defs' 56.1") ¶ 1.) The hiring decision was approved by Paul Rose, Vice President Corporate Inventory Management. (Defs' 56.1 ¶ 4.) Plaintiff was promoted from Assistant Buyer to Buyer on March 8, 2004, based on his performance as an assistant buyer. (Defs' 56.1 ¶ 7.) The promotion was approved by Mr. Rose. (Defs' 56.1 ¶ 10.) During the summer of 2005, plaintiff sent out his resume and received an offer from another company, which he brought to Henry Schein, Inc.'s attention. (Defs' 56.1 ¶¶ 11, 13.) To induce plaintiff to stay, Henry Schein, Inc. offered him a pay raise of 16.2% and "the potential to earn a significantly higher bonus." (Defs' 56.1 ¶ 16.) Plaintiff accepted Henry Schein, Inc.'s offer and stayed on as a Buyer.

In September 2005, two Senior Buyer positions became available. (Defs' 56.1 ¶ 19.) Three employees applied for the two available positions: Kristie Hoffman ("Hoffman"), Sharon Collyer ("Collyer"), and plaintiff. (Defs' 56.1 ¶¶ 20-22; Aurelien Aff. ¶ 5.) Sharon Collyer, a white female, was a Buyer on the team with one of the openings, and plaintiff was a Buyer on the other team with an opening. Both Collyer and plaintiff were in the dental division. Kristie Hoffman, a white female, was a Buyer in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

the medical division. (Aurelien Aff. ¶ 5.) The positions went to Hoffman and Collyer.

"The job description for Senior Buyer states that 'supervisory experience [is] preferred' and that incumbent 'must demonstrate leadership abilities,' and it requires a 'strong understanding of Inventory Management.' " (Defs' 56.1 ¶ 26.) It is undisputed that the "required and preferred qualifications in the Senior Buyer job description were established because they accurately reflected the legitimate business needs of the Company" and were not created with discriminatory intent. (Defs' 56.1 ¶¶ 27-28.) Performance reviews were also considered in evaluating candidates.

**\*2** Kristie Hoffman had been employed by Henry Schein, Inc. as a Buyer for six years, during which time she had "demonstrated an ability to manage others on her Buying Team effectively." (Defs' 56.1 ¶¶ 30-31; Aurelien Dep., at 241-43.) Prior to her employment at Henry Schein, Inc., "Ms. Hoffman also had approximately six years of related buying experience with a pharmaceutical company plus about two years of supervisory experience with that company." (Defs' 56.1 ¶ 32; Aurelien Dep., at 242.) Ms. Hoffman's performance review that year stated that her team "had gone through several personnel changes throughout the year and Kristie was able to help train new employees while juggling her other responsibilities.... She ha[d] also shown the ability to utilize her communication skills to involve management, other departments within Henry Schein, and the suppliers to quickly handle any problems that arise." (Defs' 56.1 ¶ 33.)

Sharon Collyer joined Henry Schein, Inc. six months before plaintiff as an Assistant Buyer and was promoted to Buyer within ten months of her date of hire. (Defs' 56.1 ¶¶ 34-35.) During her two years as a Buyer, Ms. Collyer "demonstrated an ability to manage others on her Buyer Team." (Defs' 56.1 ¶ 36.) Prior to joining Henry Schein, Inc., Ms. Collyer had a year of supervisory experience. (Defs' 56.1 ¶ 36.) Her performance review that year noted that the "team has always looked to

Sharon as a go to person." (Defs' 56.1 ¶ 37.)

As of September 2005, plaintiff had been a Buyer for a year and a half and had no prior supervisory experience, but he did gain supervisory experience in his role as Buyer as he frequently stood in for his supervisor and managed people below him. (Defs' 56.1 ¶ 38; Plaintiff's 56.1 Statement ("Pltf's 56.1") ¶ 38.) Plaintiff's performance review for that year stated that "I would like to see Coster continue to include his assistant buyer in vendor meetings so that she can learn as much as possible about establishing valuable, beneficial relationship [sic] with our vendors" and that he needed to "continue to gather as much knowledge as possible from his senior buyer, manager, Senior Inventory Analysts, and people from related departments, such as marketing." (Defs' 56.1 ¶ 39.)

Defendants contend that "[t]he Management Team, made up of Jay Goldberg, Siobhan Kelly-Hathaway, Michelle Green, and Frank Audia, interviewed the three candidates for the two Senior Buyer vacancies" and concluded unanimously that "Ms. Hoffman and Ms. Collyer's supervisory experience made them better candidates for the two open Senior Buyer positions." (Defs' 56.1 ¶¶ 43-44.) Plaintiff denies this contention and states that "defendants destroyed the notes of interviews and/or failed to keep them and are just making conclusory assertions and where there was anything they put in writing, it totally contradicted their assertions." (Pltf's 56.1 ¶ 44.)

**\*3** In January 2006, a Senior Buyer position became available, but rather than filling the position, the Company restructured the Buying Teams by redistributing the team members to other Buying Teams. (Defs' 56.1 ¶¶ 49-51; Aurelien Dep., at 137-38, 311-12.) Defendants contend that this was part of a restructuring plan to reduce the "amount of buying required of Senior Buyers, so that they could focus more of their attention on managing their Teams." (Defs' 56.1 ¶ 49.) Plaintiff alleges that this was a pretext for discrimination. Specifically, according to plaintiff, "[s]ince Plaintiff was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

the best qualified to take a future Senior Buyer position that became opened [sic] as a result of a Senior Buyer leaving his or her position, rather than open the position and promote Plaintiff to Senior Buyer, Defendant's [sic] instead told Plaintiff that the Senior Buyer position was eliminated." (Pltf's 56.1 ¶ 49.) No one applied to fill the Senior Buyer vacancy; not even plaintiff.

In May 2006, a Product Manager position became available in the Company's Corporate Brand Development Department. (Defs' 56.1 ¶ 60.) "The position required interfacing with the Company's many divisions and the ability to be responsive to the product needs of those divisions" and "involved the preparation of comparative analyses between current products and new opportunities (competitive pricing proposals), reasonably sophisticated analytical skills, and the presentation of products to various divisions within the Company ." (Defs' 56.1 ¶¶ 61-62.)

Plaintiff and his supervisor, Kim O'Connell, were the only two applicants for the position. (Defs' 56.1 ¶ 63.) "Ms. O'Connell had been with Henry Schein for fourteen years at the time of the promotion decision," during which time she had served as a Buyer for four years and a Senior Buyer for three years. (Defs' 56.1 ¶¶ 65-66.) Defendants contend that she "developed the kinds of working relationships with the other Company divisions that were important to the Product Manager position." (Defs' 56.1 ¶ 65; *but see* Pltf's 56.1 ¶ 65.) ("Plaintiff knows first hand that Kim O'Connell did not perform well as his supervisor, and that Kim O'Connell was applying for the position of Product Manager as a desperation move.")

Rick Glass and Jeffrey Sherman interviewed both candidates and defendants claim that they concluded unanimously "that Ms. O'Connell's analytical skills, and her many years with the Company, which had given her the time to develop strong relationships with the different divisions in the Company, and during which she had served in a supervisory position, made her the better candidate." (Defs' 56.1 ¶ 70.) However, plaintiff contends that an email he received from Jeffrey Sherman indicates otherwise. (Pltf's 56.1 ¶ 70.) The email was sent on June 2, 2006 in response to an email from plaintiff noting that "[i]ts [sic] a real shame because I would have been a big asset to your team." Mr. Sherman responded "I totally agree your ability to bring what we needed was crystal clear I believe, who knows what else may come down the pipe. You also really impressed Rick." (Plaintiff's Opposition to Summary Judgment, Ex. 17.) Plaintiff alleges that this indicates that Mr. Sherman and Mr. Glass selected plaintiff for the position, but that Paul Rose, Vice President Corporate Inventory Management, did not approve that selection. (Pltf's 56.1 ¶ 70.) Plaintiff concedes that Mr. Sherman and Mr. Glass had no discriminatory animus towards him. (Defs' 56.1 ¶ 73.) After plaintiff was not selected for this position, he told Supervisor Michelle Green that he thought he was not promoted to Product Manager because of his race. Defendants assert that Ms. Green did not agree or disagree with plaintiff. (Defs' 56.1 ¶ 88; Aurelien Dep., at 19-20.) Plaintiff contends that Ms. Green said, "I don't disagree with you, look around you." (Aurelien Aff. ¶ 28.)

*4 The Company did not fill the Senior Buyer position that Ms. O'Connell vacated. Defendants claim that this was done as part of the "plan to have the Senior Buyers manage, not buy, and it once again reduced the number of Buying Teams, this time from five to four." (Defs' 56.1 ¶ 75.) Plaintiff claims that this was pretext for discrimination and points to an email from Michelle Green, sent on June 9, 2006, that indicated her willingness to meet with a Senior Buyer applicant. (Plaintiff's Opposition to Summary Judgment, Ex. 19.) No one applied to fill the position and no one was hired to fill it. (Defs' 56.1 ¶ 76.) "Since then and through today, the Inventory Management Department has not increased the number of Buying Teams, each headed by one Senior Buyer." (Defs' 56.1 ¶ 78.)

On July 21, 2006, plaintiff announced his intention

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

to leave Henry Schein, Inc. (Defs' 56.1 ¶ 80.) Defendants claim that they "made efforts to get Mr. Aurelien to reconsider and possibly take another position within Henry Schein, but [their] efforts were rebuffed by Mr. Aurelien." (Defs' 56.1 ¶ 81; *but see* Aurelien Dep. at 262-63.) Plaintiff admits that he was not subjected to a racially-hostile atmosphere at work and that he left solely due to his lack of promotions. (Defs' 56.1 ¶ 58; Aurelien Dep., at 15.)

Henry Schein, Inc. had a policy prohibiting discrimination with a complaint procedure in place. Plaintiff had a copy of the handbook, but did not use the discrimination complaint procedure while employed with Henry Schein, Inc. (Defs' 56.1 ¶¶ 86-87.) Plaintiff alleges that he did not file a complaint because he feared retaliation. (Pltf's 56.1 ¶ 87.) When plaintiff resigned, he filed a letter with the Equal Employment Opportunity Commission ("EEOC"), in which he alleged he had been discriminated against on the basis of race. (Defs' 56.1 ¶ 89.) Plaintiff's EEOC Charge, dated September 10, 2006, alleges discrimination because of race and color-he did not check gender on the form because he "forgot." (Defs' 56.1 ¶¶ 90-92.) Though plaintiff did not check gender, his letter to the EEOC made numerous references to gender, including allegations that he was discriminated against because he is a black man and that less qualified women were promoted to positions instead of him.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of

showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*5** Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *St. Paul Mercury Ins. Co. v. Pepsi-Cola Bottling Co. of N. Y., Inc.,* 04 civ 360(DGT), 2007 U.S. Dist. LEXIS 56884, at \* 18, 2007 WL 2262889 (E.D.N.Y. Aug. 2, 2007). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
(Cite as: 2009 WL 366148 (E.D.N.Y.))

Page 6

(internal quotations omitted).

In addition, the Second Circuit has provided specific guidance regarding summary judgment motions in discrimination cases:

We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir.2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001)).

### IV. DISCUSSION

### A. Failure to Exhaust

As a threshold matter, defendants claim that plaintiff's claims based on gender should be dismissed because plaintiff failed to exhaust his administrative remedies. Specifically, defendants argue that "Mr. Aurelien claimed in his initial ten page letter to the EEOC, and then in his EEOC Charge, that he was discriminated against on the basis of race and color, but not gender or national origin." (Defendants' Memorandum of Law, at 15 n. 6.) Plaintiff does not dispute that he neglected to check the box for discrimination on the basis of gender in connection with his EEOC Charge.

*6 Title VII requires that an employment discrimination claimant pursue administrative procedures for each claim before commencing a lawsuit and imposes a deadline for the initiation of such procedures. See generally 42 U.S.C. § 2000e-16; *Briones v. Runyon*, 101 F.3d 287, 289-90 (2d Cir.1996). According to the Second Circuit, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 614 (2d Cir.1999). The Second Circuit has explained that

[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. In this inquiry, the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving. The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases. The 'reasonably related' exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.

*Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006) (internal quotations and citations omitted). The question is, therefore, "one intimately connected to the facts asserted in the EEOC complaint." *Id.* at 71. As set forth below, after carefully considering the factual allegations presented to the EEOC, this Court determines that the EEOC should have been on notice that, in addition to the claims based on race and color, a claim based on gender was being asserted and would reasonably be expected to be part of the EEOC's investigation given the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

allegations.

Plaintiff's letter to the EEOC dated July 21, 2006, clearly included factual allegations that put EEOC on notice that a gender claim may exist. For example, plaintiff alleges "I am one of the best in my position and for me to remain in the same role while less qualified white *females* are being promoted over me is a disgrace to both the department and company." (EEOC complaint, at 1 (emphasis added).) In addition, plaintiff repeatedly alleged that he had been discriminated against because he is "a black *man.*" (*Id.* (emphasis added).) The letter also lists several positions for which white females were selected over plaintiff, despite having allegedly inferior qualifications. (*Id.* at 7.) Where the factual allegations in the EEOC complaint "can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised," the claim meets the "reasonably related" standard. *Mathirampuzha v. Potter,* 548 F.3d 70, 77 (2d Cir.2008). In the instant case, considering all the circumstances under this standard, the Court finds that the employer and the administrative agency were on notice, on the basis of the facts alleged, that a claim for discrimination on the basis of gender might exist.

**\*7** Accordingly, the Court concludes that the plaintiff's gender claim satisfies the "reasonably related" exception to the exhaustion requirement and defendants' motion for summary judgment on that ground is denied.

### B. Failure to Promote

Plaintiff brings claim that defendants discriminated against him in the terms and conditions of his employment based on his race and/or gender in violation of Title VII. Specifically, plaintiff asserts that, on four occasions, defendants failed to promote him because he was a Black male. Defendants argue that this discrimination claim fails as a matter of law because the undisputed facts demonstrate that

he was not promoted for legitimate, non-discriminatory reasons. For the reasons set forth below, the Court finds that the plaintiff has established that genuine issues of material fact preclude summary judgment on this claim.

### 1. Legal Standard

Because plaintiff presents no direct evidence of discriminatory treatment based on his race or gender, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). With respect to a discriminatory failure to hire or promote claim, the *McDonnell Douglas* test applies. Thus, plaintiff can establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected category; (2) he applied for an available position; (3) he was qualified for the position; and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001). Moreover, "[a]n inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [ ] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone,* 986 F.Supp. 220, 228 (S.D.N.Y.1997) (citing *McDonnell Douglas,* 411 U.S. at 802).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to " 'articulate some legitimate, nondiscriminatory reason' " for the adverse employment action. *Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by com-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

petent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Patterson,* 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). " 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Patterson,* 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs,* 450 U.S. at 253).

**\*8** To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99-101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas'* s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.; Connell v. Consol. Edison Co. of N.Y., Inc.,* 109 F.Supp.2d 202, 207-08 (S.D.N.Y.2000).

As the Second Circuit observed in *James,* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove-particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2. Application

#### a. The Two Senior Buyer Positions Available in September 2005

Plaintiff first alleges that he should have been promoted to one of two Senior Buyer positions that became available in September 2005. He claims that defendants' failure to promote him to these positions was motivated by discrimination based on race and/or gender. The Court finds that plaintiff has clearly made out the *prima facie* case required by *McDonnell Douglas.* He has presented evidence that he is a member of a protected class, that he was qualified for the positions, that he applied for them, and that he was denied the positions in favor of two white women.

In response, defendants have articulated a legitimate, non-discriminatory reasons for not promoting plaintiff. Specifically, defendants argue that the two Senior Buyer positions that became available in September 2005, when plaintiff had been a Buyer for a little over a year, were filled by individuals with greater experience than plaintiff-Kristie Hoffman and Sharon Collyer-who were also the first individuals to apply for the positions. According to defendants, "[t]he job description for Senior Buyer states that '[s]upervisory experience [is] preferred' and that the incumbent 'must demonstrate leadership abilities,' and it requires a '[s]trong understanding of Inventory Management.' " (Defs' 56.1 ¶ 26.) Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination on the basis of race and/or gender by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997); *Tomney v. Int'l Ctr. for the Disabled,* 357 F.Supp.2d 721, 742 (S.D.N.Y.2005); *see also Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.1999), *aff'd mem.,* 201 F.3d 432 (2d Cir.1999); *Lapsley v. Columbia*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

*Univ.-Coll. of Physicians & Surgeons,* 999 F.Supp. 506, 515 (S.D.N.Y.1998).

**\*9** In response to defendants' showing, plaintiff points to several pieces of evidence in support of his argument that a reasonable jury could find that defendants' proffered non-discriminatory reasons for the termination were a pretext for discrimination. First, plaintiff argues that he also had supervisory experience as he "did the work of Senior Buyer when [his supervisor] was not around which was a lot of the time and supervised everybody underneath him." (Aurelien Aff. ¶ 31.) He further claims that he "was also exceptionally knowledgeable [and] was asked to write the training manual for employees including management on buying and making profit for Henry Schein." (Aurelien Aff. ¶ 31.) Plaintiff also argues that he was more qualified for the position than Ms. Hoffman because she was coming from the medical division and, therefore, did not have experience with the dental division. Plaintiff contends that he was similarly situated to Ms. Collyer. (Plaintiff's Memorandum of Law, at 13.) Plaintiff further contends that Ms. Hoffman's year-end evaluation indicates that she "barely knew how to use defendant's systems, which means that Kristie did not possess a strong understanding of Inventory Management. In addition, Kristie's end of year evaluation stated that Kristie needed much additional training." (Plaintiff's Memorandum of Law, at 13.) Plaintiff further challenges Ms. Hoffman's supervisory experience and argues that her year of experience prior to joining Henry Schein, Inc. was gained as a floor supervisor at a drug store, which would not be relevant to the position at issue. (Plaintiff's Memorandum of Law, at 14.) Plaintiff also contends that he and Ms. Collyer were similarly situated as they had equal qualifications and both "applied to replace their respective Senior Buyers in their dental division who vacated that position." (Plaintiff's Memorandum of Law, at 14.) Plaintiff argues that "by showing the fact that Defendant's [sic] promoted Sharon Collyer (White and female) who was similarly situated to and equally as qualified as

Plaintiff Coster Aurelien, (Black and male), and the fact that Defendant's [sic] promoted Kristie Hoffman over Plaintiff who was more qualified, Plaintiff has demonstrated that Defendants' promotion of the less qualified Kristie Hoffman who was White and female was done under circumstances supporting an inference of racial and gender discrimination." (Plaintiff's Memorandum of Law, at 15.)

The Second Circuit has examined cases similar to the one before this Court and has held that "[t]he employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory." *Davis v. State Univ. of N. Y.,* 802 F.2d 638, 641 (2d Cir.1986). "Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision.... At the same time, the court must respect the employer's unfettered discretion to choose among qualified candidates." *Byrne v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001) (internal quotations and citations omitted). The Second Circuit in *Byrne* went on to articulate the following standard:

**\*10** When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Id.* at 103; *see also Chambers-English v. Unisys Corp.,* No. 07-1068-cv, 2008 U.S.App. LEXIS 23421, at *2, 2008 WL 4876836 (2d Cir. Nov. 12,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

2008) (affirming the lower's court entry of judgment in defendant's favor where the record "falls far short of demonstrating that [plaintiff's] qualifications were so superior to [the selected candidate's] that no reasonable person, in the exercise of impartial judgment, could have chosen [the selected candidate] over [plaintiff] for the job in question.") (internal quotation marks omitted); *Timothy v. Our Lady of Mercy Med. Ctr.,* No. 06-0081-cv, 2007 U.S.App. LEXIS 3980, at *8-*9, 2007 WL 1120344 (2d Cir. Feb. 21, 2007) ("absent a striking disparity in ... credentials, one should be very hesitant to draw any inference from a battle of credentials").

Plaintiff argues that the standard laid out in *Byrne* only applies where a differential in credentials is the only evidence offered by plaintiff and here plaintiff also points to, among other things, the statement by Ms. Green and the circumstances surrounding the subsequent failures to promote as additional evidence to support an inference of discriminatory action. (*See* Plaintiff's Memorandum of Law, at 12 (citing *Collins v. Cohen Pontani Lieberman & Pavane,* 04 CV 8983(KMW)(MHD), 2008 U.S. Dist. LEXIS 58047, at *49-50, 2008 WL 2971668 (S.D.N.Y. July 31, 2008).) This Court agrees with plaintiff's position that the relative qualifications must be considered in light of the entire record. Specifically, the Second Circuit has made clear, in reversing a district court's grant of summary judgment to employer on a failure to promote claim, that "[i]n determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole." *Howley v. Town of Stratford,* 217 F.3d 141, 151 (2d Cir.2000) ; *see also Gregory v. Daly,* 243 F.3d 687, 700 (2d Cir.2001) ("We do not disaggregate mutually supportive assertions that plaintiff's sex played a significant causal role in the decision at issue; nor do we

treat each as a distinct claim that must separately possess a firm enough basis to survive a challenge at pleading or summary judgment.").

**\*11** This Court's conclusion on this issue, which is dictated by the Second Circuit's guidance in the above-referenced cases, is consistent with the analysis by other district courts under similar circumstances. For example, in *Henry v. Wyeth Pharms, Inc.,* No. 05 Civ. 8106(WCC), 2007 U.S. Dist. LEXIS 93694, 2007 WL 4844960 (S.D.N.Y. Dec. 19, 2007), the particular argument advanced by defendants in the instant case (both in their papers and at oral argument)-namely, that each failure to promote should be considered separately in isolation to one another-was rejected. Specifically, in *Henry,* plaintiff had claims of discrimination and retaliation based upon series of events that took place over approximately four years, including multiple claims of failure to promote. *Id.* at *2-*3. The court rejected the argument that "multiple failure to promote claims are separate and discrete employment decisions that must be analyzed on their own facts" and, instead, concluded that "it was perfectly appropriate for [the court] to consider all of plaintiff's evidence in context and as a whole, and not, as defendants would have it, as a series of isolated and completely unrelated events." *Id.* at *6-*7. In reaching this decision, the court noted that neither the Supreme Court's decision in *Nat'l R.R. Passengers Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), nor its decision in *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), suggest to the contrary. *See Henry,* 2007 U.S. Dist. LEXIS 93694, at *11 & n. 4, 2007 WL 4844960 ("Neither case [*i.e., Morgan* nor *Ledbetter* ] held, as defendants assert, that all of a plaintiff's discrimination claims-and the facts relevant to each-must be analyzed in isolation from each other on a motion for summary judgment.... If anything, *Morgan* supports the opposite view: the Court made clear that a plaintiff can rely on events that occurred outside the statutory period as 'background evidence in support of a timely claim.' *Morgan,* 536 U.S. at 113. In oth-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

er words, events that are themselves incapable of sustaining a discrimination claim can serve as evidence in support of another, valid claim.") Although each failure to promote is a discrete act in connection with the various statutory time periods, this Court is aware of no case in the jurisprudence of the Supreme Court or Second Circuit that precludes a jury from looking at the entire record, including the combined circumstances regarding multiple failures to promote, to determine whether any of the individual, alleged failures to promote was a pretext for discrimination. To the contrary, as the above-referenced Second Circuit cases have repeatedly explained, the court in reviewing the appropriateness of summary judgment should (as the jury is permitted to do in a trial) view the evidence as a whole, rather than in piecemeal fashion. *See, e.g., Ellenbogen v. Projection Video Servs., Inc.,* 99 Civ. 11046(NRB), 2001 WL 736774, at *26 (S.D.N.Y. June 29, 2001) ("[I]n the failure to promote context the Second Circuit has quite clearly instructed that a District Court is to consider the sum of the evidence in its totality, rather than examining specific aspects of evidence in isolation.").

**\*12** In fact, the Supreme Court recently reiterated the importance of looking at relative qualifications in light of the entire record when it rejected the Eleventh Circuit's test that pretext can only be established through comparative qualifications where " 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.' " *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456-57, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (quoting lower court opinion) (internal quotation and citation omitted). In rejecting this formulation, Supreme Court noted that "[t]he visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications." *Id.* Thus, although the *Ash* Court did not lower the above-referenced burden established by the Second Circuit in *Byrne* and other cases that a plaintiff must meet, it reinforced the importance of not just

looking at relative qualifications, but rather considering relative qualifications in light of the entire record. *See, e.g., Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 626-27 (6th Cir.2006) (discussing *Ash* and noting the following: "Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment."); *see also Montalvo v. United States Dep't of Agric.,* Civil Action No. 05-1377, 2006 WL 342251, at *3 (E.D.La. Nov. 27, 2006) ("The *Ash* decision was not meant to lower the burden; however, it did seek to refocus the a[sic] court's inquiry on the question of pretext as opposed to a relative level of the plaintiff's qualifications.").

In the instant case, when plaintiff's claim for failure to promote to either of these two Senior Buyer positions is considered in the context of the entire record-including, among other things, (a) plaintiff's evidence regarding his qualifications as compared to other individuals who received the promotions; (b) that plaintiff was denied other promotions to positions for which he has offered evidence that he was qualified; (c) that the Company later eliminated two senior buyer positions that became available for which plaintiff has provided evidence that he would have been the most qualified candidate; (d) that the Company filled a senior buyer position that became available shortly after plaintiff left the Company; and (e) the alleged statement by Supervisor Green that she did not disagree with plaintiff's contention that he was not promoted because of his race-a reasonable trier of fact could find that the reasons offered by defendants are pretextual. *See Terry v. Ashcroft,* 336 F.3d 128, 140 (2d Cir.2003) (finding summary judgment inappropriate where it was disputed whether plaintiff was the most qualified applicant for two positions he was denied);

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
(Cite as: 2009 WL 366148 (E.D.N.Y.))

*Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 311-14 (2d Cir.1997) (reversing a district court's granting of summary judgment in favor of the defendant, where plaintiff offered evidence that he was more qualified for a position and provided circumstantial evidence, such as deviation from its typical hiring procedures, supporting a finding of discrimination). Viewing the evidence in the light most favorable to the plaintiff, this Court finds that plaintiff does point to sufficient evidence to create a genuine factual question as to whether defendants' stated business reason for its hiring decision was a pretext for discrimination. *Id.* ("Where the plaintiff has presented evidence sufficient to support an inference of impermissible discrimination and an inference that the reasons given by the defendant for its employment decision were not its real reasons, triable issues of fact are presented."). For that reason, summary judgment is denied on the first alleged failure to promote claim.

b. The Senior Buyer Position in January 2006

**\*13** The next position plaintiff alleges he was not promoted to for discriminatory reasons was a Senior Buyer position that was vacated in January 2006. The Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas* for this claim. The standard here is somewhat different because this is not a situation in which plaintiff applied for a position that was either left unfilled despite plaintiff's qualification for the position, or was filled by someone not in plaintiff's protected class. Instead, the position was allegedly eliminated in order to avoid having to promote plaintiff due to plaintiff's race and/or gender. Here, plaintiff alleges that he was the obvious successor for the position; that the Company also eliminated the next senior buyer position that became available, for which plaintiff allegedly would have been the natural choice; that the Company did not eliminate the first senior buyer position to become available after plaintiff left the Company; and that defendants' failure to promote plaintiff to the three other positions to which plaintiff applied substanti-

ates plaintiff's claim that defendants were operating out of discriminatory animus. This is sufficient to satisfy plaintiff's *prima facie* showing. *See, e.g., Bazile v. N.Y. City Hous. Auth.*, 00 Civ. 7215(SAS), 2002 U.S. Dist. LEXIS 1639, at * 36, 2002 WL 171690 (S.D . N.Y. Feb. 1, 2002). The second element-namely, that plaintiff applied for an available position-can be established under these circumstances by demonstrating that defendants reasonably should have known that plaintiff would be interested in the position and, given the entire record, summary judgment on this element is unwarranted. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir.2008) ("At first blush, Fischer apparently fails to meet the second element of the prima facie case, since she did not apply for the Central Region Director position. In cases such as this, however, where the plaintiff alleges that there were discriminatory motives behind not announcing the position to her, Fischer only needs to show that, had [Avanade] approached her, she would have accepted the offered position, which Defendant does not contest."); *Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9, 17 (6th Cir.2007) ("In failure to promote cases where the employer does not notify its employees of the available promotion or does not provide a formal process for application, a plaintiff does not have to establish that he applied, and was considered for, the promotion. Rather, the Company has a duty to consider all who might reasonably be interested in a promotion were its availability made generally known.") (internal citation omitted); *Kolpakchi v. Principi*, 113 Fed. Appx. 633, 636 (5th Cir.2004) (actually applying for a position is not necessary where plaintiff has done everything possible to convey his interest in the position to the employer); *Kehoe v. Anheuser-Busch, Inc.*, 96 F.3d 1095, 1105 n. 13 (8th Cir.1996) ("[A]lthough it is usually necessary for a plaintiff to show that he applied for an available position, that element of the prima facie case will be excused where he demonstrates that the employer 'had some reason or duty to consider him for the post.' ") (citation omitted). Here, plaintiff contends that defendants knew that plaintiff was interested in a senior buyer position,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

that plaintiff was the obvious choice for the next available senior buyer position, and that, as a result, defendants eliminated the position. As for the fourth element, in the case of a restructuring, it is sufficient for plaintiff to put forth evidence that the "restructuring plan ... was in fact a discriminatory policy or was being implemented in a discriminatory fashion." *Bazile,* 2002 U.S. Dist. LEXIS 1639, at *34, 2002 WL 171690. In light of the other alleged failures to promote, the subsequent elimination of another Senior Buyer position for which plaintiff allegedly would have been the best candidate, and the fact that the first Senior Buyer position to become available once plaintiff left the Company was not eliminated, plaintiff has met the minimal requirements of establishing a *prima facie* case.

**\*14** Defendants responded by putting forth evidence that the position was eliminated due to a restructuring of the buying teams that took place at that time and, therefore, there was no failure to promote. (Defs' 56.1 ¶ 49; Aurelien Dep., at 137-38.) Therefore, defendants have articulated a legitimate non-discriminatory reason for defendants' failure to promote plaintiff to the position at issue. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race and/or gender discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole.

To survive summary judgment on this claim, plaintiff must point to evidence that the Company restructured in order to avoid promoting him. *See, e.g., Bazile,* 2002 U.S. Dist. LEXIS 1639, at *36, 2002 WL 171690 (plaintiff must "present evidence from which a jury could find that his race was a motivating factor in [defendants'] decisions to eliminate the ... position he applied for"). Plaintiff argues that "restructuring the buying team is pretext for discrimination." (Pltf's 56.1 ¶ 49) ("Since Plaintiff was the best qualified to take a future Senior Buyer position that became open as a result of a Senior Buyer leaving his or her position, rather

than open the position and promote Plaintiff to Senior Buyer, Defendant's [sic] instead told Plaintiff that the Senior Buyer position was eliminated.") Plaintiff points to the fact that the Company subsequently restructured to eliminate the next senior buyer position that became available, for which plaintiff alleges he would have been the best candidate, and the email at Exhibit 19, which indicates that, on or about the time the second position would have become available, the Company may have been considering candidates to fill it. Plaintiff further provides evidence that the first senior buyer position that became available after plaintiff left the Company was not eliminated. This evidence, in conjunction with defendants' alleged failure to promote plaintiff to three other positions, is sufficient evidence upon which a reasonably jury could basis a finding of discrimination. Therefore, defendants' motion for summary judgment is denied on the second failure to promote claim.

#### c. Product Manager Position

Plaintiff next alleges that he should have been promoted to a Product Manager position that became available in May 2006 in the Company's Corporate Brand Development Department. (Defs' 56.1 ¶ 60.) At the outset, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.* Plaintiff has provided evidence that, among other things, he was qualified for the position, but that it was given to a white woman in- stead.

In response, defendants have established a legitimate, non-discriminatory reason for not promoting plaintiff. Specifically, defendants argue that they selected a candidate that they determined was better suited for the position. Defendants put forth evidence that "two people applied for the Product Manager position-Mr. Aurelien and his supervisor, Kim O'Connell." (Defs' 56.1 ¶ 63.) At the time, Ms. O'Connell had worked for Henry Schein, Inc. for fourteen years and "had developed the kinds of working relationships with the other Company divi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

sions that were important to the Product Manager position." (Defs' 56.1 ¶ 65; Aurelien Dep., at 244-45.) "Ms. O'Connell had worked for Henry Schein as a Buyer for four years and as a Senior Buyer for three years at the time of the promotion decision." (Defs' 56.1 ¶ 66.) The Company's Vice President of Global Corporate Brand Development, Rick Glass, and Director of Corporate Brand Development, Jeffrey Sherman, interviewed both candidates and determined unanimously "that Ms. O'Connell's analytical skills, and her many years with the Company, which had given her the time to develop strong relationships with the different divisions in the Company, and during which she had served in a supervisory position, made her the better candidate." (Defs' 56.1 ¶¶ 69-70; Aurelien Dep., at 218-19.) Thus, defendants have articulated a legitimate non-discriminatory reason for their failure to promote plaintiff to this position and the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole.

**\*15** Plaintiff points to several pieces of evidence to support his argument that he was not promoted to this position as a result of discrimination based on race and/or gender. First, plaintiff points to an email sent to him by Jeffrey Sherman, dated June 2, 2006, which states "I totally agree your ability to bring what we needed was crystal clear I believe, who knows what else may come down the pipe. You also really impressed Rick." (Plaintiff's Opposition to Summary Judgment, Ex. 17.) Plaintiff argues that this indicates that two of the decisionmakers believed that plaintiff was qualified for the position, and the best choice for the position. Next, plaintiff argues that he was more qualified that Ms. O'Connell despite the fact that she was at Henry Schein, Inc. longer. Specifically, plaintiff points to Ms. O'Connell's performance reviews which indicate "her poor performance in the Senior Buyer position, let alone her lack of readiness for management." (Plaintiff's Memorandum of Law, at 19.) Finally, this failure to promote must be considered in the context of the evidence of other failures to promote, which further supports plaintiff's claims. Although defendants have put forth evidence challenging these claims, a jury could reasonably find, based upon the evidence put forth by plaintiff, that defendants unlawfully discriminated against plaintiff in failing to promote him to this position. *See Curry v. City of Syracuse,* 316 F.3d 324, 333 (2d Cir.2003) ("[i]t is well established that 'credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' ") (quoting *Fischl v. Armitage,* 128 F.3d 50, 55-56 (2d Cir.1997)). Based upon the evidence set forth by plaintiff, viewing it in the light most favorable to plaintiff and drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find that defendants' proffered reason for failing to promote plaintiff to this position was pretext for discrimination. Therefore, defendants' motion for summary judgment is denied as to this claim of discriminatory failure to promote.

### d. Ms. O'Connell's Senior Buyer Position

Finally, plaintiff claims that he should have been promoted to the Senior Buyer position left by Ms. O'Connell when she became Product Manager. For the reasons set forth *supra* in analyzing the first restructuring to eliminate a Senior Buyer position, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.*

Defendants have articulated a legitimate nondiscriminatory reason for their failure to promote plaintiff to this position. Specifically, defendants argue that there was no failure to promote because "the Business Management Team continued implementing its plan to have the Senior Buyers manage, not buy, and it once again reduced the number of Buying Teams, this time from five to four." (Defs' 56.1 ¶ 75; Aurelien Dep., at 137-38.) Hence, the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
(Cite as: 2009 WL 366148 (E.D.N.Y.))

Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race and/or gender discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole.

**\*16** Plaintiff responds by pointing to an email sent by Michelle Green to a recruiter on June 9, 2006, which states "[w]e are open to meeting with [an applicant]. One of our Senior Buyers is transferring to Corporate Brand. Please have [the applicant] come in ." (Plaintiff's Opposition to Summary Judgment, Ex. 19.) Plaintiff argues that this email "expressly states that Defendant's [sic] were interested in hiring a Senior Buyer for the Senior Buyer position that Kim O'Connell would vacate as a result of her promotion to Product Manager." (Pltf's 56.1 ¶ 74.) Yet, when plaintiff inquired about the promotion in July of 2006 "Defendant's [sic] for the second time told Plaintiff that they were not going to fill that Senior Buyer position." (Pltf's 56.1 ¶ 74.) Defendants provide counter-arguments, but it is clear that there is a genuine issue of material fact as to whether defendants were considering applications for the position. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003). In short, after reviewing plaintiff's evidence in light of the entire record, summary judgment on this claim is also not warranted.

In sum, with respect to the failure to promote claims, plaintiff's evidence-including, among other things, his relative qualifications compared to the individuals promoted, the circumstances surrounding the interview and decision-making process, the timing of decisions related to the elimination of positions and filling of positions, an alleged statement by Supervisor Green that she did not disagree with plaintiff's assessment that he was denied the promotion because of his race, as well as documentation, such as the June 2006 emails from Supervisors Green and Sherman-is sufficient to create genuine disputes of material fact on the issue of pretext as to each of the failures to promote. Although defend-

ants have pointed to certain evidence undermining those claims, there is sufficient evidence, when viewed in the light most favorable to plaintiff, drawing all reasonable inferences in his favor, for the claims to defeat defendants' summary judgment motion.

B. Constructive Termination

1. Legal Standard

With respect to the constructive termination claim, the *McDonnell Douglas* test again applies. Thus, plaintiff must first establish a *prima facie* case of unlawful discrimination by showing (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir.2000). To satisfy the *prima facie* case plaintiff must show that there was an adverse employment action. Plaintiff alleges that he was constructively terminated. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily ... working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir.2003). "A plaintiff must show more than that she was dissatisfied with her assignments, that she felt that the quality of her work had been unfairly criticized or that working conditions were difficult or unpleasant." *Alleyne v. Four Seasons Hotel-New York*, 99 civ. 3432(JGK), 2001 U.S. Dist. LEXIS 1503, at \*42, 2001 WL 135770 (S.D.N.Y. Feb. 15, 2001).

2. Application

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070
**(Cite as: 2009 WL 366148 (E.D.N.Y.))**

**\*17** Plaintiff has stated that he quit solely based on defendants' failure to promote him. (Aurelien Dep. at 15.) While "a denial of a promotion, without more, does not amount to a constructive discharge," *Alleyne*, 2001 U.S. Dist. LEXIS 1502, at \*43, 2001 WL 135770, an employer's "dashing reasonable expectations of career advancement may create intolerable working conditions that rise to the level of constructive discharge." *Halbrook v. Reichhold Chems., Inc.*, 735 F.Supp. 121, 127 (S.D.N.Y.1990) . Plaintiff has presented evidence that, based on the four above-described failures to promote, he believed that defendants were determined to prevent him from advancing in his career. Defendants claim that they did not intend to force plaintiff to leave and, in fact, took actions to encourage plaintiff to stay with Henry Schein, Inc. on several occasions. (Defs' 56.1 ¶¶ 16, 81.; Goldberg Dep., at 93-95; Aurelien Dep., at 262-63.) Nonetheless, the disputed issues of fact regarding the constructive termination claim are appropriately resolved by a jury under the factual circumstances of this case. Therefore, defendants' motion for summary judgment is denied as to plaintiff's claim of constructive termination as well.

### V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied in its entirety pursuant to Rule 56 of the Federal Rules of Civil Procedure.

SO ORDERED.

E.D.N.Y.,2009.
Aurelien v. Henry Schein, Inc.
Slip Copy, 2009 WL 366148 (E.D.N.Y.), 105 Fair Empl.Prac.Cas. (BNA) 1070

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
BIKUR CHOLIM, INC.; Rabbi Simon Lauber; Fellowship House of Suffern, Inc.; Malka Stern; Michael Lippman; Sara Halperin; Abraham Langsam and Jacob Levita, Plaintiffs,
v.
VILLAGE OF SUFFERN, Defendant.
United States of America, Plaintiff,
v.
Village of Suffern, Defendant.
Nos. 7:05-cv-10759 (WWE), 7:06-cv-7713 (WWE).

June 25, 2009.

**Background:** In consolidated actions, applicants and United States challenged village's denial of an application for a zoning variance that would permit applicants to use property as a guesthouse for observant Jewish visitors to hospital. Applicants moved for preliminary injunction. Village filed motion to dismiss, and village and United States filed cross-motions for summary judgment.

**Holdings:** The District Court, Warren W. Eginton, Senior Judge, held that:
(1) genuine issue of material fact existed as to whether as to whether applicants' religious observance was substantially burdened by denial of an application for a zoning variance, and
(2) genuine issues of material fact existed as to whether the enforcement of zoning law was compelling with respect to denial of application, whether there were less restrictive alternatives to further the village's interests, and whether village applied its zoning law in a neutral, general manner.

Defendant's motions granted in part and denied in part.

West Headnotes

**[1] Zoning and Planning 414 ☞570**

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k570 k. Decisions Reviewable. Most Cited Cases
Criteria relevant to the ripeness analysis in a land use case are: (1) requiring a claimant to obtain a final decision from a local land use authority aids in the development of a full record; (2) court will know precisely how a regulation will be applied to a particular parcel only if a property owner has exhausted the variance process; (3) a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes; and (4) finality requirement evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.

**[2] Zoning and Planning 414 ☞570**

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k570 k. Decisions Reviewable. Most Cited Cases
Where an appeal to a zoning board would be futile, the plaintiff need not appeal to that board in order to satisfy ripeness requirement in a land use case.

**[3] Zoning and Planning 414 ☞570**

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k570 k. Decisions Reviewable. Most Cited Cases
Challenge to village's denial of application for a zoning variance was ripe despite applicant's failure to appeal violation notice under building and zoning code since court could look at the zoning board of appeals' decision as a definitive ruling on how

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

applicant could use its property.

**[4] Zoning and Planning 414 ☞570**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General
            414k570 k. Decisions Reviewable. Most
Cited Cases
A land use case is ripe when the court can look to a
final, definitive position from a local authority to
assess precisely how they can use their property.

**[5] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1073 k. Zoning, Building, and Planning;
Land Use. Most Cited Cases
Applicants, who challenged village's denial of their
application for a zoning variance that would permit
them to use their property as a guesthouse for ob-
servant Jewish visitors to hospital, established a
prima facie claim under Religious Land Use and In-
stitutionalized Persons Act (RLUIPA); applicants
sufficiently alleged that the denial of a use variance
was a substantial burden to their practice of Ortho-
dox Judaism where they alleged that they were be-
ing discouraged from seeking treatment at hospital
by the inability to find nearby accommodations,
and were forced to choose between observing the
Sabbath and holidays and visiting the sick at hospit-
al. Religious Land Use and Institutionalized Per-
sons Act of 2000, § 2(a)(1), 42 U.S.C.A. §
2000cc(a)(1).

**[6] Constitutional Law 92 ☞1430**

92 Constitutional Law
    92XIV Right of Assembly
        92k1430 k. In General. Most Cited Cases
First Amendment includes the right to assemble for
religious exercise. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ☞967**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional
Questions
            92VI(C)1 In General
                92k964 Form and Sufficiency of Ob-
jection, Allegation, or Pleading
                    92k967 k. Particular Claims. Most
Cited Cases
Applicants, who challenged village's denial of their
application for a zoning variance that would permit
them to use their property as a guesthouse for ob-
servant Jewish visitors to hospital, adequately al-
leged that they had been denied the right to as-
semble on their property for religious exercises in
violation of First Amendment. U.S.C.A.
Const.Amend. 1.

**[8] Constitutional Law 92 ☞967**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional
Questions
            92VI(C)1 In General
                92k964 Form and Sufficiency of Ob-
jection, Allegation, or Pleading
                    92k967 k. Particular Claims. Most
Cited Cases
Applicants, who challenged village's denial of their
application for a zoning variance that would permit
them to use their property as a guesthouse for ob-
servant Jewish visitors to hospital, failed to allege a
claim under the Equal Protection Clause of the
Fourteenth Amendment where they did not allege
that they were similarly situated to property owners
that sought a similar variance for a similar plot of
land. U.S.C.A. Const.Amend. 14.

**[9] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1073 k. Zoning, Building, and Planning;
Land Use. Most Cited Cases

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

Religious Land Use and Institutionalized Persons Act (RLUIPA) does not excuse a landowner from local land use regulations. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[10] Zoning and Planning 414 ☞484**

414 Zoning and Planning
   414IX Variances or Exceptions
      414IX(A) In General
         414k484 k. Power to Grant in General.
Most Cited Cases
Under New York law, the authority to grant variances lies exclusively with the local zoning board of appeals, which enforces the zoning scheme created by the local legislature. McKinney's Town Law § 267.

**[11] Zoning and Planning 414 ☞351**

414 Zoning and Planning
   414VII Administration in General
      414k351 k. Boards and Officers in General.
Most Cited Cases
In New York, a zoning board is a distinct and separate legal entity whose members serve pursuant to the authority granted by law. McKinney's Town Law § 267.

**[12] Zoning and Planning 414 ☞582.1**

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(B) Proceedings
         414k582 Parties
            414k582.1 k. In General. Most Cited Cases

**Zoning and Planning 414 ☞721**

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(D) Determination
         414k721 k. In General. Most Cited Cases
Despite United States' naming of only new York village as defendant and not the appropriate zoning

board in Article 78 proceedings challenging denial of zoning variance, court had the power and authority, if appropriate, to enjoin village from enforcing its zoning Law and requiring it to revise the zoning law to comply with federal law and relevant constitutional provisions. McKinney's CPLR 7801 et seq. ; McKinney's Town Law § 267.

**[13] Civil Rights 78 ☞1032**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1030 Acts or Conduct Causing Deprivation
         78k1032 k. Particular Cases and Contexts.
Most Cited Cases
"Religious exercise" as used in Religious Land Use and Institutionalized Persons Act (RLUIPA) covers most any activity that is tied to a religious group's mission; not every activity carried out by a religious institution, however, is a religious exercise. 42 U.S.C.A. § 2000cc-5(7)(A) .

**[14] Constitutional Law 92 ☞1292**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(A) In General
         92k1292 k. Beliefs Protected; Inquiry Into Beliefs. Most Cited Cases
The law bars inquiry into whether a particular belief or practice is central to an individual's religion.

**[15] Civil Rights 78 ☞1073**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
Rabbi's administration of religious organization's leased property and private plaintiffs' utilizing the property constituted "religious exercise" under Religious Land Use and Institutionalized Persons Act (RLUIPA); rabbi's action in seeking zoning vari-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

ance that would permit use of the property as a guesthouse for observant Jewish visitors to hospital was motivated by his belief that it was his religious duty to help the sick and their family, and other plaintiffs believed that taking care of the sick included visiting them at the hospital. 42 U.S.C.A. § 2000cc-5(7)(A) .

**[16] Civil Rights 78 ☞1073**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
If the denial of an application for a variance has a minimal impact on an institution's religious exercise, the denial is not a substantial burden for purposes of Religious Land Use and Institutionalized Persons Act (RLUIPA), but a complete denial of the enjoyment of the property is not required to show a substantial burden. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[17] Civil Rights 78 ☞1073**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
Where an organization has no realistic alternatives to its desired land use, a temporary or incomplete denial may constitute a substantial burden within meaning of Religious Land Use and Institutionalized Persons Act (RLUIPA). Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[18] Civil Rights 78 ☞1032**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1030 Acts or Conduct Causing Depriva-

tion
      78k1032 k. Particular Cases and Contexts. Most Cited Cases
Generally applicable regulations, imposed a neutral manner, are not substantial burdens within meaning of Religious Land Use and Institutionalized Persons Act (RLUIPA). Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[19] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Given that the commandments were to visit the sick and to observe the Sabbath, and that the commandment to visit the sick could take a back seat to the observance of the Sabbath, genuine issue of material fact existed as to whether applicants' religious observance was substantially burdened by denial of an application for a zoning variance that would permit applicants to use property as a guesthouse for observant Jewish visitors to hospital, precluding summary judgment in favor of village on Religious Land Use and Institutionalized Persons Act (RLUIPA) claim. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[20] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issues of material fact existed as to whether the enforcement of zoning law was compelling with respect to denial of application for a zoning variance that would permit applicants to use property as a guesthouse for observant Jewish visitors to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

hospital, whether there were less restrictive alternatives to further the village's interests, and whether village applied its zoning law in a neutral, general manner, precluding summary judgment in favor of village on Religious Land Use and Institutionalized Persons Act (RLUIPA) claim. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[21] Zoning and Planning 414 $\Longleftarrow$762**

414 Zoning and Planning
    414XI Enforcement of Regulations
        414XI(A) In General
            414k762 k. Defenses to Enforcement.
Most Cited Cases
If a reasonable factfinder could find that there are less restrictive alternatives to further the Village's interests, there are questions of fact as to whether defendant applied its Zoning Law in a neutral, general manner.

## *MEMORANDUM OF DECISION ON VARIOUS MOTIONS*

WARREN W. EGINTON, Senior District Judge.

**\*1** These consolidated actions arise from the denial by the Village of Suffern Zoning Board of Appeals [FN1] of an application for a zoning variance that would permit plaintiffs Bikur Cholim, Inc., Rabbi Simon Lauber and the Fellowship House of Suffern, Inc. (collectively "Bikur Cholim") to use their property in Suffern, New York as a guesthouse for observant Jewish visitors to Good Samaritan Hospital in Suffern.

Bikur Cholim, together with Malka Stern, Michael Lippman, Sara Halperin, Abraham Langsam and Jacob Levita (collectively "private plaintiffs"), commenced this action on December 23, 2005. The United States of America filed suit on September 26, 2006. These actions were then consolidated.

Now pending before the Court are (1) private plaintiffs' motion for a preliminary injunction (Doc.

# 4); [FN2] (2) private plaintiffs' second motion for a preliminary injunction (Doc. # 17); (3) defendant Village of Suffern's motion to dismiss private plaintiffs' complaint and for a preliminary injunction (Doc. # 23); (4) defendant's motion to dismiss the United States' complaint (Doc. # 88; 7:06-cv-7713, Doc. # 3); (5) the United States' motion for summary judgment or, in the alternative, for a preliminary injunction (Doc. # 133); (6) defendant's motion for summary judgment (Doc. # 142); and (7) private plaintiffs' motion to strike (Doc. # 151).

Plaintiffs have brought this action pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"). The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and the pendent state claims pursuant to 28 U.S.C. § 1367. The United States is authorized to bring claims pursuant to 42 U.S.C. § 2000cc-2(f).

Because the relevant factual background is different for the motions to dismiss and the motions for summary judgment, the Court will review the facts and allegations pertinent to each separately.

**I. Motions to Dismiss**

**A. Background on Motions to Dismiss**

For purposes of ruling on a motion to dismiss, the Court accepts all factual allegations of the complaint as true.

**1. Private Plaintiffs' Amended Complaint (Doc. # 22)**

Plaintiff Bikur Cholim, Inc. is a New York not-for-profit corporation. Since 1988, it has sought to accommodate the religious exercise of Jewish families of patients at three hospitals, including Good Samaritan Hospital in Suffern. Plaintiff Rabbi Simon Lauber is the Founder and Executive Director of Bikur Cholim, Inc. Plaintiff Fellowship House of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

Suffern, Inc. owns the facility in Suffern and leases it to Bikur Cholim for ten dollars per month. The facility ("Shabbos House") is located at 5 Hillcrest Road in Suffern. Plaintiffs Malka Stern, Sara Halperin, Michael Lippman, Abraham Langsam and Jacob Levita are observant Jews who have used, currently use or expect to use the Shabbos House.

Jewish law prohibits travel on the Sabbath-from sunset on Friday to sunset on Saturday. This prohibition includes a prohibition from operating, driving or riding in a motor vehicle. In addition, Jewish law prohibits using electricity or spending money on the Sabbath. These restrictions also apply to the approximately ten holy days throughout the Jewish year which have similar restrictions as the Sabbath.

*2 Bikur cholim is a Jewish commandment to visit the sick. Observant Jews believe that bikur cholim is one of the most important commandments.

The Shabbos House provides overnight accommodations for those unable to travel on the Sabbath to visit patients at Good Samaritan Hospital. Its use is limited to Friday nights and the ten holy days. Bikur Cholim does not charge its guests for stays. Rabbi Lauber claims that the operation of this house is a fundamentally important aspect of his religious exercise and is motivated by his sincere religious beliefs. He further alleges that forcing him to discontinue his administration of the Shabbos House would substantially burden his religious exercise.

Private plaintiffs contend that some patients would not seek treatment were it not for Bikur Cholim's accommodation of their family members and visitors. Sabbath, holiday and daily prayers are held at the Shabbos House.

From 1998 until 2000, the Shabbos House was located at a different site in a residential neighborhood. It was then housed inside Good Samaritan Hospital until 2005 when it moved to its current location. On April 26, 2005, Village Code Enforce-

ment Officer John Loniewski issued violation notices under Suffern's Building and Zoning Code section 205-3(A)(3) citing the presence of "cardboard boxes, garbage, pizza boxes, fast food wrappers and construction debris" on the porch. Loniewski also issued a notice violation under section 266-22(B) of the Building and Zoning Code for a "use not in compliance with the certificate of Occupancy on File," which certificate was issued for an "erect single family dwelling." On May 9, an Order to Remove Violation was issued for a May 6 use violation.

On July 7, 2005, Loniewski issued a violation under Building and Zoning Code section 205-3(A)(4) citing "old wood slats, paper bags, broken ceramic tiles and garbage," which, private plaintiffs contend, were being stored under the house's back porch. Loniewski also issued a violation notice under section 205-3(A)(5) for "overgrown bushes and shrubs" and "the lawn not ... mowed and many dead tree limbs." Private plaintiffs assert that the bushes were not overgrown and that the grass was newly planted and could not yet be mowed.

Private plaintiffs allege that while the Shabbos House was receiving property maintenance violations, the property at 7 Hillcrest Road was littered with debris and garbage and no violations were issued.

On July 12, Loniewski entered the Shabbos House by following a staff member. He issued a violation under section 404.4.1 of the New York Property Maintenance Code because there were too many beds in the master bedroom given the square footage of the room. On August 1, Loniewski issued a violation notice under section R317.1 of the New York Residential Code citing "no smoke alarms in the sleeping rooms formerly designated as the den and the dining room." All fines except for the one for the improper use violation were resolved in August 2005 by correction of the problem and payment of $2,500 in fines. The improper use violation was held in abeyance conditional upon the Shabbos House applying for a use variance before the Zon-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

ing Board of Appeals, which application occurred on August 1, 2005.

**\*3** The Shabbos House is located in an "R-10" zoning district. Such zoning allows use by right of the property for one-family detached dwellings and places of worship. By special permit, the following are allowed in an R-10 district: public utility building substations, utility lines and poles serving 25 or more kilowatts; standpipes and water towers; public and private hospitals and sanitariums; convalescent and nursing homes; private membership clubs; public schools; colleges; dormitories accessory to schools; private and public elementary or secondary schools; nursery schools; daycare centers; and home occupations. Sections 266-2 and 266-33(F) permit dormitories in the R-10 zoning district "only as accessory uses to schools of general or religious instruction...." Bikur Cholim's use was not considered a "dormitory." There is no zoning district within Suffern that permits "transient/motel uses" or temporary accommodations. Private plaintiffs assert there is no other location within reasonable and safe walking distance that could house Good Samaritan Hospital patients or their family members and that there are no available alternate locations in Suffern where Bikur Cholim may locate the Shabbos House.

On August 2, 2005, Bikur Cholim submitted an application for a use variance to continue operating the Shabbos House in the R-10 zone. The application sought a variance from Suffern Zoning Law section 266-22(B) which states that "[o]nly those uses listed for each district as being permitted shall be permitted. Any use not specifically listed as being permitted shall be deemed to be prohibited." The application requested use of:

a one family residence for overnight occupancy for up to 17 people, who are family members of the patients at Good Samaritan Hospital. Overnight occupancy will be limited to Fridays and approximately 10 Jewish Holiday days, when travel is not permitted. There is no charge for cover.... The accommodations are offered, without charge as a

community service. This service is offered in conjunction with Good Samaritan Hospital....

Bikur Cholim asserts that it is willing to limit the occupancy of the Shabbos House to fourteen individuals. The application claims that the variance was necessary for a "community hardship."

Suffern defined Bikur Cholim's use as a "transient/motel use." There is no definition for "transient/motel use" in Suffern's Zoning Law. Under Zoning Law section 266-54(D)(3), the Village Board of Appeals may grant a use variance upon "a showing by the applicant that applicable zoning regulations and restrictions have caused unnecessary hardship." To show such hardship under section 266-54(D)(3)(a), the applicant must demonstrate that: (1) it cannot realize a reasonable return, provided that the lack of return is substantial as demonstrated by competent financial evidence; (2) the alleged hardship relating to the property in question is unique and does not apply to a substantial portion of the district or neighborhood in which it is located; (3) the requested use variance, if granted, will not alter the essential character of the neighborhood; and (4) the alleged hardship has not been self-created." Section 266-54(D)(1) provides that the "Board of Appeals is authorized to vary or modify the strict letter of this Zoning Law where its literal interpretation would cause practical difficulties or unnecessary hardships in such manner as to observe the spirit of the law, secure public safety and welfare and do substantial justice." The Zoning Board of Appeals unanimously denied Bikur Cholim's application on November 17, 2005, which decision was filed with the Village Clerk on November 29.

**\*4** Private plaintiffs bring claims under RLUIPA for substantial burden on religious exercise, 42 U.S.C. § 2000cc(a); for nondiscrimination, 42 U.S.C. § 2000cc(b)(2); for "equal terms," 42 U.S.C. § 2000cc(b)(1); and for "exclusion and limits," 42 U.S.C. § 2000cc(b)(3). They also assert that their rights under the Free Exercise and Free Association Clauses of the First Amendment and the Equal Pro-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

tection Clause of the Fourteenth Amendment to the United States Constitution were violated, and they assert claims under 42 U.S.C. § 1983. Finally, they allege that their rights under the New York State Constitution were violated. They seek declaratory and injunctive relief.

In its answer to private plaintiffs' amended complaint, defendant asserts a counterclaim that private plaintiffs' use of the property is an illegal use and a violation of Suffern Village Code chapters 162 and 205.

## 2. The United States' Complaint (7:06-cv-7713, Doc. # 1)

The United States' complaint alleges that the Zoning Board's denial of Bikur Cholim's variance application and Suffern's enforcement of such denial constitute an imposition or implementation of a land use regulation within the meaning of RLUIPA, 42 U.S.C. § 2000cc(a)(1), and that such denial and enforcement substantially burden the religious exercise of Orthodox Jews who need to visit the sick at Good Samaritan hospital while observing religious proscriptions against driving on the Sabbath and other Holy Days. The United States further claims that such denial and enforcement of the Zoning Law do not further a compelling government interest, and even if they did, they are not the least restrictive means of doing so.

## B. Discussion

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the

claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007) (applying flexible "plausibility standard" to Rule 8 pleading), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868.

For purposes of ruling on the motions to dismiss, the Court only reviews the pleadings and the exhibits to them. *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993). Additional facts submitted in a motion to dismiss, or exhibits thereto, are not reviewed by the Court at this stage. Further, the Court accepts as true all allegations of fact, but not conclusory statements of law. *Ashcroft v. Iqbal,* 129 S.Ct. at 1949 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

## 1. Motion to Dismiss Private Plaintiffs' Amended Complaint

### a. Whether Private Plaintiffs' Claims are Ripe

**\*5** Defendant first argues that private plaintiffs' claim under RLUIPA is not ripe because Bikur Cholim's application for a variance before the Zoning Board offered perfunctory and insufficient evidence. Defendant also asserts that Bikur Cholim failed to appeal the Code Enforcement Officer's determination that its use was not permissible to the Zoning Board of Appeals. Instead, Bikur Cholim sought a use variance. Private plaintiffs argue in response that (1) their facial challenge to the zoning

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

law has no finality requirement; (2) Bikur Cholim's citation for improper use became final once it did not appeal the citation to the Zoning Board of Appeals; (3) the Zoning Board of Appeals' denial of Bikur Cholim's use variance constitutes a final decision that may be challenged before this Court; (4) its proposed use would not meet a stated exception to the zoning law; (5) the adequacy of Bikur Cholim's variance application is irrelevant to the ripeness analysis; and (6) by seeking a preliminary injunction, defendant has made these issues ripe for adjudication.

The question of ripeness raises issues of Article III's case or controversy requirement as well as prudential limitations on the exercise of judicial authority. *See Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 733 n. 7, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). It requires a determination of whether the Court should defer until such time as the claims have matured into a more appropriate form before the Court. *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

[1] In a land use case like this one, four factors are relevant to the ripeness analysis. *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).[FN3] As the Court explained in *Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342 (2d Cir.2005):

First, ... requiring a claimant to obtain a final decision from a local land use authority aids in the development of a full record. Second, and relatedly, only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel. Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes. Thus, requiring a meaningful variance application as a prerequisite to federal litigation enforces the long-standing principle that disputes should be decided on non-constitutional grounds whenever

possible. Finally ..., federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.

*Murphy,* 402 F.3d at 347.

[2] There are, however, exceptions to the rule of ripeness. Where an appeal to a zoning board would be futile, the plaintiff need not appeal to that board. *Southview Assoc., Ltd. v. Bongartz,* 980 F.2d 84, 98 (2d Cir.1992); *see also Murphy,* 402 F.3d at 349 ("[A] property owner need not pursue such applications when a zoning agency ... has dug in its heels and made clear that all such applications will be denied."). In general, however, failure to seek a variance prevents a zoning decision from becoming ripe. *Williamson,* 473 U.S. at 190.

***6** [3] As to defendant's first argument in support of its claim that this controversy is not yet ripe-that Bikur Cholim's application for a variance was perfunctory-the merits of the Zoning Board's rejection of the application is not properly before the Court on a motion to dismiss. Whether the application was inadequate and properly dismissed on its merits or was adequate and was rejected in violation of RLUIPA is a fact-based question better suited for summary judgment. What matters at this stage is whether private plaintiffs adequately pleaded that their variance was denied. That, they did. *See* Amended Complaint ¶ 62.

The crux of defendant's claim that this case is not yet ripe is that Bikur Cholim did not challenge Loniewski's violation notice under Building and Zoning Code section 266-22(B) issued on April 26, 2005. The Court disagrees and finds Bikur Cholim's failure in this regard to be irrelevant. First, private plaintiffs claim that the violation was held in abeyance pending the application for a use variance. Second, and more importantly, after this violation, Bikur Cholim sought a use variance from the Zon-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

ing Board of Appeals, which was denied.

[4] A case is ripe when the court "can look to a final, definitive position from a local authority to assess precisely how they can use their property." *Murphy,* 402 F.3d at 347. The Court can look at the Zoning Board of Appeals' decision as a definitive ruling on how Bikur Cholim can use its property. It is the denial of the application that serves as the basis for jurisdiction before the Court.

**b. Whether Private Plaintiffs Have Sufficiently Alleged a Violation of RLUIPA**

Defendant next moves for dismissal arguing that private plaintiffs have failed to allege a prima facie case of a violation under RLUIPA. RLUIPA prohibits a government from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person ... or institution, unless the government demonstrates that imposition of the burden on that person ... or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1); *Westchester Day Sch. v. Vill. of Mamaroneck,* 386 F.3d 183, 186 (2d Cir.2004) ( *"Westchester Day Sch. I"* ). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "The use, building, or conversion of real property for the purpose of religious exercise shall be considered ... religious exercise." 42 U.S.C. § 2000cc-5(7)(B). "Religious exercise" under RLUIPA is to be defined broadly and "to the maximum extent permitted by the terms of this chapter and the Constitution." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 347 (2d Cir.2007) ( *"Westchester Day Sch. III"* ); 42 U.S.C. § 2000cc-3(g).

*7 To state a claim for violation of RLUIPA, plaintiffs must present evidence that the land use regulation at issue as implemented: (1) imposes a

substantial burden (2) on the "religious exercise" (3) of a person, institution, or assembly. 42 U.S.C. § 2000cc(a)(1); *Westchester Day Sch. v. Vill. of Mamaroneck,* 379 F.Supp.2d 550, 555 (S.D.N.Y.2005) ( *"Westchester Day Sch. II"* ); *Murphy v. Zoning Comm'n of the Town of New Milford,* 148 F.Supp.2d 173, 187 (D.Conn.2001). If plaintiffs are successful in making that prima facie showing, the burden shifts to the government to demonstrate that the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc(a)(1)(A-B).

[5] Accepting the factual allegations of the amended complaint as true, the Court must conclude that private plaintiffs have established a prima facie claim under RLUIPA. First, they have sufficiently alleged that the denial of a use variance is a substantial burden to their practice of Orthodox Judaism. They claim that the inability to operate the Shabbos House burdens their religion in two ways. As to Rabbi Lauber, they claim that the commandment of bikur cholim requires him to operate the house. As to plaintiffs Stern, Lippman, Halpern, Langsam and Levita, private plaintiffs assert that their religion is substantially burdened by being forced to choose between observing the Sabbath and holidays and visiting the sick at Good Samaritan Hospital. They further allege that they are being discouraged from seeking treatment at Good Samaritan Hospital by the inability to find nearby accommodations.[FN4]

As to the religious exercise prong, the Court of Appeals in *Westchester Day Sch. III* commented that the district court must examine whether a particular use by a religious organization was for a religious purpose, such as prayer, or a secular purpose, such as a gymnasium in a religious school. *See Westchester Day Sch. III,* 504 F.3d at 347-48. If the improvement or building is to be used for religious education or practice, land use regulations related to it could affect the land users' religious exercise. *See id.* at 348.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

Here, private plaintiffs have sufficiently alleged that the Zoning Board's rejection of Bikur Cholim's use variance and defendant's enforcement of the Zoning Law served as burdens to their religious exercise as defined under RLUIPA. The allegations related to Rabbi Lauber's religious obligation to operate a facility to enable observant individuals to visit the sick on the Sabbath and holidays as well as the other individual plaintiff's obligations to observe the Sabbath while being able to visit their family members at Good Samaritan Hospital implicate their religious exercise. *See Cathedral Church of the Intercessor v. Incorporated Vill. of Malverne,* 2006 U.S. Dist. LEXIS 12842, *25-26, 2006 WL 572855 (E.D.N.Y. Mar. 6, 2006).

Finally, there is no dispute that private plaintiffs are persons and institutions under the law. Therefore, private plaintiffs have met their burden of showing a prima facie case under RLUIPA.

**\*8** The Court notes defendant's argument that private plaintiff's proposed use is analogous to a group of individuals sharing a communal home. At this juncture, the Court only reviews the pleadings and takes factual allegations at their word. Whether defendant's actions support plaintiff's contention that the enforcement of the Zoning Law would constitute a substantial burden on private plaintiffs' religious exercise is not a question to be answered on a rule 12(b) motion to dismiss.

In addition, defendant argues that it has a compelling interest in enforcing its zoning regulations and in prohibiting transient uses such as private plaintiffs', it has used the least restrictive means of enforcing such regulations. This defense to a RLUIPA claim is not before the Court as the Court determines whether private plaintiffs have pleaded a prima facie case. The Court will address it below, when it analyzes the parties' summary judgment papers. Dismissal at this stage is inappropriate as to private plaintiffs' RLUIPA claim.

**c. Private Plaintiffs' Free Association Claim**

[6] Defendant next moves to dismiss private plaintiffs' claim for a violation of their First Amendment rights to free association. The First Amendment provides that the government "shall make no law ... abridging ... the right of the people peaceably to assemble...." This protection embraces two types of associational rights: (1) intimate human relationships, and (2) association for purposes of engaging in protected speech. *Roberts v. United States Jaycees,* 468 U.S. 609, 617-618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). It also includes the right to assemble for religious exercise. *See Sanitation & Recycling Indus. v. City of New York,* 107 F.3d 985, 996-997 (2d Cir.1997).

[7] Private plaintiffs adequately allege that they have been denied the right to assemble at the Shabbos House for religious exercises. The Court will therefore leave these plaintiffs to their proof and deny dismissal on this count. Again, whether the zoning regulations are neutral is not a question for this motion.

**d. Private Plaintiffs' Equal Protection Claim**

[8] Defendant argues that private plaintiffs have failed to allege a claim under the Equal Protection Clause of the Fourteenth Amendment. In order to state such a claim, private plaintiffs must allege that they are (1) similarly situated to an entity (2) that was treated differently. *Congregation Kol Ami v. Abington Twp.,* 309 F.3d 120, 137 (3d Cir.2002); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To meet the first prong, plaintiffs must allege that they were similarly situated to property owners that sought a similar variance for a similar plot of land. *Burke v. Town of E. Hampton,* 2001 U.S. Dist. LEXIS 22505, *21-22, 2001 WL 624821 (E.D.N.Y. Mar. 16, 2001).

Private plaintiffs have made no allegations of similarly situated property owners to survive dismissal on this claim.[FN5] *Economic Opportunity Comm'n of Nassau County, Inc. v. County of Nassau,* 47

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

F.Supp.2d 353, 370 (E.D.N.Y.1999). Dismissal would thus be appropriate but for private plaintiffs' argument that the zoning law treats religious organizations unequally because it allows dormitories and nursery homes to operate through special permits, which are similar uses to Bikur Cholim's. Private plaintiffs' claim that the zoning law on its face violates their rights under the Equal Protection Clause is unsupported by any citation to case law. Nor do private plaintiffs point in their amended complaint to any nursing homes or dormitories existing within the Village of Suffern.

**\*9** This facial challenge to the law is purely hypothetical. Private plaintiffs, in essence, suggest that, although there are not comparators, a secular comparator would receive better treatment than private plaintiffs did. In this sense, this claim is not a Fourteenth Amendment claim. Instead, it is either a free exercise claim under the First Amendment or under RLUIPA. *See Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."); 42 U.S.C. § 2000cc(b)(1) ("No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."); *see also Third Church of Christ v. City of New York,* 2008 U.S. Dist. LEXIS 99822, 2008 WL 5102466 (S.D.N.Y. Dec. 2, 2008). Without any comparators pleaded in the amended complaint for the Court to examine, private plaintiffs' claim under the Equal Protection Clause cannot stand. Therefore, it will be dismissed.

**e. Claim for Article 78 Relief**

Private plaintiffs assert a claim for relief under Article 78 of the New York Civil Practice Law and Rules. Defendant seeks dismissal of this claim, contending that Bikur Cholim's application for a vari-

ance was insufficient. As the Court discussed above, the adequacy of Bikur Cholim's variance application should not be reviewed based on the amended complaint, but based on the full record as developed through discovery. Therefore, the Court will not dismiss this claim under rule 12(b)(6).

**f. Conclusion as to the Motion to Dismiss Private Plaintiffs' Amended Complaint**

For the reasons discussed above, the Court will grant defendant's motion to dismiss private plaintiffs' amended complaint only as to the claim for relief under the Equal Protection Clause of the Fourteenth Amendment. As to all other claims, the motion will be denied.

**2. Motion to Dismiss United States' Complaint**

Defendant moves to dismiss the United States' complaint under rule 12(b)(6) of the Federal Rules of Civil Procedure arguing that (1) the United States' claim is not yet ripe; (2) the United States has not alleged that the Shabbos House constitutes a religious exercise; (3) the United States has failed to allege that there has been a substantial burden on Orthodox Jews' religious exercise; (4) Suffern has a compelling interest in implementing and enforcing its zoning regulations; and (5) the United States has failed to allege that Suffern did not use the least restrictive means in enforcing its zoning regulations.

The analysis applicable to the private plaintiffs' amended complaint applies also to the United States' complaint. Because the United States has sufficiently alleged in its complaint a violation of RLUIPA as it relates to the Shabbos House, the motion to dismiss its complaint will be denied. The United States adequately pleaded that the denial of the variance constituted a substantial burden on Orthodox Jews, and the United States is able to bring this action pursuant to 42 U.S.C. § 2000cc-2(f), which provides that the "United States may bring an action for injunctive or declaratory relief to enforce compliance with this Act."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

*10 Accordingly, the Court will deny defendant's motion to dismiss the United States' complaint.

## II. Motions for Summary Judgment

The United States has filed for summary judgment related to its action (7:06-cv-7713), while the Village of Suffern has filed a cross motion related to both actions.

### A. Background on Summary Judgment

The parties have submitted briefs, a stipulation of facts and supporting exhibits which reflect the following factual background.[FN6]

The Shabbos House is located directly across the street from the entrance to Good Samaritan Hospital at 5 Hillcrest Road in the Village of Suffern. It is between a commercial office building with a parking lot and residential homes. It is located in an R-10 zoning district.

The emergency room of Good Samaritan Hospital treats approximately 36,000 patients per year, approximately five to ten percent of whom are observant Jews.

### 1. Background on Suffern Zoning Law and Shabbos House Placement

According to the Village of Suffern Zoning Law, one-family detached dwellings and places of worship are both permitted uses in an R-10 district. By special permit, the zoning law allows public utility buildings and substations (subject to certain limitations); hospitals, sanitariums and convalescence and nursing homes; private membership clubs; dormitories accessory to schools; nursery, elementary and secondary schools; home occupations; hospital heliports; and medical office buildings on the campus of a hospital. There is no provision in the zoning law for transient-use hotels or motels. The minimum lot size required for a single family dwelling is 10,000 square feet with a minimum

width of 90 feet.

Rabbi Lauber is an Orthodox Rabbi. After his own hospitalization in 1981, he established Bikur Cholim, Inc. as a nonprofit organization to observe the religious obligation of bikur cholim. He believes it his religious mission to bring comfort and ease the anxiety and pain of patients and their families. Bikur Cholim, Inc. operates the Shabbos House to further this goal.

From 1988 until 2001, the Shabbos House was located at 1 Campbell Avenue, on Good Samaritan Hospital's grounds in Suffern. From 2001 until 2005, the Shabbos House was located within Good Samaritan Hospital. Because of certain developments in 2004, Bikur Cholim was no longer able to operate out of the hospital.

On May 12, 2004, a developer unrelated to Bikur Cholim applied for area variances to permit the construction of a single family house at 5 Hillcrest Road. The developer had to obtain a variance to build such house because the lot did not meet the minimum lot size or width requirement under the Zoning Law. While the minimum lot size for a single-family dwelling is 10,000 square feet, the lot at 5 Hillcrest Road is 9,286 square feet. The minimum width requirement is 90 feet, but the lot at 5 Hillcrest Road is 75 feet. The variances were approved by the Zoning Board of Appeals on July 22, 2004. The house was built in 2005, and the developer was issued a certificate of occupancy on February 2, 2005. The certificate of occupancy stated that the "intended use" was for a "single family dwelling."

*11 Fellowship House purchased the house and now leases it to Bikur Cholim for ten dollars per annum. Good Samaritan Hospital provides parking for guests of the Shabbos House, and Rabbi Lauber averred that there would likely be no more than two cars parked in front of the Shabbos House at any time.

As of July 12, 2005, the Shabbos House was set up

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

with six beds in the master bedroom, two beds in bedroom no. 2, three beds in bedroom no. 3, three beds in the former den and three beds in the former dining room. The Shabbos House does not have an automatic sprinkler system.

## 2. Relevant Jewish Law

Observant Jews observe the Sabbath from sundown Friday to sundown Saturday. In addition, there are six holidays comprising ten to eleven days per year. Together, there can be sixty-three such Sabbath and Holy Days. On certain occasions, the Sabbath can immediately precede or follow such Holy Days, creating a three day "holiday."

On the Sabbath and these Holy Days, observant Jews are obligated to abstain from certain conduct. Specifically, they refrain from using electricity, using combustion engines (e.g., driving), carrying objects in public areas and walking outside a certain radius. These restrictions may be relaxed when there are life-threatening circumstances. When there is a even a remote threat to life, Jewish laws requires individuals to engage in otherwise forbidden acts, such as driving a car to seek medical attention. Once the danger has passed, however, these acts become forbidden again. Because of the restrictions, an observant Jew could not register at or pay for a hotel or carry money, keys or identification.

On the Sabbath and Holy Days, observant Jews are obligated to follow certain rituals. For example, they must wash their hands before meals, consume a minimum quantity of bread during each of three meals, recite certain prayers over a cup of wine and pray three times per day.

The Jewish obligation to visit the sick includes providing for the comfort and emotional tranquility of the patient. It also requires children to perform personal services on behalf of a parent, such as assistance with feeding, even where assistance from others is available.

The Shabbos House provides lodging, meals and a place to pray for observant Jews who are at Good Samaritan Hospital on the Sabbath or Holy Days. Plaintiffs also claim that it encourages those people needing medical care on the Sabbath or Holy Days to seek it by allowing them a place to stay if the medical needs, and thus the exigent circumstances, abate on the Sabbath or Holy Days. In such scenarios, patients will not be left without sleeping accommodations or kosher food. The Shabbos House thus eliminates the difficulties of complying with the Sabbath rules and the requirement to seek medical care where there is even a remote threat to life.[FN7] Plaintiffs contend that observant patients may also terminate treatment in the absence of the Shabbos House so that they may reach home before the onset of the Sabbath. They assert that when such observant individuals visit the emergency room on Friday afternoons, they will request quick treatment so as to be able to return home before the Sabbath begins.

*12 The Shabbos House encourages family members to fulfill their Jewish obligation to give personal care and assistance to the sick and one's parents. Although plaintiffs term this an "obligation," several private plaintiffs testified that the obligation of bikur cholim is secondary to the laws of the Sabbath. That is, they could not violate the Sabbath to visit or care for the sick on that day if they did not have accommodations to make it possible. How they approach this dilemma, they testified, turns on the proximity of the sick person and their personal relationship.[FN8] The Shabbos House further enables family members to be near patients who may have a language barrier with hospital staff and allows family members to be physically present at the hospital when medical decisions must be made during the Sabbath.

## 3. Private Plaintiffs

Private plaintiffs Malka Stern, Michael Lippman, Sara Halperin and Jacob Levita are observant Jews who have stayed at the Shabbos House on the Sab-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

bath to visit an ill relative or spouse. Each private plaintiff lives outside walking distance from Good Samaritan Hospital and has stayed at the Shabbos House when they could no longer visit at the Hospital. They each used the Shabbos House to sleep, eat and pray. They also assert that without the Shabbos House, they would be forced to choose between observing the Sabbath and visiting their family members. Stern attended to her husband daily for six weeks when he was hospitalized with Alzheimer's disease and unable to speak. Levita visited his father each Sabbath. Lippman and Halperin are brother and sister who attended to their mother on a daily basis when she was being treated for a blood fungus infection.

Each private plaintiff observes the laws of the Sabbath and believes that they have a religious obligation to visit the sick. Each testified, however, that this obligation is secondary to the laws of the Sabbath and need not be followed on the Sabbath when distance or other factors make visits impractical.

**4. Enforcement of the Zoning Law Against Bikur Cholim**

On April 27, 2005 and May 8, 2005, Bikur Cholim was issued two notices, titled "Order to Remove Violation" by Suffern's Code Enforcement Officer John Loniewski. The notices alleged that the Shabbos House constituted an impermissible use of the property. Loniewski initiated proceedings in the Suffern Justice Court alleging the violations set forth in the notices and also issued an appearance ticket to Bikur Cholim. On August 1, 2005, Loniewski observed fire safety violations under the New York State Residential Code concerning smoke alarms in and just outside of all sleeping areas.

Thereafter, Bikur Cholim applied to the Zoning Board of Appeals, requesting a use variance to continue operating the Shabbos House. This application stayed the proceedings in the Justice Court. In the application, Bikur Cholim requested a variance

to allow the use of the house for overnight occupancy for up to seventeen people who are family members of patients at Good Samaritan Hospital. The application stated that overnight occupancy would be limited to Friday night and approximately ten Jewish holidays and that there would be no charge for staying at the House. The appeal was based on "community hardship." Bikur Cholim's request for up to seventeen guests was later reduced to fourteen guests. In this case, plaintiffs state that they wish to use the house for up to fourteen guests.

**\*13** The Zoning Law requires zoning decisions to be based on the four criteria set forth in section 266-54(D)(3)(a). These factors require that the applicant demonstrate that: (1) it cannot receive a reasonable return on the property as shown by "competent financial evidence;" (2) the hardship is unique and does not apply to a substantial portion of the neighborhood; (3) the applicant's use would not alter the essential character of the neighborhood; and (4) the alleged hardship has not been self-created.

The Rockland County Commissioner of Planning recommended against granting the variance. In a letter to the Zoning Board of Appeals, he wrote:

[Bikur Cholim's proposed] use is incompatible with the single-family use that is predominant in the R-10 zoning district and is not consistent with the community character of the surrounding residential neighborhood. A three-bedroom, single family residence cannot accommodate seventeen overnight guests.... [I]t seems unlikely that adequate on-site parking can be provided.

The Zoning Board of Appeals held a hearing on November 17, 2005 on Bikur Cholim's application. The notice of the hearing stated that Bikur Cholim was appealing the violation notices so as "to permit maintenance and use of a conversion of a single family dwelling to a transient/motel use...." Although between five and forty residents typically attend Zoning Board meetings, over one hundred people attended the hearing. At the hearing, Dr. Mi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

chael Lippe, Director of Emergency Room Services at Good Samaritan Hospital, spoke on behalf of Bikur Cholim, noting some of the issues that arise with observant patients concerning the Sabbath. Bikur Cholim's attorney also spoke. In addition, several community members spoke against the variance application.

The Zoning Board denied Bikur Cholim's application. As reflected in the minutes of the hearing, the Zoning Board found the following: (1) Bikur Cholim had "offered no evidence, financial or otherwise, that the appellant cannot realize a reasonable rate of return as a one-family residence;" (2) Bikur Cholim "failed to demonstrate enforcement of the Code for one-family residences in that zoning district created a unique hardship to his property;" and (3) "the hardship was self-created." The Zoning Board also stated that Bikur Cholim contended that the Shabbos House would not alter the essential character of the neighborhood. In addition, the Board noted at the hearing that:

[I]t was decided that there was a credibility issue.... There are safety and fire issues. The short form SEQR [FN9] was not completed. [Applicants] did not demonstrate any of the criteria for a use variance. [The Board] believes a reasonable return could be had, the character of the neighborhood would be affected (safety of the children), and the hardship was self created.

Therefore, the Board voted unanimously to deny the application. In his deposition, Michael Holden, a member of the Zoning Board and defendant's rule 30(b)(6) deponent, disavowed the Zoning Board's reliance on the issues of fire safety, the failure to complete a SEQR, the number of guests at the Shabbos House and the Rockland County GML review.

**\*14** The Zoning Board later issued a document entitled "Appeal by Fellowship House of Suffern, Inc./Bikur Cholim-Partners In Health." In the document, the Zoning Board made the following findings of fact:

1. The appellant does not intend to use the property as a "one-family dwelling unit...."

2. The appellant offered no financial evidence to indicate that it could not realize a reasonable return on the property as a one-family residence pursuant to the Code....

3. The appellant did not demonstrate the alleged hardship, namely the enforcement of the Code for this property to remain a one-family dwelling, was unique to this property and did not apply to a substantial portion of the district or neighborhood....

4. The appellant failed to demonstrate how permitting 14 unrelated overnight guests would not alter the essential character of the neighborhood, which consists primarily of one-family detached dwellings. Based upon the evidence presented, the Board finds there are no other transient uses among the one-family dwellings in the neighborhood.

5. The appellant acknowledged that the hardship was self-created....

* * *

7. The use proposed is out of character with other homes in the district.... Given the nature of the proposed use, [the Shabbos House would] ... consequently create a negative impact on traffic in this neighborhood.

8. ... No evidence was offered as to how occupancy would be limited to 14 people.

9. Although the appellant contends the use is "in furtherance of religious beliefs" that does not make the proposed use a "religious use." It is not a tenet of the religion to visit patients in a hospital or to have a place to walk to after a visit or stay in the hospital. The proposed use would be a convenience to people who wished to do that but the use in and of itself is not for religious purposes.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

10. The proposed use is not a place of worship. It is a place for persons of a particular religious faith to lodge overnight.... The proposed use is not for the exercise of their religion but to accommodate persons for lodging purposes while family members are in the hospital.

11. The appellant has failed to establish that enforcement of the Code on this property imposes a substantial burden on its religious exercise, particularly given that the appellant contends the property is still to be used as a "one-family" dwelling that is consistent with the surrounding neighborhood.... Although the application for a variance requests permission for use as a one family residence, the proposed use ... is actually a transient/motel use.

* * *

13. The appellant did not prepare the SEQRA short form EAF and presented no evidence upon which this Board could make a SEQRA determination.

Holden was unable to identify this document or state what it was. He further stated that certain explanations for the denial of the application included in the document were not the actual reasons for the Zoning Board's decision. Specially, he denied that the following were concerns for the Zoning Board: (1) garbage issues; (2) concerns over the number of guests; (3) that Bikur Cholim's use was religious; (4) whether bikur cholim is a tenet of the Jewish religion; (5) the Shabbos House's use as a place of worship; (6) whether guests were from a particular synagogue or affiliated group; and (7) whether the purpose of the Shabbos House was to allow Jewish people to exercise their religion.

*15 Suffern asserts now that the application was denied because (1) Bikur Cholim has not shown that it could not obtain a reasonable return on its investment; (2) the hardship was self-created; and (3) Bikur Cholim failed to show that the proposed use would not alter the essential character of the neighborhood. Holden testified that he believed that, giv-

en the use proposed by Bikur Cholim, any future application would likely be futile. Specifically, he stated that "based on what I know today, the answer would be no, I can't see [Bikur Cholim being granted a variance] there." Certain Zoning Board members testified in their depositions that the Zoning Board could place some restrictions upon the operations of the Shabbos House that would lead to it receiving a variance.

**5. Other Applications for Variances in the Village of Suffern**

The Zoning Board has granted a use variance to the Knights of Columbus for the construction and use of a private membership club. The building is used as a meeting hall and gathering place for members of the club. The application was submitted prior to the purchase of the property. Holden admitted in his deposition that none of the four factors for giving a variance were addressed in the application. He further stated that because the Knights had yet to purchase the property, he did not believe that it could show that the hardship was not self-created. Despite this, the application was granted.

Nextel Communications, a public utility, applied for a use variance to mount a wireless communication facility atop an existing apartment building. In granting the application, the Zoning Board made no findings relating to the four factors.

The Zoning Board also granted a use variance to John DeNino to convert an office into a space to accommodate a children's party facility. The applicant made no showing related to the four factors.

**6. Alternatives to the Shabbos House**

There are no hotels or other places of lodging in the Village of Suffern. The nearest such hotel is a Holiday Inn Hotel in Montebello, New York. It is located 1.8 miles from Good Samaritan Hospital. Many of the guests of the Shabbos House, including the elderly, the infirm and nursing mothers,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

would likely have a difficult time walking between the Hotel and the Hospital. In addition, observant Jews often wear traditional black clothing and cannot carry flashlights or wear reflective tape on the Sabbath. This would make it difficult for motorists to see them at night.

To reach the Holiday Inn from the Hospital, the most direct route is for a pedestrian to walk along Route 59. The parties agree that Route 59 has poorly developed pedestrian facilities and sidewalks and does not meet widely recognized design standards for pedestrians. In addition, areas of the road lack sidewalks, forcing pedestrians to walk on the shoulder.

**B. Discussion on Summary Judgment**

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*16** A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 24. The

mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for the party. *See Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir.2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *See Patterson v. County of Oneida,* 375 F.3d 206, 218 (2d Cir.2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004) .

The United States has moved for summary judgment on its claim that the Village of Suffern violated RLUIPA. Defendant's motion is addressed to the RLUIPA claims of all plaintiffs.

The Court will first address defendant's procedural arguments in support of summary judgment before turning to the substantive issues under RLUIPA covered by both motions.

**1. Whether Plaintiffs' Claims are Ripe**

Defendant first moves for summary judgment on the grounds that plaintiffs' claims are not yet ripe because (1) Bikur Cholim did not appeal the notice of use violation and (2) Bikur Cholim's application for a use variance was allegedly perfunctory and lacking in necessary evidence. The Court addressed these arguments above and, now with the benefit of a full record, adheres to its previous holding.

Private plaintiffs' case is a challenge to the Zoning Board's denial of Bikur Cholim's application for a use variance, not an appeal of the violation notice issued by Loniewski. In addition, Bikur Cholim applied for a use variance as a means of defending against the violation notice. Defendant's argument

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

that private plaintiffs' claims are not yet ripe because of the lack of appeal of the violation is therefore misplaced.

[9] RLUIPA does not excuse a landowner from local land use regulations. *See* 146 Cong. Rec. S7774, 7776 (2000) (statement of Sens. Hatch & Kennedy) ("This Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay."). In *Murphy,* the Second Circuit Court of Appeals confirmed that local land use procedures are applicable to land to be used for a religious purpose. In that case, the Court of Appeals vacated the decision of the district court and instructed that the case be dismissed for plaintiffs' failure to appeal their land use violation to the local zoning board of appeals. *See Murphy,* 402 F.3d 342.

**\*17** Even if Bikur Cholim had appealed the violation to the Zoning Board, the Court finds that such an appeal would have been futile. The Zoning Board denied the variance, finding that the Shabbos House did not meet the criteria for a use variance in an R-10 zone. On what basis could Bikur Cholim have successfully appealed the violation notice; how could it have raised different issues than the variance application did? Defendant's argument that such an appeal would have had any likelihood of success is misplaced considering the denial of the variance.

The concerns of the Court of Appeals in *Murphy* about the development of a full record of the facts and standards underlying the operations of the Shabbos House and the relevant zoning provisions are mitigated in this case by the Zoning Board's decision on the variance application. *See Murphy,* 402 F.3d at 352 ("[B]efore the Zoning Board of Appeals the Murphys would have had the opportunity to challenge and develop a record on the standards (or lack thereof) underlying New Milford's determination.... In addition, the availability of alternative re-

strictions ... may have been explored."). In this case, plaintiffs' injuries are not ill-defined as they were in *Murphy.* The Zoning Board addressed the merits of Bikur Cholim's use, albeit in a different context than an appeal, as distinguished from *Murphy* where the zoning board did not address the cease and desist order.

Similarly, the Court cannot find that Bikur Cholim's application was perfunctory and not reviewed. Although the Zoning Board's decision referred to Bikur Cholim's failure to proffer evidence to meet the four criteria under section 266-54(D)(3)(a) of the Zoning Law, the minutes of the Zoning Board hearing indicate that these issues were addressed. In addition, the Zoning Board previously had granted variances without a full discussion of the four criteria. In light of this, the Court believes that Bikur Cholim made a strategic decision to address the strong points of its application and ignore the weaknesses. The application was denied on its merits despite Bikur Cholim's presentation. While defendant contends Bikur Cholim's application may have been weak, there is no reason to believe that it was not a sincere and forthright application. Therefore, the Court finds that plaintiffs' claims are ripe for review.

## 2. Whether the United States Has Failed to Name and Serve a Necessary Party

Defendant next argues that the United States has failed to name and serve a necessary party. Specifically, defendant contends that because, under New York law, only a zoning board of appeals, and not the town or village, has the authority to grant or deny a variance, the United States' failure to name the Zoning Board as a defendant means that this case is jurisdictionally deficient and must be dismissed. This argument is limited to the United States' complaint as the heading of point II of defendant's memorandum of law in support of summary judgment is entitled: "The Government Failed to Name and Serve a Necessary Party." Further, defendant did not address private plaintiffs' action in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

this section of its memorandum of law.

**\*18** The United States' complaint seeks (1) a de-claration that the denial of the variance violated RLUIPA and (2) an injunction enjoining the Vil-lage of Suffern from applying Suffern's zoning laws that would substantially burden individuals' reli-gious exercise related to Bikur Cholim or in a mat-ter that would violate RLUIPA. Private plaintiffs' amended complaint seeks similar relief. They also seek relief under Article 78 of the New York Civil Procedure Law and Rules, which, if successful, would have the Court overturn the denial of the variance. Only private plaintiffs' complaint seeks a variance.

[10][11] Under New York law, the authority to grant variances lies exclusively with the local zon-ing board of appeals, which enforces the zoning scheme created by the local legislature. *Commco, Inc. v. Amelkin,* 62 N.Y.2d 260, 267, 476 N.Y.S.2d 775, 465 N.E.2d 314 (1984); N.Y. Town Law § 267 . A zoning board is a distinct and separate legal en-tity whose members serve pursuant to the authority granted by the New York law. *Commco,* 62 N.Y.2d at 266-67, 476 N.Y.S.2d 775, 465 N.E.2d 314; Town Law § 267.

In addressing Article 78 proceedings, courts have been very mindful that the town or village is not the proper defendant or respondent. *See, e.g., Commco,* 62 N.Y.2d at 265-66, 476 N.Y.S.2d 775, 465 N.E.2d 314; *Emmett v. Town of Edmeston,* 3 A.D.3d 816, 819, 771 N.Y.S.2d 568 (3d Dep't), *aff'd,* 2 N.Y.3d 817, 781 N.Y.S.2d 260, 814 N.E.2d 430 (2004). On the other hand, where a plaintiff seeks to enjoin enforcement of a zoning decision, courts have upheld the naming of only the town as defendant and not the appropriate zoning board. *See, e.g., Leblanc-Sternberg v. Fletcher,* 104 F.3d 355, 1996 U.S.App. LEXIS 31800, 1996 WL 699648 (2d Cir. Dec. 6, 1996) (affirming injunction enjoining village from denying equal protection of laws by enforcing its zoning code and requiring vil-lage to revise zoning code; zoning board was not named as defendant); *cf. Congregation Mischknois*

*Lavier Yakov, Inc. v. Bd. of Trs. for Vill. of Air-mont,* 301 Fed. Appx. 14, 15 (2d Cir.2008) (affirming judgment of district court where court "so ordered" stipulation between plaintiffs and vil-lage that would allow plaintiffs to construct a resid-ential school and local zoning board was not a party to action).[FN10]

[12] This Court thus concludes that it has the power and authority, if appropriate, to enjoin defendant from enforcing its Zoning Law and requiring it to revise the Zoning Law to comply with RLUIPA and relevant constitutional provisions pursuant to the al-legations of the United States' complaint. "[T]he power of the federal courts to remedy constitutional violations is broad and flexible." *Leblanc-Stern-berg,* 1996 U.S.App. LEXIS 31800, \*6, 1996 WL 699648. An exercise of such power in this case is permissible.

Because defendant did not move for summary judg-ment against private plaintiffs' amended complaint on the basis of their failure to name the Zoning Board as a defendant, the Court will not making any rulings on the sufficiency of private plaintiffs' complaint and the availability of the requested re-lief. The Court, however, questions whether it has the authority to issue relief under Article 78 without the Zoning Board being named as a defendant. The Court will reserve judgment on this issue until such time as it raised, on a motion, by the parties.

**3. Claims Under RLUIPA**

**\*19** Defendant moved for summary judgment on private plaintiffs' and the United States' RLUIPA claims, arguing that plaintiffs have failed to estab-lish that Bikur Cholim's use of the property is a "religious exercise," and that, even if it was a reli-gious exercise, plaintiffs have failed to show that it was substantially burdened by the denial of the variance. In support of its motion for summary judgment, the United States contends that defendant has failed to demonstrate that it has a compelling interest and used the least restrictive means to fur-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

ther that interest in denying the variance and enforcing its zoning law. Each party further asserts that it has met its burden of persuasion as to the various elements required under RLUIPA.

As discussed above, RLUIPA requires that a municipality's land use regulations be structured and applied in a manner that does not impose a "substantial burden on the religious exercise of a person ... or institution, unless the government demonstrates that imposition of the burden on that person ... or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). To demonstrate a claim under RLUIPA, plaintiffs must show that the land use regulation (1) imposes a substantial burden (2) on the "religious exercise" (3) of a person, institution, or assembly. 42 U.S.C. § 2000cc(a)(1); *Westchester Day Sch. II,* 379 F.Supp.2d at 555. Even if it substantially burdens religious exercise, a land use provision does not violate RLUIPA when it furthers a compelling state interest and does so using the least restrictive means. Defendant bears the burden of proof on this issue.

**a. Religious Exercise Analysis**

RLUIPA requires plaintiffs to prove that bikur cholim is a "religious exercise" under the law. RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "The use, building, or conversion of real property for the purpose of religious exercise shall be considered ... religious exercise." 42 U.S.C. § 2000cc-5(7)(B). "Religious exercise" under RLUIPA is to be defined broadly and "to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g); *Westchester Day Sch. III,* 504 F.3d at 347.

[13] "Religious exercise" as used in RLUIPA

"covers most any activity that is tied to a religious group's mission." *Living Water Church of God v. Charter Twp. Meridian,* 258 Fed. Appx. 729, 736 (6th Cir.2007). Plaintiffs must show that the activity is a "sincere exercise of religion" even if the activity is not compelled by the religion. *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 663 (10th Cir.2006). Not every activity carried out by a religious institution, however, is a "religious exercise." 146 Cong. Rec. S7774, S7776 (2000) (noting that when religious institutions use property in ways comparable to secular institutions, such activity may not necessarily constitute "religious exercise").

***20** [14][15] The law "bars inquiry into whether a particular belief or practice is 'central' to [an individual's] religion." *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (inmate's RLUIPA action). In addition, the Court may not judge the merits of various religious practices. As the Second Circuit Court of Appeals has stated:

> Because the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires, courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists. As such, religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious.

*Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002). In light of this, the evidence clearly demonstrates that Rabbi Lauber is motivated by the religious obligation of bikur cholim. He testified that he believes it is his religious duty to help the sick and their family. Running the Shabbos House is his exercise of this

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

duty. Whether the Shabbos House is an absolute obligation-that is, whether it is secondary to any other religious precepts-does not affect its status as a "religious exercise" under the law.[FN11]

The conclusion as to the individual plaintiffs is not as clear. On the one hand, they testified that they used the Shabbos House to fulfill the obligation of bikur cholim in visiting their family members at Good Samaritan Hospital. On the other hand, a reasonable jury may find that it is not a religious motivation, but a familial motivation that encourages them to visit their family members. In other words, many children with sick parents or spouses with sick partners visit their loved ones in hospitals for non-religious reasons.

*Fifth Ave. Presbyterian Church,* however, answers this question. There, a church argued that it had a free exercise right to use several outdoor staircases on its property for homeless persons to sleep. Almost two years later, New York City informed the church that the city would no longer allow the homeless to sleep on the stairs and proceeded to remove the homeless from the church's stairs. The city argued that the homeless were a public nuisance. After the Court issued a preliminary injunction allowing the church to operate a de facto homeless shelter on its stairs, but not on its property adjacent to the public sidewalk, the city appealed. The Court of Appeals for the Second Circuit upheld the preliminary injunction, finding that when the church allowed homeless people to sleep on its stairs, that constituted a religious exercise under the First Amendment. *Fifth Ave. Presbyterian Church,* 293 F.3d 570.

*21 The church's program can be seen from two perspectives. The first is as a religiously-motivated program for the welfare of the community. The second is as a secular program aimed at improving the community. In finding the church's activities to be religiously motivated, the Court of Appeals implied that even if a religious exercise has a corresponding secular purpose that may be otherwise met by secular organizations, that exercise may still

constitute a religious exercise to the religious institution. *See also Grace United Methodist Church,* 451 F.3d at 662-63 (observing that activity need not be mandatory to be a "religious exercise").

So too here. While individual plaintiffs' actions may be partly motivated by their obligations as family members, their testimony that they are also obligated by the tenets of their faith and the Court's reluctance to question those feelings leads the Court to conclude that the obligation to engage in bikur cholim is a religious activity. This activity, however, means taking care of the sick. In this case, it is visiting them at the hospital.

**b. Substantial Burden Analysis**

The phrase "substantial burden" is a term of art in Supreme Court jurisprudence, defined previously in numerous cases on the Free Exercise Clause. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In enacting RLUIPA, Congress did not intend to depart from the traditional definition provided by previous cases. Indeed, RLUIPA's legislative history indicates that Congress meant for the term "substantial burden" to be interpreted "by reference to Supreme Court jurisprudence." 146 Cong. Rec. S7774, S7776 (2000).

In general Supreme Court jurisprudence, a substantial burden exists when an individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand." *Sherbert,* 374 U.S. at 404. In the context of land use regulations, however, the Court of Appeals has defined a substantial burden as where "government action ... directly *coerces* the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

religious institution to change its behavior." *Westchester Day Sch. III,* 504 F.3d at 349; *see also Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 997 (7th Cir.2006) ("[A] land use regulation imposes a 'substantial burden' on religious exercise if it necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property for the purpose thereof within the regulated jurisdiction generally-effectively impracticable."); *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir.2004) ("[A] 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."); *San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004) ("[F]or a land use regulation to impose a 'substantial burden,' it must be oppressive to a significantly great extent.").

**\*22** [16][17] If the denial of an application for a variance has a minimal impact on the institution's religious exercise, the denial is not a substantial burden. *Westchester Day Sch. III,* 504 F.3d at 349. But a complete denial of the enjoyment of the property is not required to show a substantial burden. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 900 (7th Cir.2005). Where an organization has no realistic alternatives to its desired use, a temporary or incomplete denial may constitute a substantial burden. *Westchester Day Sch. III,* 504 F.3d at 349.

[18] It would be inappropriate to look only at the effects of a denial to determine whether there is a substantial burden. As the Supreme Court has cautioned, "[t]he freedom asserted by [some may] bring them into collision with [the] rights asserted by" others and that "[i]t is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin." *Braunfeld v. Brown,* 366 U.S. 599, 604, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Therefore, generally applicable regulations, imposed a

neutral manner, are not substantial burdens. *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 389-91, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990).

Private plaintiffs testified that the commandment of bikur cholim could become secondary to the observation of the Sabbath where bikur cholim is made impractical by distance or weather. Furthermore, Rabbi Lauber testified that the religious obligation of bikur cholim depends on the conditions, distance and safety concerns.

[19] This case is not about visiting family members at the hospital. It is about whether the enforcement of a zoning code against a communal home operated to accommodate certain individuals' religious practices constitutes a substantial burden on religious exercise. The cases presented by the parties are inapposite to this point. The Court is not addressing the expansion of a religious school or the placement of a church or synagogue. Instead, the Court is analyzing a house maintained to allow individuals to exercise their religion conveniently.

The Court questions whether the denial of a variance and the absence of the Shabbos House substantially burdens the observance of bikur cholim if the weather can equally interfere with its observance and prevent the practice of bikur cholim. No doubt, a religious practice that is aspirational may be substantially burdened. Further, the Court recognizes that it is outside its province to question Jewish law and private plaintiffs' religious beliefs. Given that (1) the commandments are to visit the sick and to observe the Sabbath, (2) the commandment to visit the sick may take a back seat to the observance of the Sabbath and (3) this case concerns accommodations to observe those commandments, it is a question for the factfinder as to whether private plaintiffs' religious observance is substantially burdened. Summary judgment will be denied as to the individual plaintiffs as the Court cannot conclude that this is a substantial burden. *See Bey v. Douglas County Corr. Facility,* 2008 U.S. Dist. LEXIS 54703, \*10, 2008 WL 2783140 (D.Kan. Ju-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

ly 15, 2008) (whether an action is a "substantial burden" is a question of fact for jury; RLUIPA prisoner case).

**\*23** Because the Court finds that there is a question of fact as to whether private plaintiffs' religious exercise was substantially burdened, it will not address the significance of the Holiday Inn and how its presence affects the substantial burden analysis.

### c. Compelling State Interest

The United States argues that the Village lacks a compelling interest in enforcing its Zoning Code so as to bar the Shabbos House. In response, defendant argues that it has a compelling interest in upholding its zoning laws and the neighborhood characteristics that are at the heart of the zoning laws.

A compelling interest is an "interest[ ] of the highest order." *Westchester Day Sch. III,* 504 F.3d at 353. As the Supreme Court stated in the context of free exercise claims, "only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Sherbert,* 374 U.S. at 406.

[20] While upholding zoning laws may be considered a compelling interest, the Village must demonstrate that the enforcement in those zoning laws is compelling in this particular instance, not in the general scheme of things. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 432, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) ("Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances ... cannot carry the day.... [T]here is no indication that Congress ... considered the harms posed by the particular use at issue here....").

Bikur Cholim's variance application was denied, on its merits, because the Zoning Board was not satisfied that the use of Shabbos House would fit into community of single-family homes. Specifically, the Zoning Board found that the Shabbos House

would affect the character of the neighborhood and endanger neighborhood children. According to the Zoning Law, the burden of demonstrating a right to a variance lies with the applicant.

The Court will not take a position on whether there was substantial evidence to support this conclusion. Nor will the Court comment on whether these concerns are compelling. Instead, the Court finds that there are disputed issues of material fact precluding it from granting summary judgment on this issue. Therefore, the Court will address whether the denial of the variance was the least restrictive means of furthering the interest.

### d. Least Restrictive Means

[21] Under the least restrictive means test, the Village must show that there are "no alternative forms of regulation" that would further the compelling interest. *Sherbert,* 374 U.S. at 407. Further, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entm't Group,* 529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The village must prove that any "plausible, less restrictive alternative would be ineffective" in achieving its goals. *Id.* at 816.

**\*24** In *Westchester Day Sch. III,* the Court of Appeals affirmed the district court's finding that the zoning board's complete denial of a construction permit when it had the authority to authorize the permit with conditions was not the least restrictive means of further the village's interest. *Westchester Day Sch. III,* 504 F.3d at 353.

Here, the members of the Zoning Board testified, as did Holden on behalf of the Village, that they could have granted the use variance subject to various restrictions. Therefore, because a reasonable factfinder could find that there are less restrictive alternatives to further the Village's interests, the Court will deny summary judgment on this issue.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

**e. Whether the Zoning Law was Neutrally Applied**

Courts have previously held that a neutrally-applicable zoning law cannot pose a substantial burden under RLUIPA. *See, e.g., Midrash Sephardi,* 366 F.3d at 1227-28 & n. 11; *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 763 (7th Cir.2003) ("[N]o Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest."). In this case, there are questions of fact as to whether defendant applied its Zoning Law in a neutral, general manner given the grants by the Zoning Board of variances to the Knights of Columbus, Nextel Communications and John DeNino. While these situations may be distinguishable, they are significantly similar to Bikur Cholim's as to present a question for the factfinder.

**4. Private Plaintiffs' Other Claims**

Private plaintiffs also assert claims under the equal terms and discriminations provisions of RLUIPA. *See* 42 U.S.C. §§ 2000cc(b)(1), (2). Defendant did not raise or address these issues in its motion for summary judgment. In addition, these claims have different elements than a claim under 42 U.S.C. § 2000cc(a). *See, e.g., Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 510 F.3d 253, 261-69 (3d Cir.2007). The Court has not reviewed the merits of such claims on summary judgment but finds that there are disputes issues of fact as to these other claims. Therefore, these claims will be left for trial.

**III. Motion to Strike**

Private plaintiffs have filed a motion (Doc. # 151) to strike the affidavit of Robert Magrino, the Assistant Village Attorney of the Village of Suffern, or, in the alternative, for permission to depose Mag-

rino. Magrino's affidavit was offered in support of defendant's motion for summary judgment. The Court is inclined to grant private plaintiffs' motion and allow them to depose Magrino. But because the Court will deny defendant's motion for summary judgment, the Court will instead deny private plaintiffs' motion to strike as moot .[FN12]

**IV. Motions for Preliminary Injunction**

*25 Plaintiffs and defendant have together filed three motions for preliminary injunctions. Plaintiffs' motions seek the maintenance of the status quo with the Shabbos House operating, while defendant's motion seeks a preliminary injunction against the operations of the House. The parties have represented to the Court and defendant has stated in its memorandum of law in support of its motion for summary judgment that the parties have consented to the maintenance of the status quo during the pendency of these proceedings. The Court applauds the parties for agreeing to this freeze of proceedings.

In light of this informal stay, the Court will not rule on the motions for preliminary injunction, but will instead take them under advisement through trial. Counsel should contact the Court if circumstances change that would require the Court to act upon these motions.

**V. Summary**

To summarize the Court's ruling, private plaintiffs' claim for a violation of the Fourteenth Amendment Equal Protection Clause will be dismissed under rule 12(b)(6). As to plaintiffs' RLUIPA claims, the Court concluded that Rabbi Lauber's administration of the Shabbos House and private plaintiffs' utilizing the Shabbos House constitute "religious exercise" under RLUIPA. As to all other elements of the RLUIPA claims, these remain for the factfinder.

Further, the Court will deny the motion to strike as moot in light of the fact that Magrino's testimony

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
(Cite as: 2009 WL 1810136 (S.D.N.Y.))

would not have affected the Court's decision or analysis. Even if Magrino had testified to improprieties in the Zoning Board's decision making, this would not have helped plaintiffs' show a substantial burden on a religious exercise or a lack of a compelling interest. Magrino's testimony could only have bolstered defendant's arguments, which the Court found was insufficient to warrant summary judgment.

The motions for preliminary injunctions will remain pending before the Court through trial.

### CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion to dismiss private plaintiffs' complaint (Doc. # 23) only as to the equal protection claim; DENIES defendant's motion to dismiss against the United States (7:06-cv-7713; Doc. # 3; Doc. # 88); DENIES the parties' motions for summary judgment (Docs.# 133, 142) except as to plaintiffs' claims that the Shabbos House constitutes "religious exercise;" and DENIES as moot private plaintiffs' motion to strike (Doc. # 151). The Court takes no action on the motions for preliminary injunctions.

Dated at White Plains, New York, this *24th* day of June, 2009.

FN1. The Zoning Board of Appeals is not a party to either action pending before the Court.

FN2. Unless otherwise stated, all citations to a docket entry are in case 7:05-cv-10759.

FN3. The Supreme Court in *Williamson* addressed the ripeness requirement in a Takings context. The Takings analysis is not relevant here, even though the remainder of the Supreme Court's analysis related to land use challenges is.

FN4. In their response to the motion to dismiss, private plaintiffs claim that they cannot go to the hospital on the Sabbath because they cannot secure accommodations for their family. This allegation was not included in the amended complaint, and, therefore, the Court is not relying on it. The United States' complaint is similarly silent on this allegation.

FN5. To the extent that private plaintiffs allege that the house at 7 Hillcrest Road also had debris in its yard but did not receive a violation, this allegation of uneven enforcement is not relevant to the challenge to the Zoning Law preventing the existence of the Shabbos House.

FN6. Several of defendant's statements of fact are not supported with citations to admissible evidence. Where appropriate, the Court has disregarded such statements. In addition, to several of plaintiffs' statements of fact, defendant denied the allegation without citation to the support for its denial. Plaintiffs' statements, in these instances, will be accepted as true. *See* Local Rule of Civil Procedure 56.1(d). Additionally, defendant offers the affidavit of Robert Geneslaw, a land use expert. Although Geneslaw was sworn, much of his testimony does not appear to be made on the basis of personal knowledge, and he does not aver that it was. Therefore, this testimony will be disregarded by the Court, as appropriate. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting ... affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

FN7. None of the private plaintiffs claim to be patients or potential patients of Good Samaritan Hospital for whom these circumstances are likely to occur.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)
**(Cite as: 2009 WL 1810136 (S.D.N.Y.))**

FN8. Although, as discussed below, the Court should not and cannot question the importance of a religious obligation, the absoluteness of the obligation is relevant to whether a burden on its observation is substantial under the law.

FN9. A "SEQR" or "SEQRA" is a "Short Environmental Quality Review."

FN10. The Court also notes that in *Westchester Day Sch.,* it ordered the local zoning board to issue a special permit for construction. In that case, the zoning board was named as a defendant, as was the village itself. *See Westchester Day Sch. v. Vill. of Mamaroneck,* 417 F.Supp.2d 477, 572 (S.D.N.Y.2006).

FN11. The Court does not agree with defendant that the importance of the religious obligation is affected by Rabbi Lauber's receipt of a salary for his actions. There is no reason for the Court to discount Rabbi Lauber's testimony that he administers the Shabbos House out of a religious obligation and not a financial desire. In addition, defendant cites no case to suggest that these are mutually exclusive motivations or that the presence of a financial interest defeats a religious motive in determining whether an activity is a religious exercise.

FN12. This conclusion is without prejudice to plaintiffs filing motions in limine as to Magrino's testimony prior to trial, as appropriate, or deposing Magrino prior to tri- al.

S.D.N.Y.,2009.
Bikur Cholim, Inc. v. Village of Suffern
--- F.Supp.2d ----, 2009 WL 1810136 (S.D.N.Y.)

**END OF DOCUMENT**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.