UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLAUDIA WOODARD and ELISE LAWLESS,

Plaintiffs,

-against-

TWC MEDIA SOLUTIONS, INC. and THE
WEATHER CHANNEL,

Defendants.

Case No. 09 Civ. 3000 (BSJ)

**DECLARATION OF LAURA SACK IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON CLAUDIA WOODARD'S CLAIMS**

Laura Sack, an attorney duly admitted to the United States District Court for the Southern

District of New York, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

1.      I am a shareholder in the firm of Vedder Price P.C., attorneys for Defendants

TWC Media Solutions, Inc. ("TWCMS") and The Weather Channel ("TWC").  I am familiar

with all the facts and circumstances set forth in this Declaration.  I make this Declaration in

Further Support of Defendants' Motion for Summary Judgment on Claudia Woodard's claims,

based on my review of Defendants' Local Rule 56.1 Statement (the "56.1 Statement"),

Woodard's Statement of Disputed Material Facts Pursuant to Local Rule 56.1 (the

"Counterstatement"), and the record evidence in this case.

2.      True and correct copies of relevant transcript pages from the deposition of

Claudia Woodard, dated September 1, 2009 and September 3, 2009, are attached as Exhibit 1.

3.      True and correct copies of relevant transcript pages from the deposition of Mark Gall, dated September 17, 2009, are attached as Exhibit 2.

4.      True and correct copies of relevant transcript pages from the deposition of Catherine Jolly, dated September 29, 2009, are attached as Exhibit 3.

5.      True and correct copies of relevant transcript pages from the deposition of Lisa Longo, dated September 18, 2009, are attached as Exhibit 4.

6.      True and correct copies of relevant transcript pages from the deposition of Rick Monihan, dated September 25, 2009, are attached as Exhibit 5.

7.      True and correct copies of relevant transcript pages from the deposition of Jen Monson, dated September 29, 2009, are attached as Exhibit 6.

8.      True and correct copies of relevant transcript pages from the deposition of Mary Jo Romeo, dated September 24, 2009, are attached as Exhibit 7.

9.      True and correct copies of relevant transcript pages from the depositions of Pam Sawyer, dated September 16, 2009, are attached as Exhibit 8.

10.      True and correct copies of relevant transcript pages from the deposition of Terrence Sekel, dated September 14, 2009, are attached as Exhibit 9.

11.      A true and correct copy of Coster Aurelian's EEOC Charge, dated July 21, 2006, is attached as Exhibit 10.

12.      A true and correct copy of TWCMS's position statement to the EEOC responding to Woodard's Amended Charge, dated November 13, 2006, which was produced by Plaintiff Claudia Woodard in the course of discovery, is attached as Exhibit 11.

13.     A true and correct copy of a letter from Lee Bantle to the EEOC, dated April 17, 2007, which was produced by Plaintiff Claudia Woodard in the course of discovery, is attached as Exhibit 12.

14.     A true and correct copy of a string of emails between Claudia Woodard and Pam Sawyer, dated March 24, 2005, which was produced by Defendants in the course of discovery, is attached as Exhibit 13.

15.     A true and correct copy of a letter from Roy Salins to Kenneth Goldberg, dated September 30, 2009, is attached as Exhibit 14.

16.     A true and correct copy of a letter from Claudine Costello Halcomb to Peter Wright, dated February 8, 2005, which was produced by Defendants in the course of discovery, is attached as Exhibit 15.

17.     A true and correct copy of a 2005 Associate Compensation Summary for Peter Wright, effective March 7, 2005, which was produced by Defendants in the course of discovery, is attached as Exhibit 16.

18.     A true and correct copy of a 2004 Compensation Agreement for Paul Celt, which was produced by Defendants in the course of discovery, is attached as Exhibit 17.

19.     A true and correct copy of a 2005 Associate Compensation Summary for Paul Celt, which was produced by Defendants in the course of discovery, is attached as Exhibit 18.

20.     A true and correct copy of a 2004 Compensation Agreement for Matt Derella, which was produced by Defendants in the course of discovery, is attached as Exhibit 19.

21.     A true and correct copy of a 2005 Associate Compensation Summary for Matt Derella, which was produced by Defendants in the course of discovery, is attached as Exhibit 20.

22.     A true and correct copy of a letter from Maria Goldsholl to Janet Schatz, dated August 9, 2004, which was produced by Defendants in the course of discovery, is attached as Exhibit 21.

23.     A true and correct copy of a 2005 Associate Compensation Summary for Janet Schatz, which was produced by Defendants in the course of discovery, is attached as Exhibit 22.

24.     A true and correct copy of a 2004 Compensation Agreement for Sylvester Phifer, which was produced by Defendants in the course of discovery, is attached as Exhibit 23.

25.     A true and correct copy of a 2005 Associate Compensation Summary for Sylvester Phifer, which was produced by Defendants in the course of discovery, is attached as Exhibit 24.

26.     A true and correct copy of a 2004 Compensation Agreement for Janet Galchus, which was produced by Defendants in the course of discovery, is attached as Exhibit 25.

27.     A true and correct copy of a 2005 Associate Compensation Summary for Janet Galchus, which was produced by Defendants in the course of discovery, is attached as Exhibit 26.

28.     A true and correct copy of Exhibit 4 identified in the deposition of Jennifer Monson (a 2004 Compensation Agreement for Jennifer Monson) is attached as Exhibit 27.

29.     A true and correct copy of Exhibit 5 identified in the deposition of Jennifer Monson (a 2005 Associate Compensation Summary for Jennifer Monson) is attached as Exhibit 28.

30.     A true and correct copy of Exhibit 24 identified in the deposition of Claudia Woodard (Plaintiff Woodard's Amended Responses and Objections to Defendants' Interrogatories, dated August 10, 2009) is attached as Exhibit 29.

31.     A true and correct copy of Exhibit 29 identified in the deposition of Claudia Woodard (an email from Claudia Woodard to herself, dated January 14, 2005) is attached as Exhibit 30.

32.     Woodard denies paragraph 3 of the 56.1 Statement, which states, "[t]he role of the CST was different than the general sales team insofar as Client Development Managers ('CDMs') were not responsible for negotiating advertising deals or communicating with agencies to sell advertising."  It is not possible for Woodard to deny this statement of fact, given that she admits she was not responsible as a CDM for negotiating advertising deals or communicating with agencies to sell advertising.  (*See* Counterstatement ¶ 12.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

33.     Woodard denies paragraph 5 of the 56.1 Statement, which states, "[a]t no time during Camp's employment with TWCMS and/or TWC did he ever receive (or to his knowledge, was he eligible for) any bonus tied to hiring diversity candidates."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Moreover, Woodard's averment that, "as per the deposition of Pam Sawyer, bonuses for management at the VP level and above were based in part upon diversity hiring" is not supported by the record evidence Woodard cites.  Sawyer testified that "[t]he diversity objective around recruiting was to make sure there were qualified diverse candidates in the interviewing pool"; she did not testify that bonuses were tied to *hiring* diversity candidates. (Sawyer Tr. 133.)  Sawyer further testified that certain employees "had a percentage of their annual bonus tied to doing I think up to five objectives tied to diversity."  (*Id.*)

34.     Woodard denies paragraph 15 of the 56.1 Statement, which states, "[a]side from having one brief conversation with Sales Associate Will Tague, Woodard did nothing to gain a general overview of Media Math during her tenure as a CDM."  It is not possible for Woodard to deny this statement of fact, given her deposition testimony that the brief conversation with Tague was the only thing she did as a CDM to gain a general overview of Media Math.  (Pl. Tr. 54-55.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Indeed, paragraph 51 of Woodard's affidavit (which she cites) relates solely to the period of time during which she was an *Account Manager*.

35.     Woodard denies paragraph 17 of the 56.1 Statement, which states, "[i]n nearly two months in the CDM role, Woodard failed to contact all of the clients on her list, and she met with only three clients."  It is not possible for Woodard to deny this statement of fact, given: (i) her written admission in an August 12, 2004 memo to Mark Gall and Meade Camp, that, "[a]s you know, I have not had an opportunity to contact everyone on my list"; and (ii) her deposition testimony that, during her tenure as a CDM, she met only met with Hankook Tire, TIAA-CREF and Oppenheimer Fund.  (Declaration of Laura Sack, dated November 3, 2009 ("Sack Decl."), Ex. L; Pl. Tr. 67-69.)  Furthermore, in denying paragraph 17 of the 56.1 Statement, Woodard identifies only three clients she met with as a CDM: Bill Bainbridge (SVP Marketing at Hankook Tire) (Woodard Aff. ¶ 7), TIAA-CREF, and Oppenheimer.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

36.     Woodard denies paragraph 22 of the 56.1 Statement, which states, "Woodard's total compensation package as a CDM was $148,050."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from the Compensation Agreement she

signed on September 14, 2004.  (Sack Decl., Ex. N.)  Moreover, Woodard admitted at her deposition that, "[b]ased upon the document, my package would have been $141,000 at target with an additional $7,050 in potential bonus opportunity."  (Pl. Tr. 38.)  And in denying paragraph 22, Woodard admits that her "initial annual compensation package" totaled $148,050. Finally, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

37.     Woodard denies paragraph 24 of the 56.1 Statement, which states, "Meadow started as a CDM on March 8, 2004, with a total compensation package of $121,800."  It is not possible for Woodard to deny this statement of fact, given the record evidence concerning Meadow's compensation as a CDM.  (Meadow Aff., ¶ 2, Ex. A.)  And in denying paragraph 24, Woodard admits that Meadow's "initial annual compensation package" totaled $121,800 ($70,000 plus $46,000 plus $5,800).  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

38.     Woodard denies paragraph 26 of the 56.1 Statement, which states, "Woodard's target compensation package for 2005 remained the same as it had been for 2004 ($148,050)."  It is not possible for Woodard to deny this statement of fact, given the record evidence concerning her compensation for 2005.  (Sack Decl., Ex. M.)  And in denying paragraph 26, Woodard admits that her total compensation package for 2005 was $148,050, just as it had been for 2004. (*See supra* ¶ 22.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

39.     Woodard denies paragraph 27 of the 56.1 Statement, which states, "Woodard's total gross revenue goal was $3,050,000."  It is not possible for Woodard to deny this statement of fact, given the documentation concerning her total gross revenue goal for 2005.  (Sack Decl.,

Ex. M.)  And in denying paragraph 27, Woodard admits that she was assigned an "Annual Gross Revenue Goal" for 2005 of $3,050,000.   Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

40.     Woodard denies paragraph 28 of the 56.1 Statement, which states, "[a]s an Account Manager in January 2005, Woodard was eligible to earn $176,987 if she performed at 10% above target."  It is not possible for Woodard to deny this statement of fact, given the record evidence concerning her compensation for 2005.   (Sack Decl., Ex. M.)   And in denying paragraph 28, Woodard admits that for 2005, if she exceeded her targets by 10%, she was eligible to receive total cash compensation of $176,987.03.   Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

41.     Woodard denies paragraph 29 of the 56.1 Statement, which states, "Woodard's base compensation decreased in 2005 (as did that of Meadow and Budkofsky), while her commission opportunity increased."  It is not possible for Woodard to deny this statement of fact, given the record evidence concerning her, Meadow's and Budkofsky's compensation for 2004 and 2005.  (Sack Decl., Exs. M-P; Meadow Aff., Exs. A-B.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

42.     Woodard denies paragraph 30 of the 56.1 Statement, which states, "[a]s an Account Manager in January 2005, Meadow's total target compensation was $125,454.12."  It is not possible for Woodard to deny this statement of fact, given the record evidence concerning Meadow's compensation for 2005.   (Meadow Aff., Ex. B.)   And in denying paragraph 30, Woodard admits that Meadow's "annual compensation package" for 2005 was $125,454.

Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

43.     Woodard denies paragraph 31 of the 56.1 Statement, which states, "Meadow's total gross revenue goal was $3,350,000." It is not possible for Woodard to deny this statement of fact, given the documentation concerning Meadow's total gross revenue goal for 2005. (Meadow Aff., Ex. B.)  And in denying paragraph 31, Woodard admits that Meadow was assigned an "Annual Gross Revenue Goal" for 2005 of $3,350,000.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

44.     Woodard denies paragraph 37 of the 56.1 Statement, which states, "[w]hen Woodard started as an Account Manager, her client list was 'somewhat junior.'"  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from Romeo's deposition testimony (Q: "Did Ms. Woodard have what you would consider to be a somewhat junior account list to cover when she was reporting to you?"  A: "As I recall, yes.").  (Romeo Tr. 59-60.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Furthermore, Woodard's averment that "Defendants gave [her] what was essentially a 'dead accounts' list" is nothing more than argument, and is not supported by the record evidence she cites.

45.     Woodard denies paragraph 46 of the 56.1 Statement, which states, "Woodard 'had a great deal of conversations with Mark Gall about her deals because every deal [she] did had to be approved by him."  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from her own deposition testimony.  (Pl. Tr. 151.)  And, in denying paragraph 46, Woodard admits she testified that "I had a great deal of conversations with Mark Gall about

my deals because every deal I did had to be approved by him."  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

46.     Woodard denies paragraph 48 of the 56.1 Statement, which states, "[i]n his role as General Manager during the course of Woodard's employment with TWCMS, Iaffaldano spent roughly 40% of his time in the New York office."  (Iaffaldano Aff. ¶ 3.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not address the percentage of time Iaffaldano spent in New York during the relevant time frame.

47.     Woodard denies paragraph 49 of the 56.1 Statement, which states, "[w]hen Iaffaldano visited the New York office, he made it a point to try to speak to each Account Manager and ask them about their accounts and what their goals were."  (Iaffaldano Aff. ¶ 3.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not address whether Iaffaldano made it a point to try to speak to each Account Manager and ask them about their accounts and what their goals were when he visited the New York office.

48.     Woodard denies paragraph 50 of the 56.1 Statement, which states, "Iaffaldano wanted to know whether the Account Managers had a business plan and were working that plan enthusiastically."  (Iaffaldano Aff. ¶3.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not address what Iaffaldano wanted to know.

49.     Woodard denies paragraph 51 of the 56.1 Statement, which states, "[a]fter Iaffaldano had several conversations with Woodard concerning her accounts, he was left with the overall impression that Woodard 'took no for an answer' too often and did not have the perseverance needed to convince clients to advertise on TWC."  (Iaffaldano Aff. ¶ 3.)  I have

reviewed the record evidence Woodard cites to deny this statement of fact, and it does not address Iaffaldano's overall impression of Woodard.

50.      Woodard denies paragraph 53 of the 56.1 Statement, which states, "Gall thanked Woodard for coming forward, and he told her that he would discuss the matter with Human Resources."  It is not possible for Woodard to deny this statement of fact, given that is taken directly from an August 18, 2004 email from Gall to Woodard.  (Sack Decl., Ex. Q.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  And in denying paragraph 53, Woodard admits that Gall sent her an email in which he thanked her and said he would meet with her again after he discussed the matter with Pam [in HR] at length.  Further, Woodard's averment that "Gall was insincere in expressing a 'thank you' because he too harbored unlawful discriminatory animus" is nothing more than argument, and is not supported by the record evidence Woodard cites.

51.      Woodard denies paragraph 62 of the 56.1 Statement, which states, "[l]ater that day, Gall gave Woodard a summary of his investigation, and he told her that Celt had been given a verbal warning."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from an August 25, 2004 email from Gall to Woodard.  (Sack Decl., Ex. R.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

52.      Woodard denies paragraph 63 of the 56.1 Statement, which states, "Gall asked Woodard to tell him immediately if any similar situations arose in the future."  It is not possible for Woodard to deny this statement of fact, given that Gall's August 25, 2004 email to Woodard expressly states, ". . . please know that I want to hear from you immediately if any similar situations arise in the future . . ." (Sack Decl., Ex. R.)  And in denying paragraph 63, Woodard

admits that she received Gall's August 25, 2004 email, and she admits that it included the contents described in paragraph 63.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

53.     Woodard denies paragraph 68 of the 56.1 Statement, which states, "If one removes the zero ratings for categories in which Woodard was thought to be 'too new,' her overall rating remains between 'Requires improvement' and 'Exhibits good behaviors consistently.'"  It is not possible for Woodard to deny this statement of fact, given the scores and observations contained in her 2004 performance review.  (Sack Decl., Ex. U.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

54.     Woodard denies paragraph 71 of the 56.1 Statement, which states, "[n]owhere in the memorandum or email did Woodard claim that she was being paid less because she is a black woman or because she had previously complained about Celt's comments toward Broderick."  It is not possible for Woodard to deny this statement of fact, given the contents of her January 6, 2005 memorandum to Iaffaldano and her January 4, 2005 email to Romeo.  (Sack Decl., Exs. V-W.)  And in denying paragraph 71, Woodard admits that she did not "expressly allege" in those two written communications that she was being paid less because she is a black woman or had complained about Paul Celt.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

55.     Woodard avers in paragraph 73 of the Counterstatement that "on the Pella deal, Mr. Gall failed to provide approval."  I have reviewed the record evidence Woodard cites, and it does not provide support for the averment, given that neither the document nor deposition testimony she cites indicate that Gall "failed to provide approval" on the Pella deal.

56.     Woodard denies paragraph 77 of the 56.1 Statement, which states, "Woodard appreciated Romeo's hands-on approach in getting the plan out to Siewers."  It is not possible for Woodard to deny this statement of fact, given that she sent Romeo an email on January 19, 2005, in which she said, "I appreciate your hands on approach and involvement in getting the plan out."  (Sack Decl., Ex. Y at TWC 160.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

57.     Woodard denies paragraph 83 of the 56.1 Statement, which states, "Romeo relayed to Woodard Siewer[s]'s perception that Woodard wanted Siewers to do her job for her, that Woodard had a 'listening problem' and a 'knowledge problem,' and that Siewers had to call Woodard four times to get a response from Woodard."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from Woodard's notes of her meeting with Romeo.  (Sack Decl., Ex. AA.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

58.     Woodard denies paragraph 85 of the 56.1 Statement, which states, "Woodard understood the decision and did not argue with Romeo's instruction because, as Woodard herself acknowledged, 'the customer is always right.'"  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from an email Woodard sent to Romeo on January 28, 2005, in which Woodard states, "[a]s a professional, I understand that management sometimes needs to make difficult decisions for the better good of the organization.  Since 'the customer is always right,' I will not argue with your direction."  (Sack Decl., Ex. Y at TWC 158.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

59.     Woodard denies paragraph 87 of the 56.1 Statement, which states, "[s]hortly after Romeo took Woodard off the Pella deal because of client complaints, Woodard faxed a memo to Sawyer complaining for the first time about alleged discriminatory comments and actions by Romeo that dated back almost two months."   It is not possible for Woodard to deny this statement of fact, given her deposition testimony that she complained about Romeo only after Romeo took her off the Pella deal:

> Q:     Why not, did you complain to HR about Ms. Romeo before Ms. Romeo told you you would not be working with Ms. Siewers?
>
> A:     No, I had not.  (Pl. Tr. 225.)
>
> *     *     *
>
> Q:     Ms. Woodard, when was the first time you went to HR to complain about Mary Jo Romeo?
>
> A:     That's a question I can answer.  It was January 28, 2005.
>
> Q:     And it was after Ms. Romeo told you that you would no longer be working with Lisa Siewers; isn't that correct?
>
> A:     Correct.  (Pl. Tr. 227.)

60.     Woodard denies paragraph 89 of the 56.1 Statement, which states, "Woodard also complained about other comments Romeo allegedly made that were unrelated to Woodard's race, color, national origin or gender."   It is not possible for Woodard to deny this statement of fact, given the contents of the complaint she faxed to Sawyer.  (Sack Decl., Ex. BB.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

61.     Woodard denies paragraph 93 of the 56.1 Statement, which states, "[o]n February 3, Romeo submitted a response to Woodard's complaint, which Sawyer investigated."   It is not possible for Woodard to deny this statement of fact, given Romeo's memorandum and Sawyer's

testimony concerning the actions she took after she received that memorandum.  (Sack Decl., Ex. FF; Sawyer Tr. 140-41.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

62.     Woodard avers in paragraphs 97-99 of the Counterstatement that Patty Norway, who negotiated with Woodard on behalf of Initiative Trade, was pleased with her performance.  I have reviewed the record evidence Woodard cites, and it does not provide support for the averment, given that the document does not refer to Patty Norway.  (Goldberg Cert., Ex. II.)

63.     Woodard avers in paragraphs 100-104 of the Counterstatement that "[she] had a history of successful dealings with [Active International]."  I have reviewed the record evidence Woodard cites, and it does not provide support for the averment.  (Monihan Tr. 244-46, 261.)  To the contrary, Monihan's cited testimony refers only to a single transaction he helped Woodard close, and which he testified "left [him] with a bad feeling."  (Monihan Tr. 27-28, 244-46, 261.)

64.     Woodard avers in paragraphs 100-104 of the Counterstatement that "[she] had success with other clients that praised her."  I have reviewed the record evidence Woodard cites, and it does not provide support for the averment, given that it reflects that only one client, Kara Levine, praised Woodard.  (Goldberg Cert., Ex. II.)

65.     Woodard denies paragraph 102 of the 56.1 Statement, which states, "Camp understood Viserto's comments to mean that if TWCMS did not remove Woodard from the Active account, Active might decrease the amount of advertising it placed on TWC."  (Camp Aff. ¶ 19.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

66.     Woodard denies paragraph 105 of the 56.1 Statement, which states, "Deirdre O'Grady, Head of P&I, reported to Gall on April 5, that:

> From a planning perspective and overall understanding of media Claudia is struggling. It does not seem to be a learning curve issue at this point we have had the same questions and conversation there just doesn't seem to be any retention. There are specific concepts that we have reviewed that she is not absorbing . . . .
>
> I am becoming increasingly concerned because having the same conversation over and over again is not the best use of our resources.

It is not possible for Woodard to deny this statement of fact, given that it is quoted verbatim from O'Grady's April 5, 2005 email to Gall. (Sack Decl., Ex. GG.) Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

67.   Woodard denies paragraph 106 of the 56.1 Statement, which states, "Rick Monihan, a Director in P&I who reported to O'Grady, expressed the same view as O'Grady: he spent a lot of time coaching Woodard, but she nonetheless kept coming back to him with the same questions." It is not possible for Woodard to deny this statement of fact, given Monihan's deposition testimony that "one of my complaints [to O'Grady] was that I would teach something and it seemed to keep coming back to me . . . ." (Monihan Tr. 30.) Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial. Furthermore, Woodard's averment that "Mr. Monihan had previously approached Mr. Gall about providing support to Ms. Woodard and Mr. Gall's response made it clear to Mr. Monihan that Mr. Gall had not intention of doing so" is nothing more than speculation.

68.   Woodard denies paragraph 107 of the 56.1 Statement, which states, "Monihan complained to Romeo that Woodard repeatedly asked him the same questions and 'that [Woodard] just didn't seem to get' it." It is not possible for Woodard to deny this statement of fact, given that it is taken directly from Romeo's deposition testimony, and given that Monihan

admitted at his deposition that he might have spoken to Romeo concerning problems he had with Woodard's performance.  (Romeo Tr. 78-79; Monihan Tr. 59.)  Indeed, in denying this statement of fact, Woodard admits that Monihan made the quoted statement during his deposition. Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

69.     Woodard denies paragraph 108 of the 56.1 Statement, which states, "Monihan was 'not fond' of Woodard's work ethic."  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from Monihan's deposition testimony.  (Monihan Tr. 27-28.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

70.     Woodard denies paragraph 109 of the 56.1 Statement, which states, "Monihan explained, '[m]y feeling was in my experience I spent a lot of time having to coach [Woodard] on media math and when she finally had a deal that was closing, it was her first deal through Active Media, I happen to know the buyer so I made the call with her in the office and as we reached a point where the deal was getting ready to close I offered her to take over the conversation and she basically said to me no, you're doing fine, keep it up and I wound up closing the deal and that to me was – left with a bad feeling.  It was not the kind of thing I would have expected.'"  (Monihan Tr. 27-28.)  It is not possible for Woodard to deny this statement of fact, given that it is quoted verbatim from Monihan's deposition testimony.  (Monihan Tr. 27-28.)  Indeed, in denying this statement of fact, Woodard admits that Monihan made the quoted statement during his deposition.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

71.     Woodard denies paragraph 110 of the 56.1 Statement, which states, "Monihan was not a salesperson, and it was not his job to close deals."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Indeed, Woodard's averment "that Monihan testified that he helped various Account Managers with their deals and testified that it was not uncommon for him to do so" is not supported by the record evidence Woodard cites to support the averment, given that Monihan did not testify that it was his job to *close deals* for Account Managers.  To the contrary, Monihan testified that when he closed the Active deal for Woodard, it "left [him] with a bad feeling [and] [i]t was not the kind of thing [he] would have expected."  (Monihan Tr. 27-28.)

72.     Woodard denies paragraph 111 of the 56.1 Statement, which states, "Monihan told Sawyer that discharging Woodard 'was probably the right thing to do.'"  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from Monihan's deposition testimony.  Indeed, in denying this statement of fact, Woodard admits that Monihan testified he told Sawyer that releasing Woodard "was probably the right thing to do."  Additionally, Monihan testified that he was honest with Sawyer with respect to his opinion of Woodard's performance.  (Monihan Tr. 228.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

73.     Woodard denies paragraph 112 of the 56.1 Statement, which states, "Jen Monson, another TWCMS Account Manager, likewise complained to Romeo that Woodard was taking too much of her time asking her questions."  It is not possible for Woodard to deny this statement of fact, given Romeo's and Monson's deposition testimony on the subject.  (Romeo Tr. 79; Monson Tr. 103.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

74.     Woodard denies paragraph 113 of the 56.1 Statement, which states, "[o]ver the roughly ten-month period during which Meadow worked with Woodard, he formed the opinion that she was not a good performer, and that she did not understand the television business." (Meadow Aff. ¶ 22.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.   Further, Woodard's averment that Meadow attempted to sabotage her is nothing more than argument, and is not supported by the record evidence she cites.

75.     Woodard denies paragraph 114 of the 56.1 Statement, which states, "[o]n January 28, Romeo and Gall told Woodard that they were considering 'a range of options including other roles at a lower level] for her, and that Romeo '[had] reservations in general about [Woodard's] skillsets and the mismatch for the skills required for an Account Manager."   It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from a January 28, 2005 email from Romeo to Woodard.   Indeed, in denying this statement of fact, Woodard admits that this is precisely what Romeo told Woodard in the email.   Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

76.     Woodard denies paragraph 115 of the 56.1 Statement, which states, "Gall also observed that Woodard was not sufficiently developing her skill sets, nor was she learning the business at the pace necessary for her to be successful."   It is not possible for Woodard to deny this statement of fact, since it is taken directly from Gall's deposition testimony.  (Gall Tr. 286.) Indeed, in denying this statement of fact, Woodard admits that this is precisely what Gall testified.   Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.   Further, Woodard's averment that Gall

-19-

had no basis to render such an opinion is nothing more than argument, and is refuted in any event by Woodard's own admission that she had to talk to Gall about all her deals.  (Pl. Tr. 151.)

77.     Woodard denies paragraph 117 of the 56.1 Statement, which states, "in 2005, Iaffaldano was apprised of several performance deficiencies related to Woodard."  (Iaffaldano Aff. ¶ 4.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Further, Woodard's averment that Iaffaldano was aware of her "protected complaints" is not supported by the record evidence Woodard cites to support the averment.

78.     Woodard denies paragraph 121 of the 56.1 Statement, which states, "[i]n late March [2005], Iaffaldano had a conversation with Gall about Woodard's performance deficiencies in which Iaffaldano expressed the opinion that she should either be discharged immediately, or demoted to a Sales Service Associate ("SSA") position without a pay decrease through an agreed upon date."  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from Iaffaldano's testimony by affidavit (Iaffaldano Aff. ¶ 5), and is corroborated by a contemporaneous email from Gall.  (Sack Decl., Ex. II.)  And in denying this statement of fact, Woodard admits that Gall sent Sawyer an email which recounts his conversation with Iaffaldano as described in paragraph 121 of the 56.1 Statement.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

79.     Woodard denies paragraph 122 of the 56.1 Statement, which states, "[i]n or around March 2005, after Romeo left TWCMS, Camp pitched in and supervised Woodard until TWCMS found a new regional manager to replace Romeo."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her

denial.  Indeed, in denying this statement of fact, Woodard admits that she was assigned to Camp after Romeo left.

80.    Woodard denies paragraph 123 of the 56.1 Statement, which states, "As Woodard's supervisor, it was Camp's observation that she was a terrible Account Manager." (Camp Aff. ¶ 14.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

81.    Woodard denies paragraph 124 of the 56.1 Statement, which states, "[a]s Woodard's supervisor, Camp found that she only had a rudimentary grasp of Media Math, and had not developed any significant client relationships."  (Camp Aff. ¶ 14.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

82.    Woodard denies paragraph 125 of the 56.1 Statement, which states, "[a]s Woodard's supervisor, Camp observed that she made comparatively few sales calls, and was lacking in strategic ideas as to why a company should advertise on TWC."  (Camp Aff. ¶ 15.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

83.    Woodard denies paragraph 126 of the 56.1 Statement, which states, "[a]s Woodard's supervisor, Camp was frustrated by Woodard's failure to seek him out for advice on her accounts, or to update him generally as to the status of her efforts."  (Camp Aff. ¶ 16.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

84.     Woodard denies paragraph 127 of the 56.1 Statement, which states, "[d]uring Camp's three years as a manager at TWCMS, Woodard was the only individual reporting to him who did not regularly seek him out for advice concerning accounts." (Camp Aff. ¶ 16.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

85.     Woodard denies paragraph 128 of the 56.1 Statement, which states, "[a]s Woodard's supervisor, Camp observed that Woodard's most significant performance failures related to her inability to gain the trust and confidence of her clients." (Camp Aff. ¶ 18.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

86.     Woodard denies paragraph 129 of the 56.1 Statement, which states, "[i]n April 2005, Camp expressed to Iaffaldano concerns similar to those Gall had expressed with respect to Woodard's lack of skill at her job and her not working hard enough." (Iaffaldano Aff. ¶ 6.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

87.     Woodard denies paragraph 131 of the 56.1 Statement, which states, "[i]n April 2005, after consultation with Human Resources, Gall and Camp, Iaffaldano approved the decision to give Woodard a written performance warning." (Iaffaldano Aff. ¶ 7.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Furthermore, Woodard's averments that the written warning raised false criticisms of her performance and was a set up for discharge based upon Gall's March 28, 2050 email to Pam Sawyer are nothing more than argument, and are not supported by the record evidence Woodard cites to support the averments.

88.     Woodard denies paragraph 132 of the 56.1 Statement, which states, "[o]n April 18, Gall and Camp presented Woodard with a written warning "to express [] concerns regarding [Woodard's] general performance as an Account Manager."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from the written warning that Woodard admits she received.  (Sack Decl., Ex. JJ.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Furthermore, Woodard's averments that the written warning raised false criticisms of her performance and was a set up for discharge based upon Gall's March 28, 2005 email to Pam Sawyer are nothing more than argument, and are not supported by the record evidence Woodard cites to support the averments.

89.     Woodard denies paragraph 133 of the 56.1 Statement, which states, "Gall drafted the memorandum with assistance from Sawyer and Camp."  It is not possible for Woodard to deny this fact, given the contents of Gall's and Sawyer's deposition testimony.  (Gall Tr. 112; Sawyer Tr. 154-55.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

90.     Woodard denies paragraph 134 of the 56.1 Statement, which states, "Sawyer's role in drafting the warning 'was to ensure that it delivered clear information to Woodard using input of leaders and their assessments . . . .'"  It is not possible for Woodard to deny this statement of fact, given that it is quoted verbatim from Sawyer's deposition testimony.  (Sawyer Tr. 157.)  Indeed, in denying this statement of fact, Woodard admits that this is what Sawyer testified.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

91.     Woodard denies paragraph 135 of the 56.1 Statement, which states, "[a]t Gall's request, Regional Sales Manager Lisa Longo was also present at this meeting with Woodard."  It is not possible for Woodard to deny this statement of fact, given Ms. Longo's deposition testimony.  (Longo Tr. 21.)  Indeed, in denying this statement of fact, Woodard admits that Longo attended the meeting.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

92.     Woodard denies paragraph 136 of the 56.1 Statement, which states, "Gall informed Woodard that Kahme and Viserto had complained about her and had requested a new TWCMS salesperson because of their dissatisfaction with Woodard's customer service, and he told Woodard that she was no longer to call on Active, Initiative and Icon Media."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from the written warning Woodard received on April 18.  (Sack Decl., Ex. JJ; Pl. Tr. 424.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

93.     Woodard denies paragraph 137 of the 56.1 Statement, which states, "[a] follow up performance discussion was scheduled for May 12, and Woodard was explicitly warned that 'failure to meet the above expectations and sustain the improved level of performance will result in further disciplinary action, up to and including termination.'"  It is not possible for Woodard to deny this statement of fact, given that it is quoted verbatim from the April 18 written warning.  (Sack Decl., Ex. JJ.)  Indeed, in denying this statement of fact, Woodard admits that this is what she was told in the written warning.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

94.     Woodard avers in paragraph 138 of the Counterstatement that "[her] April 18, 2005 email was substantially similar to [her] January 28 email about account coverage that Ms. Romeo admits there was nothing improper about Ms. Woodard's January 28, 2005 email . . ." This averment is nothing more than argument.  Moreover, Woodard avers that "[she] had been negotiating a deal with Christina Lincoln, a buyer at ICON International-the Lennox Account, and Mr. Gall had instructed Ms. Woodard to complete the deal."  I have reviewed the record citation Woodard cites, and it does not support the averment, given that it does not state whether Gall instructed Woodard to close the deal after she was presented with the written warning, instead merely stating that Gall gave this instruction "in April 2005."  (Woodard Aff. ¶ 47.)

95.     Woodard denies paragraph 139 of the 56.1 Statement, which states, "Gall advised Woodard that her email was both inappropriate and incorrect, and she apologized."  It is not possible for Woodard to deny this statement of fact, given that Gall advised Woodard in an April 18, 2005 email that "[y]our email to the team was not only inappropriate . . ., but incorrect" and that Woodard responded by email stating "[t]hank you for the clarification and sorry for the miscommunication."  (Sack Decl., Ex. KK.)  Indeed, in denying this statement of fact, Woodard admits that Gall sent her an email containing the statements attributed to him in paragraph 139.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

96.     Woodard denies paragraph 140 of the 56.1 Statement, which states, "Soon after the April 18 meeting, Woodard told Jim Quinn, a buyer with Active, that she had been informed by Gall that '[Quinn's] superiors are looking for or wanted someone else.'"  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from her own deposition testimony.  (Pl. Tr. 432-33.)  And in denying this statement of fact, Woodard admits telling

Quinn what is described in paragraph 140.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

97.    Woodard avers in paragraphs 141-142 of the Counterstatement that "Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn and . . . that Lisa Longo has no personal knowledge."  This averment is not supported by the record evidence: as Longo's contemporaneous notes reflect, she was present when Quinn made the report to Gall that is recounted in paragraph 141.  (Sack Decl., Ex. LL.)

98.    Woodard denies paragraph 145 of the 56.1 Statement, which states, "Gall informed Iaffaldano that the client representative had complained to Gall that Woodard's call made him uncomfortable.  (Iaffaldano Aff. ¶ 8.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

99.    Woodard denies paragraph 146 of the 56.1 Statement, which states, "Iaffaldano found this very troubling, because it evidenced poor judgment on Woodard's part and put TWCMS in an awkward position with a client."  (Iaffaldano Aff. ¶ 8.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

100.    Woodard avers in paragraphs 140 and 143-146, *inter alia*, of the Counterstatement that "Gall admitted that it was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Instead, Gall testified only that *if a client called Woodard* and she was no longer covering that account, it would be reasonable for her to direct those clients to contact her superior.  (Gall Tr. 156-57.)  Gall never testified that Woodard's comments to Quinn were "reasonable" or appropriate.

101.    Woodard avers in paragraphs 143-146 of the Counterstatement that she had a history of successful dealings with the Active account.  I have reviewed the record evidence Woodard cites, and it does not support the averment.  In fact, Woodard cites only to Monihan's deposition testimony, which does not support the averment.  (*See supra* ¶ 63.)

102.    Woodard denies paragraph 144 of the 56.1 Statement, which states, "[w]ithin days after Iaffaldano approved the request to give Woodard a written performance warning, he learned that Woodard had made a phone call to a representative of an agency she had been prohibited from calling on."  It is not possible for Woodard to deny this statement of fact, given that it is a direct quote from Iaffaldano's testimony by affidavit, and given Woodard's own deposition testimony that she was prohibited from "calling on" Active, Initiative and Icon.  (Iaffaldano Aff. ¶ 8; Pl. Tr. 421.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

103.    Woodard denies paragraph 145 of the 56.1 Statement, which states, "Gall informed Iaffaldano that the client representative had complained to Gall that Woodard's call made him uncomfortable."  (Iaffaldano Aff. ¶ 8.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Furthermore, Woodard averment that "Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn" is not supported by the record evidence.  (*See supra* ¶ 97.)

104.    Woodard denies paragraph 146 of the 56.1 Statement, which states, "Iaffaldano found this very troubling, because it evidenced poor judgment on Woodard's part and put TWCMS in an awkward position with a client."  (Iaffaldano Aff. ¶ 8.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

105.    Woodard denies paragraph 147 of the 56.1 Statement, which states, "Gall spoke to Human Resources and shared his opinion that Woodard could not perform the job of an Account Manager because of 'her inability to satisfy her customers and to understand the customer's business . . . .'"  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from Gall's deposition testimony.  (Gall Tr. 287.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

106.    Woodard denies paragraph 148 of the 56.1 Statement, which states, "Gall, Iaffaldano and Camp, in consultation with Human Resources and the Legal department, decided to terminate Woodard's employment and she was discharged on April 22."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from the testimony by affidavit of Iaffaldano and Camp, and the deposition testimony of Gall and Sawyer.  (Camp Aff. ¶ 25; Iaffaldano Aff. ¶ 9; Gall Tr. 149; Sawyer Tr. 161-62, 169.)  Furthermore, Woodard's averment that "[a]ccording to Mark Gall, he did not make the decision to terminate Ms. Woodard's employment and was not involved in such termination decision" is not supported by the record evidence: Gall testified, for example, that he provided input to human resources related to the decision to terminate Woodard, specifically "[t]hat Claudia cannot do the job as presently required."  (Gall Tr. 286-87.)

107.    Woodard denies paragraph 149 of the 56.1 Statement, which states, "[a]fter the decision had been made to terminate Woodard's employment, she presented Camp with a rebuttal to her April 18 written warning, which Camp forwarded to Human Resources."  (Camp Aff. ¶ 26.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

108.    Woodard denies paragraph 150 of the 56.1 Statement, which states, "Woodard's rebuttal did not precipitate her termination, nor did it change Camp's opinion that she should be discharged."  (Camp Aff. ¶ 8.)  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

109.    Woodard denies paragraph 154 of the 56.1 Statement, which states, "[a]t no time during this very lengthy investigation period did the EEOC contact TWCMS to request any information beyond what was contained in the position statements TWCMS submitted in response to Woodard's EEOC Charge and her Amended EEOC Charge."  (Powhatan Aff. ¶ 4.) It is not possible for Woodard to deny this statement of fact, given that she has no personal knowledge of the communications (or absence thereof) between the EEOC and TWCMS. Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

110.    Woodard denies paragraph 155 of the 56.1 Statement, which states, "[a]t no time during this very lengthy investigation period did the EEOC invite TWCMS to meet with any EEOC representatives regarding Woodard's Charge."  (Powhatan Aff. ¶ 4.)  It is not possible for Woodard to deny this statement of fact, given that she has no personal knowledge of the communications (or absence thereof) between the EEOC and TWCMS.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

111.    Woodard denies paragraph 156 of the 56.1 Statement, which states, "[i]n the course of discovery in this action, Defendants learned for the first time that the EEOC investigator and an EEOC trial attorney had met with Woodard and her lawyer sometime after she filed her EEOC Charge against TWCMS, but before the EEOC issued its determination on

that Charge." (Powhatan Aff. ¶ 5.)  It is not possible for Woodard to deny this statement of fact, given that she has no personal knowledge of when Defendants learned about her meeting with the EEOC.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

112.    Woodard denies paragraph 157 of the 56.1 Statement, which states, "[h]ad TWCMS been informed that Woodard and her counsel had been given the opportunity to meet with the EEOC investigator and with counsel for the EEOC in the course of the EEOC investigation, TWCMS would have requested the same opportunity to meet with the EEOC." (Powhatan Aff. ¶ 5.)  It is not possible for Woodard to deny this statement of fact, given that she has no personal knowledge of when Defendants learned about her meeting with the EEOC, or of what TWCMS would have done had it learned this fact prior to the commencement of this litigation.  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

113.    Woodard denies paragraph 158 of the 56.1 Statement, which states, "[o]n January 18, 2006, Woodard's attorney complained in writing to the EEOC that the EEOC investigator had repeatedly failed to return his calls."  It is not possible for Woodard to deny this statement of fact, given that it is taken directly from the text of her attorney's letter to the EEOC.  (Sack Decl., Ex. WW.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

114.    Woodard denies paragraph 159 of the 56.1 Statement, which states, "[b]lack employees Sly Phifer and Lakieban Brown were both promoted to Account Manager by Gall, and both received ample coaching and counseling from Gall."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her

denial.  Indeed, in denying this statement of fact, Woodard admits that both Phifer and Brown were promoted to Account Manager.  Furthermore, Woodard's averment that "any support given by Gall to Phifer and Brown supports Plaintiffs' claims of gender discrimination, since Messrs. Phifer and Brown are males . . ." is nothing more than argument.

115.   Woodard avers in paragraph 160 of the Counterstatement that Jeanne Sachs was terminated.  This averment is not supported by any citation to record evidence.

116.   Woodard denies paragraph 162 of the 56.1 Statement, which states, "Gall promoted Poillon to Director of Sales in May 2007."  I have reviewed the record evidence Woodard cites, and it does not provide support for her denial.  Indeed, in denying paragraph 162, Woodard admits that Ms. Schatz [Poillon] was promoted from Account Manager to Sales Manager in May 2007.

117.   Woodard avers in paragraph 163 of the Counterstatement that "Gall's alleged treatment of Ms. Schatz is not a defense."  This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

118.   Woodard denies paragraph 164 of the 56.1 Statement, which states, "Gall hired Diana Scully as an Account Manager."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Indeed, in denying this statement of fact, Woodard admits that Scully was hired as an Account Manager.

119.   Woodard avers in paragraphs 166 and 167 of the Counterstatement that "Iaffaldano engaged in inappropriate and unlawful conduct and is unqualified to opine that Gall acted properly."  This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

120.     Woodard avers in paragraphs 168 and 169 of the Counterstatement that "Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that Mr. Gall acted properly."   This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

121.     Woodard denies paragraph 170 of the 56.1 Statement, which states, "[d]uring Camp's employment at TWCMS, he observed that Gall differentiated employees by how hard they worked, and he observed that, to the extent Gall seemed to prefer certain employees over others, he preferred those who worked the hardest."   I have reviewed the record evidence Woodard cites, and it does not provide support to deny Camp's observations.   Furthermore, Woodard's averment that "Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants" is nothing more than argument, and is not supported by the record evidence she cites.

122.     Woodard avers in paragraphs 171 and 172 of the Counterstatement that "Camp engaged in inappropriate and/or unlawful conduct and is unqualified to opine that other managers acted properly."   This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

123.     Woodard avers in paragraph 173 of the Counterstatement that "Gall's alleged treatment of Ms. Matrange and Ms. Schatz (aka Poillon) is not a defense."   This averment is nothing more than argument, and is not supported by the record evidence she cites.

124.     Woodard avers in paragraphs 174-176 of the Counterstatement that "Ms. Schatz's alleged observations is not a defense."   This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

125.     Woodard avers in paragraphs 177 and 178 of the Counterstatement that "Defendants' alleged treatment of Ms. Schatz is not a defense."  This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

126.     Woodard denies paragraphs 179 and 180 of the 56.1 Statement, which contain statements by Poillon concerning Gall's Monday morning meetings with Account Managers.  I have reviewed the record evidence Woodard cites to deny these paragraphs, and it does not provide support for her denials.

127.     Woodard avers in paragraph 181 of the Counterstatement that "any award to Mr. Derella is not a defense."  This averment is nothing more than argument, and Woodard provides no record citation to support the averment.

128.     Woodard denies paragraph 182 of the 56.1 Statement, which states, "[t]he sales managers and Iaffaldano named Terry Sekel's team 'sales team of the year' for the whole company in 2005 and 2006."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Furthermore, Woodard's averment that "the alleged events occurred after Ms. Woodard was unlawfully terminated and are not a defense" is nothing more than argument, and she provides no record citation to support the averment.

129.     Woodard denies paragraphs 183-184, 186-188, and 190-193 of the 56.1 Statement, which contain statements by Derella concerning his observations of Gall's and other TWCMS managers' treatment of TWCMS employees.  I have reviewed the record evidence Woodard cites to deny these paragraphs, and it does not provide support for her denials.

130.    Woodard avers in paragraphs 183-184, 186-188 and 190 that "Derella's alleged observations is not a defense."   This averment is nothing more than argument, and Woodard provides no record evidence to support the averment.

131.    Woodard denies paragraph 185 of the 56.1 Statement, which states, "[d]uring Derella's employment at TWCMS, he observed that Gall differentiated employees by how hard they worked and that to the extent Gall seemed to prefer certain employees over others, he preferred those who worked the hardest."   I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for Woodard's denial of Derella's observations.   Furthermore, Woodard's averment that "Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants" is nothing more than argument, and is not supported by the record evidence she cites.

132.    Woodard denies paragraph 189 of the 56.1 Statement, which states, "[d]uring Derella's employment at TWCMS, he observed that Gall treated Matrange exceedingly well and that Gall devoted a lot of attention to Matrange, especially with respect to coaching and counseling her sales efforts."   I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for Woodard's denial of Derella's observations.

133.    Woodard avers in paragraphs 189 and 191 of the Counterstatement that "Gall's alleged treatment of Ms. Matrange and Ms. Schatz [aka Poillon] is not a defense."   This averment is nothing more than argument, and is not supported by the record evidence she cites.

134.    Woodard avers in paragraph 193 of the Counterstatement that "Gall's alleged treatment of Ms. Scully is not a defense."   This averment is nothing more than argument, and is not supported by the record evidence she cites.

135.    Woodard denies paragraphs 194-204 of the 56.1 Statement, which contain statements by Meadow concerning his observations of Gall's and other TWCMS managers' treatment of TWCMS employees.  I have reviewed the record evidence Woodard cites to deny these paragraphs, and it does not provide support for her denials.

136.    Woodard avers in paragraphs 194-195, 197-199, 201 and 203 of the Counterstatement that "Meadow's alleged observations is not a defense."  This averment is nothing more than argument, and is not supported by the record evidence she cites.

137.    Woodard avers in paragraph 196 of the Counterstatement that "Lawless was one of the hardest working Account Managers and a top producer, yet was unlawfully fired by Defendants."  This averment is nothing more than argument, and is not supported by the record evidence she cites.

138.    Woodard avers in paragraph 200 of the Counterstatement that "Gall's alleged treatment of Ms. Matrange is not a defense."  This averment is nothing more than argument, and is not supported by the record evidence she cites.

139.    Woodard avers in paragraph 202 of the Counterstatement that "Gall's alleged treatment of Schatz is no defense to Plaintiffs' claims."  This averment is nothing more than argument, and is not supported by the record evidence she cites.

140.    Woodard avers in paragraph 204 of the Counterstatement that "Gall's alleged treatment of Ms. Scully is not a defense."  This averment is nothing more than argument, and is not supported by the record evidence she cites.

141.    Woodard denies paragraph 206 of the 56.1 Statement, which states, "[o]n two occasions when Meadow was late to work without a prior excuse, Gall took Meadow's chair into Gall's office, requiring Meadow to retrieve his chair from Gall personally when Meadow arrived

to work." (Meadow Aff. ¶ 18.)  I have reviewed the record evidence Woodard cites to deny this paragraph, and it does not provide support for her denial.

142.    Woodard denies paragraphs 207 and 208 of the 56.1 Statement, which refer to the fact that Defendants had a harassment policy which explicitly detailed a procedure for employees to use to complain about harassment.  I have reviewed the record evidence Woodard cites to deny these statements of fact, and it does not provide support for her denials.  Furthermore, in paragraphs 207 and 208 of the Counterstatement, Woodard's averment that "Defendants failed and refused to enforce" the policy is unsupported by the record evidence she cites.

143.    Woodard denies paragraph 211 of the 56.1 Statement, which states, "Gall's toy bat was a memento Ted Turner (Gall's former employer) had given to him."  I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.  Indeed, in denying this statement of fact, Woodard admits that Gall testified he received the bat from Ted Turner.

144.    Woodard denies paragraph 212 of the 56.1 Statement, which states, "Paul Iaffaldano, Janet Poillon, Matt Derella and Craig Meadow never witnessed Gall swing his toy bat at anyone or threaten anyone with his toy bat."  It is not possible for Woodard to deny this statement of fact, given that there is no evidence suggesting that any of these people witnessed Gall swinging his toy bat at anyone or threatening anyone with his toy bat.  Moreover, I have reviewed the record evidence Woodard cites to deny these paragraphs, and it does not provide support for her denials.  Furthermore, in paragraphs 212 and 218 of the Counterstatement, Woodard avers that "Gall summoned Ms. Woodard, Ms. Lawless, Jen Monson and/or other female employees into his office and swung a baseball bat and rubbed his hand on it in a sexual manner, in front of these and other female employees."  The record evidence Woodard cites in

support of this averment does not indicate that Woodard, Lawless or any other female employee other than Monson testified that they witnessed Gall rub his hand on the toy bat in what they perceived as a sexual manner.  Neither Woodard nor Lawless submitted an affidavit in support of this averment, they offered no deposition testimony to this effect, and they did not assert this claim in their EEOC Charges or in their Complaint in this action.

145.   Woodard denies paragraph 217 of the 56.1 Statement, which states, "Gall never touched Woodard nor said anything provocative on the single occasion 'very early' in her employment, as she was leaving Gall's office following a business meeting, that Gall allegedly 'got real close to me and violated [Woodard's] personal space.'"  It is not possible for Woodard to deny this statement of fact, given that she testified at deposition as follows:

Q:   And on how many occasions did this occur?

A:   Once.

Q:   When was that?

A:   It was early on in my – in my employment.  It was very early.  I don't remember when, but it had to be the first half of my employment.  (Pl. Tr. 454-55.)

\*        \*        \*

Q:   Why were you in his office in the first place?

A:   It was for business reasons, and I don't recall the exact – exact reasons why we were there, but it was definitely for business reasons.

Q:   So you were in his office having a business conversation?

A:   Yes.

Q:   And then you got up to leave and then, as you describe it, he got up close to you; is that correct?

A:   Yes.

Q:   Did he make physical contact with you, Ms. Woodard?

A:      Personal space, there was no physical.

Q:      Did he touch you, Ms. Woodard?

A:      No.

Q:      Did he say anything provocative to you?

A:      No.  (Pl. Tr. 460.)

146.     Woodard denies paragraph 220 of the 56.1 Statement, which states, "Woodard never brought Gall's alleged racial or sexual harassment to the attention of anyone in management of Human Resources."  It is not possible for Woodard to deny this statement of fact, given her deposition testimony that she never reported any of Gall's alleged racial or sexual harassment to management or Human Resources.  (*See* Pl. Tr. 75-76, 216, 453, 458-59.) Furthermore, Woodard's denial is inconsistent with her emails to Gall in August 2004, and by her deposition testimony that "when Mark Gall made his own discriminatory comments [in August 2004], I didn't want him to be threatened thinking that I'm going to report him . . . ." (Sack Decl., Exs. Q, S-T; Pl. Tr. 200.)

147.     Woodard denies paragraph 222 of the 56.1 Statement, which states, "Woodard never reported to Human Resources or Iaffaldano that she considered TWCMS to be a 'boy's club.'"  It is not possible for Woodard to deny this statement of fact, given her deposition testimony that she never reported to Human Resources or management Gall's alleged exclusion of females from his breakfasts and coffees with male Account Managers, nor did she include this allegation in any written internal complaint to Defendants.  (Pl. Tr. 443-44.)  Moreover, I have reviewed the record evidence Woodard cites to deny this statement of fact, and it does not provide support for her denial.

## Additional Facts Pursuant to Rule 56.1(b)

148.   Woodard avers in paragraph 228 of the Counterstatement that "Defendants admit Ms. Woodard was qualified."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  In fact, Camp's affidavit does not state that Woodard was qualified for the CDM position, only that "[he] thought her skill set would be a great match for the CDM position" before he hired her.  (*See* Camp Aff. ¶ 7.)

149.   Woodard avers in paragraph 230 of the Counterstatement that, "[p]rior to [her] termination, Mr. Camp never advised [her] that there was any deficiency in her job performance . . . ."  This allegation is refuted by Woodard's own deposition testimony that Camp was present when she was presented with a written performance warning on April 18, 2005, and also by the written warning itself, which references some prior discussions regarding her performance at which Camp was present.  (Pl. Tr. 416; Sack Decl., Ex. JJ.)

150.   Woodard avers in paragraph 236 of the Counterstatement that "Ms. Woodard maintains that Defendants subjected her to numerous discriminatory, derogatory, harassing and inappropriate comments about women, blacks, and persons of Jamaican national origin.  She maintains that unlawful and discriminatory comments were made by, among others, [Celt, Gall, Romeo and Camp]."  This averment is nothing more than legal conclusions and argument.  Furthermore, Woodard has admitted that Camp made no inappropriate comments to her.  (Pl. Tr. 512; Declaration of Laura Sack, dated December 22, 2009, Ex. CC ¶ 10.)

151.   Woodard avers in paragraph 237 of the Counterstatement that "[s]imilar comments were made when Defendants hired Catherine Jolly, another African American female."  I have reviewed the record evidence Woodard cites, and it does not support the

averment: paragraph 18 of Bhiro's Affidavit does not state that any such comments were made when Jolly was hired.

152.    Woodard avers in paragraph 238 of the Counterstatement that "Defendants paid bonuses to managers at the Vice President level and up, which bonuses took into account diversity hiring."   As discussed in paragraph 33 above, this averment is incorrect: Sawyer testified that diversity bonuses were related to the number of diversity candidates in the *interviewing* pool.  (Sawyer Tr. 133.)  Sawyer did *not* testify that bonuses took into account diversity *hiring*.  Furthermore, Woodard's averment that "[b]ased on Ms. Sawyer's testimony, Mr. Camp, a Senior Vice President, received bonuses linked to diversity hiring" is nothing more than argument, and is directly refuted by Camp's testimony by affidavit.  (Camp Aff. ¶¶ 6-7.)

153.    Woodard avers in paragraph 243 of the Counterstatement that "Gall's emails to Ms. Woodard purporting to address Mr. Celt's unlawful conduct were insincere."  This averment is nothing more than argument.  Furthermore, Woodard's averment that "[she] made it clear to Mr. Gall that his conduct was unwelcome and offensive" is not supported by the record evidence she cites.  (*See supra* ¶ 146.)

154.    Woodard avers in paragraph 248 of the Counterstatement that "Ms. Romeo immediately began making unlawful discriminatory comments to Ms. Woodard based on race, ethnicity and about black women which incorporated gender discrimination."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Furthermore, Woodard's averment that "[i]n essence, Romeo was telling Ms. Woodard that she was only hired for cosmetic purposes, to fill some alleged quota" is nothing more than argument.

155.   Woodard avers in paragraph 249 of the Counterstatement that "Romeo was essentially telling Ms. Woodard that she didn't want to hire someone of Ms. Woodard's protected classes and didn't want to spend money to do so."  This averment is nothing more than argument.

156.   Woodard avers in paragraph 250 of the Counterstatement that "Romeo was essentially degrading all black women."  This averment is nothing more than argument.

157.   Woodard avers in paragraph 251 of the Counterstatement that "[she] reminded Romeo that Ms. Woodard was born in Jamaica and raised in Paterson."  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that there is absolutely no evidence that Woodard *reminded* Romeo of her national origin or background. Furthermore, this averment contradicts Woodard's own handwritten notes of the alleged comments and paragraph 304 of the Counterstatement, both of which state that Romeo asked Woodard where she grew up and Woodard responded that she was born in Jamaica and raised in Paterson.  (Sack Decl., Ex. DD.)  Moreover, Woodard's averment that "Mr. Camp now admits statements were made" is not supported by the record evidence she cites: Camp testified by affidavit that aside from the comments about Paterson, New Jersey, Romeo did not make any other comments that were remotely offensive or inappropriate.  (Camp Aff. ¶ 13.)

158.   Woodard avers in paragraph 252 of the Counterstatement that "Defendants denied her equal assignment of accounts and support and stripped [her] of accounts, and accorded preferential treatment to Account Managers that were male and/or Caucasian."  This averment is nothing more than argument.

159.    Woodard avers in paragraph 254 of the Counterstatement that "Defendants assigned Ms. Woodard an account list with 44 clients, but only 4 had prior spending history with TWC or broadcast cable overall.  These 4 clients were credited with only $117,375 in spending." I have reviewed the record evidence Woodard cites, and it does not support her averment.  Most significantly, this averment ignores the fact that Woodard was assigned to accounts that had been credited with $2,357,132 in spending.  (Goldberg Cert., Ex. Q at Ex. 55.)  Woodard's averment focuses solely on the accounts for which she had been assigned the client split, while ignoring the accounts for which she had been assigned planning or buying.  (*Id.*)  As Woodard testified: "[t]he business is separated into three parts and each person is credited a certain percent.  Clients, 34 percent; planning, 33 percent; and buying, 33 percent."  (Pl. Tr. 70.)  Furthermore, Woodard's averment that "Defendants assigned what was essentially a 'dead accounts' list to Ms. Woodard, containing unpromising accounts and agencies" is nothing more than argument.  Additionally, Woodard avers that "Romeo considered Ms. Woodard's assignment to be a junior territory with a dead list of accounts."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Finally, Woodard avers that "when Ms. Woodard asked her peers for information on the accounts, she received information that they had not returned calls made by her peers."  This averment is unsupported by the record evidence: Woodard only cites to *one* example, despite that she phrases the averment in the plural.

160.    Woodard avers in paragraph 255 of the Counterstatement that "Monihan told [her] that . . . black employees are resented."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Monihan never told Woodard that Defendants resent black employees.  Instead, he testified that he had no factual basis for his comment to Woodard that the hiring of diversity candidates backfires because the minority employees are then

resented, and he also testified that his comment was not specific to The Weather Channel. (Monihan Tr. 99-100.)

161.     Woodard avers in paragraph 257 of the Counterstatement that "Defendants assigned Meadow a far superior account list."  This averment is nothing more than argument. Furthermore, Woodard avers that "Defendants assigned Mr. Meadow an account list with 16 clients, 11 of which had a prior spending history with TWC.  These 11 clients were credited with $1,708,180 in spending."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Furthermore, Woodard's averment that "Defendant gave Mr. Meadow an account list that placed him at more than 58% to his annual revenue goal before Mr. Meadow made any sales" is not supported by any documentary evidence.  Finally, Woodard's averment that "Mr. Meadow's revenue goal for 2005 was $3,050,500, merely $5,000 above that assigned to Ms. Woodard" is not supported by the record evidence.  To the contrary, Mr. Meadow's Annual Gross Revenue Goal for 2005 was $3,350,000, which was $300,000 (or 10%) higher than Woodard's Annual Gross Revenue Goal for 2005.  (Meadow Aff., Ex. B; Sack Decl., Ex. M.)

162.     Woodard avers in paragraph 258 of the Counterstatement that "Defendants gave Mr. Wright an account list that was far superior to Ms. Woodard's account list."  This averment is nothing more than argument.

163.     Woodard avers in paragraph 263 of the Counterstatement that "Lawless was also denied equal treatment regarding account assignments . . . ."  This averment is nothing more than argument.  Furthermore, Woodard's averment that "Gall did not go on any sales calls with Ms. Monson, which distinguished Mr. Gall's treatment of Ms. Monson from his treatment with male Account Managers that he fully supported" is nothing more than argument, and is not supported

by the record evidence, given Monson's testimony that she went on a sales call with Gall and that Gall promoted her.  (Monson Tr. 35, 58.)

164.    Woodard avers in paragraph 264 of the Counterstatement that "items were missing from Ms. Woodard's desk, such as sales documents, notes, presentation materials, etc." I have reviewed the record evidence Woodard cites, and it does not support the averment.

165.    Woodard avers in paragraph 265 of the Counterstatement that "Defendants denied Ms. Woodard training and support."  This averment is nothing more than argument. Furthermore, Ms. Woodard avers that Gall "did not provide any training to Ms. Woodard."  This averment is directly contradicted by Woodard's own deposition testimony that she "had a great deal of conversations with Mark Gall about her deals because every deal [she] did had to be approved by him."  (Pl. Tr. 151; *see also* Reply Br. 7.)

166.    Woodard avers in paragraph 267 of the Counterstatement that, "[t]hus, Ms. Romeo had no basis to evaluate Ms. Woodard on December 8, 2004, after just one week of working with her."  This averment is nothing more than argument.

167.    Woodard avers in paragraph 269 of the Counterstatement that "[t]he evaluation raised false criticisms of [her] job performance"; "Ms. Woodard was, in fact, 'too new' to be evaluated and certainly too new to be evaluated by Ms. Romeo, who had only been employed since on or about November 30, 2004"; "[t]his treatment of Ms. Woodard stood in stark contrast to Defendants' treatment of male Account Managers"; and "[t]hus, unlike Ms. Woodard, who was penalized in her review for being 'too new,' Mr. Duke was not penalized in his review for being 'too new.'"  These averments are nothing more than argument.

168.    Woodard avers in paragraph 270 of the Counterstatement that "Defendants denied [her] such 'reasonable' treatment in preparing her 2004 evaluation, which intentionally included scores of 0, the lowest score, in categories where she was 'too new' to push her performance rating downward."  These averments are nothing more than argument.

169.    Woodard avers in paragraph 271 of the Counterstatement that "[t]his email contradicted the performance evaluation given to Ms. Woodard."  This averment is nothing more than argument.  Furthermore, Woodard's averment that "clients also praised Ms. Woodard" is not supported by the record evidence she cites, which relates only to a single client.  (Goldberg Cert., Ex. II.)

170.    Woodard avers in paragraph 272 of the Counterstatement that, "[a]fter the review, Mr. Gall did not provide any training to Ms. Woodard . . . ."  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Woodard testified that she "had a great deal of conversations with Mark Gall about [her] deals because every deal [she] did had to be approved by him."  (Pl. Tr. 151.)

171.    Woodard avers in paragraph 273 of the Counterstatement that "Defendants made discriminatory compensation decisions and adopted discriminat[ory] compensation practices, and subjected her to discriminatory compensation decisions and compensation practices."  This averment is nothing more than argument.

172.    Woodard avers in paragraph 278 of the Counterstatement that Celt's compensation was $233,698.09 for 2005 (at goal).  This averment is wrong.  Celt's compensation for 2005 at goal was $195,489.  (Goldberg Cert., Ex. P at Ex. 18 at TWC 1801.)

173.    Woodard avers in paragraph 279 of the Counterstatement that Derella's compensation for 2006 was $267,362.  This averment is wrong.  Derella's compensation for 2006 at goal was $214,578.  (Goldberg Cert., Ex, P at 18 at TWC 1823.)

174.    Woodard avers in paragraph 280 of the Counterstatement that Defendants gave Wright a raise "even though Defendants admit that Mr. Wright had performance deficiencies, particularly with media math" is nothing more than argument.   Furthermore, Woodard's averment that Terry Sekel testified that Wright "was weak on media math" is wrong.  In reality, Sekel testified that Wright was "[n]ot as strong as other people" with respect to media math. (Sekel Tr. 14.)

175.    Woodard avers in paragraph 283 of the Counterstatement that, "[b]ased on Mr. Gall's statement, the evaluation scores given to Account Managers were below their actual level of job performance."  This averment is nothing more than argument.

176.    Woodard avers in paragraph 285 of the Counterstatement that "Defendants' compensation practices with respect to male Account Managers is also in stark contrast to Defendants' compensation practices with other female Account Managers, particularly Elise Lawless and Jen Monson."  This averment is nothing more than argument.

177.    Woodard avers in paragraph 292 of the Counterstatement that the reassignment of her planner to Trina Wilson was "inappropriate since both employees were new hires."  This averment is nothing more than argument.

178.    Woodard avers in paragraph 293 of the Counterstatement that, "[a]s of January 2005, Mr. Gall had not gone on any sales calls with Ms. Woodard and took no interest in her or her development."  This averment is contradicted by Woodard's own deposition testimony that she "had a great deal of conversations with Mark Gall about [her] deals because every deal [she]

did had to be approved by him." (Pl. Tr. 151.) Furthermore, Woodard's averment that Gall "took no interest in her or her development," is nothing more than argument.

179.   Woodard avers in paragraph 298 of the Counterstatement that "no feedback was provided" with respect to her January 20, 2005 territory plan.  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Furthermore, Woodard's averment that "[t]he criticism of Ms. Woodard was belied by Mr. Gall's December 14, 2004 email about the 'Pella team'" is nothing more than argument.

180.   Woodard avers in paragraph 300 of the Counterstatement that "[s]he sent this email because Ms. Romeo had removed Ms. Woodard from the Pella deal."  I have reviewed the record evidence Woodard cites, and it does not support the averment.

181.   Woodard avers in paragraph 301 of the Counterstatement that, "[i]n late January 2005, Ms. Woodard, who was attending a sales training meeting in Florida, advised Pam Sawyer (Director of Human Resources) that she intended to file a complaint."  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Moreover, Woodard's averment that "[o]n or about January 28, 2005, Ms. Woodard filed a written complaint of discrimination and 'hostile work environment' against Ms. Romeo with Pam Sawyer" is not supported by the record evidence, which reveals that Woodard faxed the complaint to Sawyer on January 31, 2005.  (Sack Decl., Ex. CC.)  Furthermore, Woodard's averment that she included an allegation in her complaint to Sawyer that "Ms. Romeo repeatedly screamed at Ms. Woodard" is not supported by the record evidence she cites: her complaint to Sawyer contained no such allegation.  (Sack Decl., Ex. BB.)  Finally, Woodard's averment that she included an allegation in her complaint to Sawyer that "Ms. Romeo told a Senior Buyer, referring to Ms. Woodard 'most of the nice ones are not too bright'" is not supported by the record evidence and is

contradicted by Woodard's own complaint memorandum, in which she said, "I cannot say with certainty that Mary Jo was referring to me . . . ."  (Sack Decl., Ex. BB at ¶ F.)

182.    Woodard avers in paragraph 303 of the Counterstatement that "Defendants did not respond to Woodard's rebuttal."  This averment is not supported by any record citation.

183.    Woodard avers in paragraph 306 of the Counterstatement that Romeo admitted that "when Ms. Woodard was transferred to Account Manager she was given a 'junior territory.'"  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Romeo stated that Woodard was given a "junior Account Manager's territory." (Goldberg Cert., Ex. P at Ex. 53.)

184.    Woodard avers in paragraph 307 that Romeo was "apparently" traveling with Budkofsky on a sales call.  I have reviewed the record evidence Woodard cites, and it does not support the averment.

185.    Woodard avers in paragraph 308 of the Counterstatement that "Sawyer downplayed Ms. Romeo's conduct . . . ."  This averment is nothing more than argument.

186.    Woodard avers in paragraph 309 of the Counterstatement that "[t]hus, there is an issue of fact as to why Defendants terminated Ms. Romeo's employment."  This averment is nothing more than argument.

187.    Woodard avers in paragraph 311 of the Counterstatement that "[she] demonstrated an outstanding work ethic."  This averment is nothing more than argument. Furthermore, Woodard's averment that "Gall ignored Ms. Woodard's email and did not even return the Oppenheimer Funds account to Ms. Woodard, an account she had previously cultivated" is not supported by the record evidence she cites; in reality, there is no record

evidence that Gall ignored Woodard's email or that Woodard ever requested the Oppenheimer Funds account.

188.    Woodard avers in paragraph 312 of the Counterstatement that, "[o]n March 23, 2005, Ms. Woodard and Ms. Lawless closed a $200,000 deal with TIAA-CREF."  I have reviewed the record evidence Woodard cites, and it does not support the averment.

189.    Woodard avers in paragraph 313 of the Counterstatement that "Gall made it clear that he did not intend to" provide support to Woodard.  I have reviewed the record evidence Woodard cites, and it does not support the averment.  Furthermore, Woodard's averment that "Monihan also complained to Pam Sawyer that Mr. Gall discriminated against women and ran a boys club" is not supported by the record evidence, given Monihan's testimony that he told Sawyer he considered Jill Matrange to be one of the boys.  (Monihan Tr. 131.)  Finally, Woodard's averment that "Defendants did not take any remedial action" is not supported by any citation to the record evidence.

190.    Woodard avers in paragraph 314 of the Counterstatement that, "[a]ccording to the email, by March 28, Mr. Iaffaldano had decided to terminate Ms. Woodard."  This averment is nothing more than argument, and is not supported by any citation to the record evidence.

191.    Woodard avers in paragraph 315 of the Counterstatement that "Gall solicited this email from Ms. O'Grady to provide Ms. Sawyer with documentation to support firing Ms. Woodard."  This averment is nothing more than speculation and argument, and is not supported by the record evidence she cites.

192.    Woodard avers in paragraph 316 of the Counterstatement that "Defendants did not take any remedial action."  This averment is not supported by any citation to record evidence.

193.    Woodard avers in paragraph 317 of the Counterstatement that, "[i]n February 2005, Ms. Woodard documented the fact that Mr. Gall had cancelled meetings that Ms. Woodard had scheduled with Active."  I have reviewed the record evidence Woodard cites, and it does not support the averment; the document does not reflect who cancelled the meetings with Active or who scheduled those meetings.  (*See* Pl. Ex. 84.)  Furthermore, Woodard's averment that "[o]n April 7, 2005, Ms. Woodard documented that Mr. Gall had canceled a meeting with Reid Steinberg" is not supported by the record evidence Woodard cites to support the averment, given that the document makes no reference to who canceled the meeting.  Instead, Woodard stated, "Mark, Thank you so much for connecting with Reid Steinberg today on the meeting cancellation – that was good damage control for us, especially since we cancelled on them previously on March 8."  (*See* Pl. Ex. 96.)

194.    Woodard avers in paragraph 318 of the Counterstatement that, "[o]n or about April 18, 2005, Defendants, through Gall, issued a memorandum to Ms. Woodard raising false criticisms of her performance . . . ."   This averment is nothing more than argument.  Furthermore, Woodard's averment that Gall made Ms. Woodard's account list "even worse" is nothing more than argument.

195.    Woodard avers in paragraph 319 of the Counterstatement that "[her] April 18 email regarding account coverage was substantially similar to her January 28, 2005 email regarding account coverage."  This averment is nothing more than argument.

196.    Woodard avers in paragraph 321 of the Counterstatement that "[t]his was even a worse accounts list and was imposed upon Ms. Woodard to make it impossible for her to do her job."  This averment is nothing more than argument.

197.   Woodard avers in paragraph 322 of the Counterstatement that Longo "had no opinion of her."  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Longo testified only that she had no opinion of Woodard's "job performance."  (Longo Tr. 24.)

198.   Woodard avers in paragraph 323 of the Counterstatement that Active "had not requested that Ms. Woodard be removed from their account."   I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Woodard testified only that Active never told *her* that they did not want her on the account.  (Pl. Tr. 486-87.)

199.   Woodard avers in paragraph 324 of the Counterstatement that "[s]he fully rebutted the accusations against her."  This averment is nothing more than argument.

200.   Woodard avers in paragraph 331 of the Counterstatement that "[t]his accusation was unfounded because Account Managers did not make decisions on rates."  This averment is nothing more than argument.  Furthermore, Woodard's averment that "Account Managers did not make decisions on rates" is not supported by the record evidence she cites: Monihan testified that Woodard did not have authority to determine *rate structures*, but that she could negotiate rates within the parameters set by P&I on rate structures.  (Monihan Tr. 258-59.)

201.   Woodard avers in paragraph 332 of the Counterstatement that "Defendants HR Department takes management's side with respect to any issue regarding employee job performance."  This averment is nothing more than argument.

202.   Woodard avers in paragraph 333 of the Counterstatement that "Defendants unlawfully terminated Ms. Woodard's employment."   This averment is nothing more than argument.

203.    Woodard avers in paragraph 334 of the Counterstatement that "Sawyer did not attend the termination meeting . . . ."  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Sawyer testified that she did not recall whether she participated in the termination meeting by phone.  (Sawyer Tr. 160-62.)

204.    Woodard avers in paragraph 336 of the Counterstatement that, "[d]uring discovery, Defendants alleged that Ms. Woodard was terminated because after she received her April 18 warning, she allegedly made certain statements to clients."  This averment is nothing more than argument.

205.    Woodard avers in paragraph 337 of the Counterstatement that "Defendants' stated reason for firing her is a pretext for discrimination and retaliation."  This averment is nothing more than argument.  Furthermore, Woodard's averment that "Defendants admit that it was reasonable for Ms. Woodard to advise clients that she was no longer covering their accounts" is not supported by the record evidence she cites.  (*See supra* ¶ 100.)

206.    Woodard avers in paragraph 338 of the Counterstatement that "Gall has no knowledge of what Ms. Woodard allegedly said to Mr. Quinn."  This averment is not supported by the record evidence.  In fact, this averment is contradicted by the contemporaneous notes Longo took of Gall's conversation with Quinn.  (Sack Decl., Ex. LL.)  Moreover, Woodard's averment that "[she], with Mr. Monihan, had previously had successful dealings with Active Media . . ." is not supported by the record evidence she cites.  (*See supra* ¶ 63; Monihan Tr. 244-46.)

207.    Woodard avers in paragraph 339 of the Counterstatement that, "[a]ccording to Mark Gall, he did not make the decision to terminate Ms. Woodard's employment and was not involved in such termination decision."  This averment is not supported by the record evidence;

Gall testified, for example, that he provided input to human resources related to the decision to terminate Woodard "[t]hat Claudia cannot do the job as presently required." (Gall Tr. 286-87.) Furthermore, Woodard's averment that, "[b]ased on Mr. Gall's testimony, Mr. Camp was not involved in the termination decision" is nothing more than argument.

208. Woodard avers in paragraph 340 of the Counterstatement that "Gall's deposition testimony is contradicted by the deposition testimony of other witnesses." This averment is nothing more than argument.

209. Woodard avers in paragraph 344 of the Counterstatement that "[t]his is outstanding performance, since the second quarter of 2005 was to end June 30, 2005 and Ms. Woodard was already at 117% of her goal as of April 19, 2005." This averment is contradicted by the record evidence, given that Monihan testified that this number reflected *projected revenue*. (Monihan Tr. 242.) Monihan further testified that if a client demanded that an account manager be taken off of an account, that would negatively affect projections. (Monihan Tr. 243.)

210. Woodard avers in paragraph 348 of the Counterstatement that, "[a]ccording to Mr. Gall, Ms. Woodard would be qualified for employment at BBC America, where Mr. Gall is currently employed." In reality, Gall testified that he would not hire Woodard as an Account Manager at BBC because, "[w]hen Claudia was at The Weather Channel, I observed that she wasn't developing her skill sets in an appropriate fashion and in learning the business at the levels that are required to be successful. And she didn't have a thirst for knowledge on the customer which is very important to us." (Gall Tr. 286.) Gall also testified that "BBC is a big company, It's – there's many divisions other than mine, the one that I work on or work with. I'm sure she has skill sets that would fit – that could fit in need of our organization. There's 35 different divisions in New York." (Gall Tr. 118-19.)

211.    Woodard avers in paragraph 352 of the Counterstatement that "Gall had high turnover among his female subordinates."  I have reviewed the record evidence Woodard cites, and it does not support the averment.

212.    Woodard avers in paragraph 354 of the Counterstatement that, "[i]n 2005, after Defendants fired Ms. Woodard, Defendants threatened Ms. Lawless (then a current employee) who had supported Ms. Woodard, telling her that she was 'either for the Company or not' and that Ms. Lawless should cease helping 'birds with broken wings', apparently referring to Ms. Woodard and Meena Bhiro, a female employee of Guyanese descent."  These averments are nothing more than argument, and are not supported by record evidence, given that Woodard cites only to the Complaint and Lawless's EEOC Charge.

213.    Woodard avers in paragraph 361 of the Counterstatement that "the EEOC's files produced during discovery reflect that all parties had a full and fair opportunity to present documents and information to the EEOC."  This averment is nothing more than argument.

214.    Woodard avers in paragraph 365 of the Counterstatement that "Jolly testified that she was a victim of discrimination, including among other items, the fact that she was denied work after she returned to the office from a maternity leave."  Woodard's averment is not supported by the record evidence.  First, Jolly's only complaint of mistreatment was that after she came back from maternity leave she was not provided a full workload for three months. (Jolly Tr. 92-93.)  Second, Jolly was promoted after she returned from her maternity leave.  (*Id.* 92.)  Third, Jolly's compensation increased when she returned from maternity leave.  (*Id.* 94.)

215.    Woodard avers in paragraph 366 of the Counterstatement that "[t]hese affidavits support Plaintiffs' claims and provide additional instances of Defendants' discrimination."  This averment is nothing more than argument.

216.    Woodard avers in paragraph 367 of the Counterstatement that "Marina Petrova, another female employee, expressed similar sentiments."  I have reviewed the record evidence Woodard cites, and it does not support the averment, given that Monihan did not testify about what Petrova told him, but what Iaffaldano told him about Petrova.  (*See* Monihan Tr. 213-14, 263-65.)  Furthermore, neither Woodard nor Lawless identified Petrova in their Interrogatory Responses.  (Sack Decl. II, Ex. CC.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2009.

By:     /s/Laura Sack
          Laura Sack, Esq.