UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                      :
CLAUDIA WOODARD and ELISE LAWLESS     :
                                      :
                        Plaintiffs,   :
                                      :
            v.                        :      09-cv-3000 (BSJ)(AJP)
                                      :      **Memorandum & Order**
                                      :
TWC MEDIA SOLUTIONS, INC. and         :
THE WEATHER CHANNEL,                  :
                                      :
                        Defendants.   :
                                      :
------------------------------------- X

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Plaintiff Claudia Woodard brings this lawsuit for

employment discrimination against Defendants TWC Media

Solutions, Inc. and The Weather Channel, (referred to

collectively as "TWC") on the basis of race and gender, hostile

work environment and unlawful retaliation under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2

("Title VII"), the Civil Rights Act of 1866, as amended, 42

U.S.C. §1981, New York State Human Rights Law ("NYSHRL")

Executive Law § 296, and New York City Human Rights Law

("NYCHRL"), N.Y.C. Administrative Code § 8-101 *et seq.*[1]

---

[1] "We have repeatedly noted that claims brought under New York State's Human
Rights Law are analytically identical to claims brought under Title VII."
Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997).  NYCHRL, however,
"explicitly requires an independent liberal construction analysis in all
circumstances, even where State and federal civil rights laws have comparable
language.  The independent analysis must be targeted to understanding and
fulfilling . . . [NYCHRL's] 'uniquely broad and remedial' purposes, which go
beyond those of counterpart State or federal civil rights laws."  Williams v.

Plaintiff is an African American female of Jamaican ancestry. As an employee of TWC, Plaintiff alleges that she received negative performance and salary reviews, was subjected to harassing comments, and ultimately was terminated because of her race and gender, as well as in retaliation for her complaints to TWC management.  Before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, Defendants' motion is GRANTED.

## STATEMENT OF FACTS[2]

TWC hired Plaintiff in May 2004 as a Client Development Manager ("CDM") reporting to Meade Camp, the Senior Vice President for Client Development.  (Def.'s 56.1 Stmt. ¶ 8; Pl.'s 56.1 Stmt. ¶ 8.)  Plaintiff was previously employed as an Account Executive at the Wall Street Journal.  (Pl.'s 56.1 Stmt. ¶ 229.)  In early 2004, prior to Plaintiff being hired, Meade Camp told various employees that he wanted to hire a black woman for the CDM position, at least in part to satisfy a diversity hiring initiative that could increase his bonus.  (Pl.'s 56.1 Stmt. ¶ 237.)

As a CDM, Plaintiff was responsible for developing relationships with clients so that they would later purchase

---

New York City Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009).
[2] The following facts are either undisputed or resolved in favor of Plaintiff. Defendants vigorously deny most of Plaintiff's allegations.

advertising space from TWC.   (Def.'s 56.1 Stmt. ¶ 11; Pl.'s 56.1
Stmt. ¶ 11.)   Plaintiff's initial compensation package totaled
$148,050 annually, including $85,000 base salary, $57,000 annual
commission opportunity, and $7,050 annual bonus opportunity.
(Def.'s 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22.)

     In August 2004, the CDM position was eliminated at TWC, and
all three existing CDMs became Account Managers.   (Def.'s 56.1
Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.)   As an Account Manager,
Woodard was now responsible for actually selling advertising
space with TWC to a designated client list.   (Def.'s 56.1 Stmt.
¶¶ 33-36; Pl.'s 56.1 Stmt. ¶¶ 33-36.)   In her new position,
Plaintiff's total compensation package remained the same for
2005, but her guaranteed base salary was reduced to $66,622.51.
(Pl.'s 56.1 Stmt. ¶ 26.)   She now reported to Mark Gall, Senior
Vice President for Eastern Region Sales.   (Pl.'s 56.1 Stmt. ¶
231.)

     On August 18, 2004, Plaintiff informed Gall that Paul Celt,
another Account Manager at TWC, made a series of inappropriate
comments to another employee, Sales Assistant Lavern Broderick,
including that she was "tilling Jamaican rum in her bathtub."
(Def.'s 56.1 Stmt. ¶ 52; Pl.'s 56.1 Stmt. ¶ 11.)   Plaintiff's
email informed Gall that she was offended by Celt's comments.
(Pl.'s 56.1 Stmt. ¶ 241.)   Gall told Plaintiff that he would
inform human resources about her complaint.   (Def.'s 56.1 Stmt.

¶ 53; Pl.'s 56.1 Stmt. ¶ 53.)  Gall later emailed Plaintiff to report that he had warned Celt that he considered such behavior "a serious breach of conduct" that would not be tolerated at TWC.  (Def.'s 56.1 Stmt. ¶ 55; Pl.'s 56.1 Stmt. ¶ 55.)  Celt apologized to Plaintiff in late August 2004, and Gall requested that Plaintiff inform him if any similar situations arose in the future.  (Def.'s 56.1 Stmt. ¶¶ 60-64; Pl.'s 56.1 Stmt. ¶¶ 60-64.)

During the investigation of Plaintiff's complaint, Gall made comments that Plaintiff found offensive, including that Jamaicans do not have a strong work ethic, Jamaicans think they are better than other blacks but they are not, and black males only wanted to "sow their seed" and have children with multiple women to prove their masculinity.  (Pl.'s 56.1 Stmt. ¶ 243–46.) Plaintiff never reported these comments to TWC management. (Pl.'s 56.1 Stmt. ¶ 220.)

Additionally, early in Plaintiff's employment with TWC, Mark Gall, her then supervisor, "intimidated [her] . . . [and] got very close in her face."  (Pl.'s 56.1 Stmt. ¶ 351.)  Twice during Plaintiff's employment, Mr. Gall's pants split in front of female employees, including the Plaintiff.  (Pl.'s 56.1 Stmt. ¶ 213.) Plaintiff also saw Gall rub a baseball bat he kept in his office "in a sexual manner."  (Pl.'s 56.1 Stmt. ¶ 218.) On "multiple occasions," Plaintiff says that Gall summoned her and

other female employees to his office, where he put his legs wide open on his desk while wearing pants.  (Pl.'s 56.1 Stmt. ¶ 213.) On December 16, 2004, Plaintiff believes that various male TWC employees went through her desk without her permission.  (Pl.'s 56.1 Stmt. ¶ 264.)  Plaintiff never reported any of these incidents to TWC management.  (Def.'s 56.1 Stmt. ¶¶ 216, 219-22.)

In October 2004, Plaintiff was assigned a list of accounts and agencies she was directed to contact for the purpose of selling advertising space.  Defendants admit that this was a "junior" account list, assigned to Plaintiff because she lacked sales experience in cable television.  (Def.'s 56.1 Stmt. ¶ 37.) Plaintiff believed she was assigned a "dead account list" that would make it difficult for her to reach her assigned sales goal.  (Pl.'s 56.1 Stmt. ¶ 254.)  At her request, Plaintiff was allowed to retain two accounts from her time as a CDM, Hanook Tires and TIAA-CREF.  (Def.'s 56.1 Stmt. ¶ 40; Pl.'s 56.1 Stmt. ¶ 40.)

In December 2004, Plaintiff received a performance review with a score of .55 out of 3.0, which ranked between "Requires Improvement" and "Exhibits good behaviors consistently." (Def.'s 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66.)  The review was conducted by Mark Gall and Mary Jo Romeo, her new supervisor. (Sack Declaration Ex. U, Woodard Performance Evaluation

12/8/04.)  Plaintiff considered this to be a negative review and
sent a memorandum in January 2005 claiming the review was not "a
fair or timely behavioral assessment" to Paul Iaffaldano,
Executive Vice President and General Manager, and Patricia
Keener, Compensation Analyst.  (Def.'s 56.1 Stmt. ¶ 69; Pl.'s
56.1 Stmt. ¶ 69.)  The memorandum also complained about
Plaintiff's 2005 compensation package.  (Pl.'s 56.1 Stmt. ¶ 69.)
Plaintiff also sent an email with the same complaints to Romeo.
(Def.'s 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70.)  Neither
written complaint specifically mentioned that she believed she
was being discriminated against because of her race and gender,
or because of her earlier complaints against Celt.  (Def.'s 56.1
Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71.)

     In January 2005, Plaintiff attempted to secure an
advertising commitment from Active International, an advertising
agency.  Lisa Siewers, Associate Director of National Broadcast
at Active, contacted Mark Gall in mid-January to complain about
Woodard's performance in working with Active.  (Def.'s 56.1
Stmt. ¶¶ 72-73; Pl.'s 56.1 Stmt. ¶¶ 72-73.)  Mary Jo Romeo, then
Plaintiff's supervisor, was informed of the customer complaint
and intervened to assist with the client.  (Def.'s 56.1 Stmt. ¶
76; Pl.'s 56.1 Stmt. ¶ 77.)  On January 20, 2005, Romeo
instructed Plaintiff via email that she should not contact this
client until after Romeo met with the client for lunch on

January 21.  During that lunch, Siewers informed Romeo that she
was dissatisfied with Plaintiff's work on the deal, and that
this could cause TWC to lose business.  (Def.'s 56.1 Stmt. ¶ 80;
Pl.'s 56.1 Stmt. ¶ 80.)  Romeo later met with the Plaintiff
regarding the situation.  She relayed Siewers' feedback,
including that "Woodard had a listening problem and a knowledge
problem" and that the client had trouble reaching Plaintiff.
(Def.'s 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.)  Plaintiff was
removed from the deal on January 28, 2010.  (Def.'s 56.1 Stmt. ¶
84; Pl.'s 56.1 Stmt. ¶ 84.)

    In the same email informing Plaintiff that she would no
longer be working with Siewers and Active, Romeo expressed
concerns about whether Plaintiff was a proper fit for the role
of Account Manager.  She noted that she and Mark Gall were
considering whether a lesser role would be more appropriate, and
stated that they would discuss Plaintiff's future further in the
upcoming weeks.  (Def.'s 56.1 Stmt. ¶¶ 100-02; Pl.'s 56.1 Stmt.
¶¶ 100-02.)

    That same day, immediately after Romeo informed her that
she would no longer be on the Active account, Plaintiff faxed a
memo to Human Resources Representative Pam Sawyer complaining
that Romeo had created a "hostile work environment" for her.
(Def.'s 56.1 Stmt. ¶ 87; Pl.'s 56.1 Stmt. ¶ 87; Sack Declaration
Ex. BB, Fax from Woodard to Sawyer; Woodard Dep. 227:8-16.)  She

stated that on December 3, 2004, Romeo told her that the only
reason she was hired was because of the company's diversity
initiative.  On another occasion, Romeo told her that "based on
her experience ... black women have problems speaking up because
they do not want to appear stupid."  Plaintiff also included
other observations and complaints that did not mention her race
or gender.  (Sack Declaration Ex. BB, Fax from Woodard to
Sawyer.)

Sawyer and Gall promptly contacted Plaintiff about her
complaint.  (Def.'s 56.1 Stmt. ¶¶ 91-92; Pl.'s 56.1 Stmt. ¶¶ 91-
92.)  TWC management investigated Plaintiff's accusations and
Romeo's response.  Sawyer met with Romeo and Plaintiff in mid-
February 2005.  Romeo was terminated within a few days of this
meeting, both because of the comments made to Plaintiff and
because of complaints by other individuals against Romeo.
(Def.'s 56.1 Stmt. ¶ 95; Pl.'s 56.1 Stmt. ¶ 95.)  Plaintiff then
reported to Meade Camp again.  (Def.'s 56.1 Stmt. ¶ 96; Pl.'s
56.1 Stmt. ¶ 96.)

In early 2005, Meade Camp reported receiving two additional
client complaints about Plaintiff's performance.  First, Heidi
Kahme, an employee of TWC client Initiative Trade, told him to
"get this woman out of my shop."  (Def.'s 56.1 Stmt. ¶¶ 97-98;
Pl.'s 56.1 Stmt. ¶¶ 97-98.)  However, other employees of
Initiative who worked with Plaintiff were pleased with her

performance.  (Pl.'s 56.1 Stmt. ¶ 97.)  Camp also reported
receiving a complaint from John Viserto, the senior executive of
Active International, about Plaintiff being a "waste of his
time" and potentially harmful to the client's relationship with
TWC.  (Def.'s 56.1 Stmt. ¶¶ 100-02; Pl.'s 56.1 Stmt. ¶¶ 100-02.)
Plaintiff reports receiving positive feedback from other members
of Active International.  (Pl.'s 56.1 Stmt. ¶¶ 100-02.)

   In April 2005, Deirdre O'Grady, a vice president at TWC,
emailed Mark Gall regarding Plaintiff's performance.  She said
that Plaintiff was "struggling" with absorbing and retaining
information.  O'Grady expressed "increasing concern" that
dealing with Plaintiff's difficulties was "not the best use of
our resources."  (Def.'s 56.1 Stmt. ¶ 105; Pl.'s 56.1 Stmt. ¶
105.)

   During the same time period, Rick Monihan, a director at
TWC who reported to O'Grady, also expressed concerns about
Plaintiff's performance, work ethic, and ability to retain
information.  (Def.'s 56.1 Stmt. ¶¶ 107-10; Pl.'s 56.1 Stmt. ¶¶
107-10.)  Additionally, Monihan expressed concern that TWC was
not giving Plaintiff adequate support in her development, and
that she was "set up for failure" because of the difficulty of
her assigned account list.  (Pl.'s 56.1 Stmt. ¶¶ 107-10.)
Monihan ultimately believed that firing Plaintiff was "probably

9

the right thing to do" at the time.  (Def.'s 56.1 Stmt. ¶ 110; Pl.'s 56.1 Stmt. ¶ 110.)

Throughout the spring of 2005, TWC management engaged in discussions regarding Plaintiff's future with the company.  Mark Gall spoke with Paul Iaffaldano repeatedly about the issue. Gall told Iaffaldano that several clients had complained about the Plaintiff, that she was not progressing at an acceptable pace, and that she was not working hard to improve.  (Def.'s 56.1 Stmt. ¶¶ 117-20; Pl.'s 56.1 Stmt. ¶¶ 117-20.)  In late March, Iaffaldano expressed the opinion that Plaintiff should either be terminated immediately or kept on until an agreed upon date in a lesser position.  (Def.'s 56.1 Stmt. ¶ 121; Pl.'s 56.1 Stmt. ¶ 121.)  In April 2005, after managing her directly for more than a month, Meade Camp spoke to Iaffaldano about similar concerns, including that Plaintiff lacked the skills necessary to perform her job, and that she was not working hard enough to improve.  (Def.'s 56.1 Stmt. ¶ 129; Pl.'s 56.1 Stmt. ¶ 129.)

On April 18, 2005, Gall and Camp met with Plaintiff and presented her with a written warning, approved by Iaffaldano. (Def.'s 56.1 Stmt. ¶ 132; Pl.'s 56.1 Stmt. ¶ 132.)   The memorandum outlined four major areas of concern: inability to understand business concepts, lack of sales efficiency and productivity, lack of judgment in sales negotiations, and inability to work effectively with clients.  The letter

10

confirmed that because of client complaints, Plaintiff would no longer work with Active Media or Initiative Trade. Additionally, Plaintiff would no longer handle Icon International.   The letter concluded with three expectations for Plaintiff going forward.   First, Plaintiff was to achieve her required sales goals.   Second, Plaintiff was to improve her knowledge of TWC's business and communicate professionally with clients on those matters.   Finally, Plaintiff was instructed to effectively demonstrate her understanding of advertising sales business concepts in her client presentations and her internal communications at TWC.   Plaintiff was informed that the failure to meet these expectations could result in termination.   A follow-up meeting was set for May 12, 2005.   (Def.'s 56.1 Stmt. ¶ 132; Pl.'s 56.1 Stmt. ¶ 132; Sack Declaration Ex. JJ, Memorandum from Gall to Woodard.)

On the same day as the meeting regarding her performance, Plaintiff sent an email to various employees at TWC that anyone with questions regarding Active Media or Initiative Trade should contact Mark Gall.   She stated that she would still work with Icon International.   (Def.'s 56.1 Stmt. ¶ 138; Pl.'s 56.1 Stmt. ¶ 138.)   Gall immediately responded by email that Plaintiff's message was incorrect; she would no longer be working with Icon. Further, Gall characterized the email as inappropriate, because management would handle all staff communications regarding

11

assignments.  (Sack Declaration Ex. JJ, Emails between Woodard
and Gall on April 19, 2005.)

The next day, April 19, 2005, Plaintiff called Jim Quinn, a
buyer with Active International, to inform him that "your
superiors ... are looking for or wanted somebody else."  (Def.'s
56.1 Stmt. ¶ 140; Pl.'s 56.1 Stmt. ¶ 140.)  Quinn then called
Gall and relayed the substance of Plaintiff's call.  He stated
that the conversation put him in an uncomfortable situation.
(Def.'s 56.1 Stmt. ¶ 141; Pl.'s 56.1 Stmt. ¶ 141; Sack
Declaration Ex. LL "Notes from Lisa Longo during Woodard
Performance Discussion and during Woodard follow up on
4/19/2005.")  Gall informed Iaffaldano of Mr. Quinn's complaint.
(Def.'s 56.1 Stmt. ¶ 145; Pl.'s 56.1 Stmt. ¶ 145.)  Gall also
informed Human Resources that he believed Plaintiff could not
perform the job of Account Manager.  (Def.'s 56.1 Stmt. ¶ 147;
Pl.'s 56.1 Stmt. ¶ 147.)

Shortly after these events, Gall, Iaffaldano, Camp, along
with Human Resources and TWC's Legal Department, made the
decision to terminate Plaintiff's employment.  She was
officially terminated on April 22, 2005.  (Def.'s 56.1 Stmt. ¶
148; Pl.'s 56.1 Stmt. ¶ 148.)

On April 22, 2005, Plaintiff submitted a rebuttal to the
written warning issued on April 18, 2005.  She contested the
accuracy of the warning against her, stating that she was able

and willing to improve her business skills, was currently on
track to meet her quarterly revenue goal, and had received
positive feedback from clients.  (Sack Declaration, Ex. MM,
Memorandum from Woodard to Gall.)  She also stated that since
her complaints about Mary Jo Romeo's comments, she believed she
was receiving even less support from management.  (Id.)  TWC
made the decision to terminate Plaintiff prior to receiving
Plaintiff's letter response.  (Def.'s 56.1 Stmt. ¶ 149; Pl.'s
56.1 Stmt. ¶ 149.)

Plaintiff subsequently filed with the Equal Employment
Opportunity Commission ("EEOC").  The EEOC issued a probable
cause finding and a right to sue notice.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary
judgment may not be granted unless all of the submissions taken
together show that there is no genuine issue of material fact
and that the moving party is entitled to judgment as a matter of
law.  The moving party bears the burden of demonstrating the
absence of a material factual question. In making this
determination, a court must view all facts in the light most
favorable to the non-moving party, resolving all ambiguities and
drawing all inferences against the moving party.  Sista v. CDC
Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).
Although the Second Circuit has emphasized the need for district

13

courts to act with caution when considering whether to grant
summary judgment to an employer in an employment discrimination
case, a plaintiff must provide more than "conclusory allegations
. . . and show more than some metaphysical doubt as to the
material facts." Gorzynski v. Jetblue Airways Corp., 596 F.3d
93, 101 (2d Cir. 2010) (internal citations and quotations
omitted). A defendant will be entitled to summary judgment
unless the plaintiff "can point to evidence that reasonably
supports a finding of prohibited discrimination." Joseph v.
Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (citations and
quotations omitted).

## DISCUSSION

Plaintiff's complaint states four causes of action: (1)
race and gender discrimination under Title VII, 42 U.S.C. §
1981, NYSHRL, and NYCHRL; (2) unlawful retaliation in violation
of Title VII, 42 U.S.C. § 1981, NYSHRL, and NYCHRL (3)
discriminatory harassment and hostile work environment due to
race and gender under Title VII, 42 U.S.C. § 1981, NYSHRL, and
NYCHRL; and (4) pay discrimination because of race and gender
under Title VII, 42 U.S.C. § 1981, NYSHRL, and NYCHRL.

As a preliminary matter, Plaintiff argues that statements
by clients regarding her performance are inadmissible hearsay.
They are not hearsay. They are not being offered for the truth
of their contents but, rather, for the fact that they were made.

14

Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 66 n.2 (2d Cir. 2003)(holding that disputed complaints made against a Plaintiff were admissible because "inaccuracy of reports [made against a Plaintiff] does not matter if ... [the supervisor] believed them.")  Plaintiff can produce no evidence to show that these statements were not actually made by TWC clients and not actually received by TWC management.  She does not dispute that Iaffaldano, Gall, and Camp, the three TWC managers who ultimately made the decision to terminate Plaintiff, believed that clients had complained about Plaintiff's performance.  (Pl.'s 56.1 Stmt. ¶¶ 73 – 83, 97 – 104, 118; Def.'s 56.1 Stmt. ¶¶ 73 – 83; 97 – 104, 118.)  Moreover, in her April 22, 2005 response letter, described above, Plaintiff admitted that Siewers complained about her and stated she was "unaware" of any other client complaints.  (Sack Declaration, Ex. MM, Memorandum from Woodard to Gall.)  Therefore, the sworn testimony of TWC managers that clients complained to them about Plaintiff is admissible.

## 1.  Race and Gender Discrimination

### a. Legal Standard

Claims of employment discrimination brought under Title VII are examined under the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).  Under this analysis, the plaintiff must first establish a *prima facie* case

15

of discrimination based on race or gender.  If a plaintiff establishes the required elements, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the allegedly discriminatory act.  <u>Farias v. Instructional Sys.</u>, 259 F.3d 91, 98 (2d Cir. 2001) (citation omitted).  If the defendant can provide such a reason, the burden shifts back to plaintiff to point to evidence that "reasonably supports a finding of prohibited discrimination."  <u>Id.</u> (citation and quotation omitted).  If plaintiff is unable to provide such evidence, a defendant will be entitled to summary judgment.  <u>Id.</u>

To establish a prima facie case, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the position or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discriminatory intent.  <u>Id.</u>

To establish an inference of discriminatory intent, Plaintiff "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful."  <u>Golden Pac. Bancorp v. F.D.I.C.</u>, 375 F.3d 196, 200 (2d Cir. 2004) (citations and quotations omitted).  Plaintiff "must be able to demonstrate admissible evidence sufficient to permit an inference of discriminatory motive."  <u>Williams v. Alliance Nat'l</u>

16

Inc., No. 98 Civ. 7984 (RCC), 2001 U.S. Dist. LEXIS 2904, at *11
(S.D.N.Y. Mar. 19, 2001) (citations omitted), aff'd No. 01 Civ.
7350, 2001 U.S. App. LEXIS 25143 (2d Cir. Nov. 19, 2001).

**b. Analysis of Federal and State Claims**

In support of her claim for discriminatory discharge,
Plaintiff asserts that: (1) in early 2004, prior to Plaintiff's
hire, Meade Camp stated he would only hire a "black woman" for
Plaintiff's position; (2) in August 2004, after Plaintiff
complained that a coworker had made offensive comments in her
presence, her supervisor Mark Gall made discriminatory comments
to her; (3) Plaintiff's next supervisor, Mary Jo Romeo, also
made discriminatory comments to her in December and January
2005; (4) in October 2004, she was assigned a "dead account
list" that set up her for failure at TWC; and (5) throughout her
employment with TWC, she was treated less favorably than other
white male Account Managers.

Assuming without finding that Plaintiff has established a
*prima facie* case, Plaintiff's evidence of discriminatory intent
is insufficient to avoid summary judgment.

First, Plaintiff's claim that discriminatory comments made
by supervisors Camp, Gall, and Romeo establish an inference of
discriminatory motive is unpersuasive.  Plaintiff has failed to
show how Camp's about that he would only hire a black woman for
her position would support an inference that she was eventually

17

fired by him because of her race or gender.  See Grady v.
Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)
(attributing special significance "when the person who made the
decision to fire was the same person who made the decision to
hire").

Second, while Gall's derogatory statements about Jamaicans
might otherwise suffice to demonstrate the requisite
discriminatory motive, in this case they lack a causal nexus to
the termination decision and qualify only as stray remarks.  In
determining whether a comment should be considered a stray
remark, courts consider who made the remark, when the remark was
made in relation to the termination, the content of the remark,
and the context in which the remark was made.  Pronin v. Raffi
Custom Photo Lab., Inc., 383 F.Supp.2d 628, 637 (S.D.N.Y. 2000).
Remarks are especially likely to be considered "stray" when made
by a decision maker unrelated to the decision-making process
temporally remote from the date of decision.  Campbell v.
Alliance Nat. Inc., 107 F.Supp.2d 234, 247 (S.D.N.Y. 2000).
Plaintiff has not demonstrated how such comments affected or
were related to the termination decision.  Moreover, Gall's
comments were made in August 2004, approximately eight months
before Plaintiff's termination.

Third, the comments of Mary Jo Romeo in December and
January 2005 are not persuasive evidence of discriminatory

18

intent because Plaintiff cannot show that Romeo had any role in TWC's decision to terminate her employment.  In fact, Romeo was fired by TWC within a month of Plaintiff's complaint, more than two months before Plaintiff was terminated.  The only comments Romeo allegedly made were on December 3, 2004, when Romeo "made it clear that she believed the Company's diversity policy to be the only reason I was hired" and that "based on [Romeo's] experience in dealing with black women, she finds that black women have problems speaking up and asking questions because they do not want to appear stupid."  These remarks qualify as "stray comments," as they were made by a non-decision maker, months away from the termination decision, and did not involve an employment decision.  See Pronin, 383 F.Supp.2d at 637. Furthermore, given that Romeo was terminated shortly after these remarks were made, Plaintiff cannot successfully argue that such remarks have a "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."  Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007).

Fourth, Plaintiff has failed to submit evidence that the account list she was given demonstrates discriminatory intent. Plaintiff admits that she had no prior experience selling cable advertising and was new to the industry when she became an account manager.  (Pl.'s 56.1 Stmt. ¶¶ 34, 41; Def.'s 56.1 Stmt.

19

¶¶ 34, 41.)  She also admits that, per her request, she was allowed to keep two additional accounts she had established relationships with in her prior position.  (Pl.'s 56.1 Stmt. ¶ 40; Def.'s 56.1 Stmt. ¶ 40.)  While the parties agree that Plaintiff was assigned at least a "junior" account list, Plaintiff has failed to demonstrate that the reason for this assignment was discriminatory.  Rather, she has admitted facts that establish a rational business reason for the assignment.  Moreover, TWC's proffered reason for Plaintiff' termination was not low sales performance, but rather was her inability to deal with clients in a professional manner.  As a result, the assignment of a less promising account list is not sufficient to establish pretext.

Fifth, Plaintiff's argument that she was treated less favorably than peers outside of her protected class also fails to establish pretext.  To support an inference of discriminatory treatment, Plaintiff must demonstrate that she was treated differently than other similarly situated employees outside of the Plaintiff's protected group.  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).  To be similarly situated, the employees must be similar "in all material respects."  Id. This does not require that employees be identical, but that courts consider "(1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same

20

workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Id.

Plaintiff fails to present evidence of employees who are sufficiently similar to provide a basis for finding pretext. Plaintiff can point to no other employee who was the topic of complaints to TWC management by clients, or who was subject to discipline for conduct of comparable seriousness. As a result, Plaintiff's attempt to establish pretext fails, and her claim of wrongful termination must be dismissed.

### c. NYCHRL Claim

The Court construes Plaintiff's NYCHRL claim independently from Plaintiff's state and federal claims because the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling . . . the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart state or federal civil rights laws." Williams v. New York City Housing Auth., 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009). Thus, less egregious conduct than that required under Title VII may support a claim of employment discrimination under the NYCHRL. The City law does not impose "an overly restrictive 'severe or pervasive' bar," but defendants can nevertheless "still avoid liability if they prove

21

that the conduct complained of consists of nothing more than
what a reasonable victim of discrimination would consider 'petty
slights and trivial inconveniences.'"   Id. at 79-80.

Having reviewed the record separately with respect to
Plaintiff's NYCHRL claim while keeping in mind the New York City
law's "uniquely broad and remedial" purposes, the Court
concludes that Plaintiff has failed to demonstrate any genuine
issue of material fact as to whether she was wrongfully
terminated for discriminatory reasons.   To the extent that the
NYCHRL is more liberal than its state or federal counterparts,
Plaintiff has still failed to frame any genuine issue of fact as
to discriminatory termination under the NYCHRL; the conduct
alleged is far from a borderline violation.   See, e.g.,
Williams, 872 N.Y.S.2d at 41 ("[S]ummary judgment will still be
available where [employers] can prove that the alleged
discriminatory conduct in question does not represent a
'borderline' situation . . . .").   Accordingly, Plaintiff's
claim of wrongful discriminatory termination under the NYCHRL is
dismissed.

## 2.  Unlawful Retaliation

### a.  Legal Standard

In order to make out a prima facie case of unlawful
retaliation under Title VII, a plaintiff must adduce sufficient
evidence to permit a trier of fact to find that: (1) the

22

plaintiff engaged in a protected activity; (2) the employer knew
of this activity; (3) the employer took adverse action against
the plaintiff; and (4) a causal connection existed between the
protected activity and the adverse action.  See Kessler v.
Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06
(2d Cir. 2006).  Once the plaintiff establishes a prima facie
case of retaliation, the burden shifts to the employer to
establish a legitimate, non-discriminatory reason for the
action.  See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039
(2d Cir. 1993).  If the employer meets its burden, then the
burden shifts back to the plaintiff to show that "there is
sufficient potential proof for a reasonable jury to find the
proffered legitimate reason merely a pretext for impermissible
retaliation."  Richardson, 180 F.3d at 443 (citing Gallagher v.
Delaney, 139 F.3d 338, 348 (2d Cir.1998)).

### b. Analysis of Federal and State Claims

Plaintiff's retaliation claim centers around two separate
complaints of discriminatory treatment by TWC staff members.
The first occurred in August 2004, when Plaintiff complained to
manager Mark Gall that Paul Celt, a white account manager, made
discriminatory comments about Jamaicans.  Plaintiff contends
that after this complaint, she was subject to adverse employment
actions, including a negative performance review and a less
attractive compensation package in December 2004.  The second

23

complaint was made on January 28, 2005, when Plaintiff submitted
a written complaint documenting discriminatory comments made to
her by her then supervisor, Mary Jo Romeo.  Plaintiff contends
that after this complaint, TWC began its efforts to terminate
her, and ultimately succeeded in her firing on April 22, 2005.

Defendants argue that Plaintiff has failed to establish the
requisite causal connection between these protected activities
and the alleged adverse employment actions.  Although the Second
Circuit "has not drawn a bright line to define the outer limits
beyond which a temporal relationship is too attenuated to
establish a causal relationship," Gorman-Bakos v. Cornell Co-op
Extension of Schenectady, 252 F.3d 545, 554 (2d Cir.2001), many
courts in this circuit have held that periods of two months or
more defeat an inference of causation.  Ragin v. East Ramapo
Cent. School Dist., 2010 WL 1325779 at *24 (S.D.N.Y. March 31,
2010).  Here, Defendants contend that the gap of six months
between Plaintiff's first complaint and the decrease in
compensation package defeats the inference of a causal
connection.  Similarly, Defendants argue that the gap of just
under three months between Plaintiff's complaint about Romeo and
her termination is too great to establish a causal connection.

The Court agrees that in this circumstance, the extended
time periods between each protected activity and adverse action
is too attenuated to establish a causal connection.

24

Further, even if the time period between the protected activity and the retaliatory act was not too attenuated, Plaintiff fails to introduce evidence demonstrating retaliatory intent.  To establish retaliatory intent, a plaintiff must show either direct evidence of retaliatory animus directed at the plaintiff or circumstantial evidence, including "that the protected activity was followed closely by discriminatory treatment" or by evidence of "disparate treatment of fellow employees who engaged in similar conduct."  Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).

Regarding the compensation change in December 2004, Plaintiff admits that the two other employees who were transitioned from CDM to Account Manager, including individuals outside of her protected class, both received similar changes to their compensation package including a reduction of their guaranteed base salary.

As to Plaintiff's termination, Plaintiff can point to no discriminatory treatment closely following her complaint. Moreover, Defendant has produced evidence that Plaintiff was informed by email that management was reconsidering whether the Account Manager position was a fit for Plaintiff immediately before Plaintiff sent her complaint to Human Resources.  (Def.'s 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.)  This undermines

Plaintiff's claim that her reprimand and termination were
retaliatory.

Similarly, after Plaintiff received her final warning from
TWC management on April 18, 2005 outlining the areas she needed
to improve in, she admits that she called a client to inform him
she would no longer be handling his account.  That client then
called Mark Gall, reporting that the call had made him
"uncomfortable."  Plaintiff's written warning required her to
communicate professionally with all clients; the letter
explicitly noted that any violation of the terms of the warning
could lead to termination.  Given that Plaintiff disobeyed this
directive just one day after her performance meeting,
Plaintiff's argument that the termination was actually
retaliatory is unpersuasive.  Additionally, she can point to no
other employee who was the topic of multiple client complaints
and not treated the same way.

Accordingly, Plaintiff's retaliation claims under federal
law and the NYSHRL are dismissed.

### c. NYCHRL Claim

As discussed earlier, this Court recognizes that in light
of the 2005 Restoration Act and the recent First Department
decision Williams v. New York City Housing Authority, we must
construe the NYCHRL "more broadly than federal civil rights laws
and the State HRL."  872 N.Y.S.2d at 36-37.  However, even under

26

this more liberal standard, a plaintiff must still link the adverse action to a "retaliatory motivation." Id. at 35. Moreover, summary judgment is still appropriate where a defendant "can prove that the alleged discriminatory conduct in question . . . could only be reasonably interpreted as representing no more than petty slights or trivial inconveniences." Kaur v. New York City Health and Hospitals Corp., 688 F.Supp.2d 317, 340 (S.D.N.Y. 2010) (alteration in original) (citation and quotation omitted).

This Court has engaged in an "independent analysis" of Plaintiff's claims under this standard and finds that no genuine issue of material fact has been raised indicating that Plaintiff actually suffered from an adverse employment action with the requisite retaliatory motive.  Therefore, even under the more liberal standard of the NYCHRL, Plaintiff's claims of retaliatory adverse employment actions cannot constitute retaliation "in any manner" and therefore are dismissed.

### 3. Hostile Work Environment

#### a. Legal Standard

To state a hostile work environment claim, a plaintiff must show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift

Sys., 510 U.S. 17, 21 (1993) (internal quotation marks and
citations omitted).  A plaintiff "must show not only that she
subjectively perceived the environment to be abusive, but also
that the environment was objectively hostile and abusive."
Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).
Plaintiff must also show that a "specific basis exists for
imputing the conduct that created the hostile environment to the
employer."  Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996).

       "Generally, 'incidents must be more than episodic; they
must be sufficiently continuous and concerted in order to be
deemed pervasive.'"  Id. (quoting Alfano v. Costello, 294 F.3d
365, 374 (2d Cir. 2002)).  "To decide whether the threshold has
been reached, courts examine the case-specific circumstances in
their totality and evaluate the severity, frequency, and degree
of the abuse."  Alfano, 294 F.3d at 374.  "Where reasonable
jurors could disagree as to whether alleged incidents of . . .
insensitivity or harassment would have adversely altered the
working conditions of a reasonable employee, the issue of
whether a hostile work environment existed may not properly be
decided as a matter of law."  Patterson v. Oneida, 375 F.3d 206,
227 (2d Cir. 2004).

### b. Analysis of Federal and State Claims

       In supporting her claim for hostile work environment,
Plaintiff points to a variety of conduct by TWC employees.  This

28

conduct includes the discriminatory comments by Gall, Camp, and Romeo, as well as a general pattern of poor treatment by supervisors, including their refusal to train her, giving her a negative evaluation in December 2004, and issuing the April 2005 written warning.  Additionally, Plaintiff contends that Gall and other white male Account Managers rummaged through her desk and removed her personal belongings.  (Pl.'s 56.1 Stmt. ¶ 264.)  On "multiple occasions," Plaintiff saw Gall spread his legs on his desk while wearing pants.  (Pl.'s 56.1 Stmt. ¶ 350.)  She also saw him once rub a baseball bat "in a sexual manner," and on another occasion Gall stood too close to her, making her feel uncomfortable.  (Id.)  This was part of what she considered "ongoing workplace harassment against other females and women of color."  (Pl.'s Br. 24.)

In this case, the conduct Plaintiff alleges is insufficient as a matter of law to meet the threshold level of severity or pervasiveness that is required for a hostile work environment claim.  While Plaintiff reports approximately ten discriminatory comments made by Gall, Camp, and Romeo in her eleven months of employment with TWC, none of the comments were sufficiently severe to amount to materially adverse changes in the terms and conditions of Plaintiff's employment.

Plaintiff's description of Mark Gall's conduct, while perhaps inappropriate, does not rise to the level of the

seriousness and pervasiveness required as a matter of law.
While Plaintiff alleges that there were "multiple incidents,"
she does not contend that they were continuous, occurring daily
or even weekly.  The few incidents Plaintiff described are not
severe enough for a reasonable person to find that Plaintiff's
work environment was materially altered.

Plaintiff relies heavily on the harassment allegedly
suffered by other female employees at TWC.  Even taking these
allegations as true, where Plaintiff was not the direct
recipient of harassing or threatening comments, they are far
less persuasive in establishing a claim of hostile work
environment.  See Benette v. Cinemark U.S.A., Inc., 295 F. Supp.
2d 243, 251 (W.D.N.Y. 2003) ("[M]ost of the incidents were not
directed at Benette herself or they did not happen in her
presence" but rather "were heard 'second-hand' through other
employees.").

Therefore, Plaintiff has failed to show that she suffered
from an objectively abusive work environment so permeated with
such discriminatory intimidation, ridicule, and insult based on
her sex or race that a reasonable person would find that the
terms and conditions of employment were altered.  Accordingly,
Defendants' motion for summary judgment on Plaintiff's hostile
work environment claim under Title VII and NYSHRL is granted.

**c. NYCHRL Claim**

30

As discussed above, the Court construes Plaintiff's NYCHRL claim independently from Plaintiff's state and federal claims, because the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language.  The independent analysis must be targeted to understanding and fulfilling . . . [NYCHRL's] 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws."  Williams v. New York City Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009).  Thus, less egregious conduct than that required under Title VII may support a hostile work environment claim under the NYCHRL.  The City law does not impose "an overly restrictive 'severe or pervasive' bar," but defendants can nevertheless "still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  Id. at 41.

Even under the less stringent standard of the NYCHRL, Plaintiff has failed to demonstrate any genuine issue of material fact as to whether a hostile work environment existed at TWC.  To the extent that the NYCHRL is more liberal than its state or federal counterparts, Plaintiff has still failed to frame any genuine issue of fact as to a hostile work environment

31

under the NYCHRL; the conduct alleged is far from a borderline
Title VII violation.   Therefore, Plaintiff's hostile work
environment claim under the NYCHRL is dismissed.

   4. **Pay Discrimination**

      a. **Legal Standard**

   To establish a prima facie case of pay discrimination under
Title VII, a plaintiff must show that: (1) she belonged to a
protected class; (2) she was paid less than members outside of
the protected class for work requiring the same level of
responsibility; and (3) evidence of discriminatory animus.
Quarless v. Bronx-Lebanon Hospital Center, 228 F.Supp.2d 377,
383 (S.D.N.Y. 2002).   To avoid summary judgment, Plaintiff must
produce some evidence to show that she was "substantially
similar" to a member outside of her protected class who received
more compensation.   The comparison is not valid unless Plaintiff
can show that she was "substantially similar" to the comparator
employee in all material respects.   Quarless, 228 F.Supp.2d at
383-84 (quoting McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d
Cir. 2001)).

      b. **Analysis of Federal and State Claims**

   Plaintiff argues that she was compensated less than
"various white male Account Managers." (Pl.'s Br. 22.)   She
alleges that for 2005 her base salary was reduced and her
overall compensation package was unchanged, while other white

32

male Account Managers received raises.  (Id.)  Specifically, she points to Craig Meadow, one of the CDMs who became an Account Manager in 2004, as a comparator.  Meadow also received a substantial decrease in his guaranteed base salary and an increase in his potential commission compensation.  However, Meadow received a three percent raise to his overall compensation package in 2005 while Plaintiff received no raise. (Def.'s 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29; 274 - 79.)[3]

Plaintiff's claim of pay discrimination must fail because she cannot point to evidence establishing any "similarly situated" employee outside of her protected class who was better compensated for similar work.  Craig Meadow is not "similarly situated" to Plaintiff for the purposes of her pay discrimination claim.  Plaintiff admits that she received a less than favorable performance review, and she cannot point to other employees who received a raise despite a negative performance review.  Meadow, who received a three percent raise to his total compensation package in 2005, submitted a sworn affidavit that he received "a very good performance review" for 2004. (Affidavit of Craig Meadow, ¶ 6).  Moreover, Plaintiff's total compensation package, even with Meadow's raise, exceeded

---

[3] Plaintiff's Rule 56.1 Statement lists other white male employees who she contends received raises, including Matt Derella, Paul Celt, and Peter Wright.  Plaintiff fails to explain how such employees are "similarly situated" and merely states that they received raises, often months or years after Plaintiff was terminated.  Therefore, these allegations are irrelevant to Plaintiff's claim.

Meadow's total compensation package by more than $25,000 in 2005.  Plaintiff has failed to establish a genuine issue of material fact as to her claim of pay discrimination, and Defendants' motion for summary judgment on the federal and NYSHRL pay discrimination claims is granted.

### c. Analysis of NYCHRL Claim

For the reasons discussed above, this Court has independently construed Plaintiff's claim of pay discrimination under the more liberal standard of the NYCHRL.  Here, Plaintiff cannot even demonstrate that her compensation was actually less favorable than any similarly situated employee.  As the conduct alleged is far from a borderline situation, Plaintiff has still failed to frame any genuine issue of fact as to pay discrimination under the NYCHRL's more liberal standard.  See, e.g., Williams, 872 N.Y.S.2d at 41 ("[S]ummary judgment will still be available where [employers] can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation . . . .").  Therefore, Plaintiff's claims of pay discrimination under the NYCHRL are dismissed.


### CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of the Court is directed to terminate the case as to Plaintiff Claudia Woodard.

34

SO ORDERED:


_____
Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**


Dated:     New York, New York
           January 3, 2011